# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re* | ) | Chapter 11 |
|  | ) |  |
| LANDSOURCE COMMUNITIES DEVELOPMENT LLC, *et al.*, | ) | Case No. 08-11111 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | **Proposed Objection Date: May 18, 2009 at 4:00 p.m.** |
|  | ) | **Proposed Hearing Date: May 20, 2009 at 1:00 p.m.** |
|  | ) |  |

## MOTION OF BARCLAYS BANK PLC, AS ADMINISTRATIVE AGENT AND PLAN PROPONENT, FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363, 503, 1123 AND 1125 OF THE BANKRUPTCY CODE APPROVING (I) BACKSTOP AGREEMENT IN CONNECTION WITH A CONTEMPLATED RIGHTS OFFERING AND THE RELATED RIGHTS OFFERING PREMIUM AND EXPENSE REIMBURSEMENT AND (II) MARKETING OF BACKSTOP COMMITMENT AMOUNTS AND RELATED RIGHTS OFFERING PREMIUM

Barclays Bank PLC, as Plan Proponent and Administrative Agent (the "Administrative Agent" or "Plan Proponent"), for itself and various financial institutions or entities that may become, from time to time, lenders under that certain Super-Priority Debtor-in-Possession First Lien Credit Agreement dated June 16, 2008 by and among LandSource Communities Development, LLC, as Parent Guarantor, LandSource Holding Company, LLC, as Borrower, the Guarantors party thereto, and the Lenders parties thereto (as amended and modified from time to time, the "DIP Credit Agreement"), hereby moves the Court for entry of an order, pursuant to sections 105(a), 363(b), 503, 1123(a)(5) and 1125(e) of title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), approving (i) the backstop rights purchase agreement (the "Backstop Agreement"), a copy of which is attached hereto as Exhibit

$\underline{A}$[1] and incorporated herein by reference, by and among the Plan Proponent, certain investment entities (the "Backstop Parties") set forth on Schedule 1 thereto, LandSource Communities Development LLC (the "Company"), and Newhall Holding Company, LLC ("Holdco"), and approving the related Rights Offering Premium (as defined below) and Expense Reimbursement (as defined below); and (ii) marketing of the Backstop Commitment Amounts (as defined in the Backstop Agreement) and payment of the Rights Offering Premium in cash in the event the Debtors either consummate an Alternative Transaction or a Termination Payment Event occurs (each as defined below) (the "Backstop Motion"). In support of the Backstop Motion, the Plan Proponent, by and through its undersigned counsel, respectfully represents as follows:[2]

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Backstop Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Backstop Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105, 363, 503, and 1123 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and Local Rule 6004-1.

## BACKGROUND

### I.     General Background

3.     On June 8, 2008 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors

---

[1] Attached hereto as Exhibit B is a black-lined copy of the Backstop Agreement that shows those changes made to the Backstop Agreement since the filing of the Backstop Agreement as an Exhibit to the Second Amended Plan (as defined herein).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the Second Amended Plan.

continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     These cases are being jointly administered for procedural purposes only pursuant to an order of the Court entered in these cases on June 10, 2008 [Docket No. 27].

5.     On June 10, 2008, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee").

6.     On July 21, 2008, this Court entered an order finally approving the DIP Credit Agreement [Docket No. 306]. The DIP Credit Agreement matures on May 31, 2009.

## II.     The Plan

7.     The Debtors' exclusive period to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code expired as of October 7, 2008. Shortly after expiration of the Debtors' exclusive period to file a plan of reorganization, the Plan Proponent filed the Joint Chapter 11 Plans for LandSource Communities Development LLC and its Affiliated Debtors (the "Original Plan") and the related disclosure statement (the "Original Disclosure Statement") [Docket Nos. 741 and 835, respectively].

8.     On March 20, 2009, the Plan Proponent filed the First Amended Joint Chapter 11 Plan of Reorganization for LandSource Communities Development LLC and its Affiliated Debtors (the "Amended Plan") and related disclosure statement (the "Amended Disclosure Statement") [Docket Nos. 1360 and 1361, respectively]. The Amended Plan amends and supersedes the Original Plan. The Amended Disclosure Statement amends and supersedes the Original Disclosure Statement.

9.     On May 6, 2009, the Plan Proponent filed the Second Amended Joint Chapter 11 Plans of Reorganization for LandSource Communities Development LLC and its

Affiliated Debtors (the "Second Amended Plan") and the related disclosure statement (the "Second Amended Disclosure Statement") [Docket Nos. 1583 and 1584, respectively]. The Second Amended Plan amends and supersedes the Amended Plan. The Second Amended Disclosure Statement amends and supersedes the Amended Disclosure Statement.

