**EXHIBIT A**

# BACKSTOP RIGHTS PURCHASE AGREEMENT

by and among

LandSource Communities Development LLC,

Newhall Holding Company, LLC,

Barclays Bank PLC, in its capacity as Plan Proponent

and

The Parties Listed on <u>Schedule 1</u> Attached Hereto

Dated: May ___, 2009

# TABLE OF CONTENTS

**Section 1.**      Definitions ................................................................................... 2

**Section 2.**      Rights Offering; Backstop Commitment ................................ 7

     **2.1**    The Rights Offering. ................................................................. 7
     **2.2**    Backstop ..................................................................................... 7

**Section 3.**      Representations and Warranties of the Company and Holdco. ........................ 9

     **3.1**    Organization ............................................................................. 9
     **3.2**    Due Authorization, Execution and Delivery; Enforceability. ...................... 9
     **3.3**    Due Issuance and Authorization of Units .............................. 9
     **3.4**    No Conflicts .............................................................................. 9
     **3.5**    No Registration ....................................................................... 10

**Section 4.**      Representations and Warranties of The Backstop Parties .......................... 10

     **4.1**    Organization ........................................................................... 10
     **4.2**    Due Authorization .................................................................. 10
     **4.3**    Due Execution; Enforceability .............................................. 10
     **4.4**    Consents .................................................................................. 10
     **4.5**    No Conflicts ............................................................................ 11
     **4.6**    Legal Proceedings ................................................................. 11
     **4.7**    No Registration Under the Securities Act ........................... 11
     **4.8**    Accredited Backstop Party .................................................... 11
     **4.9**    Additional Information .......................................................... 11
     **4.10**   Arm's Length ......................................................................... 12
     **4.11**   No Broker's Fees .................................................................... 12
     **4.12**   Subscription Form ................................................................. 12

**Section 5.**      Additional Covenants ............................................................ 12

     **5.1**    Uncertificated Units .............................................................. 12
     **5.2**    Further Assurances ................................................................ 12
     **5.3**    Commercially Reasonable Efforts ........................................ 12
     **5.4**    HSR .......................................................................................... 12

**Section 6.**      Conditions to Backstop Parties' Obligations ...................... 13

**Section 7.**      Conditions to Company's and Holdco's Obligations ......... 14

**Section 8.**      Miscellaneous ......................................................................... 15

| | | |
|---|---|---:|
| 8.1 | Notices | 15 |
| 8.2 | Survival of Representations and Warranties, etc | 16 |
| 8.3 | Assignment | 16 |
| 8.4 | Entire Agreement | 17 |
| 8.5 | Waivers and Amendments | 17 |
| 8.6 | Governing Law; Jurisdiction; Venue; Process | 17 |
| 8.7 | Counterparts | 18 |
| 8.8 | Headings | 18 |
| 8.9 | Severability | 18 |
| 8.10 | Termination | 18 |
| 8.11 | Conflict with Confirmation Order and Plan | 19 |
| 8.12 | No Third Party Beneficiaries | 19 |
| 8.13 | Adjustments | 19 |

# BACKSTOP RIGHTS PURCHASE AGREEMENT

THIS BACKSTOP RIGHTS PURCHASE AGREEMENT (this "Agreement") is made this [ ] day of May, 2009, by and among Barclays Bank PLC, in its capacity as proponent of the Plan (the "Plan Proponent"), the investment entities set forth on Schedule 1 attached hereto (each, a "Backstop Party" and collectively, the "Backstop Parties"), upon its execution of this Agreement on the terms set forth herein, LandSource Communities Development LLC, a Delaware limited liability company (the "Company") and upon its execution of this Agreement on the terms set forth herein, Newhall Holding Company, LLC, a Delaware limited liability company ("Holdco"). Capitalized terms used herein but not defined herein will have the meaning assigned to them in the Plan.

## WITNESSETH:

WHEREAS, on June 8, 2008 (the "Petition Date"), the Company and certain of its subsidiaries (collectively, the "Debtors," as set forth herein) filed voluntary Chapter 11 petitions in the Bankruptcy Court (as defined below), and the Debtors' chapter 11 cases are being jointly administered under Case No. 08-11111 (KJC) (the "Chapter 11 Cases");

WHEREAS, in connection with the Plan, the Plan Proponent has determined that the Debtors' successful reorganization requires, among other things, an infusion of capital for working capital purposes and deleveraging their balance sheet by means of a significant new equity investment;

WHEREAS, the Plan Proponent intends, pursuant to the Plan, to partially effectuate this deleveraging by converting certain Claims of the Holders of First Lien Secured Claims, Allowed Second Lien Claims and Allowed Unsecured Claims into Units of Holdco, a newly formed Delaware limited liability company (which will own 100%[1] of the equity interest of the Company on the Effective Date), to be outstanding on the Effective Date pursuant to the Plan;

WHEREAS, Lennar Corporation (or its Affiliates) will acquire 15% of the Initially Issued Units[2] (subject to dilution due to Units being issued to the Management Co. and Emile Haddad) pursuant to a cash investment into Holdco and the Company on the Effective Date (the "Lennar Investment");

WHEREAS, the Plan Proponent has determined that a rights offering backstopped by the Backstop Parties, on terms and conditions set forth in this Agreement (the "Rights Offering"), is the most appropriate method at this time in which to obtain the necessary new money investment in Holdco and the Company (in addition to the Lennar Investment);

WHEREAS, in the Rights Offering, the Rights Offering Participants will be offered the opportunity, in exchange for cash payments to the Company (on behalf of Holdco), to subscribe for all of the New Units to be issued pursuant to the Rights Offering (the "Rights Offering

---

[1] Such percentage to be adjusted for any equity held by Lennar Corporation (or its Affiliates), Management Co. or Emile Haddad at Reorganized Landsource Communities on the Effective Date.

