**Exhibit 25**

**Class 5 Turnover Trust Agreement**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-----------------------------------------------------------------------x

*In re*          :   Chapter 11

                :

LANDSOURCE COMMUNITIES     :   Case No. 08-11111 (KJC)

DEVELOPMENT LLC, *et al.*,[1]      :

                :   (Jointly Administered)

              Debtors.    :

-----------------------------------------------------------------------x

## CLASS 5 TURNOVER TRUST AGREEMENT

## Dated: _____, 2009

---

[1] The Debtors are as follows: California Land Company; Friendswood Development Company LLC; Kings Wood Development Company, L.C.; LandSource Communities Development LLC; LandSource Communities Development Sub LLC; LandSource Holding Company, LLC; Lennar Bressi Ranch Venture, LLC; Lennar Land Partners II; Lennar Mare Island, LLC; Lennar Moorpark, LLC; Lennar Stevenson Holdings, L.L.C.; LNR-Lennar Washington Square, LLC; LSC Associates, LLC; NWHL GP LLC; The Newhall Land and Farming Company (A California Limited Partnership); The Newhall Land and Farming Company; Southwest Communities Development LLC; Stevenson Ranch Venture LLC; Tournament Players Club at Valencia, LLC; Valencia Corporation; and Valencia Realty Company.

# TABLE OF CONTENTS

1. Definitions: ................................................................................................. 5

   1.1 Terms Defined Above ................................................................................ 5
   1.2 Additional Defined Terms ......................................................................... 5

2. Authority of and Certain Directions to Class 5 Turnover Trustee ..................... 6

   2.1 Creation of Class 5 Turnover Trust .......................................................... 6
   2.2 Property in the Class 5 Turnover Trust ..................................................... 7
   2.3 Purpose of Class 5 Turnover Trust ........................................................... 7

3. Beneficial Interests. ........................................................................................ 8

   3.1 Creation of Beneficial Interests ................................................................ 8
   3.2 Sharing of Proceeds ................................................................................. 8
   3.3 No Transfer or Exchange .......................................................................... 8
   3.4 Absolute Owners ...................................................................................... 8
   3.5 Means of Payment .................................................................................... 9

4. Delivery and Acceptance of Class 5 Turnover Trust Estate. ............................ 9

   4.1 Conveyance by Debtors ............................................................................ 9
   4.2 Acceptance of Conveyance ....................................................................... 9

5. Administration of Class 5 Turnover Trust Estate. ........................................... 9

   5.1 Powers of the Class 5 Turnover Trustee ................................................... 9
   5.2 Limitations on Class 5 Turnover Trustee: Investments ........................... 11

      5.2.1 No Trade or Business ...................................................................... 11
      5.2.2 Investments of Cash ....................................................................... 11

   5.3 Transferee Liabilities ............................................................................. 11
   5.4 Administration of Trust .......................................................................... 12
   5.5 Payment of U.S. Trustee's Fees .............................................................. 12
   5.6 Fiscal Year ............................................................................................. 12
   5.7 Reports ................................................................................................... 12
   5.8 Compensation of the Class 5 Turnover Trustee ....................................... 12
   5.9 Termination ............................................................................................ 12
   5.10 No Bond ................................................................................................ 12

6. Source of Payments: Distributions To The Beneficiaries ............................... 13

   6.1 Distributions from Class 5 Turnover Trust Estate ................................... 13
   6.2 Frequency and Amounts of Cash Payments ............................................ 13
   6.3 Establishment of the Claim Accounts ..................................................... 13
   6.4 Allocation of Distributions from Class 5 Turnover Trust Estate .............. 14
   6.5 Distributions of Property Allocated to Disputed Claims .......................... 14
   6.6 Unclaimed Property ............................................................................... 14

      6.6.1 Escrow of Unclaimed Property ....................................................... 14

     6.6.2   Distribution of Unclaimed Property ......................................................... 15

     6.6.3   Time Bar to Cash Payments ...................................................................... 15

6.7     Fractional Distributions ....................................................................................... 15

6.8     Final Distribution ................................................................................................ 15

6.9     Dissolution of the Class 5 Turnover Trust .......................................................... 16

6.10    Class 5 Turnover Trust Expenses ........................................................................ 16

7.       Other Duties of the Class 5 Turnover Trustee. ............................................................. 17

7.1     Management of Class 5 Turnover Trust Estate .................................................... 17

7.2     No Implied Duties ................................................................................................ 17

8.       Concerning the Class 5 Turnover Trustee. .................................................................... 17

8.1     Acceptance by Class 5 Turnover Trustee ............................................................ 17

8.2     Discretionary Submission of Questions ............................................................... 17

8.3     Resignation of Class 5 Turnover Trustee. ........................................................... 17

     8.3.1   Resignation ............................................................................................... 17

     8.3.2   Appointment of a Successor Class 5 Turnover Trustee ............................ 18

8.4     Acceptance of Appointment by Successor Class 5 Turnover Trustee .................. 18

9.       Class 5 Turnover Trust Advisory Board ....................................................................... 18

9.1     Role of the Class 5 Turnover Trust Advisory Board ........................................... 18

9.2     Class 5 Turnover Trust Advisory Board Members ............................................. 18

9.3     Duties of the Class 5 Turnover Trust Advisory Board ........................................ 19

9.4     Class 5 Turnover Trust Advisory Board Bylaws ................................................ 19

9.5     Board Voting Requirements ................................................................................. 19

     9.5.1   Majority Vote Requirement ....................................................................... 19

     9.5.2   Unanimous Vote Requirement ................................................................... 20

9.6     Reporting ............................................................................................................. 20

9.7     Retention and Compensation of Professionals .................................................... 20

9.8     Reimbursement .................................................................................................... 20

10.     Liability of Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board. .. 21

10.1    No Recourse and Limitation on Liability ............................................................ 21

10.2    Discretion of Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board 21

10.3    Reliance by Class 5 Turnover Trustee, Class 5 Turnover Trust and Class 5 Turnover Trust Advisory Board. ........................................................................ 22

    10.3.1 Reliance on Docum ents ............................................................................ 22

    10.3.2 Retention of Professional s ........................................................................ 22

    10.3.3 Reliance on Class 5 Turn over Trustee and Class 5 Turnover Trust Advisory Board22

10.4    Exculpation; Indemnification. .............................................................................. 22

    10.4.1 Exculpation ............................................................................................... 23

NY 239664101v3

   10.4.2 Indemnification of Class 5 Turnover Trustee, Class 5 Turnover Trust Advisory
      Board and Agents ................................................................................................ 23
   10.4.3 Payment of Expenses ......................................................................................... 23
   10.4.4 Insurance .............................................................................................................. 24

11.  Miscellaneous. ................................................................................................................... 24

 11.1 Title to Trust Estate .......................................................................................................... 24
 11.2 Notices ................................................................................................................................ 24
 11.3 Severability ........................................................................................................................ 24
 11.4 Counterparts ....................................................................................................................... 25
 11.5 Binding Agreement ............................................................................................................ 25
 11.6 No Personal Liability of Beneficiaries .............................................................................. 25
 11.7 Headings ............................................................................................................................. 25
 11.8 Construction ........................................................................................................................ 25
 11.9 Governing Law ................................................................................................................... 25
 11.10 Construction with the Plan ................................................................................................ 25
 11.11 Subject to Court's Jurisdiction .......................................................................................... 25
 11.12 Intention of the Parties ...................................................................................................... 26
 11.13 Valuation of Assets ........................................................................................................... 26
 11.14 Requirement of Undertaking ............................................................................................. 26
 11.15 Books and Records ............................................................................................................ 26

NY 239664101v3

# CLASS 5 TURNOVER TRUST AGREEMENT

THIS CLASS 5 TURNOVER TRUST AGREEMENT ("Agreement") is dated as of [_____], 2009, by and among California Land Company; Friendswood Development Company LLC; Kings Wood Development Company, L.C.; LandSource Communities Development LLC; LandSource Communities Development Sub LLC; LandSource Holding Company, LLC; Lennar Bressi Ranch Venture, LLC; Lennar Land Partners II; Lennar Mare Island, LLC; Lennar Moorpark, LLC; Lennar Stevenson Holdings, L.L.C.; LNR-Lennar Washington Square, LLC; LSC Associates, LLC; NWHL GP LLC; The Newhall Land and Farming Company (A California Limited Partnership); The Newhall Land and Farming Company; Southwest Communities Development LLC; Stevenson Ranch Venture LLC; Tournament Players Club at Valencia, LLC; Valencia Corporation; and Valencia Realty Company (collectively, the "Debtors") and KDW Restructuring & Liquidation Services LLC, not in its individual capacity, but solely as Class 5 Turnover Trustee hereunder (the "Class 5 Turnover Trustee"), in accordance with the Second Amended Joint Chapter 11 Plans of Reorganization for LandSource Communities Development LLC and each of its Affiliated Debtors Proposed by Barclays Bank PLC (the "Plan Proponent"), as Administrative Agent, Under the Super-Priority Debtor-In-Possession First Lien Credit Agreement, as Modified, dated [_____, 2009] (as amended, modified or supplemented from time to time, the "Plan"). Any capitalized terms used, but not defined, herein will have those meanings assigned to such terms in the Plan.

## RECITALS:

WHEREAS, the Debtors filed voluntary petitions commencing their respective cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code ("Bankruptcy Code") on June 8, 2008 in the United States Bankruptcy Court for the District of Delaware ("Court") and such Chapter 11 Cases are jointly administered under Case Number 08-11111;

WHEREAS, the Plan Proponent filed the Plan, and such Plan contemplates that a trust will be created for the benefit of the Holders of Allowed Unsecured Claims in Classes 5(a) - (u) solely for purposes of (a) receiving fifty percent (50%) of the First Lien Creditor Trust Proceeds and (b) distributing such proceeds (net of any expenses) to the Holders of Allowed Unsecured Claims in Classes 5(a) - (u) in accordance with the Plan (the "Class 5 Turnover Trust");

WHEREAS, the Plan was confirmed by the Court pursuant to that certain Order entered on [_____, 2009] (the "Confirmation Order");

WHEREAS, all conditions to consummation of the Plan have been met (or waived) as of the date of execution of this Agreement;

WHEREAS, the Debtors and the Holders of Allowed Unsecured Claims in Classes 5(a) - (u) (the latter, collectively, the "Beneficiaries") desire to create and fund the Class 5 Turnover Trust, as contemplated by the Plan, pursuant to this Agreement; and

4

WHEREAS, the Beneficiaries desire to exchange their Allowed Claims under the Plan for Beneficial Interests (as defined herein) in the Class 5 Turnover Trust.

## AGREEMENTS:

NOW THEREFORE, for and in consideration of the premises, and the mutual promises and agreements contained herein and in the Plan, the receipt and sufficiency of which are hereby expressly acknowledged, the Plan Proponent and Class 5 Turnover Trustee hereby agree as follows:

1. Definitions:

 1.1 Terms Defined Above. As used in this Agreement, each of the terms "Agreement," "Bankruptcy Code," "Beneficiaries," "Chapter 11 Cases," "Court," "Confirmation Order," "Class 5 Turnover Trust," "Debtors," "Plan," "Plan Proponent" and "Class 5 Turnover Trustee" will have the meanings hereinabove set forth.

 1.2 Additional Defined Terms. As used herein, the following terms will have the meanings set forth below, unless the context otherwise requires:

 (a) "Beneficial Interest" means the rights and interests of each of the Beneficiaries in and to the Class 5 Turnover Trust Estate as described in Section 3 herein.

 (b) "Claim Account" has the meaning ascribed to such term in Section 6.3(b) of this Agreement.

 (c) "Claims List" has the meaning ascribed to such term in Section 6.3(a) of this Agreement.

 (d) "Class 5 Turnover Trust Advisory Board" means that certain three (3) member advisory board relating to the Class 5 Turnover Trust which members will be appointed by the Committee, as described in Section 9 of this Agreement.

 (e) "Class 5 Turnover Trust Advisory Board Member" and "Class 5 Turnover Trust Advisory Board Members" have the meanings ascribed to such terms in Section 9.2(a) of this Agreement.

 (f) "Class 5 Turnover Trust Estate" means fifty percent (50%) of the First Lien Creditor Trust Proceeds, which will be irrevocably assigned, transferred and conveyed to the Class 5 Turnover Trust, free and clear of all claims, liens, encumbrances and other liabilities, including all Claims against and Interests in the Debtors, in accordance with the Plan and as of the Effective Date.

 (g) "Class 5 Turnover Trust Expenses" means all costs, expenses and obligations incurred by the Class 5 Turnover Trustee, the Class 5 Turnover Trust,

the Class 5 Turnover Trust Advisory Board and their respective members, officers, directors, employees, professionals, representatives, agents, successors, heirs and assigns in administering the Class 5 Turnover Trust or in any manner connected, incidental or related thereto, including, but not limited to, the fees and expenses of any professionals retained by the Class 5 Turnover Trustee, the Class 5 Turnover Trust or the Class 5 Turnover Trustee Advisory Board, including its members, to assist in carrying out its duties pursuant to this Agreement and the Plan.

(h)     "Class 5 Turnover Trust Proceeds" means fifty percent (50%) of the First Lien Creditor Trust Proceeds *less* the Class 5 Turnover Trust Expenses.

(i)     "Disputed Claim Distribution Amount" has the meaning ascribed to such term in Section 6.5 of this Agreement.

(j)     "Final Cash" has the meaning ascribed to such term in Section 6.8 of this Agreement.

(k)     "Final Distribution" has the meaning ascribed to such term in Section 6.8 of this Agreement.

(l)     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(m)     "Permitted Transfer" has the meaning ascribed to such term in Section 3.3 of this Agreement.

(n)     "Resolved Claim" has the meaning ascribed to such term in Section 6.5 of this Agreement.

(o)     "Residual Authority" has the meaning ascribed to such term in Section 9.1(c) of this Agreement.

(p)     "Unanimous Vote" has the meaning ascribed to such term in Section 9.5.2 of this Agreement.

(q)     The terms "Class 5 Turnover Trustee," "Class 5 Turnover Trust Advisory Board Member," "representative," "employer" or "agent" as used herein, where applicable, include the heirs, successors, executors, administrators, personal representatives or estates of such Persons or entities.

2.     Authority of and Certain Directions to Class 5 Turnover Trustee: Declaration of Trust.

2.1     Creation of Class 5 Turnover Trust. Pursuant to Article IX.A of the Plan and the Confirmation Order, and effective as of the Effective Date of the Plan, the

NY 239664101v3

Beneficiaries and the Debtors hereby create the Class 5 Turnover Trust for the benefit of the Beneficiaries.

2.2     Property in the Class 5 Turnover Trust. The Class 5 Turnover Trust will hold the legal title to all property at any time constituting a part of the Class 5 Turnover Trust Estate and will hold such property in trust to be administered and disposed of by it pursuant to the terms of this Agreement and the Plan for the benefit of the Beneficiaries.  The Class 5 Turnover Trustee is authorized to make disbursements and payments from the Class 5 Turnover Trust Estate in accordance with the provisions of Sections 5 and 6 of this Agreement and pursuant to the Plan.

2.3     Purpose of Class 5 Turnover Trust. This Class 5 Turnover Trust is organized for the sole purposes of (a) receiving fifty percent (50%) of the First Lien Creditor Trust Proceeds and (b) distributing the Class 5 Turnover Trust Proceeds, with no objective to engage in the conduct of a trade or business.  In accordance with such express and limited purposes, as of the Effective Date, the Class 5 Turnover Trustee is hereby authorized and directed to (w) take any and all steps necessary to maintain the Class 5 Turnover Trust as a liquidating trust for federal income tax purposes in accordance with Treasury Regulation Section 301.7701-4(d) and as a "grantor trust" subject to the provisions of Subchapter J of the Internal Revenue Code unless otherwise required; (x) take all reasonable and necessary actions to conserve and protect the Class 5 Turnover Trust Estate; (y) commence, administer, compromise, settle or otherwise dispose of, as appropriate, the Class 5 Turnover Trust Estate; and (z) distribute the Class 5 Turnover Trust Proceeds to the Beneficiaries, in as prompt, efficient and orderly a fashion as possible and in accordance with the Plan and the provisions of Section 6 hereof. The Class 5 Turnover Trust is intended to qualify as a liquidating trust under the Internal Revenue Code and the regulations promulgated thereunder, specifically Treasury Regulation Section 301.7701-4(d), and as such is a "grantor trust" for federal income tax purposes with the Beneficiaries treated as grantors and owners of the Class 5 Turnover Trust Estate.  In particular:

(i)     The Class 5 Turnover Trust is organized for the primary purpose of liquidating the assets of the Class 5 Turnover Trust Estate, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Class 5 Turnover Trust.  The Class 5 Turnover Trust will not be deemed a successor of the Debtors; and

(ii)     The Class 5 Turnover Trust provides that the Beneficiaries of the Class 5 Turnover Trust will be treated as the grantors of the Class 5 Turnover Trust and deemed owners of the assets of the Class 5 Turnover Trust Estate.  This Agreement requires the Class 5 Turnover Trustee to file returns for the Class 5 Turnover Trust as a grantor trust pursuant to Treas. Reg. §1.671-4(a); and

(iii)     This Agreement provides for consistent valuations of the transferred property by the Class 5 Turnover Trustee and the

Beneficiaries, and those valuations will be used for all federal income tax purposes; and

(iv)     All of the Class 5 Turnover Trust's income is to be treated as subject to tax on a current basis to the Beneficiaries who will be responsible for payment of any tax due; and

(v)     This Class 5 Turnover Trust contains a fixed or determinable termination date that is not more than five years from the date of creation of the Class 5 Turnover Trust and that is reasonable based on all the facts and circumstances; and

(vi)     The investment powers of the Class 5 Turnover Trustee, other than those reasonably necessary to maintain the value of the assets of the Class 5 Turnover Trust Estate and to further the liquidating purpose of the Class 5 Turnover Trust, are limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills; and

(vii)     The Class 5 Turnover Trustee is required to distribute at least once per twelve-month period to the Beneficiaries the Class 5 Turnover Trust's net income plus all net proceeds from the sale of the assets of the Class 5 Turnover Trust Estate, except that the Class 5 Turnover Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the assets of the Class 5 Turnover Trust Estate or to meet claims and contingent liabilities (including Disputed Claims).

