# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> **LANDSOURCE COMMUNITIES DEVELOPMENT LLC,** *et al.,* <br><br> *Debtors*. | **Chapter 11** <br><br> **Case No. 08-11111 (KJC)** <br><br> **Jointly Administered** <br><br> Objection Deadline: February 24, 2010 at 4:00 p.m. (ET) <br> Hearing Date: March 3, 2010 at 2:00 p.m. (ET) |

## FIRST (SUBSTANTIVE) OMNIBUS OBJECTION BY REORGANIZED LENNAR MARE ISLAND, LLC TO CERTAIN (A) NO LIABILITY; (B) REDUCE AND ALLOW; AND (C) MISCLASSIFIED CLAIMS

Lennar Mare Island, LLC, one of the debtors in the above-captioned bankruptcy case ("LMI", or when referencing facts occurring after the Effective Date of the Plan, "Reorganized LMI"), by and through its undersigned counsel, hereby submits this omnibus objection (the "Omnibus Objection") seeking entry of an order pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Rule 3007-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") disallowing and/or reducing and allowing certain claims listed in Exhibits A, B and C to the attached Proposed Order. In support of this Omnibus Objection, the Reorganized Debtors rely on the *Declaration of Thomas Sheaff in Support of the First (Substantive) Objection by Reorganized Lennar Mare Island, LLC to Certain (A) No Liability; (B) Reduce and Allow; and (C) Misclassified Claims* (the "Sheaff Declaration"), filed contemporaneously herewith. In further support of this Omnibus Objection, Reorganized LMI respectfully represents as follows[1]:

---

[1] Capitalized terms not defined herein have the same meaning as defined in the Plan.

## JURISDICTION

1. This Court has jurisdiction to consider this Omnibus Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 502 of title 11 of the Bankruptcy Code, Rule 3007 and Rule 9014 of the Bankruptcy Rules, and Rule 3007-1 of the Local Rules.

## BACKGROUND

### A. The Chapter 11 Case

3. On June 8, 2008 (the "Petition Date"), LandSource Communities Development, LLC and most if its direct and indirect subsidiaries, including LMI (collectively, the "Debtors", or when referencing facts occurring after the Effective Date of the Plan, the "Reorganized Debtors") filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. On June 10, 2008, the Court entered an Order jointly administering the Debtors' bankruptcy cases under the above-captioned bankruptcy number.

4. On July 20, 2009, the Court entered an Order confirming the *Second Amended Joint Chapter 11 Plans of Reorganization for LandSource Communities Development LLC and each of its Affiliated Debtors* (the "Plan") [Docket No. 2151]. The Plan became effective on July 31, 2009 (the "Effective Date").

5. The Plan provided that it was to be funded from a variety of sources, including payment by Lennar Corporation or one of its wholly-owned subsidiaries ("Lennar") of $140 million on the Effective Date. See Plan, Section VIII.E. The consideration that Lennar received in return included 100% of the equity interests in Reorganized LMI. This took the form

of cancelling the member interests in LMI that were held by LandSource Holding Company, LLC (which was a Debtor and was and is wholly owned by LandSource Communities Development, LLC, now renamed Newhall Land Development, LLC ("Reorganized LandSource")) and issuing new member interests in Reorganized LMI to Lennar Homes of California, Inc. ("LHOC"). The Plan further provided that cash held by LMI on the Effective Date was to be swept to Reorganized LandSource. In fact, on the Effective Date, Lennar contributed $140 million to funding the Plan and the transactions provided for in the Plan were consummated, including cancelling the member interests in LMI that had been held by LandSource Holding Company, LLC, issuing new member interests in Reorganized LMI to LHOC and sweeping the cash held by LMI to Reorganized LandSource.

6. Pursuant to Article XI.A of the Plan, the Reorganized Debtors are responsible for filing objections to all claims except for objections to Class 5 general unsecured claims, which are the responsibility of the Creditor Trust. Any objections were required pursuant to Article XI.A of the Plan to be filed no later than 180 days after the Effective Date, or January 27, 2009, unless the deadline for objecting to claims was extended by the Court.

7. Reorganized LMI and Reorganized LandSource are in disagreement as to who is required to fund any Allowed Administrative and Priority Claims asserted against LMI.