10.     The Second Amended Plan provides for the reorganization of each of the Debtors, with ownership of the Reorganized Debtors and their respective assets vesting in the applicable Reorganized Debtor, free and clear of all claims, liens, charges, encumbrances and interests of Claims and Interests Holders, except as otherwise specifically provided in the Second Amended Plan. Upon emergence, Reorganized LandSource Communities will be owned 85% by Holdco (which in turn will be owned by the Holders of Allowed First Lien Claims, Allowed Second Lien Claims, Allowed Unsecured Claims and the Rights Offering Participants) and 15% by Lennar Corporation (or another entity designated by Lennar Corporation), in each case subject to dilution due to equity issued to Management Co. and Emile Haddad.

11.     In connection with the Second Amended Plan, the Plan Proponent entered into an agreement with Lennar Corporation, Management Co. and Emile Haddad whereby Lennar Investor is making a $140 million investment into the Reorganized Debtors in exchange for, among other things, 15% of the Units in Reorganized LandSource Communities [Docket No. 1583, Exh. D].

## III.     The Rights Offering

12.     In connection with the Second Amended Plan, the Plan Proponent proposes to initiate a rights offering backstopped by the Backstop Parties (the "Rights Offering") in order to raise up to $140,000,000 (the "Rights Offering Amount") for the Reorganized Debtors (subject to adjustment). Accredited Holders of First Lien Claims, Second Lien Claims

and Allowed Unsecured Claims (which Allowed Unsecured Claims will not include any Disallowed Claims, Disputed Claims or Claims that are the subject of pending litigation) as of the Voting Record Date (each, a "Rights Offering Participant") will be offered an opportunity to subscribe for the Units in Holdco issued in connection with the Rights Offering (the "Rights Offering Units").[3] The price of such Rights Offering Units will be equal to the final Rights Offering Amount divided by the Rights Offering Units.

## IV.    The Backstop Rights Purchase Agreement

13.    After significant arms-length negotiations with the Backstop Parties, the Plan Proponent (with the assistance of Lazard Freres & Co. LLC ("Lazard"), the Debtors' financial advisor) and the Backstop Parties came to agreement on the form of the Backstop Agreement, which will provide assurance that the full amount of the Rights Offering contemplated by the Second Amended Plan will be funded.

14.    If the Rights Offering is not fully subscribed as of the Subscription Expiration Date and the Debtors do not consummate an Alternative Transaction and a Termination Payment Event has not occurred, the Backstop Parties have agreed to purchase, on the Effective Date, the Rights Offering Units that have not been subscribed for by the Rights Offering Participants.  The price of the Units (as defined in the Backstop Agreement) issued to the Backstop Parties will be the same as the Rights Offering Units issued to the Rights Offering Participants; *provided* that the Backstop Parties will be entitled to a downward adjustment to the aggregate amount paid by each of them for Rights Offering Units in accordance with the Backstop Agreement.  Such downward adjustment is being granted to the Backstop Parties in

---

[3] The Holders of Allowed First Lien Claims, Allowed Second Lien Claims and Allowed Unsecured Claims as of the Voting Record Date will be offered a certain percentage of the Rights Offering Units to be agreed upon by the Plan Proponent and Backstop Parties at or prior to the hearing to approve the adequacy of the Second Amended Disclosure Statement, currently scheduled for May 20, 2009.

exchange for their commitments under the Backstop Agreement and such downward adjustment will equal 5% of the Rights Offering Amount in the aggregate (the "Rights Offering Premium").

15.    Under the Backstop Agreement, each of the Backstop Parties is also entitled to be reimbursed for all reasonable and documented out-of-pocket fees and expenses, including the reasonable fees and expenses of counsel and other professionals retained by such Backstop Party, that have been and are subsequently incurred in connection with the negotiation, preparation and implementation of the Rights Offering, excluding any amounts incurred after the termination of the Backstop Agreement.