[2] Such units may be issued to Lennar Corporation (or its Affiliates), Management Co. or Emile Haddad at Reorganized Landsource Communities on the Effective Date.

Units"), which such Units will constitute, in the aggregate, up to 56% of the outstanding Units in Holdco as of the Effective Date (the "Initially Issued Units"), subject to dilution due to Units being issued to the Management Co. and Emile Haddad and as adjusted for the final Rights Offering Amount;

WHEREAS, the amount of the Rights Offering will be $140,000,000, subject to adjustment by the Administrative Agent in accordance with the terms of the Plan (the "Rights Offering Amount") and the purchase price per unit (the "Exercise Price") of the Rights Offering Units will be determined by dividing the Rights Offering Amount by the number of Rights Offering Units;

WHEREAS, pursuant to the Rights Offering, each Rights Offering Participant will have the non-detachable, non-assignable and non-transferable right (except to permitted affiliates) to subscribe for the number of Rights Offering Units as set forth in the Plan , as applicable (such Rights Offering Participant's "Individual Subscription Right");

WHEREAS, to facilitate the Rights Offering, and in consideration of the payment of the premiums and expense reimbursements described herein, each Backstop Party is willing to purchase on the Effective Date, to the extent that the Rights Offering is not fully subscribed and an Alternative Transaction is not consummated, its share of the Rights Offering Units that have not been subscribed for by the Rights Offering Participants by the Subscription Expiration Date;

WHEREAS, pursuant to the Plan and Section 8.3(b) below, the Plan Proponent, subject to the Confirmation Order, will cause the Company and Holdco to execute this Agreement on or prior to the Effective Date; and

WHEREAS, the Parties agree that any valuations of the Debtors' assets or estates, whether implied or otherwise, arising from this Agreement will not be binding for any other purpose, including but not limited to, determining recoveries under the Plan, and this Agreement does not limit such rights regarding valuation in these Chapter 11 Cases.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained in this Agreement, the Parties hereto hereby agree as follows:

**Section 1.    Definitions.**

(a)    For purposes of this Agreement, the following terms will have the meanings set forth below:

"Affiliate" has the meaning assigned to such term in Bankruptcy Code Section 101(2).

"Agreement" has the meaning assigned to it in the Preamble.

"Allowed Second Lien Claims" has the meaning set forth in the Plan.

"Allowed Unsecured Claims" has the meaning set forth in the Plan.

"Alternative Transaction" means (i) the approval by the Bankruptcy Court of a sale or sales of all or a material portion of the Debtors' assets to a third party other than Holders of the First Lien Secured Claims, (ii) the filing of a plan of reorganization that does not contemplate the consummation of the Rights Offering and reorganization of the Debtors on substantially similar terms as set forth in the Plan or (iii) the acceptance of the Plan Proponent in accordance with the Plan of parties (other than the Backstop Parties and their permitted Affiliates and assigns) as "backstop parties" for the Rights Offering.

"Antitrust Division" has the meaning assigned to it in Section 5.4 hereof.

"Approvals" means all approvals and other authorizations that are required under the Bankruptcy Code for Reorganized LandSource Communities and Holdco to take the actions set forth herein and in the Plan.

"Backstop Commitment Amounts" means the amounts set forth under the heading "Backstop Commitment Amounts" on Schedule 1 opposite each Backstop Parties' name.

"Backstop Commitment" means the agreement by the Backstop Parties pursuant to this Agreement to purchase all of the Rights Offering Units that are not purchased by the Rights Offering Participants as part of the Rights Offering; *provided* that each Backstop Party agrees to fund up to the amount set forth under the heading "Backstop Commitment Amounts" opposite each of their names on Schedule 1 attached hereto (and will receive the applicable number of Remaining Rights Offering Units based on the final funding by each Backstop Party).

"Backstop Commitment Percentages" means the percentages set forth under the heading "Backstop Commitment Percentages" on Schedule 1 opposite each Backstop Parties' name.

"Backstop Party" and "Backstop Parties" have the meanings assigned to such terms in the Preamble.

"Backstop Party Material Adverse Effect" means a material adverse effect on (a) the ability of a Backstop Party to perform its obligations under this Agreement or (b) the validity or enforceability of this Agreement against a Backstop Party.

"Backstop Purchase Price" has the meaning assigned to it in Section 2.2(c)(i) hereof.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, whether acting through its bankruptcy court unit or otherwise.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Chapter 11 Cases" has the meaning assigned to it in the Recitals.

"Claim" has the meaning set forth in the Plan.

"Company" has the meaning assigned to it in the Preamble.

"Confirmation Date" means the date on which the Confirmation Order is entered by the Clerk of the Bankruptcy Court.

"Confirmation Order" has the meaning assigned to it in Section 6(a) hereof.

"Debtors" means, collectively: California Land Company; Friendswood Development Company, LLC; Kings Wood Development Company, L.C.; the Company; LandSource Communities Development Sub LLC; LandSource Holding Company, LLC; Lennar Bressi Ranch Venture, LLC; Lennar Land Partners II; Lennar Mare Island, LLC; Lennar Moorpark, LLC; Lennar Stevenson Holdings, L.L.C.; LNR-Lennar Washington Square, LLC; LSC Associates, LLC; NWHL GP LLC; The Newhall Land and Farming Company (A California Limited Partnership); The Newhall Land and Farming Company; Southwest Communities Development LLC; Stevenson Ranch Venture LLC; Tournament Players Club at Valencia, LLC; Valencia Corporation; and Valencia Realty Company; as debtors and debtors-in-possession in the Chapter 11 Cases.