3.     Beneficial Interests.

3.1     Creation of Beneficial Interests. Beneficial Interests in the Class 5 Turnover Trust will be held by the Beneficiaries as provided in the Plan. Beneficial Interests in the Class 5 Turnover Trust will not be evidenced by any certificate or other instrument or document. The Beneficial Interests will be uncertificated.

3.2     Sharing of Proceeds. All Beneficial Interests in the Class 5 Turnover Trust will rank equally as to priority of Distributions from the Class 5 Turnover Trust with respect to the Class 5 Turnover Trust Estate and will share ratably in the payment of all Class 5 Turnover Trust Expenses.

3.3     No Transfer or Exchange. Beneficial Interests in the Class 5 Turnover Trust are non-transferable and non-assignable other than to successors in interest or by will, the laws of descent and Distribution, or by operation of law ("Permitted Transfer").

3.4     Absolute Owners. The Class 5 Turnover Trustee may deem and treat the persons who are Beneficiaries (as determined in accordance with the Plan) as the

NY 239664101v3

absolute owners of the Beneficial Interests in the Class 5 Turnover Trust for the purpose of receiving Distributions and payments thereof or on account thereof and for all other purposes whatsoever. Unless the Class 5 Turnover Trustee receives actual written notice of a Permitted Transfer from the duly authorized transferee not less than thirty (30) days prior to a Distribution made pursuant to the terms of this Agreement, and subject to the applicable provisions of Bankruptcy Rule 3001(e), the Class 5 Turnover Trustee will have no duty or obligation to make or direct any Distributions or payments to such transferee of a Permitted Transfer.

3.5     <u>Means of Payment</u>. Cash payable to the Beneficiaries pursuant to Section 6 hereof will be paid by checks drawn on an account maintained by the Class 5 Turnover Trust.

4.     <u>Delivery and Acceptance of Class 5 Turnover Trust Estate.</u>

4.1     <u>Conveyance by Debtors</u>. On the Effective Date, the Class 5 Turnover Trust Estate will be transferred to, and fully vest in, the Class 5 Turnover Trust, free and clear of all claims, liens, encumbrances and other liabilities, including all Claims and Interests in the Debtors, as further specified in the Plan and the Confirmation Order. At any time and from time to time after the date hereof at the Class 5 Turnover Trustee's request and without further consideration, the Debtors or the Reorganized Debtors will execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation, and will cooperate and take such other actions as the Class 5 Turnover Trustee may deem reasonably necessary or desirable in order to more effectively transfer, convey and assign all rights, title and interests in and to the Class 5 Turnover Trust Estate to the Class 5 Turnover Trust.

4.2     <u>Acceptance of Conveyance</u>. The Class 5 Turnover Trustee is hereby directed to, and the Class 5 Turnover Trustee agrees that it will:

(a)     accept delivery from the Debtors of the Class 5 Turnover Trust Estate on behalf of the Class 5 Turnover Trust;

(b)     take such other action as may be required of the Class 5 Turnover Trust hereunder, including the receipt and acceptance as part of the Class 5 Turnover Trust Estate of any property or rights, including, without limitation, notes and other negotiable instruments, which the Class 5 Turnover Trustee may receive in connection with or in consideration of the Class 5 Turnover Trust Estate; and

(c)     comply with all applicable tax reporting and tax payment obligations of a Class 5 Turnover Trustee under a trust pursuant to Subchapter J of the Internal Revenue Code and all applicable state and local income tax statutes.

5.     <u>Administration of Class 5 Turnover Trust Estate.</u>

5.1     <u>Powers of the Class 5 Turnover Trustee</u>. During the Class 5 Turnover Trustee's administration of the Class 5 Turnover Trust, and subject to all the other

provisions of this Agreement and the Plan, the Class 5 Turnover Trustee is authorized to perform those acts and has those powers necessary to accomplish the purposes of the Class 5 Turnover Trust, without further authorization from the Bankruptcy Court, subject only to oversight by the Class 5 Turnover Trust Advisory Board as specifically set forth herein, including the following:

(a) to receive and hold all assets of the Class 5 Turnover Trust Estate and to have exclusive possession and control thereof as permissible under applicable law;

(b) to enter into, perform and exercise rights under contracts binding upon the Class 5 Turnover Trust (but not upon the Class 5 Turnover Trustee in its respective individual or corporate capacities) which are reasonably incident to the administration of the Class 5 Turnover Trust and which the Class 5 Turnover Trustee, in the exercise of its business judgment, reasonably believes to be in the best interests of the Class 5 Turnover Trust;

(c) to establish and maintain accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, into which all cash and property of the Class 5 Turnover Trust may be deposited, and draw checks or make withdrawals from such accounts, and to pay or distribute such amounts of the Class 5 Turnover Trust Estate as permitted or required under this Agreement;

(d) to employ attorneys, accountants, appraisers, property managers, brokers, realtors, expert witnesses, insurance adjusters or other persons whose services may be necessary or advisable in the sole judgment of the Class 5 Turnover Trustee, to advise or assist it in the discharge of its duties as Class 5 Turnover Trustee, or otherwise in the exercise of any powers vested in the Class 5 Turnover Trustee, and to pay from the Class 5 Turnover Trust Estate reasonable compensation to such attorneys, accountants, appraisers, property managers, brokers, realtors, expert witnesses, insurance adjusters or other persons;

(e) to pay any and all Class 5 Turnover Trust Expenses that are necessary expenses attributable or relating to the management, maintenance, operation, preservation or liquidation of the Class 5 Turnover Trust Estate;

(f) to sue or be sued in connection with any matter arising from or related to the Plan or this Agreement that affects in any way the rights or obligations of the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Beneficiaries;

(g) to represent the interests of the Beneficiaries with respect to any matters relating to this Agreement or the Class 5 Turnover Trust affecting the rights of such Beneficiaries;

(h) to act as representative of the Class 5 Turnover Trust Estate;

10

(i)      to file all applicable tax reports and tax returns and to pay all applicable tax obligations of a liquidating trust agreement; and

(j)      to do any and all other things, not in violation of any other terms of this Agreement, which, in the reasonable business judgment of the Class 5 Turnover Trustee, are necessary or appropriate for the proper liquidation, management, investment and Distribution of the assets of the Class 5 Turnover Trust Estate in accordance with the provisions of this Agreement and the Plan.

5.2      <u>Limitations on Class 5 Turnover Trustee:  Investments</u>.

5.2.1      <u>No Trade or Business</u>. The Class 5 Turnover Trustee will carry out the purposes of the Class 5 Turnover Trust and the directions contained herein and will not at any time enter into or engage in any business (except as may be consistent with the limited purposes of the Class 5 Turnover Trust), including, without limitation, the purchase of any assets or property (other than such assets or property as are necessary to carry out the purposes of Section 2, Section 7, and Section 5.2.2 hereof), on behalf of the Class 5 Turnover Trust or the Beneficiaries.  The Class 5 Turnover Trustee is directed to take all reasonable and necessary actions to make timely Distributions of the Class 5 Turnover Trust Proceeds and to otherwise not unduly prolong the duration of the Class 5 Turnover Trust.

5.2.2      <u>Investments of Cash</u>. All Cash held by the Class 5 Turnover Trust will be invested by the Class 5 Turnover Trustee, in consultation with the Class 5 Turnover Trust Advisory Board, in only (a) direct obligations of, or obligations guaranteed by, the United States; (b) obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States, as an agency or instrumentality thereof; (c) AAA rated tax-free securities issued by municipalities or state governments or agencies; or (d) such other obligations or instruments as may from time to time be approved for such investments by Final Order of the Bankruptcy Court; *provided, however,* that the Class 5 Turnover Trustee may, to the extent it deems necessary, deposit monies in demand deposits (including money market funds) at any commercial bank, trust company or other financial institution organized under the laws of the United States or any state thereof which has, at the time of such deposit, a capital stock and surplus aggregating at least $500,000,000.  The investment powers of the Class 5 Turnover Trustee will be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments such as U.S. Treasury Bills; *provided, however,* that the scope of any such investments will be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS ruling, other IRS pronouncements or otherwise.  Such investments will mature in such amounts and at such times as may be deemed necessary by the Class 5 Turnover Trustee, in consultation with the Class 5 Turnover Trust Advisory Board, to provide funds when needed to make Distributions and payments as required by the Plan.

5.3      <u>Transferee Liabilities</u>. If any liability is asserted against the Class 5 Turnover Trust as transferee of the Class 5 Turnover Trust Estate on account of any claimed

11

liability of or through the Debtors, except as otherwise provided in the Plan, the Class 5 Turnover Trustee may use such part of the Class 5 Turnover Trust Estate as may be necessary in contesting any such claimed liability and in payment, compromise, settlement and discharge thereof on terms reasonably satisfactory to the Class 5 Turnover Trustee. In no event will the Class 5 Turnover Trustee be required or obligated to use its own property, funds or assets for any such purposes.

5.4     Administration of Trust. In administering the Class 5 Turnover Trust, the Class 5 Turnover Trustee, subject to the express limitations contained herein, is authorized and directed to do and perform all such acts, to execute and deliver such deeds, bills of sale, instruments of conveyance, and other documents as it may deem necessary or advisable to carry out the purposes of the Class 5 Turnover Trust.

5.5     Payment of U.S. Trustee's Fees. The Class 5 Turnover Trust will be liable for the payment of any fees payable to the Office of the United States Trustee on account of Distributions made by the Class 5 Turnover Trust.

5.6     Fiscal Year. The Class 5 Turnover Trust's fiscal year will end on December 31 of each year, unless the Class 5 Turnover Trustee deems it advisable to establish some other date on which the fiscal year of the Class 5 Turnover Trust will end.

5.7     Reports. The Class 5 Turnover Trustee will prepare, deliver and file, as the case may be, reports as follows:

(a)     Prepare and file unaudited interim financial reports as may be required by regulatory authorities, applicable laws, rules or regulations or as the Class 5 Turnover Trustee deems advisable during the fiscal year; and

(b)     Prepare, file and mail, within the time required by applicable law or regulation, necessary income tax information, tax returns or reports to the Beneficiaries and applicable taxing authorities.

5.8     Compensation of the Class 5 Turnover Trustee. The Class 5 Turnover Trustee will be entitled to receive reasonable compensation for services rendered on behalf of the Class 5 Turnover Trust, as approved by the Class 5 Turnover Trust Advisory Board. The Class 5 Turnover Trust will reimburse the Class 5 Turnover Trustee for its actual reasonable out-of-pocket expense including, including, without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings. All compensation and other amounts payable to the Class 5 Turnover Trustee will be paid from the Class 5 Turnover Trust only.

5.9     Termination. The duties, responsibilities and powers of the Class 5 Turnover Trustee will terminate on the date that the Class 5 Turnover Trust is dissolved under applicable law in accordance with this Agreement, the Plan, by an order of the Bankruptcy Court or by entry of a final decree closing the Chapter 11 Cases.

5.10     No Bond. The Class 5 Turnover Trustee will serve without a bond.

6.    Source of Payments: Distributions To The Beneficiaries.

6.1    Distributions from Class 5 Turnover Trust Estate. All Distributions to be made hereunder to the Beneficiaries will be made only from the assets, income and proceeds of the Class 5 Turnover Trust Estate and only to the extent that the Class 5 Turnover Trustee has received sufficient assets, income or proceeds of the Class 5 Turnover Trust Estate to make such Distributions in accordance with the Plan and the terms of this Section 6.  Each Beneficiary will look solely to the assets, income and proceeds of the Class 5 Turnover Trust Estate, and not to the Class 5 Turnover Trustee in its personal, individual or corporate capacity for Distribution to such Beneficiary as herein provided.

6.2    Frequency and Amounts of Cash Payments. As often as the Class 5 Turnover Trustee in its reasonable discretion and judgment deems appropriate, after consultation with the Class 5 Turnover Trust Advisory Board, the Class 5 Turnover Trustee will transfer and pay, or cause to be transferred and paid, to the Beneficiaries (subject to the provisions of Section 3 hereof) such aggregate amount of cash, if any, held in the Class 5 Turnover Trust, less such amounts as otherwise might be needed to pay the expenses, debts, charges, liabilities and obligations of the Class 5 Turnover Trust.  The aggregate amounts required to be distributed to the Beneficiaries at various intervals will be determined by the Class 5 Turnover Trustee, in consultation with the Class 5 Turnover Trust Advisory Board, in accordance with the Plan, and the Class 5 Turnover Trustee's determination will be final and conclusive on all persons, in the absence of gross negligence or willful misconduct on the part of the Class 5 Turnover Trustee, and will not be reviewed by the Court and, only if funds are available, will be paid at least once per twelve (12) month period commencing with the Effective Date.  In determining the amount of any such Distribution, the Class 5 Turnover Trustee may rely and will be fully protected in relying upon the advice and opinion of independent public accountants or of counsel to the Class 5 Turnover Trustee.

6.3    Establishment of the Claim Accounts.

(a)    On the Effective Date of the Plan, the Debtors will make available to the Class 5 Turnover Trustee a list of all Beneficiaries, the addresses of all Beneficiaries as of the Effective Date, and the designation of each such Beneficiary as the Holder of an Allowed or Disputed Claim (the "Claims List").  The Class 5 Turnover Trustee will be entitled to rely upon the Claims List in calculating and making Distributions from the Class 5 Turnover Trust Estate as provided herein; *provided, however,* that the Claims List will be adjusted from time to time by the Class 5 Turnover Trustee, as provided in Section 6.3 of this Agreement and will be adjusted based upon updated information from the Class 5 Trustee as to the Holders of any Allowed or Disputed Unsecured Claims.  The Class 5 Turnover Trustee also will revise the Claims List from time to time upon receipt of notice from a Beneficiary stating that such Beneficial Interest has been transferred according to a Permitted Transfer, that the new holder has complied with any applicable provisions of Bankruptcy Rule 3001(e) (and providing evidence thereof), and setting forth the name and address of such new Beneficiary; *provided, however,* that the Class 5 Turnover Trustee will not be required to revise such Claims List during the thirty (30) day period preceding the date of any Distribution made hereunder and in accordance with the Plan.  The

Class 5 Turnover Trustee will establish the revised Claims List that is to be used in conjunction with the Distribution not less than fourteen (14) days prior to the date of such Distribution.

(b)     Upon receipt of or access to the Claims List, the Class 5 Turnover Trustee will establish on the Class 5 Turnover Trust's books and records an account representing each Allowed Claim or Disputed Claim as set forth on the Claims List (each, a "Claim Account"). It is expressly understood that the establishment of the Claim Accounts by the Class 5 Turnover Trustee or its agents is solely for administrative convenience, and that amounts allocable to such Claim Accounts need not be segregated and may be commingled for investment purposes as specified herein.