8. Reorganized LMI asserts that funding any such payments is the responsibility of Reorganized LandSource or the holders of the First Lien Secured Claims who funded the Rights Offering. Reorganized LMI and Lennar contend that all such Plan payments were to be funded from three primary sources: (i) the $140 million paid by Lennar, (ii) cash on hand of all the Debtors on the Effective Date (including the cash swept from LMI to Reorganized

LandSource), and (iii) proceeds of a Rights Offering (up to $140 million) to be raised by the holders of the First Lien Secured Claims. See Plan, Section VIII.C.

9. A group of the holders of the First Lien Secured Claims committed to backstop the Rights Offering, up to a maximum amount of $140 million. The amount of cash needed to be raised by the Rights Offering depended on a number of variables, including the amount of Administrative and Priority Claims against all the Debtors that needed to be paid. Thus, the amount of cash to be raised by the Rights Offering was expressed as an amount of "up to $140 million," which when combined with the $140 million paid by Lennar and the cash on hand on the Effective Date, would be sufficient to make all Plan payments, including all allowed Administrative Expense and Priority Claims against all Debtors. See Plan, Sections I.A.157 and VIII.C. In fact, on the Effective Date, the Rights Offering was funded in the amount of approximately $115.3 million (i.e., about $25 million less than the commitment from the subset of the senior lenders who backstopped the Rights Offering).

10. Reorganized LMI and Lennar assert that neither of them is responsible for paying any Administrative and Priority Claims allowed against LMI since all such payments were to come from the sources mentioned above, which were received by Reorganized LandSource, and that LMI and Lennar have already fully funded their obligations under the Plan. Reorganized LMI and Lennar also point out that Reorganized LMI received in the Plan a discharge from liability for any such Claims.[2] Reorganized LandSource disagrees and asserts

---

[2] Pursuant to Article I.A.4 of the Plan, "Administrative Expense Claim" is defined to include any claim "incurred" by the Debtors pursuant to sections 503(b) or 507(a)(2) of the Bankruptcy Code after the Petition Date and/or prior to the Effective Date. Pursuant to Article X.A.1 of the Plan, the Reorganized Debtors (including Reorganized LMI) were discharged from any and all Claims (defined to include Administrative Expense Claims and Priority Claims) based on "any act or omission, transaction, or other occurrence taking place on or before the Effective Date . . . ." Pursuant to Article XII.E of the Plan, upon entry of the Confirmation Order, all Holders of Claims were barred and enjoined from asserting any Claim against the Reorganized Debtors entitled to a discharge under the Plan, including Reorganized LMI.

4

that Reorganized LMI is responsible for funding any payments needed to satisfy any Allowed Administrative Expenses asserted against LMI.

11. Reorganized LMI and Reorganized LandSource, however, do not intend to let their disagreement regarding the source of funding of any Allowed Administrative Expenses or Priority Claims prejudice whichever of them (or whomever else is responsible for making such payments) by allowing the objection deadline to pass without objections being filed to Claims that should not be allowed irrespective of this dispute between Reorganized LMI and Reorganized LandSource. Accordingly, Reorganized LMI files this objection, but without prejudice to its position that parties other than Reorganized LMI are responsible for funding any such Claims if and to the extent they are Allowed.

## **RELIEF REQUESTED**

12. In the ordinary course of business, Reorganized LMI maintains books and records that reflect, among other things, the liabilities of LMI and Reorganized LMI, and the amounts thereof owed to their creditors. As set forth in the Sheaff Declaration, Reorganized LMI has conducted a thorough review of the proofs of claim (including any supporting documentation) for Administrative Expenses and Priority Claims asserted against LMI, the Claims set forth therein, and Reorganized LMI's books and records to determine the validity of the asserted Claims.

13. By this Omnibus Objection, Reorganized LMI objects to the Claims set forth on Exhibits A, B, and C attached to the Proposed Order (the "Claims") and, for the reasons described below, seeks entry of the Proposed Order, pursuant to Bankruptcy Code sections 105(b) and 510(b), Bankruptcy Rule 3007, Local Rule 3007-1 and the Bar Date Order, disallowing and expunging, reducing, and/or reclassifying the respective Claims.