16.    The Backstop Agreement contains customary terms and conditions typical of agreements of this type, including:[4]

| | |
|---|---|
| **Backstop Commitment:** | The agreement by the Backstop Parties to purchase all of the Rights Offering Units that are not purchased by the Rights Offering Participants as part of the Rights Offering; *provided* that each Backstop Parties will purchase the Remaining Rights Offering Units equal to its Backstop Commitment Percentage multiplied by the number of Remaining Rights Offering Units, by funding up to its applicable Backstop Commitment Amount set forth opposite its name under the heading "Backstop Commitment Amounts" on Schedule 1; *provided* that the obligations of the Backstop Parties to fund their Backstop Commitment Amounts are agreed to be several and not joint. |
| **Backstop Parties:** | The Backstop Parties (and their permitted affiliates and assigns) are comprised of the following entities:<br>• Anchorage Capital Master Offshore, Ltd. has committed to undertake a $50,000,000 Backstop Commitment<br>• Marathon Special Opportunity Master Fund, Ltd. has committed to undertake a $22,500,000 Backstop Commitment |

---

[4]Although the Plan Proponent believes that the following summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text. In the event of any inconsistency or discrepancy between a description contained in this Backstop Motion (in the following summaries or otherwise), and the terms and provisions of the Backstop Agreement, the terms of the Backstop Agreement will govern for all purposes.

- OZ Master Fund, Ltd. has committed to undertake a $20,000,000 Backstop Commitment
- Third Avenue Real Estate Value Fund and Third Avenue Opportunity Management LLC have collectively committed to undertake a $27,500,000 Backstop Commitment.
- TPG Credit Strategies Fund, L.P., TPG Credit Opportunities Investors, L.P., and TPG Credit Opportunities Fund, L.P. have collectively committed to undertake a $20,000,000 Backstop Commitment.

**Participation in Rights Offering:** Holders of First Lien Claims, Second Lien Claims and Allowed Unsecured Claims (which Allowed Unsecured Claims will not include any Disallowed Claims, Disputed Claims or Claims that are the subject of pending litigation) that are accredited investors as that term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (each, a "Rights Offering Participant") may, in exchange for cash payments to Holdco, subscribe for certain Rights Offering Units. The percentage of Rights Offering Units available to the First Lien Claims, Second Lien Claims and Allowed Unsecured Claims (which Allowed Unsecured Claims will not include any Disallowed Claims, Disputed Claims or Claims that are the subject of pending litigation) is to be agreed upon by the Plan Proponent and Backstop Parties at or prior to the hearing on the Disclosure Statement.

**Rights Offering Amount:** $140,000,000, subject to adjustment by the Plan Proponent.

**Commitment Upon Default:** In the event that one or more of the Backstop Parties fails to fund any portion of its Backstop Commitment Amount, the Plan Proponent will first reoffer such Backstop Commitment Amount to the other Backstop Parties (pro rata based on their Backstop Commitment Percentages (after excluding the non-funding Party)) and may again thereafter offer any remaining Backstop Commitment Amount to the other Backstop Parties or to another person(s) as the Plan Proponent determines in its reasonable discretion.

**Conditions to Fund:** The obligation of each Backstop Party, severally, to fund the Parties' aggregate subscription amounts and backstop commitment amounts (the "Total Commitment Amounts") will be subject to the satisfaction (or waiver by each Backstop Party in its sole reasonable discretion) of each of the following conditions on the Effective Date:

- Confirmation Order: The Final Order or Orders of the Bankruptcy Court, among other things, confirming the Second Amended Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") that is reasonably acceptable to the Backstop Parties will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

- HSR Act: The waiting period (and any extension thereof) applicable to the Second Amended Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

- Expense Reimbursement: The Debtors will have paid all Expense Reimbursements on the Effective Date; *provided* that in the event the Company in good faith disputes whether the amount of such Expense Reimbursements is "reasonable," the Debtors will separate the disputed amount and pay the remainder pursuant to the terms hereof;

- Required Consents: All of the Approvals will have been obtained;

- Rights Offering: The Rights Offering will have been consummated pursuant to and in accordance with the Second Amended Plan, *provided* that this clause will not be a condition to the obligations of the Backstop Parties to purchase Subscription Units pursuant to the Subscription Form;

- Backstop Funding: The Backstop Parties (or additional parties as provided for herein) will have funded the aggregate Total Commitments on substantially similar terms as set forth in the Backstop Agreement, *provided* that this clause will not be a condition to the obligations of any Backstop Party that has failed to fund any of its applicable Total Commitment;

- Holdco and Company Execution: Each of the Company and Holdco will have executed the Backstop Agreement; and

- Other Conditions: (i) Each of Holdco and the Company will have performed, in all material respects, their respective obligations required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of Holdco and the Company in the Backstop Agreement that are qualified as to materiality or Material Adverse Effect (as defined in the Backstop Agreement) will be true and correct in all respects, and the representations and warranties that are not

qualified as to materiality or Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date), and (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth therein).