"DIP Credit Agreement" has the meaning set forth in the Plan.

"Disclosure Statement" has the meaning set forth in the Plan.

"Disclosure Statement Order" has the meaning set forth in the Plan.

"Effective Date" has the meaning set forth in the Plan.

"Entity" means an entity as defined in Bankruptcy Code Section 101(15).

"Exercise Price" has the meaning assigned to it in the Recitals.

"Expense Reimbursement" means all reasonable and documented out-of-pocket fees and expenses of each Backstop Party, including the reasonable fees and expenses of counsel and other professionals retained by such Backstop Party, that have been and are subsequently incurred in connection with the negotiation, preparation and implementation of the Rights Offering, excluding any amounts incurred after the termination of this Agreement.

"Expiration Date" has the meaning assigned to it in Section 8.10(a) hereof.

"File" or "Filed" means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

"Final Order" has the meaning set forth in the Plan.

"First Lien Secured Claims" has the meaning set forth in the Plan.

"FTC" has the meaning assigned to it in Section 5.4 hereof.

"Holdco" has the meaning assigned to it in the Preamble.

"Holdco LLC Agreement" has the meaning set forth in the Plan.

"Holder" has the meaning set forth in the Plan.

"HSR Act" has the meaning assigned to it in Section 5.4 hereof.

"Individual Subscription Right" has the meaning assigned to it in the Recitals.

"Initially Issued Units" has the meaning assigned to it in the Recitals.

"Lennar Investment" has the meaning assigned to such term in the Preamble.

"Management Co." has the meaning assigned to such term in the Plan.

"Material Adverse Effect" means a material adverse effect on (a) the ability of the Company and Holdco, subject to the Approvals, to perform their obligations under this Agreement or (b) subject to the Approvals, the validity or enforceability of this Agreement against the Company and Holdco.

"New Units" means the number of Units in Holdco to be issued in accordance with the Rights Offering and this Agreement, all of which are subject to dilution due to the Lennar Equity Interest and the Management Co. Equity Interest and may be adjusted based on the final Rights Offering Amount.

"Party" means the Company, Holdco, the Plan Proponent or any Backstop Party, individually, and the "Parties" means the Company, Holdco, the Plan Proponent and the Backstop Parties, collectively; provided that the Company and Holdco will not be considered a Party until execution of this Agreement by each such entity, respectively.

"Petition Date" has the meaning assigned to it in the Recitals.

"Plan" means the Second Amended Joint Chapter 11 Plan for LandSource Communities and its affiliated Debtors, filed with the Clerk of the Bankruptcy Court on May 6, 2009, as it may be altered, amended or modified from time to time, and the Plan Supplement.

"Plan Proponent" has the meaning assigned to it in the Preamble.

"Plan Supplement" has the meaning set forth in the Plan.

"Primary Allocable Units" has the meaning set forth in the Plan.

"Remaining Rights Offering Units" has the meaning assigned to it in Section 2.2(b)(i) hereof.

"Reorganized LandSource Communities" has the meaning set forth in the Plan (which entity will be renamed Newhall Land Development, LLC after the Effective Date).

"Reorganized LandSource Communities LLC Agreement" means the limited liability company agreement of Reorganized LandSource Communities in effect on the Effective Date.

"Rights Offering" has the meaning assigned to it in the Recitals.

"Rights Offering Amount" has the meaning assigned to it in the Recitals.

"Rights Offering Premium" has the meaning assigned to it in Section 2.2(d) hereof.

"Rights Offering Participant" has the meaning set forth in the Plan.

"Rights Offering Units" has the meaning assigned to it in the Recitals.

"Securities Act" means the Securities Act of 1933, as amended.

"Subscription Agent" has the meaning set forth in the Plan.

"Subscription Amounts" means the amounts set forth under the heading "Subscription Amounts" on Schedule 1 opposite each Backstop Parties' name.

"Subscription Expiration Date" has the meaning set forth in the Plan.

"Subscription Form" means the subscription form(s) and applicable instructions included on the ballot sent to each Rights Offering Participant on which such Rights Offering Participant may exercise his, her or its Individual Subscription Right, in substantially the form attached hereto as Exhibit A.

"Subscription Units" means the number of Units acquired by each Backstop Party pursuant to the Rights Offering and Section 2.1(b).

"Subsidiary" means as to any Entity, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Entity.

"Termination Payment Event" means a termination of this Agreement by any applicable Party due to the failure of any of the following conditions to be satisfied on or prior to such termination: Section 6(c), Section 6(e), Section 6(g), Section 6(h)(i), Section 6(h)(ii) or Section 7(b) or a termination pursuant to 8.10(a)(ii).

"Total Commitment Amounts" means the aggregate of the Subscription Amounts and Backstop Commitment Amounts for each of the Backstop Parties.

"Unit" means the entire ownership interest of a member in Holdco at any particular time expressed in units, or fraction thereof, in accordance with the Holdco LLC Agreement, including the right of such member to any and all benefits, allocations of profits and losses and distributions to which a member may be entitled as provided in the Holdco LLC Agreement and in the Delaware Limited Liability Company Act, together with the obligations of such member to comply with all of the terms and conditions of the Holdco LLC Agreement and of the Delaware Limited Liability Company Act.