6.4     Allocation of Distributions from Class 5 Turnover Trust Estate. With respect to each Distribution made to the Beneficiaries pursuant to the terms of this Agreement and the Plan, the Class 5 Turnover Trustee will allocate to each Claim Account a Pro Rata Share of the Distribution and will reallocate to each Claim Account Pro Rata Shares of such Distribution previously allocated to any Claim Account on account of a Claim or portion thereof which has been Disallowed as provided in the Plan, in each case by multiplying the total amount of such Distribution by a fraction, the numerator of which is the amount of such Claim Account and the denominator of which is the total amount of Allowed and Disputed Claims as set forth on the Claims List (after reducing by the amount disallowed the amount of each Claim Account from which amounts have been disallowed). With respect to each Distribution made pursuant hereto, the Class 5 Turnover Trustee will distribute specified amounts to the Beneficiaries in accordance with the allocations determined in accordance with this Section 6.4, Section 3.2 and the Plan. Allocations of the Distribution relating to Disputed Claims will be retained in the Class 5 Turnover Trust by the Class 5 Turnover Trustee as part of the Class 5 Turnover Trust Estate pending resolution of the Disputed Claims and further Distributions as provided for herein.

6.5     Distributions of Property Allocated to Disputed Claims. At such time as the Debtors or the Class 5 Trustee, as applicable, compromise, settle or resolve all or any portion of a Disputed Claim, by Final Order or otherwise (a "Resolved Claim"), the Class 5 Turnover Trustee will take the following actions with regard to the Distribution allocated to the Claim Account established for that Resolved Claim (the "Disputed Claim Distribution Amount"): (a) distribute to the holder of the Resolved Claim that portion of the Disputed Claim Distribution Amount to which the Holder of the Resolved Claim is entitled, if any, based upon the Allowed Amount; and (b) reallocate to all other Claim Accounts, pursuant to this Section 6.5, that portion of the Disputed Claim Distribution Amount to which the Holder of the Resolved Claim is no longer entitled, if any. Upon the final resolution of any Disputed Claim and the subsequent Distribution or reallocation of the Disputed Claim Distribution Amount as herein provided, the Class 5 Turnover Trustee will adjust the Claims List to reflect the actions taken pursuant to this Section 6.5.

6.6     Unclaimed Property

6.6.1     Escrow of Unclaimed Property. The Class 5 Turnover Trustee (or, at the option of the Class 5 Turnover Trustee, the Distribution Agent) will hold any proceeds of the Class 5 Turnover Trust constituting Unclaimed Property (and all interest,

dividends, and other Distributions thereon) for the benefit of the Holders of Claims entitled thereto under the terms of this Agreement and the Plan. If any Distribution to any Holder is returned to the Class 5 Turnover Trustee as undeliverable, no further Distributions will be made to such Holder. All entities or Persons receiving undeliverable Cash will not be entitled to any interest or other accruals of any kind. Nothing contained in this Agreement or the Plan will require the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board to attempt to locate any Holder of an Allowed Claim.

6.6.2 <u>Distribution of Unclaimed Property</u>. At the end of one hundred and twenty (120) days following the date that any Cash or other property becomes Unclaimed Property, the Holder of the Allowed Claim theretofore entitled to such Unclaimed Property held pursuant to this Section 6.6 will be deemed to have forfeited such property, whereupon all right, title and interest in and to such property will be available for Distribution to all other Holders of Allowed Claims and whereupon such Holder will be forever barred from asserting any such Claim against the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board unless the Holder of an Allowed Claim entitled to Unclaimed Property makes a request in writing to the Distribution Agent for such property (which request must set forth the Distribution Address for such Holder) prior to the expiration of such period. If no such notice is received, any consideration held for Distribution on account of such Allowed Claim will revert to the Class 5 Turnover Trust for the benefit of the other Beneficiaries in accordance with this Agreement and the Plan.

6.6.3 <u>Time Bar to Cash Payments</u>. Checks issued by the Class 5 Turnover Trust on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly to the Class 5 Turnover Trustee by the Holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check must be made within one hundred and twenty (120) days from and after the date of issuance of such check. After such date, all Claims in respect of voided checks will be discharged and forever barred and the Class 5 Turnover Trust will retain all monies related thereto for the benefit of the other Beneficiaries of the Class 5 Turnover Trust in accordance with this Agreement and the Plan.

6.7 <u>Fractional Distributions</u>. The Class 5 Turnover Trustee will not be required to make any Distribution in an amount of less than $25.00 unless a request therefor is made in writing to the Distribution Agent. If no request is made as provided in the preceding sentence, all such Distributions will be treated as Unclaimed Property pursuant to the Plan. Whenever any payment of a fraction of a dollar by the Reorganized Debtors under the Plan would be required, the actual payment or Distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

6.8 <u>Final Distribution</u>. Upon the final collection of all of the assets, rights and interests comprising the Class 5 Turnover Trust Estate, and in any event prior to the dissolution (as provided for in Section 6.9 hereof), the Class 5 Turnover Trustee will prepare a final accounting of any and all monies remaining in any accounts maintained by the Class 5 Turnover Trustee on behalf of the Class 5 Turnover Trust, or otherwise remaining in the Class 5

Turnover Trust Estate (the "Final Cash"). Once the amount of the Final Cash has been determined, the Class 5 Turnover Trustee will deduct and pay from the Final Cash any and all remaining permitted costs, expenses and liabilities of the Class 5 Turnover Trust. The Class 5 Turnover Trustee will then allocate pro rata to the Claim Account of each Beneficiary the net remaining amount of Final Cash (the "Final Distribution"), and the Class 5 Turnover Trustee will distribute the Final Distribution to the Beneficiaries. To the extent that there are any remaining monies, such monies will be donated to a charity selected by the Class 5 Turnover Trustee, after consultation with the Class 5 Turnover Trust Advisory Board.

6.9 <u>Dissolution of the Class 5 Turnover Trust</u>. The Class 5 Turnover Trust will terminate five (5) years after the Effective Date, with the ability to extend the term upon the discretion of the Class 5 Turnover Trustee, after consultation with the Class 5 Turnover Trust Advisory Board and entry of an order of the Bankruptcy Court; *provided, however,* within six (6) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Class 5 Turnover Trust for a finite period if it is necessary to the liquidating purpose thereof. Multiple extensions may be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of such extended term; *provided, however,* that, prior to requesting any such extension, the Class 5 Turnover Trustee must receive an opinion of counsel or a favorable ruling from the IRS that any further extension would not adversely affect the status of the trust as a grantor trust for federal income tax purposes. Upon termination of the Class 5 Turnover Trust, all Beneficial Interests in the Class 5 Turnover Trust will be extinguished, the legal existence of the Class 5 Turnover Trust will terminate, and all assets (if any) held by the Class 5 Turnover Trust on such date will vest in the Reorganized Debtors free and clear of all claims, liens, encumbrances and other liabilities, in each case without further action of the Bankruptcy Court or any other court, administrative body or other agency. The Class 5 Turnover Trustee may cause to be filed with any applicable governmental or other regulatory authority such certificate of dissolution or cancellation and any other certificates and documents as the Class 5 Turnover Trustee, after consultation with the Class 5 Turnover Trust Advisory Board, deems necessary to reflect the termination of the legal existence of the Class 5 Turnover Trust, and may take any other action it deems necessary or desirable to reflect the transfer of all assets (if any) held by the Class 5 Turnover Trust upon termination to the Reorganized Debtors.

6.10 <u>Class 5 Turnover Trust Expenses</u>. All Class 5 Turnover Trust Expenses will be charged against and paid from the Class 5 Turnover Trust Proceeds, as appropriate. The Class 5 Turnover Trustee will pay such Class 5 Turnover Trust Expenses as and when due and payable. Counsel and any other professionals retained by the Class 5 Turnover Trustee, Class 5 Turnover Trust Advisory Board or Class 5 Turnover Trust will submit periodic statements for services rendered and costs incurred to the Class 5 Turnover Trustee and the Class 5 Turnover Trust Advisory Board for review and approval. The Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board (based on a vote of the majority of the Class 5 Turnover Trust Advisory Board) will have thirty (30) days to object to any such statement. In the event that such objection is received by the relevant professional and cannot be promptly resolved by such professional and the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board, as applicable, the dispute will be submitted by the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board, as applicable, to the Bankruptcy Court for adjudication.

*NY 239664101v3*

The Bankruptcy Court will retain jurisdiction to adjudicate any such objection. In the event that no objection is raised to a statement within the thirty (30) day period, such statement will be promptly paid by the Class 5 Turnover Trustee, in accordance with this Agreement and the Plan.

7.     Other Duties of the Class 5 Turnover Trustee.

7.1     Management of Class 5 Turnover Trust Estate. With respect to the assets of the Class 5 Turnover Trust Estate, the Class 5 Turnover Trustee may, if sufficient funds are available, purchase and maintain in existence such insurance as the Class 5 Turnover Trustee deems reasonable and necessary or appropriate from time to time to protect the Class 5 Turnover Trust, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board and the Beneficial Interests in the assets of the Class 5 Turnover Trust Estate from any potential claims or liabilities relating thereto or the Distribution thereof.

7.2     No Implied Duties. The Class 5 Turnover Trustee will not manage, control, use, sell, dispose, collect or otherwise deal with the Class 5 Turnover Trust Estate or otherwise take any action hereunder except as expressly provided herein, and no implied duties or obligations whatsoever of the Class 5 Turnover Trustee will be read into this Agreement.

8.     Concerning the Class 5 Turnover Trustee.

8.1     Acceptance by Class 5 Turnover Trustee. The Class 5 Turnover Trustee accepts the Class 5 Turnover Trust hereby created for the benefit of the Beneficiaries and agrees to act as Class 5 Turnover Trustee of the Class 5 Turnover Trust pursuant to the terms of this Agreement. The Class 5 Turnover Trustee will have and exercise the rights and powers herein granted and will be charged solely with the performance of the duties herein declared on the part of the Class 5 Turnover Trustee. The Class 5 Turnover Trustee also agrees to receive and disburse all monies actually received by him constituting part of the Class 5 Turnover Trust Estate pursuant to the terms of this Agreement and the Plan.

8.2     Discretionary Submission of Questions. Subject to the provisions of this Section 8, the Class 5 Turnover Trustee, in its sole discretion and reasonable business judgment, may, but is not be required to, submit to the Court, from time to time, any question or questions with respect to which the Class 5 Turnover Trustee may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Class 5 Turnover Trustee with respect to the Class 5 Turnover Trust Estate, or any part thereof and the administration and Distribution of the Class 5 Turnover Trust Estate. The written authorization of the Court set forth in a Final Order will constitute approval by the court of the proposed action to be taken by the Class 5 Turnover Trustee. All costs and expenses incurred by the Class 5 Turnover Trustee in the exercise of any right, power, or authority conferred by this Section 8.2 will be costs and reasonable expenses of the Class 5 Turnover Trust Estate.

8.3     Resignation of Class 5 Turnover Trustee.

8.3.1     Resignation. The Class 5 Turnover Trustee may resign and be discharged from any future obligations and liabilities hereunder by giving written notice

17

thereof to the Court and the Class 5 Turnover Trust Advisory Board at least thirty (30) days prior to the effective date of such resignation. Such resignation will become effective on the day specified in such notice.

8.3.2    Appointment of a Successor Class 5 Turnover Trustee. If, at any time, the Class 5 Turnover Trustee gives notice of its intent to resign pursuant to Section 8.3.1 hereof or becomes incapable of acting, the Class 5 Turnover Trust Advisory Board will chose a successor Class 5 Turnover Trustee to act under this Agreement and will give notice thereof to the Court.

8.4    Acceptance of Appointment by Successor Class 5 Turnover Trustee. Any successor Class 5 Turnover Trustee appointed hereunder will execute an instrument accepting such appointment hereunder in the form determined by the Class 5 Turnover Trust Advisory Board and will deliver counterparts thereof to the Court. Thereupon, such successor Class 5 Turnover Trustee will, without any further act, become vested with all of the rights, powers and duties of its predecessor hereunder with like effect as if originally named herein.

9.    Class 5 Turnover Trust Advisory Board.

9.1    Role of the Class 5 Turnover Trust Advisory Board

(a)    The Class 5 Turnover Trust Advisory Board will be responsible for overseeing the Class 5 Turnover Trustee's administration of the Class 5 Turnover Trust in compliance with the Plan and this Agreement, subject to the terms of this Agreement and the Plan and bylaws of the Class 5 Turnover Trust Advisory Board.

(b)    The Class 5 Turnover Trust Advisory Board may retain professionals as necessary, in accordance with this Agreement.

(c)    The Class 5 Turnover Trust Advisory Board has authority to engage in any and all conduct not specifically delineated within this Agreement that is reasonable and necessary to the operation and administration of the Class 5 Turnover Trust (the "Residual Authority"). The Class 5 Turnover Trust Advisory Board hereby specifically delegates such Residual Authority to the Class 5 Turnover Trustee.

9.2    Class 5 Turnover Trust Advisory Board Members

(a)    The members of the Class 5 Turnover Trust Advisory Board (the "Class 5 Turnover Trust Advisory Board Members" and each such, a "Class 5 Turnover Trust Advisory Board Member") will be three (3) members appointed by the Committee.

(b)    The initial Class 5 Turnover Trust Advisory Board Members designated by the Committee are Jeff Myers (Oakridge Landscape, Inc.), John

18

Burgeson (John Burgeson Contractors) and Jim Frankian (R.T. Frankian & Associates).

(c)    If, for any reason, any Class 5 Turnover Trust Advisory Board Members designated by the Committee ceases to be a Class 5 Turnover Trust Advisory Board Member, such designee, if available, may appoint a successor to fill the vacancy.   Otherwise, the remaining Class 5 Turnover Trust Advisory Board Members designated by the Committee may appoint a successor to fill the vacancy.  If no such replacement Class 5 Turnover Trust Advisory Board Member is appointed, the Class 5 Turnover Trustee will appoint a Person to fill the vacancy.

9.3    Duties of the Class 5 Turnover Trust Advisory Board. The Class 5 Turnover Trust Advisory Board will:

(a)    receive and review the reports of the Class 5 Turnover Trustee and consult with the Class 5 Turnover Trustee on any matters related to the Class 5 Turnover Trust, as requested by the Class 5 Turnover Trustee;

(b)    review and approve, in accordance with their reasonable business judgment:

(i)    the budget for the Class 5 Turnover Trust and any proposed changes, thereto;

(ii)    any amendment of this Agreement;

(iii)    any post-hoc ratification of the Class 5 Turnover Trustee's action;

(iv)    the selection of a successor Class 5 Turnover Trustee, in the event the Class 5 Turnover Trustee is removed, resigns or is otherwise incapacitated; and

(v)    the initiation or settlement of any litigation involving more than $1,000,000 in settlement amount.

9.4    Class 5 Turnover Trust Advisory Board Bylaws. The Class 5 Turnover Trust Advisory Board will adopt its own bylaws within thirty (30) days after the Effective Date; *provided, however,* that such bylaws will contain provisions consistent with this Agreement and the Plan.

9.5    Board Voting Requirements

9.5.1    Majority Vote Requirement

The Class 5 Turnover Trust Advisory Board will be deemed to have consented to a proposed action or inaction if two (2) of the three (3) Class 5 Turnover Trust Advisory Board Members have not objected to such action or inaction after being provided with the following notice: (a) ten (10) days notice of such action or inaction by facsimile, electronic mail or overnight delivery (plus three (3) days delivery if such notice is made by regular mail); or (b) three (3) business days telephonic notice of such action or inaction (if the Class 5 Turnover Trustee, in its discretion, believes that telephonic notice is appropriate under the circumstances). With respect to any matter directly or indirectly involving any Class 5 Turnover Trust Advisory Board Member(s), such Class 5 Turnover Trust Advisory Board Member(s) will (a) recuse himself or herself from any decision regarding such matter and (b) in the event of a tie vote among the remaining Class 5 Turnover Trust Advisory Board Members, the Class 5 Turnover Trustee will cast the deciding vote with regard to the matter for which the Class 5 Turnover Trust Advisory Board Member has recused himself or herself. The Class 5 Turnover Trust Advisory Board may take any action authorized by the Plan or this Agreement upon the affirmative vote of any two (2) Class 5 Turnover Trust Advisory Board Members.

### 9.5.2 Unanimous Vote Requirement

"Unanimous Vote" means the affirmative vote of all Class 5 Turnover Trust Advisory Board Members at the time of any such vote. The following actions will require the Unanimous Vote of the Class 5 Turnover Trust Advisory Board:

(a) Any request to the Bankruptcy Court to remove the Class 5 Turnover Trustee;

(b) The selection of a successor Class 5 Turnover Trustee, in the event the Class 5 Turnover Trustee is removed, resigns, or is otherwise incapacitated; and

(c) The amendment of this Agreement.

9.6 Reporting. The Class 5 Turnover Trust Advisory Board will (a) receive from the Class 5 Turnover Trustee such reports, as it deems reasonable, but in no event less frequently than every three (3) months, and (b) conduct regular conferences, whether in person or telephonically, with the Class 5 Turnover Trustee no less than once per thirty (30) day period unless otherwise agreed.