5

**Claims by the City of Vallejo**

14. As explained in further detail in the Sheaff Declaration, the City of Vallejo (the "City") filed several Claims against LMI that Reorganized LMI believes are unsupported in whole or in part by its books and records, or are improperly asserted as Priority or Secured Claims, as opposed to general unsecured claims. Reorganized LMI objects to the following Claims filed by the City:

15. *Claim No. 1166 ($917,600)*. The City's Claim No. 1166 was filed in response to a long-standing dispute between LMI and the City which originated well before the Petition Date. The dispute is regarding the 2002-1 Community Facilities District ("CFD") for the Mare Island project and LMI's obligation to fund the CFD's gap between expenses and revenues. In December 2008, LMI paid all CFD funds claimed by the City except for $917,600 in charges disputed by LMI. Reorganized LMI asserts (and LMI has asserted since December 2008 or earlier) that the City significantly overcharged LMI and violated the provisions of the Rate & Method of Apportionment of the CFD funds established by the City upon the formation of the CFD. Reorganized LMI believes based on a review of its own books and records that it presently owes the City $0 on account of Claim No. 1166, after accounting for CFD overcharges, and therefore Claim No. 1166 appears on the attached Exhibit A list of No Liability Claims.

16. Moreover, even the City's Claim No. 1166 is deemed allowed in any amount, Reorganized LMI asserts that this Claim must be reclassified as a general unsecured claim, as referenced in the attached Exhibit C list of Misclassified Claims. The City claims that Claim No. 1166 is both a secured claim and a claim entitled to priority status pursuant to Section 507(a)(8) of the Bankruptcy Code. However, Claim No. 1166 cannot be classified as any claim other than a general unsecured claim.

6

17. First, a review of the proof of claim indicates that the City's own allegations, even accepting them as true, assert that this Claim was not incurred during the periods prescribed in Bankruptcy Code section 507(a)(8). Accordingly, Reorganized LMI denies that this Claim is entitled to priority status.

18. Second, with respect to secured status, the Plan provides that the only Secured Claims that are to be provided secured status are those Claims that were not primed by (i) claims from the approximately $1.2 billion in Super-Priority Debtor-in-Possession Financing ("<u>DIP Financing</u>") provided in these cases pursuant to the Super-Priority Debtor-In-Possession First Lien Credit Agreement dated June 10, 2008 (the "<u>DIP Credit Agreement</u>"), or by (ii) claims from the $244 million in debt pursuant to the Second Lien Credit Agreement.[3] The DIP Financing was secured by liens on substantially all estate assets. In order for a creditor to assert that its liens stood ahead of the liens of DIP lenders, creditors were required to come before the Court and assert their priority as a holder of a "Permitted Lien" prior to entry of the Final DIP Order.[4] The Interim DIP Order [Docket No. 30] provided notice to all purported creditors asserting seniority that they must file a notice to that effect prior to the Final DIP hearing; the City failed to come forward. This Court's orders approving this DIP Financing and in confirming the Plan provided that only "Permitted Liens" (with respect to the Final DIP Order)

---

[3] Pursuant to Section I.A.167 of the Plan, which defines "Senior Permitted Lien Claim," a Claim can only be a Senior Permitted Lien Claim if (i) it constitutes "a validly perfected lien against property of the Debtors," and (ii), it has "priority over the liens securing the Debtors' obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement as of the Commencement Date."

[4] The DIP Credit Agreement provided that only holders of "Permitted Liens," as defined in Section 1.01, held priority over and above the priority of claims by the DIP lenders. The definition of "Permitted Liens" does not apply to those liens which are considered "Primed Liens." "Primed Liens" are defined in Section 1.01 to include any liens held by claimants who did not challenge the priority of the liens securing the DIP Financing prior to entry of a Final DIP Order by filing an objection or other pleading before the Bankruptcy Court. Pursuant to Paragraph 8(a)(i) of the Interim DIP Order entered on June 10, 2008 [Docket No. 30], the superpriority claims of the DIP lenders were made senior to all liens except "Permitted Liens." Paragraph 28 of the Interim DIP Order gave creditors notice of the Final DIP hearing and instructions for filing any objections to entry of a final order approving the DIP Financing.