The obligations of Holdco and the Company hereunder are subject to the satisfaction (or the waiver by the Plan Proponent in its sole reasonable discretion) of the following conditions as of the Effective Date:

- Required Consents: All of the Approvals will have been obtained;

- Rights Offering: The Rights Offering will have been consummated pursuant to the Second Amended Plan;

- Plan Confirmation: The Confirmation Order that is reasonably acceptable to the Plan Proponent and the Company will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

- HSR Act: The waiting period (and any extension thereof) applicable to the Second Amended Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

- Holdco LLC Agreement: Each of the Backstop Parties will have delivered a joinder to the Holdco LLC Agreement; and

- Other Conditions: (i) Each Backstop Party will have performed, in all material respects, its obligations required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of each Backstop Party in the Backstop Agreement that are qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all respects, and the representations and warranties that are not qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a

particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date), and (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth therein).

**Expiration Date:** July 31, 2009.

**Termination:** Termination by the Backstop Parties:

- The Backstop Parties, by consent of a majority of such Parties, will have the right, but not the obligation, to terminate the Backstop Agreement by notice to the Plan Proponent and the Company: (1) if the Company or Holdco materially breaches the Backstop Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Backstop Parties by majority consent) during which the Company and Holdco may negotiate in good faith regarding any such cure or (2) if the conditions set forth above have not been satisfied (or waived) by the Expiration Date.

- A Backstop Party may terminate its individual Total Commitment Amount within five (5) Business Days written notice to the Plan Proponent following an amendment, cancellation, modification or waiver of (1) the Second Amended Plan (in the form filed on May 6, 2009), (2) any material condition or term of the Second Amended Plan (in the form filed on May 6, 2009) or (3) any form agreement (or material term or condition thereof) attached as an Exhibit to the Second Amended Plan (in the form filed on May 6, 2009), by the Plan Proponent in accordance with the Second Amended Plan (in the form filed on May 6, 2009) which is not reasonably acceptable to such Backstop Party.

Termination by the Plan Proponent:

- The Plan Proponent will have the right, but not the obligation, to terminate the Backstop Agreement by notice to the Backstop Parties: (1) if any Backstop Party materially breaches the Backstop Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Plan Proponent) during which the breaching Backstop Parties may negotiate in good faith regarding any such cure or (2) if the conditions to Holdco or the Company's obligations have not been satisfied (or waived) by the Expiration Date. In the event that any, but not all Backstop Parties materially breach the Backstop Agreement, and such

breach is not cured after a notice period of five (5) Business Days (which may be extended by the Plan Proponent), the Plan Proponent may terminate the Backstop Agreement with respect to such Backstop Party only and the Backstop Agreement will continue to remain in effect with respect to all other Parties.

Termination due to an Alternative Transaction

- The Backstop Agreement will automatically terminate, upon the (1) approval by the Court of a sale or sales of all or a material portion of the Debtors' assets to a third party other than the Holders of the First Lien Secured Claims, (2) the filing of a plan of reorganization that does not contemplate the consummation of the Rights Offering and reorganization of the Debtors on substantially similar terms as set forth in the Second Amended Plan or (3) the acceptance of the Plan Proponent in accordance with the Second Amended Plan of parties (other than the Backstop Parties and their permitted affiliates and assigns) as Backstop Parties for the Rights Offering (an "Alternative Transaction").

In the event of termination of the Backstop Agreement as provided above, the provisions of the Backstop Agreement will immediately become void and of no further force and effect; *provided* that no Party will be released for any intentional breach existing prior to the termination.

**Rights Offering Premium:** In consideration for the Backstop Parties having agreed to purchase their applicable Subscription Units and applicable Remaining Rights Offering Units, on the Effective Date the Backstop Parties will be entitled to an amount which is equal in the aggregate to 5% of the Rights Offering Amount. The portion of the Rights Offering Premium to which each of the Backstop Parties is entitled is set forth on Schedule 1 to the Backstop Agreement, opposite each of their names under the heading "Rights Offering Premium." The portion of the Rights Offering Premium to which a Backstop Party is entitled will reduce the amount such Backstop Party is required to pay in connection with its purchase of its applicable Subscription Units. For the avoidance of doubt, the Backstop Parties will be entitled to the Rights Offering Premium without regard to whether the Rights Offering is fully subscribed, and the Backstop Parties will be entitled to payment of the Rights Offering Premium in cash if the Debtors consummate an Alternative Transaction or if a Termination Payment Event occurs (subject to the conditions more fully described below).

Notwithstanding the foregoing, in the event that any Backstop Party fails to purchase any of its applicable Subscription Units or applicable Remaining Rights Offering Units allocated to such Party, such Backstop Party will not be entitled to any portion of the Rights Offering Premium and such Backstop Party will be required to immediately pay any previously offset amounts to the Company and the Plan Proponent will have the right to offset any DIP Credit Agreement repayments payable to such Backstop Party or its Affiliates.