**Section 2.     Rights Offering; Backstop Commitment.**

**2.1     The Rights Offering.**

(a)     **Commencing the Rights Offering.** The Plan Proponent will commence the Rights Offering as part of the Plan solicitation process. Each Rights Offering Participant will have the opportunity to participate in the Rights Offering by electing to exercise its Individual Subscription Right by (i) completing and returning a duly completed Subscription Form in the manner specified in the instructions accompanying the Subscription Form and (ii) paying or arranging for payment of such Rights Offering Participant's Subscription Purchase Price (as calculated pursuant to the Subscription Form) in the manner specified in the instructions accompanying the Subscription Form.

(b)     **Individual Subscription Right.** Pursuant to the terms and subject to the conditions of this Agreement, each of the Backstop Parties hereby irrevocably commits to participate in the Rights Offering by funding the amount set forth opposite its name under the heading "Subscription Amounts" set forth on Schedule 1 for its applicable Subscription Units; *provided* that the obligations of the Backstop Parties to fund their applicable Subscription Amount are agreed to be several and not joint.

(c)     **Failure to Deliver Subscription Form.** If, for any reason, the Subscription Agent does not receive from a Rights Offering Participant both (i) a duly completed Subscription Form and the other documents included therewith on or prior to the Subscription Expiration Date and (ii) payment in immediately available funds in an amount equal to such Rights Offering Participant's Subscription Purchase Price (as calculated pursuant to the Subscription Form) on or prior to the Subscription Expiration Date, such Rights Offering Participant will be deemed to have relinquished and waived its right to participate in the Rights Offering; *provided* that the failure by a Backstop Party to deliver its Subscription Form and Subscription Purchase Price pursuant to Section 2.1(b) will not relieve such Party of any of its obligations hereunder (including pursuant to Section 2.1(b)).

**2.2     Backstop**

(a)     **Backstop Commitment.** The Backstop Parties' Total Commitment Amounts are equal, in the aggregate, to the Rights Offering Amount.

(b)     **Effectuating the Backstop Commitment.**

(i)     Pursuant to the terms and subject to the conditions of this Agreement, if fewer than all of the Rights Offering Units are subscribed for by the Rights Offering Participants under the Rights Offering, then each of the Backstop Parties will purchase from the Company (on behalf of Holdco), at the Exercise Price, the number of such Rights Offering Units that are not subscribed for pursuant to the Rights Offering (the "Remaining Rights Offering Units") equal to its Backstop Commitment Percentage multiplied by the number of Remaining Rights Offering Units, by funding up to its applicable Backstop Commitment Amount set forth opposite its name under the heading "Backstop Commitment Amounts" on Schedule 1; *provided* that the obligations of the Backstop Parties to fund their Backstop Commitment Amounts are agreed to be several and not joint.

(ii)     In the event that one or more of the Backstop Parties fails to fund any portion of its Backstop Commitment Amount, the Plan Proponent will first reoffer such Backstop Commitment Amount to the other Backstop Parties (pro rata based on their Backstop Commitment Percentages (after excluding the non-funding Party)) and may again thereafter offer any remaining Backstop Commitment Amount to such other Backstop Parties or to another person(s) as the Plan Proponent determines in its reasonable discretion.

(iii)     The closing of the purchase and sale of the Remaining Rights Offering Units, if any, will take place on the Effective Date.

(c)     **Backstop Purchase.**

(i)     **Notice.** No later than five (5) Business Days after the Subscription Expiration Date, the Plan Proponent will deliver notice to the Backstop Parties of: (A) each of the Backstop Parties' obligation to purchase the Remaining Rights Offering Units; and (B) the purchase price therefor equal to the applicable number of Remaining Rights Offering Units multiplied by the Exercise Price (the "Backstop Purchase Price").

(ii)     **Delivery of Funds.** On the Effective Date, each of the Backstop Parties will deliver to the Company (on behalf of Holdco) their applicable Backstop Purchase Price by wire transfer in immediately available funds to an account (or accounts) designated by the Company at least two (2) Business Days prior to the Effective Date. Notwithstanding the foregoing, the Backstop Parties may direct the Administrative Agent, if such direction is acceptable to the Administrative Agent in its sole discretion, to deliver each Backstop Parties' applicable repayment of the DIP Credit Agreement to the Company (on behalf of Holdco) in satisfaction of all (or a portion if less) of such Backstop Parties' Backstop Purchase Price and such Backstop Party will deliver any additional funds necessary to satisfy its full obligations hereunder to the Company (on behalf of Holdco) in the manner set forth in the immediately preceding sentence.

(d)     **The Rights Offering Premium.** In consideration for the Backstop Parties having agreed to purchase their applicable Subscription Units and applicable Remaining Rights Offering Units, on the Effective Date the Backstop Parties will be entitled to an amount, the "Rights Offering Premium," which is equal in the aggregate to 5% of the Rights Offering Amount. The

portion of the Rights Offering Premium to which each of the Backstop Parties is entitled is set forth on Schedule 1 opposite each of their names under the heading "Rights Offering Premium". The portion of the Rights Offering Premium to which a Backstop Party is entitled will reduce the amount such Backstop Party is required to pay in connection with its purchase of its applicable Subscription Units. For the avoidance of doubt, the Backstop Parties will be entitled to the Rights Offering Premium without regard to whether the Rights Offering is fully subscribed, and the Backstop Parties will also be entitled to the payment of the Rights Offering Premium in cash (without duplication) following the entry of an order by the Bankruptcy Court approving this Agreement upon or after a termination as set forth in Section 8.10(d). Notwithstanding the foregoing, in the event that any Backstop Party fails to purchase any of its applicable Subscription Units or applicable Remaining Rights Offering Units allocated to such Party, such Backstop Party will not be entitled to any portion of the Rights Offering Premium and such Backstop Party will be required to immediately pay any previously offset amounts to the Company and the Plan Proponent will have the right to offset any DIP Credit Agreement repayments payable to such Backstop Party or its Affiliates.