9.7 Retention and Compensation of Professionals. Subject to the provisions of this Agreement, the Class 5 Turnover Trust Advisory Board may retain professionals. The Class 5 Turnover Trustee may commit the Class 5 Turnover Trust Estate to, and the Class 5 Turnover Trust Estate will, pay such professionals reasonable compensation for services rendered thereto and reasonable expenses incurred therefor.

9.8 Reimbursement. The Class 5 Turnover Trust Estate will reimburse the Class 5 Turnover Trust Advisory Board Members and their professionals for the actual reasonable out-of-pocket expenses incurred by them, including, without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings.

10. <u>Liability of Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board.</u>

10.1 <u>No Recourse and Limitation on Liability</u>. No recourse will ever be had, directly or indirectly, against the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board, or, as applicable, their respective members, officers, directors, employees, professionals, representatives, agents, successors, heirs or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board under this Agreement, the Plan or by reason of the creation of any indebtedness by the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board under this Agreement or the Plan for any purpose authorized by this Agreement or the Plan. All such liabilities, covenants, and agreements of the Class 5 Turnover Trust, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board, as applicable, their respective members, officers, directors, professionals, employees, representatives, agents, successors, heirs or assigns, whether in writing or otherwise, under this Agreement or the Plan will be enforceable only against, and will be satisfied only out of, the assets of the Class 5 Turnover Trust or such part thereof as will, under the terms of any such agreement, be liable therefor, or will be evidence only of a right of payment out of the income and proceeds of the assets of the Class 5 Turnover Trust, as the case may be. Every undertaking, contract, covenant or agreement entered into in writing by the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board will provide expressly against the personal liability of the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board, including each of its members.

The Class 5 Turnover Trust, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board and, as applicable, their respective members, officers, directors, employees, professionals, representatives, agents, successors, heirs or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their respective business judgment, and the fact that such act or omission was advised, directed or approved by an attorney or other professional acting as advisor to the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board will be conclusive evidence of such good faith business judgment; *provided, however,* that this Section 10.1 will not apply to any gross negligence or willful misconduct by the Class 5 Turnover Trust, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board or, as applicable, their respective members, officers, directors, employees, professionals, representatives, agents, successors, heirs or assigns.

10.2 <u>Discretion of Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board</u>. The Class 5 Turnover Trustee and the Class 5 Turnover Trust Advisory Board, subject to any limitations and restrictions expressed and imposed by this Agreement and the Plan, may act freely under all or any of the rights, powers and authority conferred hereby, in all matters concerning the Class 5 Turnover Trust Estate, after forming their reasonable business judgment based upon the circumstances of any particular question or situation as to the best course to pursue, without the necessity of obtaining the consent or permission or authorization of

*NY 239664101v3*

the Beneficiaries, the Debtors, the Reorganized Debtors, the Court, or of any official or officer (other than the Class 5 Turnover Trust Advisory Board as required hereunder with respect to certain actions to be undertaken by the Class 5 Turnover Trustee); and the rights, powers and authority conferred on the Class 5 Turnover Trustee and the Class 5 Turnover Trust Advisory Board by this Agreement are conferred in contemplation of such freedom of reasonable business judgment and action within the limitations and restrictions so expressed and imposed; *provided, however,* that the Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board will not be liable for any error or exercise of judgment, unless it is proved that such Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board was grossly negligent or acted in a manner which constituted willful misconduct.

      10.3   <u>Reliance by Class 5 Turnover Trustee, Class 5 Turnover Trust and Class 5 Turnover Trust Advisory Board.</u>

      10.3.1   <u>Reliance on Documents</u>. The Class 5 Turnover Trust, the Class 5 Turnover Trustee and the Class 5 Turnover Trust Advisory Board may rely, and will be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Person or Persons.

      10.3.2   <u>Retention of Professionals</u>. The Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board may consult with legal counsel and with independent public accountants and other experts. The Class 5 Turnover Trustee and the Class 5 Turnover Trust Advisory Board will not be liable for any action taken or suffered by it or omitted to be taken by it without gross negligence or willful misconduct in reliance on any opinion or certification of such accountants or other professional or in accordance with the advice of such counsel or experts, *provided that* such accountants, counsel and experts were selected and retained with reasonable care.

      10.3.3   <u>Reliance on Class 5 Turnover Trustee and Class 5 Turnover Trust Advisory Board</u>. No Person dealing with the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board will be obligated to see to the application of any monies, securities, or other property paid or delivered to them or to inquire into the expediency or propriety of any transaction or the right, power, or authority of the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board to enter into or consummate the same upon such terms as the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board may deem advisable. Persons dealing with the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board can only look to the Class 5 Turnover Trust Estate to satisfy any liability incurred by the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board to such persons in carrying out the terms of this Agreement, and, except as otherwise expressly provided herein, the Class 5 Turnover Trustee and the members of the Class 5 Turnover Trust Advisory Board will have no personal, individual or corporate obligation to satisfy any such liability.

      10.4   <u>Exculpation; Indemnification.</u>

10.4.1 <u>Exculpation</u>. From and after the Effective Date, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board and, as applicable, their respective directors, officers, members, employees, attorneys, accountants, professionals, representatives, agents, successors, heirs and assigns will be and hereby are exculpated by all Persons and Entities, including without limitation, Holders of Claims and other parties in interest, from any and all Claims, Causes of Action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such parties pursuant to or in furtherance of this Agreement, the Plan, any order of the Bankruptcy Court, applicable law or otherwise, except only for actions taken or not taken, from and after the Effective Date only to the extent determined by a Final Order to be solely due to their own respective gross negligence, willful misconduct or fraud.

No Holder of a Claim or other party-in-interest will have or be permitted to pursue any Claim or Cause of Action against the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board or, as applicable, their respective directors, officers, members, employees, attorneys, accountants, professionals, representatives, agents, successors, heirs or assigns for making payments in accordance with this Agreement or the Plan or for implementing the provisions of this Agreement or the Plan. Any act taken or not taken, in the case of the Class 5 Turnover Trust Advisory Board, with the approval of the Bankruptcy Court or, in the case of the Class 5 Turnover Trustee, with the approval of the Class 5 Turnover Trust Advisory Board, will be conclusively deemed not to constitute gross negligence or willful misconduct.

10.4.2 <u>Indemnification of Class 5 Turnover Trustee, Class 5 Turnover Trust Advisory Board and Agents</u>. The Class 5 Turnover Trust hereby indemnifies to the full extent of the Class 5 Turnover Trust Estate any Person or entity who was or is a party, or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such person or entity is or was the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board or any member, director, officer, employee, member, representative, attorney, accountant, professional, agent, successor, heir or assign, as applicable, of the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board, from and against any and all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person or entity in connection with such action, suit or proceeding, including appeals thereof if such Person or entity acted without gross negligence and willful misconduct in the exercise and performance of any power or duties of such Person or entity in accordance with this Agreement.

10.4.3 <u>Payment of Expenses</u>. Expenses (including attorneys' fees) incurred in defending any action, suit or proceeding referred to in Section 10.4 may be paid by the Class 5 Turnover Trust in advance of the final disposition of such action, suit or proceeding, upon an undertaking by the Class 5 Turnover Trustee, Class 5 Turnover Trust Advisory Board or any officer, director, employee, member, representative, attorney, accountant, professional, agent, successor, heir or assign of the Class 5 Turnover Trustee or Class 5 Turnover Trust Advisory Board to repay such amount if it is ultimately determined that the Class 5 Turnover

NY 239664101v3

Trustee, Class 5 Turnover Trust Advisory Board or such Person or entity is not entitled to be indemnified.

10.4.4 <u>Insurance</u>. The Class 5 Turnover Trust may maintain insurance during its existence and after its termination, at its expense, to protect itself and the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board and their respective directors, officers, employees, members, attorneys, accountant, professional, representatives, agents, successors, heirs or assigns of and from any liability, whether or not the Class 5 Turnover Trust would have the legal power to directly indemnify the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board or their respective directors, officers, members, employees, attorneys, accountants, professionals, representatives, agents, successors, heirs or assigns of the Class 5 Turnover Trust against such liability.

11. <u>Miscellaneous.</u>

11.1 <u>Title to Trust Estate</u>. No Beneficiary will have title to any part of the Class 5 Turnover Trust Estate.

11.2 <u>Notices</u>. Unless otherwise expressly specified or permitted by the terms of the Plan or this Agreement, all notices will be in writing and delivered by registered or certified mail, return receipt requested, by hand delivery, by facsimile transmission (and confirmed by mail) or by electronic mail, in any such case addressed as follows:

If to the Class 5 Turnover Trustee: [_____]

[_____]

[_____]

[_____]

If to the Debtors: [_____]

[_____]

[_____]

[_____]

If to the Class 5 Turnover Trust Advisory Board:

[_____]

[_____]

[_____]

[_____]

and if to any Beneficiary, addressed to its latest mailing address reflected on the Claims List.

11.3 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

NY 239664101v3

11.4    Counterparts. This Agreement may be executed in multiple counterparts, each of which will constitute an original, but all of which together will constitute one and the same instrument. Signature pages may be delivered via facsimile or electronic mail ("pdf" copy) and such signature pages will be deemed original signature pages.

11.5    Binding Agreement. All covenants and agreements contained herein will be binding upon, and inure to the benefit of the Class 5 Turnover Trustee and its respective successors and assigns and any successor Class 5 Turnover Trustee provided for in Sections 8.3.2 and 8.4, its respective successors and assigns, and the Beneficiaries, and their respective personal representatives, successors and assigns. Any request, notice, direction, consent, waiver or other instrument or action by any party hereto or any Beneficiary will bind their respective heirs, personal representatives, successors and assigns.

11.6    No Personal Liability of Beneficiaries. The Beneficiaries will not incur any personal liability through their ownership or possession of their Beneficial Interests, except for taxes imposed on the Beneficiaries pursuant to applicable provisions of federal, state or local law with respect to the receipt of such Beneficial Interests or Distributions from or transactions of the Class 5 Turnover Trust and other charges specified herein. Liabilities of the Class 5 Turnover Trust are to be satisfied in all events (including the exhaustion of the Class 5 Turnover Trust Estate) exclusively from the Class 5 Turnover Trust Estate and such liabilities are not to attach to or be paid from any amounts distributed to the Beneficiaries, regardless of the time at which such Distribution took place, or from the assets of the Beneficiaries.

11.7    Headings. The headings of the various Sections herein are for convenience of reference only and will not define or limit any of the terms or provisions hereof.

11.8    Construction. Except where the context otherwise requires, words importing the masculine gender will include the feminine and the neuter, if appropriate; words importing the singular number will include the plural number and *vice versa*; and words importing persons will include partnerships, associations, and corporations.

11.9    Governing Law. This Agreement, including all matters of construction, validity and performance hereof will in all respects be governed by, and construed and interpreted in accordance with the internal laws of the State of Delaware.

11.10    Construction with the Plan. The Plan is hereby incorporated fully by reference and is made a part hereof for all purposes. In the event of any inconsistency or conflict between the terms, conditions, definitions and provisions of this Agreement and the terms, conditions and provisions of the Plan, the terms, conditions, definitions and provisions of the Plan will control.

11.11    Subject to Court's Jurisdiction. The Court will retain jurisdiction over this Class 5 Turnover Trust, the Class 5 Turnover Trust Estate, the Class 5 Turnover Trustee, the Class 5 Turnover Trust Advisory Board and the Debtors to issue any and all orders and to take other actions necessary to the implementation of this Agreement, such jurisdiction to

include, without limitation, the jurisdiction contemplated by Section 1142 of the Bankruptcy Code.

11.12 <u>Intention of the Parties</u>. The Debtors, the Beneficiaries and the Class 5 Turnover Trustee hereby express their intent to create and maintain the Class 5 Turnover Trust as a liquidating trust for federal income tax purposes in accordance with Treasury Regulation Section 301.7701-4(d) and as a "grantor trust" subject to the provisions of Subchapter J of the Internal Revenue Code, and the Class 5 Turnover Trustee further represents that the Class 5 Turnover Trust will not: (a) receive any assets of a going business; (b) receive and will not retain cash in excess of a reasonable amount to meet claims and contingent liabilities, determined in the reasonable discretion of the Class 5 Turnover Trustee, after consultation with the Class 5 Turnover Trust Advisory Board, in accordance with the provisions of Sections 5 and 6 hereof, and (c) receive general or limited partnership interests or the unlisted stock of any single issuer that represents 80 percent or more of the stock of such issuer.

11.13 <u>Valuation of Assets</u>. As soon as practicable after the Effective Date, the Class 5 Turnover Trust (to the extent that the Class 5 Turnover Trustee deems it necessary or appropriate in its sole discretion) will conduct a good faith valuation of the assets of the Class 5 Turnover Trust Estate, and will make such valuation available to the Beneficiaries upon request. The valuation will be used consistently by all parties for all federal income tax purposes.

11.14 <u>Requirement of Undertaking</u>. The Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under this Plan, or in any suit against the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board for any act taken or omitted by the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

11.15 <u>Books and Records</u>. The Class 5 Turnover Trustee will maintain, with respect to the Class 5 Turnover Trust and the Beneficiaries, books and records relating to the assets and income of the Class 5 Turnover Trust and the payment of expenses of and liabilities of, claims against or assumed by the Class 5 Turnover Trust in such detail and for such period of time as the Class 5 Turnover Trustee determines, in its sole discretion, may be necessary to make a full and proper accounting in respect thereof in accordance with this Agreement and to comply with applicable law. Except as otherwise provided herein or in the Plan, nothing in this Agreement required the Class 5 Turnover Trust, the Class 5 Turnover Trustee or the Class 5 Turnover Trust Advisory Board to file any accounting or seek approval of any court with respect to the administration of the Class 5 Turnover Trust, or as a condition for making any payment or Distribution out of the Class 5 Turnover Trust. Subject to all applicable privileges, Beneficiaries will have the right, in addition to any other rights they may have pursuant to this Agreement, under the Plan or otherwise, upon twenty (20) days' prior written

NY 239664101v3

notice delivered to the Class 5 Turnover Trustee, to request a reasonable inspection (as determine by the Class 5 Turnover Trustee) of such books and records, *provided that,* if so requested, such Beneficiary will have entered into a confidentiality agreement satisfactory in form and substance to the Class 5 Turnover Trustee and make such other arrangements as requested by the Class 5 Turnover Trustee.

NY 239664101v3

IN WITNESS WHEREOF, the parties have executed to have hereunto caused this Agreement to be duly executed, as of the day and year first written above.