7

and "Senior Permitted Lien Claims" (with respect to the Plan) were not primed by the DIP Financing. Pursuant to the Plan, only Allowed Senior Permitted Lien Claims are entitled to any distribution as Secured Claims, while any other Secured Claims are deemed to be Unsecured Claims unless the claimant commenced an action before the Bankruptcy Court to have the asserted senior lien added to the lists of Senior Permitted Liens pursuant to an order entered by this Court no later than the Confirmation Date.[5] The City again failed to challenge its treatment set forth under the Plan. Accordingly, Reorganized LMI asserts that even if the City's Claim were valid, under the terms of the Plan it is not entitled to secured status.

19. For these reasons, Claim No. 1166 is included on the list of Misclassified Claims attached as Exhibit C to the Proposed Order.

20. *Claim No. 1167 ($40,816).* The City filed Claim No. 1167 against LMI, asserted as an administrative priority claim, based on four months of payments of $10,204/month supposedly due under a letter agreement for use of City staff engineering services. In return for this monthly amount, the City was to provide LMI with a 50% discount on all fees associated with its engineering submittals. On or about April 8, 2009, LMI notified the City that LMI was being subjected to payment of fees in excess of those authorized under the letter agreement. While LMI and Reorganized LMI thereafter followed up with emails and/or letters to City staff to discuss the fee overcharge, the City has not responded. Reorganized LMI believes based on a review of its own books and records that LMI owes approximately $22,783.85 less than the City asserts on account of Claim No. 1167. Therefore, after accounting for City fee overcharges,

---

[5] Section I.A.167 of the Plan provides that all Claims which appear to be proper Senior Permitted Lien Claims appear in Exhibit H to the Disclosure Statement, while Exhibit I to the Disclosure Statement includes all Claims asserted as Senior Permitted Lien Claims which do not appear to qualify. For any Claim which purports to be a Secured Claim but which does not appear on Exhibit H or Exhibit I, Section I.A.167 then provides that any such Claim will be deemed an Unsecured Claim. The City was not listed as a lien claimant in either Exhibit H or Exhibit I. See Notice of Filing Revised Exhibits to Disclosure Statement [Docket No. 2222], filed on July 31, 2009.

Reorganized LMI believes that Claim No. 1167 should be reduced and allowed as a claim for $18,032.15. Claim No. 1167 is listed on the chart of Reduce and Allow Claims attached as Exhibit B. Reorganized LMI hereby requests that the City demonstrate through documents or other evidence that charges above this amount remain outstanding after accounting for fee overpayments by LMI.

21. *Claim No. 1240 ($1,000,000)*.[6] The City filed one claim, asserting secured and unsecured components, based on LMI's supposed liability pursuant to a Dredge Pond and Settlement Agreement by and between the City and LMI. The City states that LMI's liability stems from two sources. First, the City asserts a $500,000 general unsecured claim based on a missed fourth and final installment payment of $500,000 pursuant to the Dredge Pond and Settlement Agreement. Second, the City asserts a $500,000 secured claim based on its purported rights to certain escrowed funds for capital improvements totaling $500,000. Pursuant to the Plan, and as noted in Exhibit 18 of the *Second Plan Supplement* [Docket No. 1895], the Dredge Pond and Settlement Agreement was rejected by LMI. LMI does not dispute that it failed to make the final $500,000 payment under the Dredge Pond and Settlement Agreement and does not object to the City's $500,000 general unsecured claim for this missed payment.[7] However, Reorganized LMI does object to the City's purported $500,000 secured claim. As noted in the City's proof of claim itself,[8] LMI was obligated to establish two escrow accounts for $250,000 each to benefit the Greater Vallejo Recreation District and Mare Island Historic Park Foundation,

---

[6] Pursuant to the *Second (Non-Substantive) Omnibus Objection by Reorganized Lennar Mare Island, LLC to Certain (A) Duplicate and (B) Insufficiently Documented Claims*, filed simultaneously herewith, Reorganized LMI also objects to Claim No. 1242 filed by the City against LMI. Claim No. 1242 is entirely duplicative of Claim No. 1240. If the Court grants both the substantive and non-substantive objections to Claim Nos. 1240 and 1242, all that should remain will be the $500,000 general unsecured claim asserted by the City against LMI as Claim No. 1240.

[7] Reorganized LMI does not seek to prejudice the rights of the Creditor Trust to object in the future to the City's Class 5 general unsecured claim.