**Expense Reimbursement:** All reasonable and documented out-of-pocket fees and expenses of each Backstop Party, including the reasonable fees and expenses of counsel and other professionals retained by such Backstop Party, that have been and are subsequently incurred in connection with the negotiation, preparation and implementation of the Rights Offering, excluding any amounts incurred after the termination of the Backstop Agreement.

17.     Lazard, the Debtors' investment banker, will market the Backstop Commitment Amounts to determine whether another party will take on the obligations of the Backstop Parties in a manner more economically beneficial to the Debtors' estates. This marketing effort will be limited to the Backstop Commitment Amounts and will not include the Individual Subscription Rights (as defined in the Backstop Agreement) of each of the Backstop Parties. The marketing effort will begin upon approval of this Backstop Motion and conclude on the fifth (5th) day before the Subscription Expiration Date. To the extent that Lazard receives any offers that may be more economically beneficial to the Debtors' estates, Lazard will present those offers to the Plan Proponent. The Plan Proponent, in consultation with Lazard, will determine whether to proceed with the Backstop Parties or such competing offer, which would constitute an "Alternative Transaction" under the Backstop Agreement.

18.     Under the Backstop Agreement, "Alternative Transaction" means (i) the approval by the Bankruptcy Court of a sale or sales of all or a material portion of the Debtor's assets to a third party other than Holders of the First Lien Secured Claims, (ii) the filing of a plan of reorganization that does not contemplate the consummation of the Rights Offering and

reorganization of the Debtors on substantially similar terms as set forth in the Second Amended Plan or (iii) the acceptance of the Plan Proponent in accordance with the Second Amended Plan of parties (other than the Backstop Parties and their permitted Affiliates and assigns) as "backstop parties" for the Rights Offering. Upon the consummation of an Alternative Transaction, the Backstop Agreement terminates. The Backstop Parties will be entitled to the Rights Offering Premium, payable to the Backstop Parties in cash (without duplication): (i) upon a consummation of an Alternative Transaction immediately prior to the termination of the Backstop Agreement or (ii) upon a consummation of an Alternative Transaction within 180 days after a termination of the Backstop Agreement if none of the Backstop Parties are in breach of their representations, warranties and agreements thereunder at the time of termination of the Backstop Agreement.

19. In addition, the Rights Offering Premium is payable to the Backstop Parties in cash (i) if all of the Backstop Parties are ready, willing and able to consummate the transactions contemplated by the Backstop Agreement, (ii) none of the Backstop Parties are in breach of their representations, warranties and agreements thereunder and (iii) a Termination Payment Event has occurred. As more fully described in the Backstop Agreement, a "Termination Payment Event" means a termination of the Backstop Agreement by any applicable Party due to the failure of any of the following conditions to be satisfied on or prior to such termination: (i) payment of all Expense Reimbursements on the Effective Date by the Debtors; (ii) consummation of the Rights Offering pursuant to and in accordance with the Second Amended Plan; (iii) execution of the Backstop Agreement by both LandSource Communities Development LLC and Holdco; (iv) performance, in all material respects, by LandSource Communities Development LLC and Holdco of their respective obligations required

to be performed by it at or prior to the Effective Date under the Backstop Agreement; (v) the representations and warranties of Holdco and LandSource Communities Development LLC in the Backstop Agreement being true and correct in all material respects (except as otherwise set forth in the Backstop Agreement); and (vi) the termination by a Backstop Party of its individual Total Commitment Amount following an amendment, cancellation, modification or waiver of (1) the Second Amended Plan (in the form filed on May 6, 2009), (2) any material condition or term of the Second Amended Plan (in the form filed on May 6, 2009) or (3) any form agreement (or material term or condition thereof) attached as an exhibit to the Second Amended Plan, which in case of clauses (1), (2) or (3) is not reasonably acceptable to such Backstop Party.

20.     The Plan Proponent believes that the provisions of the Backstop Agreement reflect an exercise of sound business judgment and further that the Rights Offering Premium and Expense Reimbursement provided thereunder are fair and reasonable given the integral role these Backstop Parties are assuming as a part of the reorganization process. The Backstop Agreement provides for the necessary assurance that the Rights Offering will generate sufficient proceeds to effectuate the proposed Second Amended Plan. Accordingly, the Plan Proponent believes that it is in the best interests of the Debtors' estates and their creditors to enter into the Backstop Agreement.