**Section 3.** **Representations and Warranties of the Company and Holdco.** The Company and Holdco will jointly and severally represent and warrant as of the Effective Date to the Backstop Parties as follows:

**3.1** **Organization.** Each of the Company and Holdco is duly formed and validly existing under the laws of the State of Delaware.

**3.2** **Due Authorization, Execution and Delivery; Enforceability.** Subject to the Approvals, each of the Company and Holdco has the requisite limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder, including the issuance of the Rights Offering Units by Holdco, and will take all necessary limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Initially Issued Units. This Agreement will constitute, assuming the execution by the other Parties hereto, the legally valid and binding obligation of the Company and Holdco, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**3.3** **Due Issuance and Authorization of Units**. The Rights Offering Units issued and delivered to the Backstop Parties pursuant to the terms of this Agreement will be, upon issuance, duly authorized and validly issued and will be free from all taxes, liens, preemptive rights and charges with respect to the issue thereof.

**3.4** **No Conflicts**. Except for the Approvals, the execution, delivery and performance of this Agreement by the Company and Holdco will not (a) conflict with or result in any breach of any provision of the Reorganized LandSource LLC Agreement or Holdco LLC Agreement as in effect on the Effective Date, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would

become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material agreement, lease, mortgage, license, indenture, instrument or other contract to which it is a party or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities laws and regulations) applicable to them or any of their Subsidiaries or by which any of their or their Subsidiaries' properties or assets are bound or affected as in effect on the Effective Date, except in the case of clauses (b) or (c) as would not, individually or in the aggregate, result in or reasonably be expected to result in a Material Adverse Effect.

**3.5    No Registration**.  Assuming the accuracy of the representations and warranties and compliance with the covenants of the Backstop Parties set forth in this Agreement, no registration of the Rights Offering Units under the Securities Act is required for the purchase of the Rights Offering Units by the Backstop Parties in the manner contemplated by this Agreement.

**Section 4.    Representations and Warranties of The Backstop Parties**.    The Backstop Parties severally, but not jointly, represent and warrant to the Company, Holdco and the Plan Proponent as follows:

**4.1    Organization**.  Each Backstop Party is duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation.

**4.2    Due Authorization**. Each Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement, the Holdco LLC Agreement and the Subscription Forms and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement, the Holdco LLC Agreement and the Subscription Forms.  Each Backstop Party is, and will be at the Effective Date, ready, willing and able to satisfy all of its obligations hereunder.

**4.3    Due Execution; Enforceability**.  This Agreement has been duly and validly executed and delivered by each Backstop Party and, assuming the execution of the other parties hereto, will constitute its valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).  The Holdco LLC Agreement and the Subscription Forms will be duly and validly executed and delivered by each Backstop Party and, assuming the execution of the other parties hereto, will constitute its valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**4.4    Consents**.  Except for filings required under and in compliance with the HSR Act, none of the execution, delivery or performance of this Agreement, the Holdco LLC Agreement

or the Subscription Forms by the Backstop Parties will require any consent of, authorization by, exemption from, filing with, or notice to any governmental entity.

**4.5     No Conflicts**.  The execution, delivery and performance of this Agreement, the Holdco LLC Agreement or the Subscription Forms by the Backstop Parties will not (a) conflict with or result in any breach of any provision of its organizational documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material agreement, lease, mortgage, license, indenture, instrument or other contract to which it is a party or by which its properties or assets are bound, or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities laws and regulations) applicable to it or by which its properties or assets are bound or affected as in effect on the Effective Date, except in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in or reasonably be expected to result in a Backstop Party Material Adverse Effect.

**4.6     Legal Proceedings**.  There are no actions, suits or proceedings to which any Backstop Party is a party or to which any property of any Backstop Party is subject that, individually or in the aggregate, has materially prohibited, delayed or adversely impacted, or if determined adversely to such Backstop Party, would reasonably be expected to materially prohibit, delay or adversely impact the Backstop Parties' performance, of their obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Backstop Parties, contemplated and, to the knowledge of the Backstop Parties, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to materially prohibit, delay or adversely impact the Backstop Parties' performance of their obligations under this Agreement.

**4.7     No Registration Under the Securities Act**.  Each Backstop Party understands that the Rights Offering Units to be purchased by it pursuant to the terms of this Agreement have not been registered, and that neither the Plan Proponent, Holdco nor the Company will be required to effect any registration or qualification, under the Securities Act or any state securities law, and the Rights Offering Units will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws. The Rights Offering Units cannot be offered for sale, sold or otherwise transferred except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act.

**4.8     Accredited Backstop Party**.  Each Backstop Party is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act.

**4.9     Additional Information**.  Each Backstop Party acknowledges that (a) it has been afforded the opportunity to ask questions and receive answers concerning Holdco, the Company and their Subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein and as otherwise considered necessary in connection with the purchase of the Rights Offering Units, (b) it has received copies of all documents and any other information requested from Holdco and the Company, or has elected to

waive such opportunity, and (c) it has been furnished with such financial and other information concerning Holdco, the Company, their Subsidiaries, their management and their business and proposed business as the Backstop Party considers necessary or appropriate for deciding whether to purchase the Rights Offering Units.