**CALIFORNIA LAND COMPANY**

By: _____
Name:_____
Title:_____


**FRIENDSWOOD DEVELOPMENT COMPANY, LLC**

By: _____
Name:_____
Title:_____

**KINGS WOOD DEVELOPMENT, L.C.**

By: _____
Name:_____
Title:_____

**LANDSOURCE COMMUNITIES DEVELOPMENT LLC**

By: _____
Name:_____
Title:_____

NY 239664101v3

**LANDSOURCE COMMUNITIES DEVELOPMENT SUB LLC**

By: _____
Name: _____
Title: _____


**LANDSOURCE HOLDING COMPANY, LLC**

By: _____
Name: _____
Title: _____

**LENNAR BRESSI RANCH VENTURE, LLC**

By: _____
Name: _____
Title: _____

**LENNAR LAND PARTNERS II**

By: _____
Name: _____
Title: _____

**LENNAR MARE ISLAND, LLC**

By: _____
Name: _____
Title: _____

NY 239664101v3

**LENNAR MOORPARK, LLC**

By: _____
Name:_____
Title:_____

**LENNAR STEVENSON HOLDINGS, L.L.C.**

By: _____
Name:_____
Title:_____

**LNR-LENNAR WASHINGTON SQUARE, LLC**

By: _____
Name:_____
Title:_____

**LSC ASSOCIATES, LLC**

By: _____
Name:_____
Title:_____

**NWHL GP LLC**

By: _____
Name:_____
Title:_____

NY 239664101v3

**THE NEWHALL LAND AND FARMING COMPANY (a California Limited Partnership)**

By: _____
Name:_____
Title:_____

**THE NEWHALL LAND AND FARMING COMPANY**

By: _____
Name:_____
Title:_____

**SOUTHWEST COMMUNITIES DEVELOPMENT LLC**

By: _____
Name:_____
Title:_____

**STEVENSON RANCH VENTURE LLC**

By: _____
Name:_____
Title:_____

**TOURNAMENT PLAYERS CLUB AT VALENCIA, LLC**

By: _____
Name:_____
Title:_____

NY 239664101v3

**VALENCIA CORPORATION**

By: _____
Name:_____
Title:_____

**VALENCIA REALTY COMPANY**

By: _____
Name:_____
Title:_____

**LITIGATION TRUSTEE:**

By: _____
Name:_____
Title:_____

NY 239664101v3

## Exhibit 26

## Amended Backstop Rights Purchase Agreement

EXECUTION COPY

# AMENDED AND RESTATED BACKSTOP RIGHTS PURCHASE AGREEMENT

by and among

LandSource Communities Development LLC,

Newhall Holding Company, LLC,

Newhall Intermediary Holding Company, LLC,

Barclays Bank PLC, in its capacity as Plan Proponent

and

The Parties Listed on <u>Schedule 1</u> Attached Hereto

Dated: July 9, 2009

# TABLE OF CONTENTS

Section 1.    Definitions................................................................................................ 3

Section 2.    Rights Offering; Backstop Commitment ...................................................... 7

2.1    The Rights Offering. ......................................................................................... 7
2.2    Backstop........................................................................................................... 8

Section 3.    Representations and Warranties of the Company, Newhall Intermediary and
Holdco.    ........................................................................................................... 9

3.1    Organization.................................................................................................... 10
3.2    Due Authorization, Execution and Delivery; Enforceability.......................... 10
3.3    Due Issuance and Authorization of Units ...................................................... 10
3.4    No Conflicts.................................................................................................... 10
3.5    No Registration .............................................................................................. 10

Section 4.    Representations and Warranties of The Backstop Parties .......................... 10

4.1    Organization.................................................................................................... 11
4.2    Due Authorization .......................................................................................... 11
4.3    Due Execution; Enforceability....................................................................... 11
4.4    Consents.......................................................................................................... 11
4.5    No Conflicts.................................................................................................... 11
4.6    Legal Proceedings.......................................................................................... 12
4.7    No Registration Under the Securities Act...................................................... 12
4.8    Accredited Backstop Party............................................................................. 12
4.9    Additional Information ................................................................................... 12
4.10   Arm's Length.................................................................................................. 12
4.11   No Broker's Fees ............................................................................................ 13
4.12   Subscription Form.......................................................................................... 13

Section 5.    Additional Covenants................................................................................ 13

5.1    Uncertificated Units ...................................................................................... 13
5.2    Further Assurances......................................................................................... 13
5.3    Commercially Reasonable Efforts ................................................................. 13
5.4    HSR................................................................................................................. 13

Section 6.    Conditions to Backstop Parties' Obligations ............................................. 14

Section 7.    Conditions to Company's, Newhall Intermediary's and Holdco's Obligations ... 15

i

| | | |
|---|---|---|
| Section 8. | Miscellaneous | 16 |
| 8.1 | Notices | 16 |
| 8.2 | Survival of Representations and Warranties, etc | 17 |
| 8.3 | Assignment | 17 |
| 8.4 | Entire Agreement | 18 |
| 8.5 | Waivers and Amendments | 18 |
| 8.6 | Governing Law; Jurisdiction; Venue; Process | 18 |
| 8.7 | Counterparts | 19 |
| 8.8 | Headings | 19 |
| 8.9 | Severability | 19 |
| 8.10 | Termination | 19 |
| 8.11 | Conflict with Confirmation Order and Plan | 20 |
| 8.12 | No Third Party Beneficiaries | 20 |
| 8.13 | Adjustments | 21 |

NY 239641934v1

# AMENDED AND RESTATED BACKSTOP RIGHTS PURCHASE AGREEMENT

THIS AMENDED AND RESTATED BACKSTOP RIGHTS PURCHASE AGREEMENT (this "Agreement") is made this 9th day of July, 2009, by and among Barclays Bank PLC, in its capacity as proponent of the Plan (the "Plan Proponent"), the investment entities set forth on Schedule 1 attached hereto (each, a "Backstop Party" and collectively, the "Backstop Parties"), upon its execution of this Agreement on the terms set forth herein, LandSource Communities Development LLC, a Delaware limited liability company (the "Company"), upon its execution of this Agreement on the terms set forth herein, Newhall Holding Company, LLC, a Delaware limited liability company ("Holdco") and upon its execution of this Agreement on the terms set forth herein, Newhall Intermediary Holding Company, LLC, a Delaware limited liability company ("Newhall Intermediary"). Capitalized terms used herein but not defined herein will have the meaning assigned to them in the Plan.

# WITNESSETH:

WHEREAS, on June 8, 2008 (the "Petition Date"), the Company and certain of its subsidiaries (collectively, the "Debtors," as set forth herein) filed voluntary Chapter 11 petitions in the Bankruptcy Court (as defined below), and the Debtors' chapter 11 cases are being jointly administered under Case No. 08-11111 (KJC) (the "Chapter 11 Cases");

WHEREAS, in connection with the Plan, the Plan Proponent has determined that the Debtors' successful reorganization requires, among other things, an infusion of capital for working capital purposes and deleveraging their balance sheet by means of a significant new equity investment;

WHEREAS, the Plan Proponent intends, pursuant to the Plan, to partially effectuate this deleveraging by converting certain Claims of the Holders of First Lien Secured Claims into Units of Holdco or Newhall Intermediary, each a newly formed Delaware limited liability company (which will collectively (directly or indirectly) acquire 27.802%[1] of the equity interest of the Company on the Effective Date pursuant to a subsequent conversion of such Claims into equity of the Company), to be outstanding on the Effective Date pursuant to the Plan (subject to adjustment for the final Rights Offering Amount);

WHEREAS, Lennar Corporation (or its Affiliates) will acquire 14.381% of the Company's Units pursuant to a cash investment into the Company on the Effective Date (the "Lennar Investment");

WHEREAS, LNR Corporation (or its Affiliates) will acquire 0.968% of the Company's Units pursuant to a cash investment into the Company on the Effective Date (the "LNR Investment");

---

[1] The equity percentages of 27.802%, 14.381%, 0.968% and 53.688% set forth in the Recitals include dilution for Units issued to Management Co. and Emile Haddad as of immediately after the Effective Date and assume a Rights Offering Amount of $140,000,000.

WHEREAS, the Plan Proponent has determined that a rights offering backstopped by the Backstop Parties, on terms and conditions set forth in this Agreement (the "Rights Offering"), is the most appropriate method at this time in which to obtain the necessary new money investment in Holdco, Newhall Intermediary and the Company (in addition to the Lennar Investment);

WHEREAS, in the Rights Offering, the Rights Offering Participants will be offered the opportunity, in exchange for cash payments to Holdco or Newhall Intermediary), to subscribe for all of the New Units to be issued pursuant to the Rights Offering (including the Unallocated Rights Offering Units, the "Rights Offering Units"), which such Units will constitute, in the aggregate, up to 53.688% of the indirect outstanding equity of the Company as of the Effective Date (the "Initially Issued Units"), subject to adjustment for the final Rights Offering Amount;

WHEREAS, the Rights Offering Units will be allocated between Units issued by Holdco and Newhall Intermediary depending on elections made by the Rights Offering Participants in which entity to have its Rights Offering Units issued from as set forth in the Plan;

WHEREAS, the amount of the Rights Offering will be up to $140,000,000, subject to adjustment by the Administrative Agent in accordance with the terms of the Plan (the "Rights Offering Amount") and the purchase price per unit (the "Exercise Price") of the Rights Offering Units will be determined by dividing the Rights Offering Amount by the number of Rights Offering Units;

WHEREAS, pursuant to the Rights Offering, each Rights Offering Participant will have the non-detachable, non-assignable and non-transferable right (except to permitted affiliates) to subscribe for the number of Rights Offering Units as set forth in the Plan , as applicable (such Rights Offering Participant's "Individual Subscription Right");

WHEREAS, to facilitate the Rights Offering, and in consideration of the payment of the premiums and expense reimbursements described herein, each Backstop Party is willing to purchase on the Effective Date, to the extent that the Rights Offering is not fully subscribed and an Alternative Transaction is not consummated, its share of the Rights Offering Units that have not been subscribed for by the Rights Offering Participants by the Subscription Expiration Date;

WHEREAS, pursuant to the Plan and Section 8.3(b) below, the Plan Proponent, subject to the Confirmation Order, will cause the Company, Newhall Intermediary and Holdco to execute this Agreement on or prior to the Effective Date;

WHEREAS, the Parties agree that any valuations of the Debtors' assets or estates, whether implied or otherwise, arising from this Agreement will not be binding for any other purpose, including but not limited to, determining recoveries under the Plan, and this Agreement does not limit such rights regarding valuation in these Chapter 11 Cases; and

WHEREAS, this Agreement amends and restates in its entirety that certain Backstop Rights Purchase Agreement, dated June 6, 2009, by and among the Parties (the "Original BSPA").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained in this Agreement, the Parties hereto hereby agree as follows:

**Section 1.    Definitions.**

(a)    For purposes of this Agreement, the following terms will have the meanings set forth below:

"Affiliate" has the meaning assigned to such term under Rule 144 of the Securities Act of 1933, as amended.

"Agreement" has the meaning assigned to it in the Preamble.

"Alternative Transaction" means (i) the approval by the Bankruptcy Court of a sale or sales of all or a material portion of the Debtors' assets to a third party other than Holders of the First Lien Secured Claims, (ii) the filing of a plan of reorganization that does not contemplate the consummation of the Rights Offering and reorganization of the Debtors on substantially similar terms as set forth in the Plan or (iii) the acceptance of the Plan Proponent in accordance with the Plan of parties (other than the Backstop Parties and their permitted Affiliates and assigns) as "backstop parties" for the Rights Offering.

"Antitrust Division" has the meaning assigned to it in Section 5.4 hereof.

"Approvals" means all approvals and other authorizations that are required under the Bankruptcy Code for the Company, Newhall Intermediary and Holdco to take the actions set forth herein and in the Plan.

"Backstop Commitment Amounts" means the amounts set forth under the heading "Backstop Commitment Amounts" on Schedule 1 opposite each Backstop Parties' name.

"Backstop Commitment" means the agreement by the Backstop Parties pursuant to this Agreement to purchase all of the Rights Offering Units that are not purchased by the Rights Offering Participants as part of the Rights Offering; *provided* that each Backstop Party agrees to fund up to the amount set forth under the heading "Backstop Commitment Amounts" opposite each of their names on Schedule 1 attached hereto (and will receive the applicable number of Remaining Rights Offering Units based on the final funding by each Backstop Party).

"Backstop Commitment Percentages" means the percentages set forth under the heading "Backstop Commitment Percentages" on Schedule 1 opposite each Backstop Parties' name.

"Backstop Party" and "Backstop Parties" have the meanings assigned to such terms in the Preamble.

"Backstop Party Material Adverse Effect" means a material adverse effect on (a) the ability of a Backstop Party to perform its obligations under this Agreement or (b) the validity or enforceability of this Agreement against a Backstop Party.

"Backstop Purchase Price" has the meaning assigned to it in Section 2.2(c)(i) hereof.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, whether acting through its bankruptcy court unit or otherwise.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Chapter 11 Cases" has the meaning assigned to it in the Recitals.

"Claim" has the meaning set forth in the Plan.

"Company" has the meaning assigned to it in the Preamble.

"Confirmation Date" means the date on which the Confirmation Order is entered by the Clerk of the Bankruptcy Court.

"Confirmation Order" has the meaning assigned to it in Section 6(a) hereof.

"Debtors" means, collectively: California Land Company; Friendswood Development Company, LLC; Kings Wood Development Company, L.C.; the Company; LandSource Communities Development Sub LLC; LandSource Holding Company, LLC; Lennar Bressi Ranch Venture, LLC; Lennar Land Partners II; Lennar Mare Island, LLC; Lennar Moorpark, LLC; Lennar Stevenson Holdings, L.L.C.; LNR-Lennar Washington Square, LLC; LSC Associates, LLC; NWHL GP LLC; The Newhall Land and Farming Company (A California Limited Partnership); The Newhall Land and Farming Company; Southwest Communities Development LLC; Stevenson Ranch Venture LLC; Tournament Players Club at Valencia, LLC; Valencia Corporation; and Valencia Realty Company; as debtors and debtors-in-possession in the Chapter 11 Cases.

"DIP Credit Agreement" has the meaning set forth in the Plan.

"Disclosure Statement" has the meaning set forth in the Plan.

"Disclosure Statement Order" has the meaning set forth in the Plan.

"Effective Date" has the meaning set forth in the Plan.

"Entity" means an entity as defined in Bankruptcy Code Section 101(15).

"Exercise Price" has the meaning assigned to it in the Recitals.

"Expense Reimbursement" means all reasonable and documented out-of-pocket fees and expenses of each Backstop Party, including the reasonable fees and expenses of counsel and other professionals retained by such Backstop Party, that have been and are subsequently incurred in connection with the negotiation, preparation and implementation of the Rights Offering, excluding any amounts incurred after the termination of this Agreement.

"Expiration Date" has the meaning assigned to it in Section 8.10(a) hereof.

"File" or "Filed" means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

"Final Order" has the meaning set forth in the Plan.

"First Lien Secured Claims" has the meaning set forth in the Plan.

"FTC" has the meaning assigned to it in Section 5.4 hereof.

"Holdco" has the meaning assigned to it in the Preamble.

"Holdco Class A Units" has the meaning assigned to it in the Plan.

"Holdco Class B Units" has the meaning assigned to it in the Plan.

"Holdco LLC Agreement" has the meaning set forth in the Plan.

"Holder" has the meaning set forth in the Plan.

"HSR Act" has the meaning assigned to it in Section 5.4 hereof.

"Individual Subscription Right" has the meaning assigned to it in the Recitals.

"Initially Issued Units" has the meaning assigned to it in the Recitals.

"Lennar Investment" has the meaning assigned to such term in the Preamble.

"LNR Investment" has the meaning assigned to such term in the Preamble.

"Management Co." has the meaning assigned to such term in the Plan.

"Material Adverse Effect" means a material adverse effect on (a) the ability of the Company, Newhall Intermediary and Holdco, subject to the Approvals, to perform their obligations under this Agreement or (b) subject to the Approvals, the validity or enforceability of this Agreement against the Company, Newhall Intermediary and Holdco.

"New Units" means the number of Units in Newhall Intermediary and the number of Holdco Class A Units to be issued in accordance with the Rights Offering and this Agreement, all of which are subject to dilution due to the Lennar Equity Interest, LNR Equity Interest, the Management Co. Equity Interest and may be adjusted based on the final Rights Offering Amount.

NY 239641934v1

"Newhall Intermediary" has the meaning assigned to it in the Preamble.

"Newhall Intermediary LLC Agreement" has the meaning set forth in the Plan.

"Original BSPA" has the meaning assigned to such term in the Preamble.

"Party" means the Company, Newhall Intermediary, Holdco, the Plan Proponent or any Backstop Party, individually, and the "Parties" means the Company, Newhall Intermediary, Holdco, the Plan Proponent and the Backstop Parties, collectively; provided that the Company, Newhall Intermediary and Holdco will not be considered a Party until execution of this Agreement by each such entity, respectively.

"Petition Date" has the meaning assigned to it in the Recitals.

"Plan" means the Second Amended Joint Chapter 11 Plans for LandSource Communities and its affiliated Debtors, filed with the Clerk of the Bankruptcy Court on July 6, 2009, as it may be altered, amended or modified from time to time, and the Plan Supplement.

"Plan Proponent" has the meaning assigned to it in the Preamble.

"Plan Supplement" has the meaning set forth in the Plan.

"Remaining Rights Offering Units" has the meaning assigned to it in Section 2.2(b)(i) hereof.

"Reorganized LandSource Communities LLC Agreement" means the third amended and restated limited liability company agreement of the Company in effect on the Effective Date.

"Rights Offering" has the meaning assigned to it in the Recitals.

"Rights Offering Amount" has the meaning assigned to it in the Recitals.

"Rights Offering Premium" has the meaning assigned to it in Section 2.2(d) hereof.

"Rights Offering Participant" has the meaning set forth in the Plan.

"Rights Offering Units" has the meaning assigned to it in the Recitals.

"Securities Act" means the Securities Act of 1933, as amended.

"Subscription Agent" has the meaning set forth in the Plan.

"Subscription Amounts" means the amounts set forth under the heading "Subscription Amounts" on Schedule 1 opposite each Backstop Parties' name.

"Subscription Expiration Date" has the meaning set forth in the Plan.

"Subscription Form" means the subscription form(s) and applicable instructions included on the ballot sent to each Rights Offering Participant on which such Rights Offering Participant

NY 239641934v1

may exercise his, her or its Individual Subscription Right, in substantially the form attached hereto as Exhibit A.

"Subscription Units" means the number of Units acquired by each Backstop Party pursuant to the Rights Offering and Section 2.1(b).

"Subsidiary" means as to any Entity, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Entity.

"Termination Payment Event" means a termination of this Agreement by any applicable Party due to the failure of any of the following conditions to be satisfied on or prior to such termination: Section 6(c), Section 6(e), Section 6(g), Section 6(h)(i), Section 6(h)(ii) or Section 7(b) or a termination pursuant to 8.10(a)(ii).

"Total Commitment Amounts" means the aggregate of the Subscription Amounts and Backstop Commitment Amounts for each of the Backstop Parties.