[8] See Proof of Claim No. 1240, p. 3; Exh. B.

respectively. These amounts were irrevocably paid, they were characterized as "donations" by LMI, and use of these funds for future capital improvements to benefit these two groups requires the approval of both LMI and the City. To this day, the funds remain in their escrow accounts. As these funds were held for the benefit of parties other than LMI even before the Petition Date, they are not property of the estate. TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.), 158 B.R. 583, 585-87 (D. Del. 1993) (holding that even when a debtor maintains some minimal legal or equitable interest in escrow funds, the greater equitable interest of a grantee means that the funds are not property of the debtor's bankruptcy estate). As a result, the City cannot recover on any Claim based on the escrowed funds, and Claim No. 1240 must be reduced so that it only covers the $500,000 general unsecured liability based on rejection of the Dredge Pond and Settlement Agreement. This Claim is listed on the chart of Reduce and Allow Claims attached as Exhibit B.

**Claim by Bank of America**

22. Bank of America, N.A. ("BofA") filed Claim No. 1213 asserting that LMI owes BofA $45,108.19. Claims for identical amounts were also filed by BofA against all of the other Debtors. BofA asserts that all Debtors are jointly and severally liable for certain costs incurred to replace prepetition letters of credit issued under the First Lien Credit Agreement with letters of credit under the DIP Credit Agreement, which was approved by the Court's *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(c) and (B) to Utilize Cash Collateral of Pre-petition Secured Parties, (II) Authorizing the Repayment in Full of All Obligations in Respect of the First Lien Credit Facility, (III) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 (IV) Treating Certain Information as Confidential Pursuant to Bankruptcy Rule 9018, and (V) Granting Related Relief* (the "Final DIP Order"), entered on July 19, 2008

[Docket No. 306]. As described in the Final DIP Order, certain postpetition expenses incurred by lenders related to prepetition letters of credit issued under the First Lien Credit Agreement were included in the "roll-up" of prepetition debt under the DIP Credit Agreement. Treatment of these expenses is also discussed in the DIP Credit Agreement itself.[9] BofA's proof of claim includes a short ½ page summary stating that $31,742.44 in "Attorneys Fees and Costs related to Letter of Credit," and $13,365.75 in "Costs and fees related to Issuance of Letters of Credit" are entitled to administrative priority status, without any mention of treatment of such fees and expenses under the DIP Credit Agreement and the Final DIP Order.

23. The Plan specifically dealt with all Claims arising under the DIP Credit Agreement and the Final DIP Order,[10] and Reorganized LMI understands that Reorganized LandSource has satisfied those obligations in full. Reorganized LMI has received no other documentation to support the full amount of costs and fees claimed by BofA and has no information supporting these amounts in its own books and records. Moreover, BofA's proof of

---

[9] Section 2.02(a) of the DIP Credit Agreement, approved by the Final DIP Order, states the following:

(a) <u>Roll-Up Facility</u>. Upon entry of te Final Order by the Bankruptcy Court (the "<u>Roll-Up Date</u>"), the Prepetition First Lien Obligations shall be deemed to have been refinanced by the Roll-Up Facility and the Prepetition First Lien Obligations shall be deemed to have been extinguished on the Roll-Up Date. Any fees or charges or amounts in respect of any Prepetition First Lien Letter of Credit presented for payment or reimbursement (in whole or in part) which arise and accrue after the Petition Date and through the Prepetition First Lien letter of Credit Replacement Date shall constitute additional Roll-Up Facility Obligations and shall be added to the Roll-Up Facility Obligations as of each date that any such fees, charges and/or amounts shall become due and owing in accordance with the Prepetition First Lien Credit Agreement.

[10] "First Lien Secured Claims" are defined in the Plan to include Claims stemming from the "Roll-Up Facility" (defined as the roll-up as described in section 2.02 of the DIP Credit Agreement) and the First Lien Credit Agreement. Section I.A.84 of the Plan defines First Lien Secured Claims as follows:

the Secured Claims of and obligations owing to the lenders with respect to the Roll-Up Facility and the First Lien Credit Agreement in such amount equal to the Value of the Encumbered Assets less the amount outstanding under the Revolver Facility as of the Effective Date. The First Lien Secured Claims are Allowed pursuant to this Plan and will be deemed Class 3(a) - (u) Claims.