## **RELIEF REQUESTED**

21.     By this Backstop Motion, the Plan Proponent respectfully requests that the Court approve: (a) the Backstop Agreement and the related Rights Offering Premium and Expense Reimbursement, and (b) the marketing of the Backstop Commitment Amounts and payment of the Rights Offering Premium by the Debtors in cash in the event an Alternative Transaction is

consummated or if a Termination Payment Event occurs (subject to the conditions set forth in the Backstop Agreement).

**BASIS FOR RELIEF REQUESTED**

I.    **The Backstop Agreement is in the Best Interests of the Estates and Represents a Valid Business Judgment Pursuant to Section 363 of the Bankruptcy Code**

    A.    **The Business Judgment Standard**

22.    Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C, § 363(h)(1). A court can authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. Meyers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996); The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991). Under section 363 of the Bankruptcy Code, a debtor in possession may use, sell or lease property of the estate outside the ordinary course of business if (i) it has an articulated business justification, (ii) it provides adequate notice to all creditors, and (iii) a hearing is held on the proposed use. See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991).

23.    The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The business judgment

rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. Id.; see In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

24.     Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Pursuant to section 105(a) of the Bankruptcy Code, orders are appropriate where they are essential to the Debtors' reorganization efforts and do not pose a burden on the debtor's creditors. See United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.), 197 F.3d 631, 640 (2d Cir. 1999); Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

25.     Section 1123(a)(5) of the Bankruptcy Code requires a plan proponent to "provide adequate means for the plan's implementation." Accordingly, in these cases, since it is the Plan Proponent, and not the Debtors, who are proposing the Second Amended Plan, the Plan Proponent must provide adequate means for the plan's implementation. Under the circumstances, the Plan Proponent submits that it is appropriate for the Court to exercise its equitable authority by relying upon the Plan Proponent's business judgment to implement the Second Amended Plan through the Backstop Agreement.

**B.    Entering into the Backstop Agreement is an Exercise of Sound Business Judgment**

26.    The Plan Proponent asserts that the terms of the Backstop Agreement are a result of arms-length and good faith negotiations, and are fair and reasonable in all respects. As the Plan Proponent has determined that the Debtors' successful reorganization requires, among other things, an infusion of capital for working capital purposes, the Rights Offering will provide significant new equity and deleverage the Debtors' balance sheet.   Additionally, a fully backstopped Rights Offering will minimize the risks associated with undercapitalization should the Rights Offering go undersubscribed.

27.    Further, the business judgment standard is satisfied because the Plan Proponent has arranged for the marketing of the Backstop Commitment Amounts. Lazard will undertake to market the Backstop Commitment Amounts to other potential parties until a date which is five (5) days before the Subscription Expiration Date. Per the Plan Proponent's request, Lazard will seek other potential third parties who wish to make an offer with respect to the Backstop Commitment Amount. By doing so, the Plan Proponent may ensure the most favorable outcome for the Debtors, their estates and their creditors.

28.    In light of the foregoing, the Plan Proponent submits that the relief requested herein is necessary to secure the participation of the Backstop Parties in the Rights Offering and is the best and most efficient means of allowing the Debtors to successfully emerge from these chapter 11 cases and to maximize value for the benefit of their estates and their creditors. The Plan Proponent therefore submits that entering into the Backstop Agreement and marketing the Backstop Commitment Amount is necessary to the Second Amended Plan's implementation and will maximize creditor recoveries and provide the Debtors with additional

capital, both further solidifying their financial position and providing funds to continue planned operations and future developments.

### C. The Rights Offering Premium and Expense Reimbursement Should Be Approved

29.     The Plan Proponent respectfully submits that the Rights Offering Premium and Expense Reimbursement are necessary inducements for the Backstop Parties to enter into the Backstop Agreement, particularly in view of the financial risks that they are thereby undertaking. As noted above, in the event the Rights Offering is consummated with the Backstop Parties as contemplated by the Backstop Agreement, the Rights Offering Premium will be satisfied through a downward adjustment to the purchase price of the applicable Rights Offering Units. If the Debtors consummate an Alternative Transaction or if a Termination Payment Event occurs, the Rights Offering Premium will be satisfied in cash (without duplication).

30.     The Rights Offering Premium and Expense Reimbursement are standard and customary for an equity issuer to pay, and the Plan Proponent has determined, with the assistance of Lazard, that the amount of the Rights Offering Premium and Expense Reimbursement are reasonable in relation to the nature and size of the proposed Rights Offering and the circumstances of the underwriting. The 5% premium on the $140,000,000 Rights Offering Amount creates a Rights Offering Premium of $7,000,000 which is well within the range of reasonableness.