**4.10    Arm's Length.**  Each Backstop Party understands that the Plan Proponent, Holdco and the Company are acting solely in the capacity of an arm's length contractual counterparty to such Backstop Party with respect to the transactions contemplated hereby. Additionally, such Backstop Party is not relying on Holdco, the Debtors, the Plan Proponent or any of their legal, financial, accounting or other advisors for any legal, tax, investment, accounting or regulatory advice.

**4.11    No Broker's Fees.**  To the best of its knowledge, no Backstop Party is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a claim against the Plan Proponent, Holdco or the Debtors for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated hereby.

**4.12    Subscription Form.**  Each Backstop Party hereby makes all of the representations, warranties, covenants and agreements set forth in each of their applicable Subscription Form as if fully set forth herein with respect to the Remaining Rights Offering Units purchased pursuant to this Agreement.

**Section 5.    Additional Covenants.**  Holdco, the Company (upon execution by Holdco and the Company) and each Backstop Party hereby agree to the following:

**5.1    Uncertificated Units.**  The Parties agree that the New Units will not be certificated.

**5.2    Further Assurances.**  From time to time after the date of this Agreement, the Parties will execute, acknowledge and deliver to the other Party such other instruments, documents, and certificates and will take such other actions as the other Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

**5.3    Commercially Reasonable Efforts**

(a)    Holdco and the Company will use commercially reasonable efforts to cause the conditions set forth in Section 6 to be satisfied and to consummate the transactions contemplated herein.

(b)    The Backstop Parties will use commercially reasonable efforts to cause the conditions set forth in Section 7 to be satisfied and to consummate the transactions contemplated herein.

**5.4    HSR.**  If necessary, Holdco, the Company and the Backstop Parties will (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated hereby as promptly as practicable and,

in any event, by the 20th day after the date hereof, in the case of all filings required under the HSR Act, (b) comply at the earliest practicable date with any request under the HSR Act for additional information, documents or other materials received by the Backstop Parties or their respective Subsidiaries from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other governmental body in respect of such filings or such transactions and (c) cooperate with each other in connection with any such filing (including, without limitation, to the extent permitted by applicable law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other governmental body with respect to any such filing or any such transaction. Any and all filing fees required to be paid by Holdco, the Company and the Backstop Parties under the HSR Act in connection with such filings will be borne by the Company. Each such Party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such Party will promptly inform the other Party of any oral communication with, and provide copies of written communications with, any governmental body regarding any such filings or any such transaction. No Party hereto will independently participate in any formal meeting with any governmental body in respect of any such filings, investigation or other inquiry without giving the other Party prior notice of the meeting and, to the extent permitted by such governmental body, the opportunity to attend and/or participate. Subject to applicable law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the HSR. Holdco, the Company and the Backstop Parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Holdco, the Company and the Backstop Parties, as the case may be).

**Section 6.** **Conditions to Backstop Parties' Obligations.** The obligation of each Backstop Party, severally, to fund the Total Commitment Amounts will be subject to the satisfaction (or waiver by each Backstop Party in its sole reasonable discretion) of each of the following conditions on the Effective Date:

(a) **Confirmation Order.** The Final Order or Orders of the Bankruptcy Court, among other things, confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") that is reasonably acceptable to the Backstop Parties will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

(b) **HSR Act.** The waiting period (and any extension thereof) applicable to the Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

(c) **Expense Reimbursement.** The Debtors will have paid all Expense Reimbursements on the Effective Date; *provided* that in the event the Company in good faith disputes whether the amount of such Expense Reimbursements is "reasonable," the Debtors will separate the disputed amount and pay the remainder pursuant to the terms hereof;

(d) **Required Consents.** All of the Approvals will have been obtained;

(e) **Rights Offering.** The Rights Offering will have been consummated pursuant to and in accordance with the Plan, *provided* that this clause will not be a condition to the obligations of the Backstop Parties to purchase Subscription Units as set forth in Section 2.1(b) pursuant to the Subscription Form;

(f) **Backstop Funding.** The Backstop Parties (or additional parties as provided for herein) will have funded the aggregate Total Commitments on substantially similar terms as set forth herein, *provided* that this clause will not be a condition to the obligations of any Backstop Party that has failed to fund any of its applicable Total Commitment;

(g) **Holdco and Company Execution.** Each of the Company and Holdco will have executed this Agreement; and

(h) **Other Conditions.** (i) Each of Holdco and the Company will have performed, in all material respects, their respective obligations hereunder required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of Holdco and the Company in this Agreement that are qualified as to materiality or Material Adverse Effect will be true and correct in all respects, and the representations and warranties that are not qualified as to materiality or Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date) and (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth herein).

**Section 7.  Conditions to Company's and Holdco's Obligations**. The obligations of Holdco and the Company hereunder are subject to the satisfaction (or the waiver by the Plan Proponent in its sole reasonable discretion) of the following conditions as of the Effective Date:

(a) **Required Consents.** All of the Approvals and all of the approvals necessary for the consummation of the transactions contemplated by this Agreement will have been obtained;

(b) **Rights Offering.** The Rights Offering will have been consummated pursuant to the Plan;

(c) **Plan Confirmation.** The Confirmation Order that is reasonably acceptable to the Plan Proponent and the Company will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

(d) **HSR Act.** The waiting period (and any extension thereof) applicable to the Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

(e) **Holdco LLC Agreement.** Each of the Backstop Parties will have delivered a joinder to the Holdco LLC Agreement; and

(f) **Other Conditions.** (i) Each Backstop Party will have performed, in all material respects, its obligations hereunder required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of each Backstop Party in this Agreement that are qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all respects, and the representations and warranties that are not qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date) and (iii) (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth herein).