"Unit" has the meaning set forth in the Plan; provided that for purposes of this Agreement, the term "Unit" with respect to Newhall Intermediary shall include the corresponding Holdco Class B Units issued therewith (without duplication).

"Unallocated Rights Offering Units" has the meaning set forth in the Plan.

**Section 2.      Rights Offering; Backstop Commitment.**

**2.1      The Rights Offering.**

(a)      **Commencing the Rights Offering.** The Plan Proponent will commence the Rights Offering as part of the Plan solicitation process. Each Rights Offering Participant will have the opportunity to participate in the Rights Offering by electing to exercise its Individual Subscription Right by (i) completing and returning a duly completed Subscription Form in the manner specified in the instructions accompanying the Subscription Form and (ii) paying or arranging for payment of such Rights Offering Participant's Subscription Purchase Price (as calculated pursuant to the Subscription Form) in the manner specified in the instructions accompanying the Subscription Form.

(b)      **Individual Subscription Right.** Pursuant to the terms and subject to the conditions of this Agreement, each of the Backstop Parties hereby irrevocably commits to participate in the Rights Offering by funding the amount set forth opposite its name under the heading "Subscription Amounts" set forth on Schedule 1 for its applicable Subscription Units; provided that the obligations of the Backstop Parties to fund their applicable Subscription Amount are agreed to be several and not joint; provided, further, that the allocations of such Subscription Amounts for either Newhall Intermediary Units or Holdco Class A Units will be as

7

specified on each Backstop Party's Subscription Form. The Parties acknowledge and agree that for the issuance of Newhall Intermediary Units to a Backstop Party, such Backstop Party shall receive the same number of Holdco Class B Units.

(c) **Failure to Deliver Subscription Form.** If, for any reason, the Subscription Agent does not receive from a Rights Offering Participant both (i) a duly completed Subscription Form and the other documents included therewith on or prior to the Subscription Expiration Date and (ii) payment in immediately available funds in an amount equal to such Rights Offering Participant's Subscription Purchase Price (as calculated pursuant to the Subscription Form) on or prior to the Subscription Expiration Date (or any applicable extension), such Rights Offering Participant will be deemed to have relinquished and waived its right to participate in the Rights Offering; *provided* that the failure by a Backstop Party to deliver its Subscription Form and Subscription Purchase Price pursuant to Section 2.1(b) will not relieve such Party of any of its obligations hereunder (including pursuant to Section 2.1(b)) and in such event, such Backstop Party shall be deemed to have elected to purchase Holdco Class A Units.

## 2.2 Backstop

(a) **Backstop Commitment.** The Backstop Parties' Total Commitment Amounts are equal, in the aggregate, to the Rights Offering Amount.

(b) **Effectuating the Backstop Commitment.**

(i) Pursuant to the terms and subject to the conditions of this Agreement, if fewer than all of the Rights Offering Units are subscribed for by the Rights Offering Participants under the Rights Offering, then each of the Backstop Parties will purchase from the Company, at the Exercise Price, the number of such Rights Offering Units (including Unallocated Rights Offering Units) that are not subscribed for pursuant to the Rights Offering (the "Remaining Rights Offering Units") equal to its Backstop Commitment Percentage multiplied by the number of Remaining Rights Offering Units, by funding up to its applicable Backstop Commitment Amount set forth opposite its name under the heading "Backstop Commitment Amounts" on Schedule 1; *provided* that the obligations of the Backstop Parties to fund their Backstop Commitment Amounts are agreed to be several and not joint. The purchase price for such Remaining Rights Offering Units may be paid to the Company as agent for Newhall Intermediary and Holdco.

(ii) In the event that one or more of the Backstop Parties fails to fund any portion of its Backstop Commitment Amount, the Plan Proponent will first reoffer such Backstop Commitment Amount to the other Backstop Parties (pro rata based on their Backstop Commitment Percentages (after excluding the non-funding Party)) and may again thereafter offer any remaining Backstop Commitment Amount to such other Backstop Parties or to another person(s) as the Plan Proponent determines in its reasonable discretion.

(iii) At least two (2) Business Days prior to the Effective Date, each Backstop Party shall notify the Company in writing the allocation of each of its applicable Remaining Rights Offering Units to be issued between Newhall Intermediary and Holdco.

(iv)     The closing of the purchase and sale of the Remaining Rights Offering Units, if any, will take place on the Effective Date.

(c)     **Backstop Purchase.**

(i)     **Notice.** No later than ten (10) Business Days after the Subscription Expiration Date, the Plan Proponent will deliver notice to the Backstop Parties of: (A) each of the Backstop Parties' obligation to purchase the Remaining Rights Offering Units; and (B) the purchase price therefor equal to the applicable number of Remaining Rights Offering Units multiplied by the Exercise Price (the "Backstop Purchase Price").

(ii)     **Delivery of Funds.** On the Effective Date, each of the Backstop Parties will deliver to an account (or accounts) designated by the Company (on behalf of Newhall Intermediary and Holdco) their applicable Backstop Purchase Price by wire transfer in immediately available funds to an account (or accounts) designated by the Company at least two (2) Business Days prior to the Effective Date. Notwithstanding the foregoing, the Backstop Parties may direct the Administrative Agent, if such direction is acceptable to the Administrative Agent in its sole discretion, to deliver each Backstop Parties' applicable repayment of the DIP Credit Agreement to the Company (on behalf of Newhall Intermediary and Holdco) in satisfaction of all (or a portion if less) of such Backstop Parties' Backstop Purchase Price and such Backstop Party will deliver any additional funds necessary to satisfy its full obligations hereunder to the Company (on behalf of Newhall Intermediary and Holdco) in the manner set forth in the immediately preceding sentence.

(d)     **The Rights Offering Premium.** In consideration for the Backstop Parties having agreed to purchase their applicable Subscription Units and applicable Remaining Rights Offering Units, on the Effective Date the Backstop Parties will be entitled to an amount, the "Rights Offering Premium," which is equal in the aggregate to 5% of the Rights Offering Amount. The portion of the Rights Offering Premium to which each of the Backstop Parties is entitled is set forth on Schedule 1 opposite each of their names under the heading "Rights Offering Premium". The portion of the Rights Offering Premium to which a Backstop Party is entitled will reduce the amount such Backstop Party is required to pay in connection with its purchase of its applicable Subscription Units. For the avoidance of doubt, the Backstop Parties will be entitled to the Rights Offering Premium without regard to whether the Rights Offering is fully subscribed, and the Backstop Parties will also be entitled to the payment of the Rights Offering Premium in cash (without duplication) following the entry of an order by the Bankruptcy Court approving this Agreement upon or after a termination as set forth in Section 8.10(d). Notwithstanding the foregoing, in the event that any Backstop Party fails to purchase any of its applicable Subscription Units or applicable Remaining Rights Offering Units allocated to such Party, such Backstop Party will not be entitled to any portion of the Rights Offering Premium and such Backstop Party will be required to immediately pay any previously offset amounts to the Company and the Plan Proponent will have the right to offset any DIP Credit Agreement repayments payable to such Backstop Party or its Affiliates.

**Section 3.     Representations and Warranties of the Company, Newhall Intermediary and Holdco.** The Company, Newhall Intermediary and Holdco will jointly and severally represent and warrant as of the Effective Date to the Backstop Parties as follows:

**3.1    Organization**.  Each of the Company, Newhall Intermediary and Holdco is duly formed and validly existing under the laws of the State of Delaware.

**3.2    Due Authorization, Execution and Delivery; Enforceability.**  Subject to the Approvals, each of the Company, Newhall Intermediary and Holdco has the requisite limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder, including the issuance of the Rights Offering Units by Newhall Intermediary and Holdco, and will take all necessary limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Initially Issued Units. This Agreement will constitute, assuming the execution by the other Parties hereto, the legally valid and binding obligation of the Company, Newhall Intermediary and Holdco, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**3.3    Due Issuance and Authorization of Units.**  The Rights Offering Units issued and delivered to the Backstop Parties pursuant to the terms of this Agreement will be, upon issuance, duly authorized and validly issued and will be free from all taxes, liens, preemptive rights and charges with respect to the issue thereof.

**3.4    No Conflicts.**  Except for the Approvals, the execution, delivery and performance of this Agreement by the Company, Newhall Intermediary and Holdco will not (a) conflict with or result in any breach of any provision of the Reorganized LandSource LLC Agreement, the Newhall Intermediary LLC Agreement or Holdco LLC Agreement as in effect on the Effective Date, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material agreement, lease, mortgage, license, indenture, instrument or other contract to which it is a party or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities laws and regulations) applicable to them or any of their Subsidiaries or by which any of their or their Subsidiaries' properties or assets are bound or affected as in effect on the Effective Date, except in the case of clauses (b) or (c) as would not, individually or in the aggregate, result in or reasonably be expected to result in a Material Adverse Effect.

**3.5    No Registration.**  Assuming the accuracy of the representations and warranties and compliance with the covenants of the Backstop Parties set forth in this Agreement, no registration of the Rights Offering Units under the Securities Act is required for the purchase of the Rights Offering Units by the Backstop Parties in the manner contemplated by this Agreement.

**Section 4.    Representations and Warranties of The Backstop Parties.**  The Backstop Parties severally, but not jointly, represent and warrant to the Company, Newhall Intermediary, Holdco and the Plan Proponent as follows:

*NY 239641934v1*

**4.1  Organization**. Each Backstop Party is duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation.

**4.2  Due Authorization**. Each Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement, the Newhall Intermediary LLC Agreement or the Holdco LLC Agreement, as applicable, and the Subscription Forms and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement, the Newhall Intermediary LLC Agreement or the Holdco LLC Agreement, as applicable, and the Subscription Forms. Each Backstop Party is, and will be at the Effective Date, ready, willing and able to satisfy all of its obligations hereunder.

**4.3  Due Execution; Enforceability**. This Agreement has been duly and validly executed and delivered by each Backstop Party and, assuming the execution of the other parties hereto, will constitute its valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity). The Holdco LLC Agreement and the Newhall Intermediary LLC Agreement, as applicable, and the Subscription Forms will be duly and validly executed and delivered by each Backstop Party and, assuming the execution of the other parties hereto, will constitute its valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity.

**4.4  Consents**. Except for filings required under and in compliance with the HSR Act, none of the execution, delivery or performance of this Agreement, the Newhall Intermediary LLC Agreement and the Holdco LLC Agreement, as applicable, or the Subscription Forms by the Backstop Parties will require any consent of, authorization by, exemption from, filing with, or notice to any governmental entity.

**4.5  No Conflicts**. The execution, delivery and performance of this Agreement, the Newhall Intermediary LLC Agreement or the Holdco LLC Agreement, as applicable, or the Subscription Forms by the Backstop Parties will not (a) conflict with or result in any breach of any provision of its organizational documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material agreement, lease, mortgage, license, indenture, instrument or other contract to which it is a party or by which its properties or assets are bound, or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities laws and regulations) applicable to it or by which its properties or assets are bound or affected as in effect on the Effective Date, except in the case

11

of clauses (b) and (c), as would not, individually or in the aggregate, result in or reasonably be expected to result in a Backstop Party Material Adverse Effect.

**4.6   Legal Proceedings.**   There are no actions, suits or proceedings to which any Backstop Party is a party or to which any property of any Backstop Party is subject that, individually or in the aggregate, has materially prohibited, delayed or adversely impacted, or if determined adversely to such Backstop Party, would reasonably be expected to materially prohibit, delay or adversely impact the Backstop Parties' performance, of their obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Backstop Parties, contemplated and, to the knowledge of the Backstop Parties, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to materially prohibit, delay or adversely impact the Backstop Parties' performance of their obligations under this Agreement.

**4.7   No Registration Under the Securities Act.**   Each Backstop Party understands that the Rights Offering Units to be purchased by it pursuant to the terms of this Agreement have not been registered, and that neither the Plan Proponent, Holdco, Newhall Intermediary nor the Company will be required to effect any registration or qualification, under the Securities Act or any state securities law, and the Rights Offering Units will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof, in the applicable state securities laws and under the Bankruptcy Code. The Rights Offering Units cannot be offered for sale, sold or otherwise transferred except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act.

**4.8   Accredited Backstop Party.**   Each Backstop Party is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act.

**4.9   Additional Information.**   Each Backstop Party acknowledges that (a) it has been afforded the opportunity to ask questions and receive answers concerning Holdco, Newhall Intermediary, the Company and their Subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein and as otherwise considered necessary in connection with the purchase of the Rights Offering Units, (b) it has received copies of all documents and any other information requested from Holdco, Newhall Intermediary and the Company, or has elected to waive such opportunity, and (c) it has been furnished with such financial and other information concerning Holdco, Newhall Intermediary, the Company, their Subsidiaries, their management and their business and proposed business as the Backstop Party considers necessary or appropriate for deciding whether to purchase the Rights Offering Units.

**4.10   Arm's Length.**   Each Backstop Party understands that the Plan Proponent, Holdco, Newhall Intermediary and the Company are acting solely in the capacity of an arm's length contractual counterparty to such Backstop Party with respect to the transactions contemplated hereby. Additionally, such Backstop Party is not relying on Holdco, Newhall Intermediary, the Company, the Debtors, the Plan Proponent or any of their legal, financial, accounting or other advisors for any legal, tax, investment, accounting or regulatory advice.

*NY 239641934v1*

**4.11    No Broker's Fees.** To the best of its knowledge, no Backstop Party is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a claim against the Plan Proponent, Holdco, Newhall Intermediary, the Company or the Debtors for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated hereby.

**4.12    Subscription Form.** Each Backstop Party hereby makes all of the representations, warranties, covenants and agreements set forth in each of their applicable Subscription Form as if fully set forth herein with respect to the Remaining Rights Offering Units purchased pursuant to this Agreement.

**Section 5.    Additional Covenants.** Holdco, Newhall Intermediary, the Company (upon execution by Holdco, Newhall Intermediary and the Company) and each Backstop Party hereby agree to the following:

**5.1    Uncertificated Units.** The Parties agree that the New Units will not be certificated.

**5.2    Further Assurances.** From time to time after the date of this Agreement, the Parties will execute, acknowledge and deliver to the other Party such other instruments, documents, and certificates and will take such other actions as the other Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

**5.3    Commercially Reasonable Efforts**

(a)     Holdco, Newhall Intermediary and the Company will use commercially reasonable efforts to cause the conditions set forth in Section 6 to be satisfied and to consummate the transactions contemplated herein.

(b)     The Backstop Parties will use commercially reasonable efforts to cause the conditions set forth in Section 7 to be satisfied and to consummate the transactions contemplated herein.

**5.4    HSR.** If necessary, Holdco, Newhall Intermediary, the Company and the Backstop Parties will (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated hereby as promptly as practicable and, in any event, by the 20th day after the date hereof, in the case of all filings required under the HSR Act, (b) comply at the earliest practicable date with any request under the HSR Act for additional information, documents or other materials received by the Backstop Parties or their respective Subsidiaries from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other governmental body in respect of such filings or such transactions and (c) cooperate with each other in connection with any such filing (including, without limitation, to the extent permitted by applicable law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any

13

of the FTC, the Antitrust Division or other governmental body with respect to any such filing or any such transaction. Any and all filing fees required to be paid by Holdco, Newhall Intermediary, the Company and the Backstop Parties under the HSR Act in connection with such filings will be borne by the Company. Each such Party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such Party will promptly inform the other Party of any oral communication with, and provide copies of written communications with, any governmental body regarding any such filings or any such transaction. No Party hereto will independently participate in any formal meeting with any governmental body in respect of any such filings, investigation or other inquiry without giving the other Party prior notice of the meeting and, to the extent permitted by such governmental body, the opportunity to attend and/or participate. Subject to applicable law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the HSR. Holdco, Newhall Intermediary, the Company and the Backstop Parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Holdco, Newhall Intermediary, the Company and the Backstop Parties, as the case may be).