Pursuant to Section XII.E of the Plan, any and all Claims were then discharged and released.

claim and the Final DIP Order acknowledge that any LMI liability to BofA stems from issuance of a guaranty of the primary obligations of co-debtor LandSource Holding Company, LLC. To the extent that BofA's claim is satisfied in full by the primary borrower LandSource Holding Company, LLC (which it was, in accordance with the Plan), any liability of LMI as guarantor must be extinguished. Reorganized LMI hereby objects to the full amount of Claim No. 1213 and lists this claim on the attached Exhibit A.

24. Reorganized LMI understands that each of the other non-LMI Debtors is also objecting to each of BofA's asserted claims for $45,108.19 in roll-up fees and expenses. Reorganized LMI joins in the separate objections of the other non-LMI Debtors for substantially the same reasons asserted by the non-LMI Debtors.

**Claim by Sonrise Consolidated, Inc.**

25. On June 25, 2009, Sonrise Consolidated, Inc. ("Sonrise") filed Claim no. 1138 an "Administrative Secured" claim against LMI for $11,765.39. Upon reviewing the Debtors' claims register, Reorganized LMI discovered that Sonrise previously filed Claim No. 1032 on or about February 23, 2009 as an "Administrative Priority" claim seeking compensation pursuant to section 503(b)(9) of the Bankruptcy Code. Claim No. 1032 was previously expunged by the Court as a late-filed claim. Claim No. 1138 seeks compensation for the same purported LMI liability as the previously late-filed Claim. Reorganized LMI believes there is no basis for asserting an Administrative Secured claim in lieu of the late-filed 503(b)(9) claim, and therefore Claim No. 1138 is also a late-filed Claim. Reorganized LMI hereby seeks to disallow and expunge this claim in its entirety and lists the claim on Exhibit A.

**Claims Satisfied Post-Petition**

26. Pursuant to Local Rule 3007-1(e)(iii)(J)(2), a party cannot object to a claim on grounds that the claim has been paid and satisfied post-petition, and therefore

Reorganized LMI has not filed objections to several claims that are satisfied as of the date of this Omnibus Objection. However, Reorganized LMI notes that the following claims were paid in full after the Effective Date:

| Creditor | Claim Number(s) | Amount of Claim(s) | Date Paid | Nature |
|---|---|---|---|---|
| California Dept. of Toxic Substances Control | 1168 | $102,873.80 | 12/3/2009 | Administrative Priority |
| Pacific States Environmental | 1179 | $21,593.30 | 12/14/2009 | Administrative Priority |
| Ghilotti Construction Company | 1180 | $565 | 10/19/2009 | Administrative Priority |
| East Bay Construction Co. | 1131 and 1133 | $157,836.16 | 2 Installments 9/14/2009 and 10/5/2009 | Secured |

## **LEGAL BASES FOR OBJECTION**

27. When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992); Matter of Int'l Match Corp., 69 F. 2d 73, 76 (2d Cir. 1934) (finding that a proof of claim should at least allege facts from which legal liability can be seen to exist). Where the claimant alleges sufficient facts to support its claim, its claim is afforded *prima facie* validity. In re Allegheny Int'l, Inc., 954 F.2d at 173. A party wishing to dispute such a claim must produce evidence in sufficient force to negate the claim's *prima facie* validity. Id. In practice, the objecting party must produce evidence that would refute at least one of the allegations essential to the claim's legal sufficiency. Id. Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. Id. The burden of persuasion is always on the claimant. Id.

13

28. For the reasons discussed in the preceding section, the Claims addressed in this Omnibus Objection do not meet the standards for *prima facie* validity and should be disallowed, reduced, or reclassified as requested.

## SEPARATE CONTESTED MATTERS

29. To the extent that a response is filed regarding any Claim listed in this Omnibus Objection and Reorganized LMI is unable to resolve the response, each such Claim, and the objection by Reorganized LMI to each such Claim asserted herein, shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014. Any order entered by the Court regarding an objection asserted in the Omnibus Objection shall be deemed a separate order with respect to each Claim.