31.     Courts in this district and others have approved equity rights offerings of the nature contemplated here. See e.g., In re Foamex Int'l Inc., Case No. 05-12685 (Bankr. D. Del. Nov. 27, 2006) (approving commitment letters with respect to debt and equity financing, commence a rights offering, and pay certain option premiums and fees); In re Silicon Graphics, Inc., Case No. 06-10977 (Bankr. S.D.N.Y. Aug. 23, 2006) (approving backstop commitment

agreements in connection with rights offering); In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (approving backstop commitment agreements in connection with rights offering); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. Feb. 23, 2006) (approving backstop commitment agreements in connection with rights offering); Atlas Air Worldwide Holdings, Inc., Case No. 04-10792 (S.D. Fla. June 8, 2004) (court authorized debtors to execute, deliver and perform put/call letter agreement).

32.     The Plan Proponent believes the fees and expenses provided for in the Backstop Agreement are reasonable in the context of the transactions contemplated and similar fee structures have been approved in connection with rights offerings of similar magnitude.  See e.g., In re Foamex Int'l Inc., Case No. 05- 12685 (Bankr. D. Del. Nov. 27, 2006) (Court approved a backstop fee of $7.5 million (5% of the total amount of $150 million rights offering)); In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (Court approved a backstop fee of $100 million (4.57% fee of total amount of $2.2 billion rights offering) and a break up fee of $20 million (.91% of the total amount of $2.2 billion rights offering)); In re Silicon Graphics, Inc., Case No. 06-10977 (Bankr. S.D.N.Y. Jun 27, 2006) (Court approved a backstop fee of $2.5 million (2% of the total amount of $50 million rights offering)); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. February 23, 2006) (Court approved a backstop fee of $100 million (5.5% of the total amount of $1.8 billion rights offering)).

### 1.     Rights Offering Premium

33.     The Plan Proponent has determined that the Rights Offering Premium is an effective means to secure the Backstop Parties' commitment to fully backstop the Rights Offering, at a fraction of the total value the Plan Proponent expects the Rights Offering Amount

to provide to the Debtors' estates. Given the substantial investment that the Backstop Parties have agreed to assume, the Plan Proponent therefore submits that the Rights Offering Premium is reasonable and necessary to the successful completion of the Rights Offering.

34. Courts in this and other districts have approved similar payments, in the form of backstop commitment fees, as a reasonable and necessary use of estate assets. See In re: J.L. French Automotive Castings, Inc., Case No, 06-10119 (MFW) (Bankr. D. Del. Mar. 29, 2006); In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2007).

### 2. Expense Reimbursement

35. The Expense Reimbursement provision of the Backstop Agreement is also the result of extended negotiations between the Plan Proponent, Lazard and the Backstop Parties. The Plan Proponent submits that the resulting Expense Reimbursement provision is likewise fair, reasonable, and necessary obligation for the Debtors to incur to induce the Backstop Parties to enter into the Backstop Agreement. The Backstop Parties will be entitled to the Expense Reimbursement if they consummate the transactions contemplated by the Backstop Agreement.

## II. The Rights Offering Premium and Expense Reimbursement Are Proper and Should be Afforded Administrative Expense Status

36. Finally, in accordance with section 503(b)(1)(a) of the Bankruptcy Code, the Rights Offering Premium (if paid in cash in the event the Debtors consummate an Alternative Transaction or a Termination Payment Event occurs) and Expense Reimbursement should be afforded administrative expense priority. The costs and expenses charged and incurred by the Backstop Parties for the benefit of the Debtors in connection with the Rights Offering are entitled to the highest level of priority for its "actual, necessary costs and expenses of preserving the estate . . ." 11 U.S.C. § 503(b)(1). Under the prevailing test, for a claim to be entitled to administrative expense priority under section 503(b)(1), "the debt must arise from a transaction

with the debtor-in-possession ... [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business.'" Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting In re Mammoth Mart. Inc., 536 F.2d 950, 954 (1st Cir. 1976)); In re Jatran, Inc., 732 F.2d 584, 587 (7th Cir. 1984); see also In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992) (stating that a claim qualifies as an administrative expense under § 503(b) where it confers a benefit that "run(s) to the debtors in possession and it is typically fundamental to the conduction of its business").