## Section 8.    Miscellaneous

**8.1    Notices.**  Any notice or other communication required or which may be given pursuant to this Agreement will be in writing and either delivered personally to the addressee, telecopied to the addressee or mailed, certified or registered mail, postage prepaid, and will be deemed given when so delivered personally or telecopied or, if mailed, five (5) days after the date of mailing, as follows:

(a)    if to a Backstop Party, to the address specified on Schedule 1 hereto.

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention:    Mark C. Smith
Sean C. Doyle
Facsimile No.: 917-777-3330

(b)    if to the Company or Holdco, to:

c/o LandSource Communities Development LLC
23823 Valencia Boulevard
Valencia, California  91355
Attention:  Board of Directors
Facsimile: 212-790-0336

with a copy to:

Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Debra A. Dandeneau
Facsimile:    212-310-8007
(counsel to the Company and Holdco)

(c)    if to the Plan Proponent, to:

Barclays Capital PLC
200 Park Avenue
New York, New York 10166
Attention:    Mark Manski
Facsimile:    212-412-7371

with a copy to:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attention:    Bruce R. Zirinsky
              Nathan A. Haynes
Facsimile:    212-801-6400
(counsel to the Plan Proponent)

and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention:    Mark C. Smith
              Sean C. Doyle
Facsimile:    917-777-3330

**8.2    Survival of Representations and Warranties, etc.**    All representations and warranties made in this Agreement, the Schedules attached hereto will survive the execution and delivery of this Agreement.

**8.3    Assignment**.

(a)    This Agreement will be binding upon and inure to the benefit of each and all of the Parties, and, except as set forth below, neither this Agreement nor any of the rights, interests or obligations hereunder may or will be assigned by any of the Parties without the prior written consent of the other Parties except as otherwise set forth in this Section 8.3. This Agreement, or any Backstop Party's obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by such Backstop Party to any Affiliate of such Backstop Party over which such Backstop Party or any of its Affiliates exercises investment authority (including Affiliated

investment funds), including, without limitation, with respect to voting and dispositive rights; *provided* that any such assignee assumes the obligations of such Backstop Party hereunder (including making all representations and warranties set forth herein by such Backstop Party as if an original party hereto) and agrees in writing to be bound by the terms of this Agreement in the same manner as such Backstop Party. Notwithstanding the foregoing, no such assignment will relieve such Backstop Party of its obligations hereunder.

(b)　Notwithstanding the foregoing, (i) the Plan Proponent, subject to the Confirmation Order, will cause the Company and Holdco to execute this Agreement and until such time the Plan Proponent may enforce all of the rights and obligations against the Backstop Parties hereunder and (ii) upon agreement of the Parties (not to be unreasonably withheld), Holdco's obligation to issue the Units hereunder may be assigned (in whole or in part) to the Company or to another newly formed holding company which will own 100% of the equity interest of the Company on the Effective Date (subject to any equity of Holdco or the Company issued to Lennar Corporation (or its Affiliates), Management Co. or Emile Haddad). The Plan Proponent will have no liability hereunder prior to or after execution by Holdco or the Company of this Agreement.

**8.4　Entire Agreement**. This Agreement and the Plan contain the entire agreement by and among Holdco, the Company, the Plan Proponent and the Backstop Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements and representations, written or oral, with respect thereto.

**8.5　Waivers and Amendments**.　This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Plan Proponent and the Backstop Parties, and following their execution, the Company and Holdco. No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

**8.6　Governing Law; Jurisdiction; Venue; Process**.　THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE. EACH PARTY HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT, FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH COURT AND

ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

If a court finds that subject matter jurisdiction is not available in the Bankruptcy Court, the Parties hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Southern District of New York or if such court will not have jurisdiction, then to the appropriate courts of the State of New York sitting in New York County.

**8.7** . This Agreement may be executed and delivered (including by facsimile or portable document format (PDF) transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed will be deemed to be an original, but all of which taken together will constitute one and the same.

**8.8 Headings**. The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

**8.9 Severability**. In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the Parties will be enforceable to the fullest extent permitted by law.

**8.10 Termination**

(a) **Termination by the Backstop Parties.**

(i) The Backstop Parties, by consent of a majority of such Parties, will have the right, but not the obligation, to terminate this Agreement by notice to the Plan Proponent and the Company: (1) if the Company or Holdco materially breaches this Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Backstop Parties by majority consent) during which the Company and Holdco may negotiate in good faith regarding any such cure or (2) if the conditions set forth in Section 6 have not been satisfied (or waived) by July 31, 2009 (the "Expiration Date").

(ii) A Backstop Party may terminate its individual Total Commitment Amount within five (5) Business Days written notice to the Plan Proponent following an amendment, cancellation, modification or waiver of (1) the Plan (in the form filed on May 6, 2009), (2) any material condition or term of the Plan (in the form filed on May 6, 2009) or (3) any form agreement (or material term or condition thereof) attached as an Exhibit to the Plan (in the form filed on May 6, 2009), by the Plan Proponent in accordance with the Plan (in the form filed on May 6, 2009) which in case of clauses (1), (2) or (3) is not reasonably acceptable to such Backstop Party.

(b) **Termination by the Plan Proponent.** The Plan Proponent will have the right, but not the obligation, to terminate this Agreement by notice to the Backstop Parties: (1) if any Backstop Party materially breaches this Agreement, and such breach is not cured after a

notice period of five (5) Business Days (which may be extended by the Plan Proponent) during which the breaching Backstop Parties may negotiate in good faith regarding any such cure or (2) if the conditions set forth in Section 7 have not been satisfied (or waived) by the Expiration Date. In the event that any, but not all Backstop Parties materially breach this Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Plan Proponent), the Plan Proponent may terminate this Agreement with respect to such Backstop Party only and this Agreement will continue to remain in effect with respect to all other Parties.