**Section 6.** **Conditions to Backstop Parties' Obligations.** The obligation of each Backstop Party, severally, to fund the Total Commitment Amounts will be subject to the satisfaction (or waiver by each Backstop Party in its sole reasonable discretion) of each of the following conditions on the Effective Date:

(a) **Confirmation Order.** The Final Order or Orders of the Bankruptcy Court, among other things, confirming the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Order") that is reasonably acceptable to the Backstop Parties will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

(b) **HSR Act.** The waiting period (and any extension thereof) applicable to the Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

(c) **Expense Reimbursement.** The Debtors will have paid all Expense Reimbursements on the Effective Date; *provided* that in the event the Company in good faith disputes whether the amount of such Expense Reimbursements is "reasonable," the Debtors will separate the disputed amount and pay the remainder pursuant to the terms hereof;

(d) **Required Consents.** All of the Approvals will have been obtained;

(e) **Rights Offering.** The Rights Offering will have been consummated pursuant to and in accordance with the Plan, *provided* that this clause will not be a condition to the

14

obligations of the Backstop Parties to purchase Subscription Units as set forth in Section 2.1(b) pursuant to the Subscription Form;

(f) **Backstop Funding.** The Backstop Parties (or additional parties as provided for herein) will have funded the aggregate Total Commitments on substantially similar terms as set forth herein, *provided* that this clause will not be a condition to the obligations of any Backstop Party that has failed to fund any of its applicable Total Commitment;

(g) **Holdco, Newhall Intermediary and Company Execution.** Each of the Company, Newhall Intermediary and Holdco will have executed this Agreement; and

(h) **Other Conditions.** (i) Each of Holdco, Newhall Intermediary and the Company will have performed, in all material respects, their respective obligations hereunder required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of Holdco, Newhall Intermediary and the Company in this Agreement that are qualified as to materiality or Material Adverse Effect will be true and correct in all respects, and the representations and warranties that are not qualified as to materiality or Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date) and (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth herein).

**Section 7.     Conditions to Company's, Newhall Intermediary's and Holdco's Obligations.** The obligations of Holdco, Newhall Intermediary and the Company hereunder are subject to the satisfaction (or the waiver by the Plan Proponent in its sole reasonable discretion) of the following conditions as of the Effective Date:

(a) **Required Consents.** All of the Approvals and all of the approvals necessary for the consummation of the transactions contemplated by this Agreement will have been obtained;

(b) **Rights Offering.** The Rights Offering will have been consummated pursuant to the Plan;

(c) **Plan Confirmation.** The Confirmation Order that is reasonably acceptable to the Plan Proponent and the Company will have been entered by the Bankruptcy Court, and no order staying the Confirmation Order will be in effect;

(d) **HSR Act.** The waiting period (and any extension thereof) applicable to the Plan and the purchase of the Rights Offering Units, if any, under the HSR Act will have been terminated or will have expired;

(e) **Holdco and Newhall Intermediary LLC Agreements.** Each of the Backstop Parties will have delivered a joinder to the Holdco LLC Agreement and Newhall Intermediary LLC Agreement (as applicable); and

(f)     **Other Conditions.** (i) Each Backstop Party will have performed, in all material respects, its obligations hereunder required to be performed by it at or prior to the Effective Date, (ii) the representations and warranties of each Backstop Party in this Agreement that are qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all respects, and the representations and warranties that are not qualified as to materiality or Backstop Party Material Adverse Effect will be true and correct in all material respects, in each case, at and as of the Effective Date as if made at and as of Effective Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct or true and correct in all material respects (as the case may be) as of such earlier date) and (iii) and (iii) all conditions precedent to the Effective Date set forth in the Plan shall have been satisfied and not waived (except for the obligations set forth herein).

### Section 8.     Miscellaneous

8.1     **Notices.** Any notice or other communication required or which may be given pursuant to this Agreement will be in writing and either delivered personally to the addressee, telecopied to the addressee or mailed, certified or registered mail, postage prepaid, and will be deemed given when so delivered personally or telecopied or, if mailed, five (5) days after the date of mailing, as follows:

(a)     if to a Backstop Party, to the address specified on <u>Schedule 1</u> hereto.

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention:     Mark C. Smith
                       Sean C. Doyle
Facsimile No.: 917-777-3330

(b)     if to the Company, Newhall Intermediary or Holdco, to:

c/o LandSource Communities Development LLC
23823 Valencia Boulevard
Valencia, California  91355
Attention: Board of Directors
Facsimile: 212-790-0336

with a copy to:

Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
Attention:     Debra A. Dandeneau
Facsimile:     212-310-8007

NY 239641934v1

(counsel to the Company)

(c)     if to the Plan Proponent, to:

Barclays Capital PLC
200 Park Avenue
New York, New York 10166
Attention:     Mark Manski
Facsimile:     212-412-7371

with a copy to:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attention:     Bruce R. Zirinsky
               Nathan A. Haynes
Facsimile:     212-801-6400
(counsel to the Plan Proponent)

and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention:     Mark C. Smith
               Sean C. Doyle
Facsimile:     917-777-3330

**8.2    Survival of Representations and Warranties, etc.**  All representations and warranties made in this Agreement, the Schedules attached hereto will survive the execution and delivery of this Agreement.

**8.3    Assignment.**

(a)     This Agreement will be binding upon and inure to the benefit of each and all of the Parties, and, except as set forth below, neither this Agreement nor any of the rights, interests or obligations hereunder may or will be assigned by any of the Parties without the prior written consent of the other Parties except as otherwise set forth in this Section 8.3. This Agreement, or any Backstop Party's obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by such Backstop Party to any Affiliate of such Backstop Party over which such Backstop Party or any of its Affiliates exercises investment authority (including Affiliated investment funds), including, without limitation, with respect to voting and dispositive rights; _provided_ that any such assignee assumes the obligations of such Backstop Party hereunder (including making all representations and warranties set forth herein by such Backstop Party as if an original party hereto) and agrees in writing to be bound by the terms of this Agreement in the

17

same manner as such Backstop Party. Notwithstanding the foregoing, no such assignment will relieve such Backstop Party of its obligations hereunder.

(b) Notwithstanding the foregoing, (i) the Plan Proponent, subject to the Confirmation Order, will cause the Company, Newhall Intermediary and Holdco to execute this Agreement and until such time the Plan Proponent may enforce all of the rights and obligations against the Backstop Parties hereunder and (ii) upon agreement of the Parties (not to be unreasonably withheld), Newhall Intermediary's and Holdco's obligation to issue the Units hereunder may be assigned (in whole or in part) to the Company or to another newly formed holding company which will own 100% of the equity interest of the Company on the Effective Date (subject to any equity of Holdco, Newhall Intermediary or the Company issued to Lennar Corporation (or its Affiliates), LNR (or its Affiliates), Management Co. or Emile Haddad). The Plan Proponent will have no liability hereunder prior to or after execution by Holdco, Newhall Intermediary or the Company of this Agreement.

**8.4    Entire Agreement.** This Agreement and the Plan contain the entire agreement by and among Holdco, Newhall Intermediary, the Company, the Plan Proponent and the Backstop Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements and representations, written or oral, with respect thereto, including the Original BSPA.

**8.5    Waivers and Amendments.** This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Plan Proponent and the Backstop Parties, and following their execution, the Company, Newhall Intermediary and Holdco. No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

**8.6    Governing Law; Jurisdiction; Venue; Process.** THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE. EACH PARTY HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT, FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

If a court finds that subject matter jurisdiction is not available in the Bankruptcy Court, the Parties hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Southern District of New York or if such court will not have jurisdiction, then to the appropriate courts of the State of New York sitting in New York County.

**8.7    Counterparts**.  This Agreement may be executed and delivered (including by facsimile or portable document format (PDF) transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed will be deemed to be an original, but all of which taken together will constitute one and the same.

**8.8    Headings**.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

**8.9    Severability**.   In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the Parties will be enforceable to the fullest extent permitted by law.

**8.10    Termination**

(a)    **Termination by the Backstop Parties.**

(i)    The Backstop Parties, by consent of a majority of such Parties, will have the right, but not the obligation, to terminate this Agreement by notice to the Plan Proponent and the Company: (1) if the Company, Newhall Intermediary or Holdco materially breaches this Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Backstop Parties by majority consent) during which the Company, Newhall Intermediary and Holdco may negotiate in good faith regarding any such cure or (2) if the conditions set forth in Section 6 have not been satisfied (or waived) by July 31, 2009 (the "Expiration Date").

(ii)    A Backstop Party may terminate its individual Total Commitment Amount by written notice given within five (5) Business Days to the Plan Proponent following a cancellation (if applicable) or a material amendment, modification or waiver of: (1) the Plan (in the form filed on July 6, 2009), (2) any material condition or term of the Plan (in the form filed on July 6, 2009), including (x) the allocation of Units among the Holders of First Lien Claims and Rights Offering Participants and (y) any cash distribution to creditors under the Plan or (3) any form agreement (or material term or condition thereof) attached as an Exhibit to the Plan (in the form filed on July 6, 2009), the Holdco LLC Agreement or Newhall Intermediary LLC Agreement, by the Plan Proponent in accordance with the Plan (in the form filed on July 6, 2009) which in case of clauses (1), (2) or (3) is not reasonably acceptable to such Backstop Party.

(b)    **Termination by the Plan Proponent.**    The Plan Proponent will have the right, but not the obligation, to terminate this Agreement by notice to the Backstop Parties: (1) if

any Backstop Party materially breaches this Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Plan Proponent) during which the breaching Backstop Parties may negotiate in good faith regarding any such cure or (2) if the conditions set forth in Section 7 have not been satisfied (or waived) by the Expiration Date. In the event that any, but not all Backstop Parties materially breach this Agreement, and such breach is not cured after a notice period of five (5) Business Days (which may be extended by the Plan Proponent), the Plan Proponent may terminate this Agreement with respect to such Backstop Party only and this Agreement will continue to remain in effect with respect to all other Parties.

(c) **Termination due to an Alternative Transaction.** This Agreement will automatically terminate upon consummation of an Alternative Transaction.

(d) **Effect of Termination.** In the event of termination of this Agreement as provided above, the provisions of this Agreement will immediately become void and of no further force and effect (other than this Article 8 (except Section 8.2) and Section 2.1(b)); provided that no Party will be released for any intentional breach existing prior to the termination. Following the entry of an order approving the terms of this Agreement by the Bankruptcy Court has been entered and notwithstanding anything herein to the contrary, the Rights Offering Premium will only be paid following a termination of this Agreement as follows (without duplication): (1) upon a consummation of an Alternative Transaction immediately prior to the termination of this Agreement, (2) upon a consummation of an Alternative Transaction within 180 days after a termination of this Agreement and if none of the Backstop Parties are in breach of their representations, warranties and agreements hereunder at the time of termination of this Agreement or (3) (A) if all of the Backstop Parties are ready, willing and able to consummate the transactions contemplated hereby on or prior to the termination of this Agreement, (B) none of the Backstop Parties are in breach of their representations, warranties and agreements hereunder and (C) a Termination Payment Event has occurred (which in the case of this clause (3), the Backstop Premium will be paid within five (5) Business Days following such termination).

**8.11    Conflict with Confirmation Order and Plan.**

(a) **Conflict with the Confirmation Order.** In the event there is a conflict between the terms of this Agreement and the terms of the Confirmation Order, the terms of the Confirmation Order will control and such Confirmation Order will control over the Plan.

(b) **Conflict with the Plan.** In the event there is a conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan will control.

**8.12    No Third Party Beneficiaries.** This Agreement will not confer any rights or remedies upon any other person or entity other than the Parties and their respective successors and permitted assigns; _provided_ that upon execution of this Agreement by the Company, Newhall Intermediary and Holdco, all of the rights of the Plan Proponent hereunder will inure to the Company, Newhall Intermediary and Holdco.

*NY 239641934v1*

**8.13   Adjustments.**   Each of the Parties acknowledges and agrees that pursuant to the Plan, the Plan Proponent may adjust the Rights Offering Amount and upon any such issuance or adjustment set forth in this Section 8.13, the amounts set forth on Schedule 1 will be adjusted proportionately by the Parties and Schedule 1 will be updated accordingly; *provided, however,* that no adjustment pursuant to this Section 8.13 will have any impact on the Backstop Parties rights to the Rights Offering Premium.

*[Signature Pages Follow]*

*NY 239641934v1*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By: _____
Name: Mark Manski
Title: Managing Director

**Anchorage Capital Master Offshore, Ltd.**

By: Anchorage Advisors, L.L.C., its investment manager

By: _____
Name:
Title:

**Marathon Special Opportunity Master Fund, Ltd.**

By: Marathon Asset Management, LP, its investment manager

By: _____
Name:
Title:

**OZ Master Fund, Ltd.**

By: OZ Management, LP, its investment manager
By: Och-Ziff Holding Corp., its general partner

By: _____
Name:
Title:

[*Signature Continued*]

NY 239641934v1

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By: _____
Name: Mark Manski
Title:   Managing Director

**Anchorage Capital Master Offshore, Ltd.**

By: Anchorage Advisors, L.L.C., its
investment manager

By: _____
Name:
Title:

**Marathon Special Opportunity Master Fund, Ltd.**

By: Marathon Asset Management, LP, its
investment manager

By: _____
Name:
Title:

**OZ Master Fund, Ltd.**

By:  OZ Management, LP, its investment
manager
By:  Och-Ziff Holding Corp., its general
partner

By: _____
Name:
Title:

*[Signature Continued]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By:_____
Name:
Title:

**Anchorage Capital Master Offshore, Ltd.**

By: Anchorage Advisors, L.L.C., its
investment manager

By:_____
Name:
Title: MICHAEL AGLIALORO
Executive Vice President

**Marathon Special Opportunity Master Fund, Ltd.**

By: Marathon Asset Management, LP, its
investment manager

By:_____
Name:
Title:

**OZ Master Fund, Ltd.**

By: OZ Management, LP, its investment
manager
By: Och-Ziff Holding Corp., its general
partner

By:_____
Name:
Title:

*[Signature Continued]*

22

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By:_____
Name:
Title:

**Anchorage Capital Master Offshore, Ltd.**

    By: Anchorage Advisors, L.L.C., its
    investment manager

By:_____
Name:
Title:    MICHAEL AGLIALORO
     Executive Vice President

**Marathon Special Opportunity Master Fund, Ltd.**

    By: Marathon Asset Management, LP, its
    investment manager

By:_____
Name:
Title:

**OZ Master Fund, Ltd.**

    By: OZ Management, LP, its investment
    manager
    By: Och-Ziff Holding Corp., its general
    partner

By:_____
Name:
Title:

*[Signature Continued]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By:_____
Name:
Title:

**Anchorage Capital Master Offshore, Ltd.**

    By: Anchorage Advisors, L.L.C., its
    investment manager

By:_____
Name:
Title:

**Marathon Special Opportunity Master Fund, Ltd.**

    By: Marathon Asset Management, LP, its
    investment manager

By:_____
Name: Louis T. Hanover
Title: Authorized Signing

**OZ Master Fund, Ltd.**

    By: OZ Management, LP, its investment
    manager
    By: Och-Ziff Holding Corp., its general
    partner

By:_____
Name:
Title:

*[Signature Continued]*

22

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**Barclays Bank PLC,**
in its capacity as Plan Proponent

By:_____
Name:
Title:


**Anchorage Capital Master Offshore, Ltd.**

    By: Anchorage Advisors, L.L.C., its
    investment manager

By:_____
Name:
Title:


**Marathon Special Opportunity Master Fund, Ltd.**

    By: Marathon Asset Management, LP, its
    investment manager

By:_____
Name:
Title:


**OZ Master Fund, Ltd.**

    By: OZ Management, LP, its investment
    manager
    By: Och-Ziff Holding Corp., its general
    partner

By:_____
Name:   Joel M. Frank
Title:    Chief Financial Officer

*[Signature Continued]*

22

**Third Avenue Real Estate Value Fund**
**Third Avenue Opportunity Management LLC**

    By:  Third Avenue Management LLC, their
    investment manager

By: _____

Name: _Vincent O. Dugan_

Title: _CFO_

**TPG Credit Opportunities Fund, L.P.**

    By:  TPG Credit Opportunities Fund GP,
    L.P.
    Its:  General Partner

_____

By:  Julie K. Braun
Vice President

**TPG Credit Opportunities Investors, L.P.**

    By:  TPG Credit Opportunities Fund GP,
    L.P.
    Its:  General Partner

_____

By:  Julie K. Braun
Vice President

**TPG Credit Strategies Fund, L.P.**

    By:  TPG Credit Strategies GP, L.P.
    Its:  General Partner

_____

By:  Julie K. Braun
Vice President

*[Signature Continued]*

**Third Avenue Real Estate Value Fund**
**Third Avenue Opportunity Management LLC**

      By: Third Avenue Management LLC, their
      investment manager

By: _____
Name: Vincent J. Dugan
Title: CFO

**TPG Credit Opportunities Fund, L.P.**

      By: TPG Credit Opportunities Fund GP,
      L.P.
      Its: General Partner

By: Julie K. Braun
Vice President

**TPG Credit Opportunities Investors, L.P.**

      By: TPG Credit Opportunities Fund GP,
      L.P.
      Its: General Partner

By: Julie K. Braun
Vice President

**TPG Credit Strategies Fund, L.P.**

      By: TPG Credit Strategies GP, L.P.
      Its: General Partner

By: Julie K. Braun
Vice President

*[Signature Continued]*

**Third Avenue Real Estate Value Fund**
**Third Avenue Opportunity Management LLC**

      By: Third Avenue Management LLC, their
      investment manager

By:_____
Name:
Title:


**TPG Credit Opportunities Fund, L.P.**

      By: TPG Credit Opportunities Fund GP,
      L.P.
      Its: General Partner

By: Julie K. Braun
Vice President


**TPG Credit Opportunities Investors, L.P.**

      By: TPG Credit Opportunities Fund GP,
      L.P.
      Its: General Partner

By: Julie K. Braun
Vice President


**TPG Credit Strategies Fund, L.P.**

      By: TPG Credit Strategies GP, L.P.
      Its: General Partner

By: Julie K. Braun
Vice President


*[Signature Continued]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of _____ 2009.