## RESPONSES TO OMNIBUS OBJECTIONS

30. To contest an objection, a Claimant must file and serve a written response to this Omnibus Objection (a "Response") so that it is received no later than February 24, 2010 at 4:00 p.m. (Eastern Standard Time) (the "Response Deadline"). Every Response must be filed with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware: 824 Market Street, Wilmington, Delaware 19801, and served upon the following entities, so that the Response is received no later than the Response Deadline, at the following addresses:

> O'Melveny & Myers LLP
> 400 S. Hope St.
> Los Angeles, CA 90071
> Attn: Ben H. Logan and
> Michael Heinrichs
>
> - and -

>           Pepper Hamilton LLP
>           Hercules Plaza, Suite 5100
>           1313 Market Street
>           P.O. Box 1709
>           Wilmington, DE 19899-1709
>           Attn:   David B. Stratton
>
>           *Co-Counsel for the Debtors*

31. Every Response to this Omnibus Objection must contain at a minimum the following information:

   (a) a caption setting forth the name of the Court, the name of the Debtors, the case number, and the title of the Omnibus Objection to which the Response is directed;

   (b) the name of the Claimant, his/her/its claim number, and a description of the basis for the amount of the Claim;

   (c) the specific factual basis and supporting legal argument upon which the party will rely in opposing this Omnibus Objection;

   (d) any supporting documentation, to the extent it was not included with the Proof of Claim previously filed with the clerk or claims agent, upon which the party will rely to support the basis for and amounts asserted in the Proof of Claim; and

   (e) the name, address, telephone number, and fax number of the person(s) (which may be the Claimant or the Claimant's legal representative) with whom counsel for the Debtors should communicate with respect to the Claim or the Omnibus Objection and who possesses authority to reconcile, settle, or otherwise resolve the objection to the disputed claim on behalf of the Claimant.

32. If a Claimant fails to file and serve a timely Response by the Response Deadline, Reorganized LMI may present to the Court an appropriate order disallowing such Claimant's claim without further notice to the Claimant.

**REPLIES TO RESPONSES**

15

33. Consistent with Local Rule 9006-1(d), Reorganized LMI may, at its option, file and serve a reply to a Response no later than 4:00 p.m. (Eastern Standard Time) one day prior to the deadline for filing the agenda on any hearing to consider the Omnibus Objection.

## **RESERVATION OF RIGHTS**

34. Reorganized LMI hereby reserves the right to object in the future to any of the Proofs of Claim listed in this Omnibus Objection or on the exhibits attached hereto on any ground, and to amend, modify, and/or supplement this Omnibus Objection, including, without limitation, to object to amended or newly-filed claims. Separate notice and hearing will be scheduled for any such objection.

35. Notwithstanding anything contained in this Omnibus Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that Reorganized LMI may have: (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code against the holders of claims subject to the Omnibus Objection; or (b) to exercise its rights of setoff against the holders of such claims relating to such avoidance actions.

## **NOTICE**

36. Reorganized LMI has provided notice of this Omnibus Objection to: (a) the United States Trustee for the District of Delaware; (b) counsel to the Creditors' Trust; counsel to the Reorganized Debtors (other than Reorganized LMI); (d) each of the Claimants whose Proof of Claim is subject to this Omnibus Objection; and (e) those parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules. In light of the nature of the relief requested, Reorganized LMI respectfully submits that no further notice is necessary.

## **COMPLIANCE WITH LOCAL RULE 3007-1**

37. The undersigned representative of Pepper Hamilton LLP certifies that he has reviewed the requirements of Local Rule 3007-1 and that the Omnibus Objection

substantially complies with that Local Rule.  To the extent that the Omnibus Objection does not comply in all respects with the requirements of Local Rule 3007-1, Pepper Hamilton LLP believes such deviations are not material and respectfully requests that any such requirement be waived.

WHEREFORE, Reorganized LMI respectfully requests the entry of the Proposed Order, substantially in the form attached hereto as **Exhibit 1**, granting the relief requested and granting such other and further relief as the Court deems just and proper.

Wilmington, Delaware
January 27, 2010

PEPPER HAMILTON LLP

/s/ David B. Stratton
David B. Stratton (DE No. 960)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:   (302) 777-6500
Facsimile:    (302) 421-8390

O'MELVENY & MYERS LLP
Ben H. Logan
400 S. Hope Street
Los Angeles, CA 90071
Telephone:   (213) 430-6000
Facsimile:    (213) 430-6407