37.     The Rights Offering Premium (if paid in cash in the event the Debtors consummate an Alternative Transaction or if a Termination Payment Event occurs) and Expense Reimbursement are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing the value thereof and enhancing creditor recoveries by providing for a significant equity rights offering that will permit the Debtors to emerge from these chapter 11 cases. The Backstop Parties provide significant benefit to the Debtors' estates during the post-petition period because they facilitate the necessary infusion of working capital into the Debtors' estates so that they may successfully reorganize. Absent the Backstop Parties' commitments, the Debtors would be over-leveraged and unable to raise the capital required to effectuate a successful reorganization.

38.     For all of the foregoing reasons, the Rights Offering Premium (if paid in cash in the event the Debtors consummate an Alternative Transaction or a Termination Payment Event Occurs) and the Expense Reimbursement associated with the proposed Rights Offering and Backstop Agreement are actual and necessary costs of preserving these estates, and should therefore be granted under section 503(b)(1)(a).

## WAIVER OF TEN-DAY STAY PROVIDED BY BANKRUPTCY RULE 6004

39.     The Plan Proponent further seeks a waiver of any stay of the effectiveness of the order approving this Backstop Motion.  Pursuant to Federal Rule of Bankruptcy Procedure 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of ten (10) days after entry of the order, unless the court orders otherwise."  Based upon the facts and circumstances set forth herein, the Plan Proponent submits that ample cause exists to justify a waiver of any ten (10) day stay imposed by Federal Rules of Bankruptcy Procedure 6004(h), 7062, or 9014 to the extent they apply.  The DIP Financing matures on May 31, 2009.  The Debtors need to emerge from chapter 11 expeditiously.  By approving this Backstop Motion and assuming that the Second Amended Disclosure Statement is approved, this Court will be approving a Backstop Motion integral to confirmation of the Second Amended Plan and will be allowing the Plan Proponent to raise funding required for the Second Amended Plan.

40.     The Plan Proponent submits that the waiver of the ten day stay is appropriate here to allow for the consummation of the transactions described in the Backstop Agreement, so that the Plan Proponent, the Debtors, the Company, Holdco and the Backstop Parties can work to consummate the transactions contemplated by the Second Amended Plan and this Backstop Motion immediately after the Second Amended Disclosure Statement is approved.

41.     The Plan Proponent has determined that the Debtors' successful reorganization requires, among other things, an infusion of cash for working capital purposes. The Rights Offering will provide significant new funding and deleverage the Debtors' balance sheet.  The certainty of funding of the Rights Offering, and consequently the viability of the Second Amended Plan, depends on approval of the Backstop Agreement and the related relief

sought in the Backstop Motion. Thus, it is crucial for order approving the Backstop Motion to be effective immediately so that (a) the Plan Proponent may solicit votes on the Second Amended Plan with the certainty that the Rights Offering will be funded; and (b) Lazard may commence its marketing efforts as described in the Backstop Motion prior to the confirmation hearing on the Second Amended Plan. Moreover, in light of the impending maturity of the DIP Credit Facility on May 31, 2009, proceeding on an expedited basis to approve the transactions contemplated to effectuate the Second Amended Plan is required.

## NOTICE

42.     Notice of this Backstop Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Debtors; (c) counsel to the Second Lien Administrative Agent; (d) counsel to the Committee; (e) the IRS; (f) the United States Securities and Exchange Commission; and (g) all parties who have requested notice in these cases pursuant to Bankruptcy Rule 2002. The Plan Proponent submits that no other or further notice need be provided.

## NO PRIOR REQUEST

43.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Plan Proponent respectfully requests that this Court enter an order, substantially in the form attached hereto (i) approving the Backstop Agreement and related Rights Offering Premium and Expense Reimbursement, (ii) approving the marketing of the Backstop Commitment Amounts, as set forth herein, and approving the related Rights Offering Premium in the event and Alternative Transaction is consummated or Termination Payment Event occurs, and (iii) granting such other and further relief, as the Court deems appropriate.

Dated: May 11, 2009
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR LLP

By: /s/ Edwin J. Harron

    Edwin J. Harron (No. 3396)
    Joseph M. Barry (No. 4221)
    The Brandywine Building
    1000 West Street, 17th Floor
    P.O. Box 391
    Wilmington, Delaware 19899-0391
    Telephone: (302) 571-6600
    Facsimile: (302) 571-1253

and

GREENBERG TRAURIG LLP

    Bruce R. Zirinsky (*pro hac vice*)
    Nathan A. Haynes (*pro hac vice*)
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400

    Nancy A. Peterman (*pro hac vice*)
    77 West Wacker Drive, Suite 3100
    Chicago, Illinois 60601
    Telephone: (312) 456-8400
    Facsimile: (312) 456-8435

Attorneys for Barclays Bank PLC, the Plan Proponent
and Administrative Agent