(c) **Termination due to an Alternative Transaction**. This Agreement will automatically terminate upon consummation of an Alternative Transaction.

(d) **Effect of Termination**. In the event of termination of this Agreement as provided above, the provisions of this Agreement will immediately become void and of no further force and effect (other than this Article 8 (except Section 8.2) and Section 2.1(b)); provided that no Party will be released for any intentional breach existing prior to the termination. Following the entry of an order approving the terms of this Agreement by the Bankruptcy Court has been entered and notwithstanding anything herein to the contrary, the Rights Offering Premium will only be paid following a termination of this Agreement as follows (without duplication): (1) upon a consummation of an Alternative Transaction immediately prior to the termination of this Agreement, (2) upon a consummation of an Alternative Transaction within 180 days after a termination of this Agreement and if none of the Backstop Parties are in breach of their representations, warranties and agreements hereunder at the time of termination of this Agreement or (3) (A) if all of the Backstop Parties are ready, willing and able to consummate the transactions contemplated hereby, (B) none of the Backstop Parties are in breach of their representations, warranties and agreements hereunder and (C) a Termination Payment Event has occurred (which in the case of this clause (3), the Backstop Premium will be paid within five (5) Business Days following such termination).

**8.11 Conflict with Confirmation Order and Plan.**

(a) **Conflict with the Confirmation Order**. In the event there is a conflict between the terms of this Agreement and the terms of the Confirmation Order, the terms of the Confirmation Order will control and such Confirmation Order will control over the Plan.

(b) **Conflict with the Plan**. In the event there is a conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan will control.

**8.12 No Third Party Beneficiaries**. This Agreement will not confer any rights or remedies upon any other person or entity other than the Parties and their respective successors and permitted assigns; *provided* that upon execution of this Agreement by the Company and Holdco, all of the rights of the Plan Proponent hereunder will inure to the Company and Holdco.

**8.13 Adjustments**. Each of the Parties acknowledges and agrees that pursuant to the Plan, (i) Units may be issued pursuant to the Plan or the Rights Offering to Holders of Allowed Second Lien Claims and Allowed Unsecured Claims and (ii) the Plan Proponent may adjust the Rights Offering Amount and upon any such issuance or adjustment set forth in clauses (i) or (ii),

the amounts set forth on Schedule 1 will be adjusted proportionately by the Parties and Schedule 1 will be updated accordingly.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By:_____

Name:

Title:

**Anchorage Capital Master Offshore, Ltd.**

    By: Anchorage Advisors, L.L.C., its investment manager

By:_____

Name:

Title:

**Marathon Special Opportunity Master Fund, Ltd.**

    By: Marathon Asset Management, LP, its investment manager

By:_____

Name:

Title:

**OZ Master Fund, Ltd.**

    By: OZ Management, LP, its investment manager
    By: Och-Ziff Holding Corp., its general partner

By:_____

Name:

Title:

*[Signature Continued]*

**Third Avenue Real Estate Value Fund**
**Third Avenue Opportunity Management LLC**

By: Third Avenue Management LLC, their
investment manager

By:_____
Name:
Title:

**TPG Credit Opportunities Fund, L.P.**

By: TPG Credit Opportunities Fund GP,
L.P.
Its: General Partner

_____
By: Julie K. Braun
Vice President

**TPG Credit Opportunities Investors, L.P.**

By: TPG Credit Opportunities Fund GP,
L.P.
Its: General Partner

_____
By: Julie K. Braun
Vice President

**TPG Credit Strategies Fund, L.P.**

By: TPG Credit Strategies GP, L.P.
Its: General Partner

_____
By: Julie K. Braun
Vice President

*[Signature Continued]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of _____ 2009.

**LandSource Communities Development LLC**

By:_____
Name:
Title:

**Newhall Holding Company, LLC**

By:_____
Name:
Title:

\*    \*    \*    \*

Schedule 1[3]

| Backstop Party | Subscription Amounts | Backstop Commitment Amounts | Backstop Commitment Percentages | Total Commitment Amounts | Rights Offering Premium |
|---|---|---|---|---|---|
| Anchorage Capital Master Offshore, Ltd. 610 Broadway, 6th Floor New York, NY 10012 | $ | $ | % | $50,000,000 | $2,500,000.00 |
| Marathon Special Opportunity Master Fund, Ltd. One Bryant Park, 38th Floor New York, NY 10036 | $ | $ | % | $22,500,000 | $1,125,000.00 |
| OZ Master Fund, Ltd. 9 West 57th Street, 39th Floor New York, NY 10019-2701 | $ | $ | % | $20,000,000 | $1,000,000.00 |
| Third Avenue Real Estate Value Fund Third Avenue Opportunity Management LLC 622 Third Avenue, 32nd Floor New York, NY 10017-6715 | $ | $ | % | $27,500,000 | $1,375,000.00 |
| TPG Credit Strategies Fund, L.P., TPG Credit Opportunities Investors, L.P. and TPG Credit Opportunities Fund, L.P. 4600 Wells Fargo Center 90 South Seventh Street Minneapolis, MN 55402 | $ | $ | % | $20,000,000 | $1,000,000.00 |
| **Total** | $ | $ | **100%** | **$140,000,000.00** | **$7,000,000.00** |

---

[3] The Parties acknowledge that the final funding for, and issuance of, Units by and to each Backstop Party may be allocated to their applicable Affiliated investment funds in accordance with the terms of this Agreement.

<u>Exhibit A</u>

Subscription Form

See attached.