**LandSource Communities Development LLC**

By:_____
Name:
Title:

**Newhall Holding Company, LLC**

By:_____
Name:
Title:

**Newhall Intermediary Holding Company, LLC**

By:_____
Name:
Title:

\*      \*      \*      \*

NY 239641934v1

| Backstop Party | Subscription Amounts | Backstop Commitment Amounts | Backstop Commitment Percentages | Total Commitment Amounts | Rights Offering Premium |
|---|---|---|---|---|---|
| Anchorage Capital Master Offshore, Ltd. 610 Broadway, 6th Floor New York, NY 10012 | $20,632,234 | $29,367,766 | 43.80% | $50,000,000 | $2,500,000.00 |
| Marathon Special Opportunity Master Fund, Ltd. One Bryant Park, 38th Floor New York, NY 10036 | $12,178,692 | $10,321,308 | 15.40% | $22,500,000 | $1,125,000.00 |
| OZ Master Fund, Ltd. 9 West 57th Street, 39th Floor New York, NY 10019-2701 | $15,072,921 | $4,927,079 | 7.35% | $20,000,000 | $1,000,000.00 |
| Third Avenue Real Estate Value Fund Third Avenue Opportunity Management LLC 622 Third Avenue, 32nd Floor New York, NY 10017-6715 | $14,431,466 | $13,068,534 | 19.49% | $27,500,000 | $1,375,000.00 |
| TPG Credit Strategies Fund, L.P., TPG Credit Opportunities Investors, L.P. and TPG Credit Opportunities Fund, L.P. 4600 Wells Fargo Center 90 South Seventh Street Minneapolis, MN 55402 | $10,642,393 | $9,357,607 | 13.96% | $20,000,000 | $1,000,000.00 |
| **Total** | **$72,957,706** | **$67,042,294** | **100%** | **$140,000,000.00** | **$7,000,000.00** |

---

[2] The Parties acknowledge that the final funding for, and issuance of, Units by and to each Backstop Party may be allocated to their applicable Affiliated investment funds in accordance with the terms of this Agreement.

## Exhibit A

## Subscription Form

See attached.

*NY 239641934v1*

## Exhibit 27

### Amendment to Executory Contracts Lists

This Exhibit sets forth a non-exclusive list of the changes to the lists of assumed contracts, rejected contracts and non-executory contracts set forth in Exhibits 17, 18, and 19 to the Plan Supplement filed with the Bankruptcy Court on June 19, 2009.

THE DETERMINATION TO ASSUME OR REJECT THE CONTRACTS SET FORTH ON THE ATTACHED EXHIBIT WAS MADE AS OF JULY 18, 2009 AND IS SUBJECT TO REVISION. THE INCLUSION OF A CONTRACT IN THIS EXHIBIT 27 IS NOT A FINAL DETERMINATION THAT SUCH CONTRACT WILL BE ASSUMED OR REJECTED, AS APPLICABLE, AND IS WITHOUT PREJUDICE TO THE PROPONENT'S RIGHT TO MODIFY THE ATTACHED LIST.

Clerical Changes

The attached list sets forth a list of changes to Exhibits 17, 18 and 19 that are purely clerical in nature.

| Name of Party | Address | City | State | Zip | Description of Contract | Contract # | Date of Contract | Debtor | Assume/ Reject/ Other | Claim Amount | Cure Amount | Change Mode |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Western Golf Properties | One Spectrum Pointe Drive, Suite #510 | Lake Forest | CA | 92630 | Food and Beverage Concession Agreement (Tournament Players Club at Valencia, LLC and Western Golf Properties, LLC and TPC Concessions, Inc. | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Removed second party from "Name of Party Column". |
| TPC Concessions Inc. | 23823 Valencia Blvd. | Valencia | CA | 91355 | Food and Beverage Concession Agreement (Tournament Players Club at Valencia, LLC and Western Golf Properties, LLC and TPC Concessions, Inc. | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for second party from "Name of Party Column". |
| Tournament Players Club of California | 112 PGA Tour Blvd, | Ponte Vera Beach | FL | 32082 | Assignment and Assumption of Ownership Interest (Tournament Players Club of California, Inc. (Assignor); the Newhall Land and Farming Company (A California Limited Partnership (Assignee) | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added additional party to contract. |
| Tournament Players Club of California | 112 PGA Tour Blvd, | Ponte Vera Beach | FL | 32082 | Member Interest Purchase Agreement between (Tournament Players Club of California, Inc. (Seller); The Newhall Land and Farming Company (A California Limited Partnership (Purchaser)) | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added additional party to contract. |
| Newhall Land and Farming Company | 23823 Valencia Blvd. | Valencia | CA | 91355 | URL/ Website Agreement (PGA TOUR Licensed Properties, Inc. (TOUR Properties); Tournament Players Club at Valencia, LLC (Licensee); The Newhall Land and Farming Company (A California Limited Partnership) | | 4/25/2005 | Tournament Players Club of Valencia | Assume | | Previously listed | Added additional party to contract. |
| Tournament Players Club of California, Inc. | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc. (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA Tour, Inc.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Property | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| PGA Tour, Inc. | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc. (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA Tour, Inc.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Property | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| The Newhall Land and Farming Company | 23823 Valencia Blvd. | Valencia | CA | 91355 | Termination Agreement (Tournament Players Club of California, Inc. (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA Tour, Inc.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Property | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column"; updated address |

| Name of Party | Address | City | State | Zip | Contract/Agreement | Date | Counterparty | Assume/Reject | | $ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PGA Tour Golf Course Properties | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA TOUR, INC.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Properties, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| Tournament Players Club of California, Inc. | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA TOUR, INC.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Properties, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| PGA Tour, Inc. | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA TOUR, INC.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Properties, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| The Newhall Land and Farming Company | 23823 Valencia Blvd. | Valencia | CA | 91355 | Termination Agreement (Tournament Players Club of California, Inc (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA TOUR, INC.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Properties, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column", updated address |
| PGA Tour Golf Course Properties | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Termination Agreement (Tournament Players Club of California, Inc (Management Company); Tournament Players Club at Valencia, LLC (Owner); PGA TOUR, INC.; The Newhall Land and Farming Company (A California Limited Partnership); PGA Tour Golf Course Properties, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for additional party from "Name of Party Column". |
| Newhall Land and Farming Company | 23823 Valencia Blvd. | Valencia | CA | 91355 | URU Website Agreement (PGA Tour Licensed Properties, Inc. ("Tour Properties); Tournament Players Club at Valencia, LLC (Licensee); The Newhall Land and Farming Company (A California Limited Partnership)) | 4/25/2005 | Tournament Players Club of Valencia | Assume | N/A | $0 | Added additional party to contract. |
| Tournament Players Club of California | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Assignment and Assumption of Ownership Interest (Tournament Players Club of California, Inc. (Assignor); The Newhall Land and Farming Company (A California Limited Partnership (Assignee)) | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added additional party to contract. |
| Tournament Players Club of California | 12 PGA Tour Boulevard | Ponte Verda Beach | FL | 32082 | Member Interest Purchase Agreement between Tournament Players Club of California, Inc. (Seller); The Newhall Land and Farming Company (A California Limited Partnership (Purchase) | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added additional party to contract. |
| Western Golf Properties | One Spectrum Pointe Drive, Suite 310 | Lake Forest | CA | 92630 | Food and Beverage Concession Agreement between Tournament Players Club at Valencia, LLC; Western Golf Properties, LLC and TPC Concessions, Inc. | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for second party from "Name of Party Column". |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TPC Concessions, Inc. | 23823 Valencia Blvd. | Valencia | CA | 91355 | Food and Beverage Concession Agreement between Tournament Players Club at Valencia, LLC, Western Golf Properties, LLC and TPC Concessions, Inc. | | | Tournament Players Club of Valencia | Assume | N/A | $0 | Added separate listing for second party from "Name of Party Column". |
| Google.com | 1600 Amphitheatre Parkway | Mountain View | CA | 94043 | Website Search Engine Optimization- Customer ID # 813-736-3418; Adwords account to help advertise Valencia.com | | | Newhall | Assume | | $0.00 | Updated description of contract. |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

## Additional Contracts

The attached list sets forth a list of additional Assumed Contracts that shall be deemed a part of Exhibit 17, additional rejected contracts that shall be deemed a part of Exhibit 18 and additional non-executory contracts that shall be deemed a part of Exhibit 19.

Amendments to Assumed/Rejected Executory Contract Lists-Additional Contracts

| Name of Party | Address | City | State | Zip | Description of Contract | Contract # | Date of Contract | Debtor | Assume/Reject/Other | Claim Amount | Cure Amount | Change Made |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| City of Santa Clarita | 23920 Valencia Blvd. | Santa Clarita | CA | 91355 | Agreement for 2nd Access-originally with LA County, includes reimbursements for certain improvements | | 1/10/1994 | Newhall Land and Farming Company | Assume | N/A | $0.00 | Additional contract. |
| Miami-Dade County | Miami-Dade County c/o Miami-Dade Water and Sewer Department PO Box 330316 | Miami | FL | 33233 | Agreement for Water and Sanitary Sewage Facilities | | 7/2/2002 | Landsource Holding Company, LLC | Assume | N/A | $0.00 | Additional contract. |
| State of California | 23823 Valencia Blvd. | Valencia | CA | 91355 | Highway Improvement Agreement-Supplement Date June 24, 2003 | | 6/10/2002 | Newhall | Assume | N/A | $0.00 | Additional contract. |
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82012258 | | Newhall | Assume | N/A | $13,366.27 | Additional contract. Contract was previously categorized as "Other" and has since been categorized as "Assumed." Some or all of the cure amount may be payable as an Allowed Permitted Lien. Duplicate payments will not be made. |
| Touro University | 27 W 23rd Street | New York | NY | 10010 | Agreement of Lease in Furtherance of Conveyance with Touro University and Touro College | | 12/11/98 as amended 5/3/02 | Mare Island | Assume | N/A | $0.00 | Additional contract. |
| Touro College | 27 W 23rd Street | New York | NY | 10010 | Agreement of Lease in Furtherance of Conveyance with Touro University and Touro College | | 12/11/98 as amended 5/3/02 | Mare Island | Assume | N/A | $0.00 | Additional contract. |
| Touro University | 27 W 23rd Street | New York | NY | 10010 | Option to Extend Lease Term and Real Estate Option Agreement with Touro University and Touro College | | 12/11/1998 | Mare Island | Assume | N/A | $0.00 | Additional contract. |
| Touro College | 27 W 23rd Street | New York | NY | 10010 | Option to Extend Lease Term and Real Estate Option Agreement with Touro University and Touro College | | 12/11/1998 | Mare Island | Assume | N/A | $0.00 | Additional contract. |
| Los Angeles County Department of Public Works | 23823 Valencia Blvd. | Valencia | CA | 91355 | The Old Road Design Agreement | | 7/17/2002 | Newhall | Other | $0.00 | $0.00 | Additional contract. |

| Lakes by the Bay South Community Development District | c/o District Offices, Severn Trent Services, Inc., 210 North University Drive, Suite 702 | Coral Springs | FL | 33071 | Agreement between Lennar Land Partners and the Lakes by the Bay Community Development District re: true-up and payment of Series 2004A and Series 2004B assessments | 6/30/2004 | Landsource Holding Company, LLC, as successor in interest to Lennar Land Partners | Reject | $0.00 | N/A | Additional contract. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - McDowell Mountain Ranch | 8/6/1993 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Newhall Depository Company | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Mortgage | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Gary Cusumano | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Water Company | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Dan Bryant | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 1/21/1998 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom Dierckman | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom Dierckman | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom Dierckman | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - McDowell Mountain Ranch | 8/6/1993 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom Dierckman | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Water Company | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Kevin Farr | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 1/21/1998 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| John Frye | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| John Frye | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| James Harter | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 9/16/1992 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| James Harter | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 8/6/1993 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Erik Higgins | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 1/19/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Sue Holl | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 7/16/1997 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Don Kimball | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Don Kimball | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - McDowell Mountain Ranch | 5/2/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Don Kimball | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Newhall Depository Company | 3/10/1992 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Don Kimball | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Water Company | 9/9/1991 | Newhall | Reject | $0.00 | N/A | Additional contract. |

| Name | Address | City | State | Zip | Document | Date | | Status | Amount | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Marlee Lauffer | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 7/20/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Robert Mayhew | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 9/16/1992 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Robert Mayhew | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Newhall Depositary Company | 3/8/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Robert Mayhew | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Mortgage | 1/19/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Robert Mayhew | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Realty Company | 1/19/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Robert Mayhew | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Water Company | 3/23/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom McKernan | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 9/21/1994 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - McDowell Mountain Ranch | 8/6/1993 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Newhall Depositary Company | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Mortgage | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Stuart R. Mork | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement - Valencia Realty Co. | 8/31/1989 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Valencia Water Company | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 6/6/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Henry Newhall | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Henry Newhall | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Jane Newhall | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Jane Newhall | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Phil Nowlin | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 9/15/1998 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Ross Pistone | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 1/21/1998 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Chuck Heffernan | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Peter Pope | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 3/18/1992 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Carl Reichardt | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Carl Reichardt | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Tom Sutton | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/20/1991 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Barry Williams | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 7/17/1996 | Newhall | Reject | $0.00 | N/A | Additional contract. |

| Ezra Zilkha | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement | 5/20/1988 | Newhall | Reject | $0.00 | N/A | Additional contract. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ezra Zilkha | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 11/14/1990 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| Steve Zimmer | 23823 Valencia Blvd. | Valencia | CA | 91355 | Indemnification Agreement Amendment | 7/21/1999 | Newhall | Reject | $0.00 | N/A | Additional contract. |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Change in Cure Amount

The attached list sets forth certain contracts for which the cure amount or claim amount has been amended.

| Amendments to Assumed/ Rejected Executory Contract Lists- Change in Cure Amount | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of Party | Address | City | State | Zip | Description of Contract | Contract # | Date of Contract | Debtor | Assumed/ Rejected/ Other | Claim Amount | Cure Amount | Change Made |
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82023192:OL | | Newhall | Assume | N/A | $169,940.63 | Cure amount was increased from $169,423.13 to $169,940.63 to account for invoice that was previously missing from Debtor's files. Some or all of the cure amount may be payable as an Allowed Permitted Lien. Duplicate payments will not be made. |
| CB Richard Ellis | 5000 Hopyard Road Suite 180 | Pleasanton | CA | 94588 | CBRE Agreement (leasing) | | | | Assume | N/A | $89,287.09 | Cure amount was increased from $78,000 to $89,287.09 by agreement of the parties. |
| DAVID GEORGE & ASSOCIATES INC | 20321 SW Birch Street Ste. 200 | Newport Beach | CA | 92660 | consultant - architecture | 82018414 : OL | | Newhall | Assume | N/A | $17,237.46 | Cure amount was increased from $15,800 to $17,237.46 by agreement of the parties. |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Change in Classification

The attached list sets forth certain contracts whose classification has been changed from "Non-Executory" to "Assumed" or "Rejected", as applicable.

NY 239671081v1

| Name of Party | Address | City | State | Zip | Description of Contract | Contract # | Date of Contract | Debtor | Assume/ Reject/ Other | Claim Amount | Cure Amount | Change Made |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82047750 : OL | | Newhall | Assume | N/A | $8,465.11 | Contract was previously categorized as "Other" and has since been categorized as "Assumed." Some or all of the cure amount may be payable as an Allowed Permitted Lien. Duplicate payments will not be made. |
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82047493 : OL | | Newhall | Assume | N/A | $55,879.37 | Contract was previously categorized as "Other" and has since been categorized as "Assumed." Some or all of the cure amount may be payable as an Allowed Permitted Lien. Duplicate payments will not be made. |
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82046861 : OL | | Newhall | Assume | N/A | $58,626.31 | Contract was previously categorized as "Other" and has since been categorized as "Assumed." Some or all of the cure amount may be payable as an Allowed Permitted Lien. Duplicate payments will not be made. |
| R T FRANKIAN & ASSOCIATES | 1329 Scott Road | Burbank | CA | 91504 | consultant - geotechnical | 82033291 : OL | | Newhall | Reject | $248,785.76 | N/A | Contract was previously categorized as "Other" and has since been categorized as "Rejected." |