# EXHIBIT D

## LLC Agreement

**LANDSOURCE COMMUNITIES DEVELOPMENT LLC**
a Delaware limited liability company

**SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

**EFFECTIVE AS OF FEBRUARY 27, 2007**

# TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINED TERMS ........................................................... 3

    1.1    Defined Terms ...................................................... 3

    1.2    Interpretation ....................................................... 20

ARTICLE 2     FORMATION AND NAME .......................................... 20

    2.1    Formation ............................................................ 20

    2.2    Name .................................................................. 20

    2.3    Additional Members ............................................. 21

    2.4    Actions by Lennar Member and LNR Members as the Class A Member ........... 22

ARTICLE 3     TERM ....................................................................... 23

    3.1    Term ................................................................... 23

ARTICLE 4     PURPOSE OF BUSINESS; OTHER BUSINESS AND ACTIVITIES; NO PARTNERSHIP OR JOINT VENTURE ................ 23

    4.1    Purposes of Business .......................................... 23

    4.2    No Partnership or Joint Venture ......................... 24

    4.3    Business Opportunities ....................................... 24

ARTICLE 5     PRINCIPAL OFFICE, REGISTERED OFFICE AND REGISTERED AGENT ................................................ 24

    5.1    Principal Office and Mailing Address ................. 25

    5.2    Registered Agent and Office ............................... 25

ARTICLE 6     NAMES AND ADDRESSES OF MEMBERS ............... 25

    6.1    Names, Addresses and Percentage Interests ....... 25

ARTICLE 7     INVESTED CAPITAL AND LOANS ......................... 25

    7.1    Original Capital .................................................. 25

    7.2    Additional Capital Contributions ....................... 26

    7.3    No Interest on Capital Contributions .................. 30

    7.4    Return of Capital Contributions ......................... 30

    7.5    Loans to Company .............................................. 30

ARTICLE 8     COMPENSATION OF AND PAYMENTS TO THE MEMBERS AND THEIR AFFILIATES; ............................ 30

    8.1    Generally ............................................................ 30

    8.2    Reimbursements; Payment of Compensation ...... 31

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---:|
| 8.3 | Transactions with Members and/or Affiliates | 31 |
| 8.4 | [Intentionally Omitted] | 32 |
| 8.5 | Option Agreements; Development Agreements | 32 |
| 8.6 | Rights of First Offer | 32 |
| 8.7 | Rights with respect to Future Residential and Commercial Property | 34 |
| ARTICLE 9 | CAPITAL ACCOUNTS; PROFITS AND LOSSES; DISTRIBUTIONS | 34 |
| 9.1 | Capital Accounts | 34 |
| 9.2 | Allocations of Profit and Losses and Other Allocation Provisions | 35 |
| 9.3 | Compliance with Section 704(b) and Excluded Entity Allocation | 36 |
| 9.4 | Distributions | 36 |
| 9.5 | Distributions in Liquidation | 39 |
| 9.6 | Compliance with Section 704(c) and Debt Allocation | 39 |
| 9.7 | Priority of Members | 41 |
| 9.8 | No Restoration of Negative Capital Account | 41 |
| 9.9 | Withheld Amounts | 41 |
| 9.10 | Consent to Allocations | 41 |
| 9.11 | Certificate of Nonforeign Status | 41 |
| 9.12 | Indemnification of Responsible Withholding Agent | 41 |
| 9.13 | Tax Treatment | 41 |
| ARTICLE 10 | MANAGEMENT OF THE COMPANY | 42 |
| 10.1 | Management by Managing Member and Executive Committee | 42 |
| 10.2 | Number; Manner of Appointment; Vacancy | 43 |
| 10.3 | Appointment of Initial Members of the Executive Committee | 43 |
| 10.4 | Place of Meetings | 44 |
| 10.5 | Regular Meetings | 44 |
| 10.6 | Special Meetings; Notice | 44 |
| 10.7 | Quorum; Unanimous Vote | 44 |
| 10.8 | Procedure; Minutes | 44 |
| 10.9 | Compensation of Executives | 45 |

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 10.10 | Action Without Meeting | 45 |
| 10.11 | Telephone and Similar Meetings | 45 |
| 10.12 | Tax Matters | 45 |
| 10.13 | Financial Records and Reports | 46 |
| 10.14 | Accountants | 51 |
| 10.15 | Duties of and Fees to the Managing Member | 51 |
| 10.16 | Duties of and Fees to the Land Bank Managing Member | 54 |
| 10.17 | The Business Plan | 57 |
| 10.18 | Financing | 58 |
| 10.19 | Time | 60 |
| 10.20 | Insurance | 60 |
| 10.21 | Major Decisions | 61 |
| 10.22 | Management of Subsidiaries | 64 |
| ARTICLE 11 | TRANSFER OF INTERESTS | 64 |
| 11.1 | Prohibition Against Transfer | 64 |
| 11.2 | Effect of Assignment; Documents | 64 |
| 11.3 | Effect of Transfer | 65 |
| 11.4 | Amendment of Certificate of Formation | 65 |
| 11.5 | Buy-Sell. | 65 |
| 11.6 | Pledges of Interests in Members | 67 |
| 11.7 | Effect of Noncompliance | 69 |
| 11.8 | Certificated Interests | 69 |
| ARTICLE 12 | LIABILITY AND INDEMNIFICATION | 69 |
| 12.1 | Liability of Executives and Members | 69 |
| 12.2 | Indemnification and Insurance | 70 |
| ARTICLE 13 | DISSOLUTION AND TERMINATION OF THE COMPANY | 73 |
| 13.1 | Dissolution | 73 |
| 13.2 | Winding-Up | 74 |
| 13.3 | Dissolution and Cancellation | 74 |
| 13.4 | Waiver of Action for Dissolution | 74 |

# TABLE OF CONTENTS
## (continued)

ARTICLE 14     NOTICES ............................................................. 75

    14.1   Notices ............................................................. 75

ARTICLE 15     FISCAL YEAR ..................................................... 75

    15.1   Fiscal Year ......................................................... 75

ARTICLE 16     BANK ACCOUNTS .............................................. 75

    16.1   Bank Accounts ................................................... 75

ARTICLE 17     AGREEMENT AND AMENDMENTS ................... 75

    17.1   Agreement and Amendments ............................... 75

ARTICLE 18     BINDING EFFECT ............................................... 76

    18.1   Binding Effect .................................................... 76

ARTICLE 19     APPLICABLE LAWS ........................................... 76

    19.1   Applicable Laws ................................................ 76

ARTICLE 20     DISCLOSURES .................................................... 76

    20.1   Disclosures ........................................................ 76

    20.2   Member's Indemnity .......................................... 78

ARTICLE 21     MISCELLANEOUS ............................................. 78

    21.1   Waiver of Action for Dissolution ....................... 78

    21.2   Third Party Beneficiaries ................................... 78

    21.3   Counterparts ...................................................... 78

    21.4   Provisions Severable ......................................... 78

    21.5   Waiver ............................................................... 79

    21.6   Further Assurances ............................................ 79

    21.7   Construction of Agreement ................................ 79

    21.8   Fees and Costs ................................................... 79

    21.9   Recalculation of Interest .................................... 79

    21.10  Venue ................................................................ 79

    21.11  [Intentionally Omitted] ...................................... 79

    21.12  Confidentiality ................................................... 80

    21.13  Publicity ............................................................ 81

    21.14  Arbitration ......................................................... 81

**TABLE OF CONTENTS**
(continued)

Page

21.15  JURY TRIAL WAIVER........................................................................... 81

# EXHIBITS

| | |
|---|---|
| Exhibit A | Members |
| Exhibit B | LandSource Direct Subsidiaries Interests |
| Exhibit 1.1(d) | IRR |
| Exhibit 1.1(e) | MWHP Land Legal Description |
| Exhibit 8.6(a)(i) | Residential ROFO Agreement |
| Exhibit 8.6(a)(ii) | Commercial ROFO Agreement |
| Exhibit 8.6(b) | Existing LandSource Agreements |
| Exhibit 10.3 | Executives |
| Exhibit 10.13(d) | Form of Responsible Contractor Report |
| Exhibit 10.13(g) | MWHP Policies and Requirements |
| Exhibit 10.13(h) | CalPERS' Objectives and Policies |
| Exhibit 10.15(b) | Development Management Services |
| Exhibit 10.16(a) | Land Bank Management Services |
| Exhibit 10.16(a)-1 | Development Management Fees and Land Bank Management Fees |
| Exhibit 10.17 | Business Plan |
| Exhibit 10.18 | Initial Financing Commitment Letter |
| Exhibit 10.20 | Insurance Requirements |

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## LANDSOURCE COMMUNITIES DEVELOPMENT LLC

**SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of LANDSOURCE COMMUNITIES DEVELOPMENT LLC**, a Delaware limited liability company (as the Company), adopted and effective as of February 27, 2007 (the "**Effective Date**"), by and among **LENNAR HOMES OF CALIFORNIA, INC.**, a California corporation (as the Lennar Member); **LNR NWHL HOLDINGS, INC.**, a Delaware corporation ("**LNR Holdings**"), and **LNR LAND PARTNERS SUB, LLC**, a Delaware limited liability company ("**LNR Land Partners**") (as the LNR Members, which together with the Lennar Member constitute the Class A Members); **MW HOUSING PARTNERS III, L.P.**, a California limited partnership ("**MWHP**") (as the Class B Member); and the **COMPANY**. Capitalized terms in this Agreement have the respective meanings set forth in Section 1.1.

## RECITALS

**WHEREAS**, the Company was originally formed under the name NWHL Investment LLC as a limited liability company under the Delaware Limited Liability Company Act (as it may be amended, the "**Act**") by the filing of its Certificate of Formation with the Secretary of State on July 17, 2003;

**WHEREAS**, the name of the Company was changed to LandSource Communities Development LLC in connection with the merger of the LandSource Predecessor with and into the Company (the "**Merger**"), the survivor of the Merger, by the filing of a certificate of merger with the Secretary of State on November 30, 2004;

**WHEREAS**, in connection with the Merger, each of the Original LNR Members and the Original Lennar Members, constituting all of the members of the Company upon the effective date of the Merger, entered into an Amended and Restated Limited Liability Company Agreement effective as of November 30, 2004 (the "**Amended Agreement**") for the purposes of setting forth their respective rights and obligations with respect to the Company, which Amended Agreement amended and restated (in its entirety) the original Limited Liability Company Agreement of the Company dated July 21, 2003;

**WHEREAS**, effective as of November 30, 2006, the Original Lennar Members consummated a series of transfer transactions resulting in the Lennar Member becoming the sole remaining member of the Original Lennar Members, subject to the terms and conditions of the Nominee Agreement executed on November 30, 2006 by the Original Lennar Members and the Lennar Member and, effective as of November 30, 2006, the Original LNR Members, consummated a series of transfer transactions resulting in LNR Holdings. and LNR Land Partners becoming the sole remaining members of the Original LNR Members (such transactions, collectively, the "**Lennar and LNR Member Consolidations**"), resulting in the Lennar Member and the LNR Members owning, in the aggregate, immediately prior to the admission of MWHP as a Member of the Company, 100% of the issued and outstanding Units (as such term is defined in the Amended Agreement) of the Company;

**WHEREAS**, MWHP has formed LandSource Holding Company, LLC (the "**Holding Subsidiary**") as a limited liability company under the Act;

**WHEREAS**, pursuant to the terms of the Formation Agreement, MWHP and Sterling Falls, LLC, a New Jersey limited liability company that is wholly-owned by MWHP, contributed, effective as of the Effective Date, to the capital of the Holding Subsidiary (the "**MWHP Subsidiary Contribution**") the MWHP Land and the MWHP Other Property (collectively, the "**MWHP Property**");

**WHEREAS**, pursuant to the terms of the Formation Agreement, MWHP has contributed cash to the Company in the amount of the MWHP Preliminary Cash Contribution;

**WHEREAS**, effective as of the Effective Date immediately after the MWHP Subsidiary Contribution, (A) the equity of the Company has been, pursuant to this Agreement, recapitalized (the "**Recapitalization**") from a two-class equity structure of Units as provided under the Amended Agreement to an equity structure of Interests (including Preferred Capital), resulting in a recapitalization and conversion of all of the Units owned by the Lennar Member and the LNR Members into an aggregate 32% Percentage Interest (a 16% Percentage Interest owned by the Lennar Member and an aggregate 16% Percentage Interest owned by the LNR Members) after giving effect to the Class A Special Distribution described in clause (B) and the simultaneous issuance of a 68% Percentage Interest to MWHP, as described in clause (C); (B) each of the Lennar Member, on the one hand, and the LNR Members, together on the other hand, received, or will receive, 50% of the Class A Special Distribution from the proceeds of certain financing obtained by the Company on or about the Effective Date, as described herein; and (C) the Company has issued to MWHP an aggregate 68% Percentage Interest in exchange for the contribution by MWHP of (i) its 100% ownership interest in the Holding Subsidiary, making the Holding Subsidiary a wholly-owned Subsidiary of the Company, and (ii) a cash contribution described herein;

**WHEREAS**, effective contemporaneously with the admission of MWHP as a Member of the Company and the MWHP Subsidiary Contribution, the Company contributed to the capital of Holding Subsidiary (the "**Company Subsidiary Contribution**") all of its assets, which were made up of (i) the equity interests owned by the Company in the Entities set forth in **Exhibit B** (the "**LandSource Direct Subsidiaries Interests**") and (ii) the LandSource Other Property (together with the LandSource Direct Subsidiaries Interests, the "**LandSource Property**"); and

**WHEREAS**, the Members of the Company desire to enter into this Agreement for the purpose of stating the rights and obligations of each of them and the Company.

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements set forth herein and other good and lawful consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree that the Amended Agreement is amended and restated in its entirety, as follows:

# ARTICLE 1

## DEFINED TERMS

1.1  **Defined Terms**.  The capitalized terms used in this Agreement shall have the respective meanings specified in this Section 1.1.

"**AAA**" has the meaning set forth in Section 10.15(d).

"**Accountants**" means Deloitte & Touche LLP (or its affiliate) or such other firm of certified public accountants agreed upon in writing by the Executive Committee.

"**Act**" means Delaware Limited Liability Company Act as enacted in the State of Delaware, as from time to time amended.

"**Additional Capital Contribution(s)**" means all contributions, other than Original Capital, made, or deemed to have been made, or required to be made, to the capital of the Company by the Members pursuant to Section 7.2, including any Substituted Capital Contributions and Priority Substituted Capital Contributions.  For purposes of calculating the IRR a Member has received pursuant to Section 9.4, all Additional Capital Contributions shall be deemed to have been made on the last day of the month in which an Additional Capital Contribution is made regardless of the day of such month on which it is actually made. Additional Capital Contributions shall not include the Excluded Entities.

"**Adjustment Determination Date**" has the meaning set forth in the Formation Agreement.

"**Affiliate(s)**" means, with respect to a Person: (a) any Person directly or indirectly owning, controlling or holding with power to vote ten percent (10%) or more of the outstanding voting securities of such Person; (b) any Person ten percent (10%) or more of whose outstanding securities are directly or indirectly owned, controlled or held with power to vote by such Person; (c) any Person directly or indirectly controlling, controlled by or under common control with such Person; (d) any officer, director, Entity manager, employee, member or partner of such Person; (e) if such Person is an officer, director, Entity manager, employee, member or partner, any Entity for which such Person acts in any such capacity; and (f) any sibling, direct descendant (including adopted children or grandchildren), parent, grandparent or spouse of such Person, or any trust or limited partnership created solely for the benefit of any such Person.

"**Agreement**" means this Second Amended and Restated Limited Liability Company Agreement of LandSource Communities Development LLC, as it may be amended and/or restated from time to time.

"**Amended Agreement**" has the meaning set forth in the Recitals.

"**Amended Southwest Options**" has the meaning set forth in the Formation Agreement.

"**Approval Actions**" has the meaning set forth in Section 10.1(a).

"**Authorization**" means each of the federal, state, county, local or foreign consents, licenses, permits, franchises, waivers, grants and/or other authorizations and/or rights granted and/or issued by, obtained from, filed with, or otherwise relating to any Governmental Entity, including any and all building permits, (i) pursuant to which the Company currently operates and/or holds any interest in the Property, (ii) that is required for or in connection with the ownership, development, operation and/or conduct of such Property as currently and/or expected to be operated and/or conducted, and/or (iii) that is required or appropriate for its employees and contractors, if any, to perform the services, duties and responsibilities performed by or on behalf of such Persons and/or for their respective customers.

"**Available Cash**" means cash receipts derived from Gross Revenues (without deduction for depreciation or for other noncash expenses or items), Reserves released to the Company operating accounts and cash available from previously contributed but unused and unallocated Invested Capital, and including unused and unallocated proceeds from any loans to the Company and unused and unallocated insurance proceeds, all as determined by the Executive Committee, after deduction for, as determined from time to time by the Executive Committee, amounts used or necessary to pay Cash Expenditures.

"**Available Property**" has the meaning set forth in Section 8.6(e).

"**Available Property Notice**" has the meaning set forth in Section 8.6(e).

"**Bad Act**" means, with respect to any Person, any act which constitutes (i) fraud or intentional misappropriation of funds, or (ii) gross negligence or willful misconduct with respect to any material act or omission on the part of such Person; provided, however, that if such act or omission is committed by an individual employee or agent of such Person and such individual employee or agent is terminated promptly upon such Person having knowledge of the act or omission and any loss resulting from such act or omission is fully covered by insurance, a surety bond or otherwise fully indemnified by the Managing Member or the Land Bank Managing Member, as applicable, then such act or omission shall not constitute a Bad Act.

"**Bankruptcy**" means the institution of any proceedings under federal or state laws for relief of debtors, including the filing of a voluntary or involuntary petition under the federal bankruptcy law or any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation or dissolution or similar relief under federal or state laws, an adjudication as insolvent or bankrupt, an assignment of property for the benefit of creditors or the taking of any other similar action for the protection or benefit of creditors, the appointment or the acquiescence to the appointment of a receiver, trustee, liquidator or a conservator of any substantial portion of the assets of a Person or the seizure by a sheriff, receiver, trustee, or conservator of substantially all of a Person's assets.

"**Book Basis**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, that (a) the initial Book Basis of the LandSource Property, excluding the Excluded Entities, shall, as of the Effective Date, equal the value shown on **Exhibit A** subject to true up adjustments described in Section 7.1, (b) the initial Book Basis of the Excluded Entities, shall, as of the Effective Date, equal its fair market value on the Effective Date, as agreed to by the Members, as shown on **Exhibit A-1**, (c) if other property is

contributed to the Company, the initial Book Basis of such property shall equal its fair market value on the date of contribution, as agreed to by the Members, subject, in the case of the MWHP Land, to true up adjustments described in Section 7.1, (d) if the Capital Accounts of the Members are adjusted pursuant to Treasury Regulation Section 1.704-1(b) to reflect the fair market value of any Company asset, as agreed to by the Members, the Book Basis of such asset shall be adjusted to equal its respective fair market value, as agreed to by the Members, as of the time of such adjustment in accordance with such Treasury Regulation, and (e) if the Capital Accounts of the Members are adjusted pursuant to Treasury Regulation Section 1.704-1(b) as a result of a Realization Event, the Book Basis of the LandSource Property held by the Company on the date of the Realization Event shall be increased by the amount of Preferred Capital issued to the Lennar Member and the LNR Members in respect of such Realization Event, and such increase shall be allocated among such items of Realization Properties in proportion to the respective Book Basis of such properties at such time, unless otherwise determined by the Executive Committee. The Book Basis of all assets shall be adjusted thereafter by depreciation or amortization as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(g) and any other adjustment to the basis of assets other than depreciation or amortization.

"**Business Day**" means any day other than Saturday or Sunday on which banks are open for business in California.

"**Business Plan**" shall have the meaning set forth in Section 10.17.

"**Buy-Out Notice**" has the meaning set forth in Section 11.5(a).

"**Buy-Sell Deposit**" has the meaning set forth in Section 11.5(a).

"**Buy-Sell Price**" has the meaning set forth in Section 11.5(a).

"**CalPERS**" means the California Public Employees' Retirement System, or any successor by acquisition, merger or recapitalization of CalPERS with or into any other Person.

"**Capital**" means, collectively, Invested Capital and Preferred Capital.

"**Capital Account**" means the separate account maintained for each Member under Section 9.1.

"**Capital Default**" has the meaning set forth in Section 7.2(d).

"**Cash Expenditures**" means, for the applicable or pertinent period, all cash expenditures or payments or commitments to make cash expenditures or payments (to the extent not funded by or disbursed from Reserves) made by the Company on its account or for the account of any of the Company's Subsidiaries (other than any Excluded Entity) during such period directly or indirectly in connection with the Company's organization or business operations, including those incurred for advertising and promotion, salaries and other employee perquisites, insurance, taxes, utilities, repairs and maintenance, capital improvements and other capital expenditures, construction of improvements, accounting or bookkeeping and legal and other professional services, computer or accounting equipment use, printing, travel, telephone, postage, principal and/or interest payments on secured and/or unsecured loans made to the Company (including,

loans or credit facilities obtained by the Company from time to time and loans from Members, amounts funded to Reserves (which shall then not be deemed Cash Expenditures when disbursed from such Reserves), and other fees, costs and expenses relating to the acquisition, ownership, development, maintenance, management and operations of the Property, including the Development Management Fees, the Land Bank Management Fees and the reimbursement of out-of-pocket expenses of the Members and their Affiliates; provided, however, that, if at any time prior to the applicable period, any given expenditure which the Company failed to pay or disburse was included as an Cash Expenditure, then such expenditure, if made during the applicable period, shall not be an Cash Expenditure hereunder for the applicable period (so that in no event would a given expenditure be "double counted" in two separate periods). Cash Expenditures do not include expenditures incurred for repairs or restoration necessitated by casualty to the extent payable out of Invested Capital, loan proceeds and/or the proceeds of any casualty insurance relating thereto, except to the extent the recovery was included in "Gross Revenues" or "Available Cash."

"**Certificate of Formation**" means the Certificate of Formation of the Company, originally filed with the Secretary of State of the State of Delaware on July 17, 2003 (under the name NWHL Investment LLC), as amended and/or restated from time to time (including pursuant to the Merger).

"**Change in Law**" means the occurrence after the date hereof of (i) the enactment of, or amendment to, any provision of the Code or the Treasury Regulations thereunder with an effective date which, by its terms, applies to the transactions contemplated hereunder; (ii) the enactment of, or amendment to, any provision of the Tax law of any state or political subdivision in which any Member or the Company is subject to Tax with an effective date which, by its terms, applies to the transactions contemplated hereunder; or (iii) a final decision of the United States Supreme Court or any of the United States Courts of Appeal or District Courts, the United States Tax Court or the United States Claims Court.

"**Class A Executives**" has the meaning set forth in Section 10.2.

"**Class A Members**" has the meaning set forth in Section 2.4, and any of their permitted assignees, successors or transferees that is admitted as a substitute Member of the Company or any additional Member of the Company admitted to the Company as a Member and designated as the Class A Members or a member of the Class A Members after the Effective Date in accordance with the requirements of this Agreement.

"**Class A Members Promote Percentage**" has the meaning set forth in Section 9.4(a)(v).

"**Class A Special Distributions**" means the special Distributions described in Section 9.4(c) and 9.4(d) to be paid to the Lennar Member and the LNR Members from the proceeds of the Initial Financing.

"**Class B Executives**" has the meaning set forth in Section 10.2.

"**Class B Member**" means each of (i) MWHP and (ii) any of its permitted assignees, successors or transferees that is admitted as a substitute Member of the Company or any additional Member of the Company admitted to the Company as a Member and designated as the

Class B Member or a member of the Class B Members (if there are more than one) after the Effective Date in accordance with the requirements of this Agreement.

"**Class of Members**" means a class of Members pursuant to the terms of this Agreement (either the Class A Members or the Class B Member, as the case may be).

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provision or provisions of succeeding law).

"**Commercial ROFO Agreement**" has the meaning set forth in Section 8.6(a)(ii).

"**Company**" means LandSource Communities Development LLC, the limited liability company formed under the Act and governed by the Certificate of Formation and this Agreement.

"**Company Property**" means such tangible and intangible assets and property and investments of every kind and nature that from time to time the Company shall acquire or purchase, including Property.

"**Company Subsidiary Contribution**" has the meaning set forth in the Recitals.

"**Company Value**" has the meaning set forth in Section 7.1(a).

"**Confidential Information**" has the meaning set forth in Section 21.12(a).

"**Contributing Member**" means any Non-Defaulting Member that elects to make a Substituted Capital Contribution or Member Loan as a result of a Capital Default pursuant to Section 7.2.

"**Contribution Notice**" has the meaning set forth in Section 7.2(c).

"**Control**," "**Controlling**," or "**Controlled**" (whether or not any such term is capitalized) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by agreement, or otherwise.

"**Covered Person**" has the meaning set forth in Section 12.2(a)(iii).

"**Credit Agreement**" means that certain Credit and Guaranty Agreement dated as of July 12, 2006 by and among LNR Property (and other parties and lenders, borrowers and guarantors) and Permitted Lender, as such Credit Agreement may be amended and/or restated.

"**Current Land Bank Properties**" means, collectively, the MWHP Land and the Southwest Land, provided that any such real property shall no longer be part of Current Land Bank Properties if it is not subject to one or more option agreements and/or purchase agreements that give a Person, including a Member or its Affiliate, rights to acquire such property from the Company or Subsidiary of the Company.

"**Damages**" has the meaning set forth in Section 10.18(b)(ii).

"**Defaulting Member**" has the meaning set forth in Section 7.2(d).

"**Deutsche Bank**" means Deutsche Bank AG, New York Branch, or any of its successors or assigns.

"**Development Management Fees**" has the meaning set forth in Section 10.15(b).

"**Development Management Services**" has the meaning set forth in Section 10.15(b).

"**Disposition**" means the act of selling, conveying, exchanging, abandoning, assigning, transferring, gifting, hypothecating, pledging, encumbering or otherwise disposing of property, including Interests (including any contract therefor), whether direct or indirect, voluntary or involuntary, by operation of law or otherwise (including by change in the form of organization), and, with respect to the Interests, the entering into any voting trust or other arrangement (other than as contemplated herein) with respect to voting rights of such Interests or the direct or indirect transfer of any other beneficial interest in the Interests whether by operation of law or otherwise; and "Dispose" and "Disposed" have the meanings correlative to such definition.

"**Distributions**" means any Available Cash or other property distributed to a Member by the Company pursuant to Section 9.4 or 9.5. For purposes of calculating the return a Member has received pursuant to Section 9.4, all Distributions shall be deemed to have been made on the last day of the month in which a Distribution is made regardless of the day of such month on which such Distribution is actually made.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Election Notice**" has the meaning set forth in Section 11.5(a).

"**Emergency**" has the meaning set forth in Section 10.17.

"**Entity**" means any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, professional association, joint venture, trust, business trust, cooperative, association or other legal entity.

"**Excluded Entities**" means the following Subsidiaries of the Company: Lennar Bridges, LLC, HCC Investors, LLC, Estates Seven, LLC, The Bridges Club at Rancho Sante Fe, Inc., and The Bridges at Rancho Sante Fe Sales Company, Inc.

"**Excess Amounts**" has the meaning set forth in Section 7.2(e).

"**Executive**" means each of, and "**Executives**" means, collectively, all of the Class A Executives and the Class B Executives.

"**Executive Committee**" has the meaning set forth in Section 10.1(a).

"**Existing LandSource Agreement**" has the meaning set forth in Section 8.6(b).

"**Existing LandSource Option Property**" has the meaning set forth in Section 8.6(c).

"**Existing Southwest Options**" has the meaning set forth in the Formation Agreement.

"**Final Determination**" means, in respect of any Member or the Company, (i) a decision, judgment, decree or other order by any court of competent jurisdiction, which decision, judgment, decree or other order is binding on such Member or the Company, has become final after all appeals allowable by law have been exhausted, or the time for filing such appeals has expired or (ii) a closing agreement entered into under Section 7121 of the Code or any other settlement agreement entered into in connection with an administrative or judicial proceeding relating to Tax matters that is binding on such Member or the Company.

"**Financings**" has the meaning set forth in Section 10.18(b).

"**Financing Loan Documents**" means those loan documents in connection with the Initial Financing, which are approved by the Executive Committee.

"**Financing Shortfall Amount**" has the meaning set forth in the Formation Agreement.

"**Financing Shortfall Loan**" has the meaning set forth in the Formation Agreement.

"**Fiscal Year**" has the meaning set forth in Section 15.1.

"**Formation Agreement**" means that certain Contribution and Formation Agreement effective as of December 28, 2006, among the Company, the Original Lennar Members, the LNR Members and MWHP, as it may be amended.

"**Future Land Bank Property**" has the meaning set forth in Section 10.15(b).

"**Governmental Entity**" means any court, administrative agency or commission, self regulatory organization or other foreign or domestic governmental or quasi-governmental authority or instrumentality.

"**Gross Closing Debt Financing Proceeds**" has the meaning set forth in the Formation Agreement.

"**Gross Revenues**" means for the applicable period all cash revenues derived by the Company from all sources (other than the Excluded Entities, Capital, loan proceeds and insurance proceeds used to repair or replace any damaged property), including the sale of all or a portion of the Property, excluding all amounts held in escrow and deposits collected in connection with sales of Property, in each case, until the same have been earned by the Company.

"**Holding Subsidiary**" has the meaning set forth in the Recitals.

"**Indemnification Expenses**" has the meaning set forth in Section 12.2(a)(i).

"**Indirect Interest**" has the meaning set forth in Section 11.6.

"**Initial Financing**" has the meaning set forth in Section 10.18(a).

"**Initial Financing Commitment Letter**" means that certain commitment letter for the Initial Financing from Barclays Capital PLC, as lead arranger and administrative agent for the lenders thereof, attached hereto as **Exhibit 10.18**.

"**Interest**" means the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits, allocations and Distributions to which a Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement and of the Act.

"**IRR**" means, as of the date of determination, the rate of return (compounded monthly), determined on a leveraged basis, for any applicable period required to cause the net present value, as of the inception date of such period, of the cash flow represented by the cumulative Distributions from and contributions of Capital to the Company (exclusive of any credits to capital applicable to the Excluded Entities or Distributions on account of the Excluded Entities) (each such Distribution or contribution made as of the date debited from or credited to the applicable Member's Capital Account) (solely for purposes of this definition, treating the final Original Capital value as a contribution of Capital to the Company as of the Effective Date) to equal zero. IRR shall be calculated using the IRR calculation feature in Microsoft Excel, or any other recognized business software designated by the Executive Committee. An example of the computation of IRR is attached hereto as **Exhibit 1.1(d)**.

"**Invested Capital**" means, with respect to each Member, the total amount of Original Capital and Additional Capital Contributions of such Member (other than Additional Capital Contributions that constitute Preferred Capital); and means, with respect to the Members, collectively, the total amount of all such Original Capital and Additional Capital Contributions.

"**Land Banking**" means land acquisitions by the Company or a Subsidiary of the Company, pursuant to a structure where the Company and/or such Subsidiary enters into a binding option agreement to sell homesites or other primarily residential improved land or land contemplated to be zoned for primarily residential purposes, to a Person, including a Member or an Affiliate of a Member, and contract with such Person, or an affiliate thereof, to construct, generally on a fixed-cost basis, any required improvements and infrastructure development of such zoned and/or entitled land; or such other activity that the Executive Committee determines constitutes Land Banking. "Land Bank" shall have a correlative meaning.

"**Land Bank Management Fees**" has the meaning set forth in Section 10.16(a).

"**Land Bank Management Services**" has the meaning set forth in Section 10.16(a).

"**Land Bank Managing Member**" has the meaning set forth in Section 10.16(a).

"**LandSource Direct Subsidiaries Interests**" has the meaning set forth in the Recitals.

"**LandSource Final Adjustment**" has the meaning set forth in the Formation Agreement.

"**LandSource Final Special Distribution**" has the meaning set forth in the Formation Agreement.

"**LandSource Final Value**" has the meaning set forth in the Formation Agreement.

"**LandSource Other Property**" means all property owned by the Company other than the LandSource Direct Subsidiaries Interests that the Company is required to contribute to the Holding Subsidiary pursuant to the terms of the Formation Agreement.

"**LandSource Payable Debt**" has the meaning set forth in the Formation Agreement.

"**LandSource Predecessor**" means the non-surviving entity that merged with and into NWHL Investment LLC by the filing of a certificate of merger with the Secretary of State on November 30, 2004 and which was originally formed under the name Lennar/LNR Funding LLC by the filing of its certificate of formation with the Secretary of State on November 3, 2003 (which name was changed to LENR Properties LLC by the filing of its Certificate of Correction with the Secretary of State on November 18, 2003, which name was subsequently changed to LandSource Communities Development LLC by the filing of its amended and restated certificate of formation with the Secretary of State on November 26, 2003).

"**LandSource Preliminary Value**" has the meaning set forth in the Formation Agreement.

"**LandSource Property**" has the meaning set forth in the Recitals.

"**LandSource Preliminary Special Distribution Amount**" means the amount of the LandSource Preliminary Special Distribution (as such term is defined in the Formation Agreement).

"**LB Properties**" has the meaning set forth in **Exhibit 10.16(a)**.

"**Lennar**" means Lennar Corporation, a Delaware corporation, or any other Entity that is the successor or assign of Lennar Corporation as a result of a Permitted Disposition or any successor by acquisition, merger or recapitalization of Lennar Corporation with or into any other Person.

"**Lennar and LNR Member Consolidations**" has the meaning set forth in the Recitals.

"**Lennar Executives**" has the meaning set forth in Section 10.2.

"**Lennar Member**" means Lennar Homes of California, Inc. or any of its respective permitted assignees, successors or transferees that is admitted as a substitute Member of the Company or any additional Member of the Company admitted to the Company as a Member and designated as a Lennar Member after the Effective Date in accordance with the requirements of this Agreement, in its capacity as a Member of the Company or as a member of the Class A Members.

"**LNR Development**" means LNR Development LLC, a Delaware limited liability company, or any other Entity that is the successor or assign of LNR Development LLC as a result of a Permitted Disposition or any successor by acquisition, merger or recapitalization of LNR Development LLC with or into any other Person.

"**LNR Executives**" has the meaning set forth in Section 10.2.

"**LNR Fund**" has the meaning set forth in the definition of a Permitted Disposition.

"**LNR Member**" means each of, and "**LNR Members**" means, collectively, all of LNR NWHL Holdings, Inc., a Delaware corporation, and LNR Land Partners Sub, LLC, a Delaware limited liability company, which, with respect to actions, consents, voting and approvals (other than actions, consents, voting and approvals of the Managing Member), shall act together as a single Member under this Agreement (except as provided in Section 2.4), or any of their respective permitted assignees, successors or transferees, including as a result of a Permitted Disposition, that is admitted as a substitute Member of the Company or any additional Member of the Company admitted to the Company as a Member and designated as an LNR Member or a member of the LNR Members after the Effective Date in accordance with the requirements of this Agreement.

"**LNR Parent**" means each of LPH, LNR Property and LNR Development or any other Entity that is the successor or assign thereof by reason of acquisition, merger or recapitalization or a Permitted Disposition.

"**LNR Property**" means LNR Property Corporation, a Delaware corporation, or any other Entity that is the successor or assign of LNR Property Corporation as a result of a Permitted Disposition or any successor by acquisition, merger or recapitalization of LNR Property Corporation with or into any other Person.

"**LPH**" means LNR Property Holdings Ltd., a Bermuda company, or any other Entity that is the successor or assign of LNR Property Holdings Ltd. as a result of a Permitted Disposition or any successor by acquisition, merger or recapitalization of LNR Property Holdings Ltd. with or into any other Person.

"**Loan Document Liability**" has the meaning set forth in Section 10.18(b)(ii).

"**MacFarlane Executives**" has the meaning set forth in Section 10.2.

"**MacFarlane Partners**" means MacFarlane Partners LLC, a Delaware limited liability company, or any successor by acquisition, merger or recapitalization of MacFarlane Partners LLC with or into any other Person.

"**Major Decision**" has the meaning set forth in Section 10.21.

"**Manage**" or "**Managed**" shall mean the ability to control substantially all day-to-day operational decisions and substantially all investment decisions of, and relative to, the Entity in question.

"**Managing Member**" has the meaning set forth in Section 10.1(a) and, initially, shall be, collectively, the Lennar Member and LNR Land Partners (acting as "co-managing members"), as set forth in Section 10.1, subject to change as provided herein.

"**Measurement Period**" has the meaning set forth in Section 8.2.

"**Member**" means each, and "**Members**" means, collectively, (a) all, of the Lennar Member and the LNR Members, which together act as the Class A Members, except as provided in Section 2.4) and MWHP (which, pursuant to the terms of this Agreement, acts as the Class B Member), and/or any of their respective permitted assignees, successors or transferees who is admitted as a member of the Company after the Effective Date in accordance with the requirements of this Agreement and/or (b) any individual or Entity to whom the Company issues an Interest, and who is admitted as a member of the Company, after the Effective Date and in accordance with the requirements of this Agreement.

"**Member Loan**" has the meaning set forth in Section 7.2(d)(i).

"**Merger**" has the meaning set forth in the Recitals.

"**MWHP**" has the meaning set forth in the Preamble, or any successor by acquisition, merger or recapitalization of MWHP with or into any other Person.

"**MWHP Final Adjustment**" has the meaning set forth in the Formation Agreement.

"**MWHP Final Cash Contribution**" has the meaning set forth in the Formation Agreement.

"**MWHP Final Property Value**" has the meaning set forth in the Formation Agreement.

"**MWHP Land**" means the parcels of real property as are more particularly described in **Exhibit 1.1(e)**, attached hereto.

"**MWHP Other Property**" means all property other than the MWHP Land that MWHP is required to contribute to the Holding Subsidiary pursuant to the terms of the Formation Agreement.

"**MWHP Preliminary Cash Contribution**" has the meaning set forth in Section 7.1(a).

"**MWHP Preliminary Cash Contribution Amount**" has the meaning set forth in the Formation Agreement.

"**MWHP Preliminary Property Value**" has the meaning set forth in the Formation Agreement.

"**MWHP Property**" has the meaning set forth in the Recitals.

"**MWHP Subsidiary Contribution**" has the meaning set forth in the Recitals.

"**MW Management**" means MW Housing Management III, LLC, a California limited liability company.

"**NAT**" means North American Title Company, an Affiliate of Lennar.

"**New Option Agreements**" has the meaning set forth in that certain Option Termination Agreement (as defined in the Formation Agreement).

"**Non-Defaulting Member**" has the meaning set forth in Section 7.2(d).

"**Non-Land Bank Managing Member**" has the meaning set forth in Section 10.16(b).

"**Non-Managing Member**" has the meaning set forth in Section 10.15(c).

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2, or any successor provision thereto.

"**Offeree Member**" has the meaning set forth in Section 11.5(a).

"**Offeree Value**" has the meaning set forth in Section 11.5(a).

"**Offering Member**" has the meaning set forth in Section 11.5(a).

"**Offeror Value**" has the meaning set forth in Section 11.5(a).

"**Original Capital**" means in respect of each Member, the amounts set forth under the column "Original Invested Capital" in **Exhibit A** as such, and as adjusted pursuant to Section 7.1.

"**Original Lennar Members**" means, collectively, all, of Lennar, Lennar Land Partners Sub, Inc., a Delaware corporation, Lennar Land Partners Sub II, Inc., a Nevada corporation, and Lennar Homes of California, Inc., a California corporation.

"**Original LNR Members**" means, collectively, all of LNR NWHL Holdings, Inc., a Delaware corporation, LNR Land Partners Sub, LLC, a Delaware limited liability company, LNR Land Partners Sub II, Inc., a Nevada corporation, LNR Mare Island, Inc., a California corporation, LNR Bressi Ranch, Inc., a California corporation, LNR 300 Washington, Inc., a California corporation, and LNR Union City, Inc., a California corporation.

"**Overpaying Member**" has the meaning set forth in Section 10.18(b)(i).

"**Partially Adjusted Capital Account**" means, with respect to any Member as of the end of any taxable year or other period of the Company, the Capital Account balance of such Member (other than any portion of a Member's Capital Account balance attributable to the Excluded Entities) at the beginning of such year or period, adjusted for all contributions of Capital and Distributions during such year or period and all special allocations pursuant to Section 9.3 (other than Section 9.3(e)) with respect to such year or period but before giving effect to any allocations of Profit or Loss pursuant to Section 9.2.

"**Partner Minimum Gain**" means the Company's "partner nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(2), or any successor provision thereto.

"**Partner Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2), or any successor provision thereto.

"**Partnership Minimum Gain**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(2) and 1.704-2(d), or any successor provision thereto.

"**Percentage Interest**" means, with respect to any Member or Class of Members, a fraction expressed as a percentage, the numerator of which is the Invested Capital of such Member or Class of Members and the denominator is the aggregate Invested Capital of all of the Members. The Percentage Interest of each of the Members as of the Effective Date shall be as set forth on **Exhibit A** subject to adjustment pursuant to Section 7.2(e), a Disposition permitted hereunder or as otherwise agreed to by the Members.

"**Permitted Disposition**" means, (a) with respect to any Member, any direct or indirect Disposition from one Member to another Member; (b) with respect to a Lennar Member or an LNR Member, (i) any direct or indirect Disposition of equity interests therein to Lennar or an Entity (A) Controlled by Lennar or its Affiliate, and (B) of which Lennar owns and continues to own, directly or indirectly, at least fifty percent (50%) of the equity interests and voting rights, or (ii) any direct or indirect Disposition of equity interests therein to any LNR Parent or an Entity (A) Controlled or Managed by any LNR Parent or its downstream (i.e., excluding Persons with common control over an LNR Parent) Affiliate, including an LNR Fund and (B) of which any LNR Parent or an LNR Fund, directly or indirectly, owns and continues to own at least fifty percent (50%) of the equity interests and voting rights, or (iii) any direct or indirect Disposition of equity interests in the Lennar Member or an LNR Member (I) to an Entity (A) Controlled or Managed either solely or collectively by Lennar, any LNR Parent and/or an LNR Fund and (B) of which Lennar, any LNR Parent and/or an LNR Fund either solely or collectively own and continue to own directly or indirectly at least fifty percent (50%) of the equity interests and voting rights, or (II) so long as at all times LNR Parent, an LNR Fund and/or Lennar Member, directly or indirectly, owns and continues to own at least fifty percent (50%) of the equity interests and voting rights of the Class A Members (iv) a direct or indirect Disposition of equity interests in the Lennar Member or an LNR Member to a fund of which any LNR Parent or any downstream (i.e., excluding Persons with common control over an LNR Parent) Affiliate is the managing member, general partner or otherwise Controls or Manages such fund (an "**LNR Fund**"); (c) with respect to MWHP, (i) MWHP can Dispose of its Interest to an Entity so long as at all times (i) MacFarlane Partners and/or WRI retains Control of or Manages such Entity, or (ii) the Interest is transferred to an Affiliate of CalPERS that is Managed by an investment advisor of CalPERS; and (d) the Class B Member may Dispose of direct or indirect equity interests in such Class B Member so long as at all times such Class B Member is Controlled or Managed by MacFarlane Partners and/or WRI or is Managed by an investment advisor of CalPERS. For purposes of this definition, fifty percent (50%) replaces ten percent (10%) in the definition of "Affiliate."

"**Permitted Lender**" has the meaning set forth in Section 11.6.

"**Permitted Lender Transfer**" has the meaning set forth in Section 11.6.

"**Person**" means any individual or Entity and, where the context so permits, the legal representatives, successors in interest (including heirs) and assigns of such Person.

"**Pledge**" has the meaning set forth in Section 11.6.

"**Pledge Agreement**" means that certain Pledge and Security Agreement securing the Credit Agreement and dated as of July 12, 2006 in favor of the Permitted Lender, as Collateral Agent, as such Pledge and Security Agreement may be amended and/or restated; or any pledge agreement in favor of Deutsche Bank, as Collateral Agent (or any successor Collateral Agent), securing any Replacement Credit Agreement.

"**Preferred Capital**" means Capital designated as "Preferred Capital" that is issued to the Class A Members, if any, pursuant to the terms of the Formation Agreement and this Agreement.

"**Preferred Return**" means, for each of the Members, if any, that owns Preferred Capital, a cumulative return computed by multiplying (a) a rate of interest, compounded annually, of five percent (5%) by (b) such Member's Unreturned Preferred Capital commencing to accrue with respect to any issuance on the effective date of such issuance.

"**Priority Substituted Capital Contribution**" has the meaning set forth in Section 7.2(d)(iv).

"**Proceeding**" has the meaning set forth in Section 12.2(a)(ii).

"**Profit**" and "**Loss**" means, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

      (a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss will be added to taxable income or loss;

      (b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, will be subtracted from taxable income or loss;

      (c)    gain or loss resulting from any Disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such Company Property, notwithstanding that the adjusted tax basis of such Company Property differs from its Book Basis;

      (d)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account

depreciation for the taxable year or other period as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)     any items specifically allocated pursuant to Section 9.3 shall not be considered in determining Profit or Loss; and

(f)     any increase or decrease to Capital Accounts, as a result of any adjustment pursuant to clause (c) of the definition of Book Basis, shall constitute an item of Profit or Loss as appropriate.

"**Property**" means (i) those parcels of or interests in real property owned from time to time by the Company or one or more of its Subsidiaries, including the Holding Subsidiary, as of the Effective Date or acquired thereafter (ii) any of the parcels of real property to which the Company or any of its Subsidiaries has the right to purchase (whether pursuant to an option agreement, purchase agreement or similar other agreement) as of the Effective Date or acquired thereafter, and (iii) any and all improvements now or hereafter constructed on any of the foregoing real property, any easements, development rights and contracts related to any of the foregoing, and any and all personal property relating to the foregoing.

"**Pro Rata Share**" means, with respect to a Member or a Class of Members in connection with certain ownership, rights, obligations or actions referenced under this Agreement, such Member's or Class of Member's respective share as determined by dividing such Member's or Class of Member's Percentage Interest by the aggregate Percentage Interests of the other Members or Class of Members with respect to such same ownership, rights, obligations or actions then referenced under this Agreement.

"**Realization Event**" has the meaning set forth in the Formation Agreement.

"**Realization Properties**" has the meaning set forth in the Formation Agreement.

"**Reallocation Right**" has the meaning set forth in Section 7.2(e).

"**Recapitalization**" has the meaning set forth in the Recitals.

"**Reimbursement Agreement**" has the meaning set forth in Section 10.18(b)(i).

"**Related Person**" has the meaning set forth in Section 10.18(b)(ii).

"**Remaining Property**" has the meaning set forth in Section 8.6(d).

"**Removal Notice**" has the meaning set forth in Section 10.15(c).

"**Replacement Credit Agreement**" means any credit or loan agreement between LNR Property and Deutsche Bank (and any other parties as lenders, borrowers and guarantors) that is entered into after the Effective Date and that replaces, in whole or in part, the Credit Agreement in connection with a refinancing by an LNR Parent.

"**Reserves**" means, with respect to any fiscal period, funds set aside during such period as and for reserves for future expenditures in amounts deemed sufficient by the Executive Committee or the Business Plan for Company purposes including working capital and to pay taxes, insurance, debt service (including to establish a sinking fund to pay any balloon payment(s) maturing in any subsequent fiscal period), capital improvements, replacements or repairs, capital or loan obligations, contingent liabilities or other costs and expenses incident to the Company and its operations.

"**Residential ROFO Agreement**" has the meaning set forth in Section 8.6(a)(i).

"**Responsible Member**" has the meaning set forth in Section 10.18(b)(ii).

"**Secretary of State**" means the Secretary of State of the State of Delaware.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shortfall**" has the meaning set forth in Section 7.2(c).

"**Southwest**" means Southwest Communities Development, LLC, a Delaware limited liability company.

"**Southwest Land**" means the real property owned by Southwest.

"**Special Class A Member**" has the meaning set forth in Section 2.3(b)(iv).

"**Special Loan**" has the meaning set forth in Section 10.18(b)(ii).

"**Special Right or Remedy**" has the meaning set forth in Section 8.1.

"**Subsidiary**" of any Person means (i) a corporation, fifty percent (50%) or more of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof, or (ii) any other Person (other than a corporation) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership and the power to Control.

"**Substitute Land Bank Managing Member**" has the meaning set forth in Section 10.16(b).

"**Substitute Managing Member**" means the Non-Managing Member or any entity or individual which assumes the role of Managing Member pursuant to Section 10.15(c) or pursuant to Section 11.6.

"**Substituted Capital Contribution**" has the meaning set forth in Section 7.2(d)(ii).

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies or other assessments, including all net income, gross income, gross receipts, sales, use, value added, ad valorem, transfer, franchise, profits, alternative minimum, license, withholding, employment, payroll, disability, excise,

estimated, stamp, occupation, property or other taxes, customs duties, fees, assessments or charges of any kind whatsoever, whether computed on a consolidated, unitary, combined, separate or any other basis, together with any interest and any penalties, additions to tax or additional amounts, in each case, imposed by any governmental taxing authority.

"**Target Account**" means, with respect to any Member as of the end of any taxable year of the Company or other period, the excess of (a) an amount equal to the hypothetical Distribution such Member would receive if all assets of the Company (other than the Excluded Entities), including cash, were sold for cash equal to their Book Basis (taking into account any adjustments to Book Basis for such year or other period), all liabilities allocable to such assets were then due and were satisfied according to their terms (limited, with respect to each nonrecourse liability, to the Book Basis of the assets securing such liability) and all remaining proceeds from such sale were distributed pursuant to Section 9.5 over (b) the amount of Partnership Minimum Gain and Partner Minimum Gain that would be charged back to such Member as determined pursuant to Treasury Regulation Section 1.704-2 in connection with such sale.

"**Transferring Member**" has the meaning set forth in Section 9.2(b).

"**Underpaying Member**" has the meaning set forth in Section 10.18(b)(i).

"**Unreturned Preferred Capital**" means, with respect to each of the Members, if any, that owns Preferred Capital, the amount of Preferred Capital of such Member, less the amount, if any, of Preferred Capital that has been distributed to such Member pursuant to Distributions under Section 9.4(a)(iii) and/or Distributions under Section 9.5 that are in accordance with Section 9.4(a)(iii), and means, with respect to all such Members collectively, the sum of such amounts.

"**Unreturned Preferred Return**" means, with respect to each of the Members, if any, that owns Preferred Capital, such accrued and unpaid Preferred Return as has not been previously distributed to such Member pursuant to Distributions under Section 9.4(a)(ii) and/or Distributions under Section 9.5 that are in accordance with Section 9.4(a)(ii), and means, with respect to all such Members collectively, the sum of such amounts.

"**U.S. GAAP**" means generally accepted accounting principles used for financial reporting in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such accounting profession, in effect from time to time.

"**Venture**" has the meaning set forth in Section 10.21(r).

"**Venture Agreement**" has the meaning set forth in Section 10.21(r).

"**WRI**" means Weyerhaeuser Realty Investors, Inc., a Washington corporation, or any successor by acquisition, merger or recapitalization of Weyerhaeuser Realty Investors, Inc. with or into any other Person.

**"WRI Executives"** has the meaning set forth in Section 10.2.

1.2 **Interpretation**. Accounting terms used but not otherwise defined in this Agreement shall have the meanings given to them under U.S. GAAP. As used in this Agreement (including exhibits, schedules and amendments), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Sections, Articles, Recitals and Preamble refer to the sections, articles, recitals and preamble, respectively, of this Agreement, unless the context requires otherwise. Words such as "herein," "hereinafter," "hereof," "hereby" and "hereunder" and the words of like import refer to this Agreement, unless the context requires otherwise. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement. The term "dollars" or "$" means United States Dollars. The term "days" means calendar days and "year" means a calendar year. The parties agree that they have been represented by counsel during, and each has been active in, the negotiation, preparation and execution of this Agreement, and, therefore, waive the application of any law or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

## ARTICLE 2

## FORMATION AND NAME

2.1 **Formation**. The history of the Company's formation, recapitalization, prior members and current Members is set forth in the Recitals, which are true and correct and incorporated into this Agreement. The Members hereby approve, ratify and confirm (i) the Recapitalization; (ii) the Class A Special Distributions; (iii) the admission of MWHP as a Member and the Class B Member of the Company as of the Effective Date, which together with the Class A Members constitute the Members of the Company; (iv) the Company Subsidiary Contribution and (v) the MWHP Subsidiary Contribution. The Members hereby agree that the purpose of the Company is as indicated in Section 4.1 hereof. The rights and liabilities of the Members shall be as provided in this Agreement, or the Act if not otherwise provided for in this Agreement; provided that, to the fullest extent permitted by law, the Members intend for this Agreement to govern over the provisions of the Act. The Members, to the extent required by applicable law, agree to execute and timely file, record and publish such articles, certificates and other documents and to take such other acts as may be necessary or appropriate to comply with the requirements of the Act and any jurisdiction in which the Company is engaged in business for formation and operation of the Company as a limited liability company.

2.2 **Name**. The name of the Company is LandSource Communities Development LLC. All of the Company's business and affairs shall be conducted under the name of the Company and title to all real or personal property owned by or leased to the Company shall either be held in such name or in the name of such nominee or trust for the Company's benefit as the Executive Committee shall determine in its sole and absolute discretion. The Executive Committee may change the name of the Company as permitted by law. In addition, the Executive Committee may adopt such trade or fictitious names as it may deem appropriate in its sole and absolute discretion as permitted by law. All trade or fictitious names shall be registered

as is provided for by the relevant laws of the States of Delaware or other applicable jurisdiction, and may be registered or given such other legal protection as may be deemed advisable by the Executive Committee in its sole and absolute discretion.

2.3    **Additional Members**.

(a)    Any Person shall be issued an Interest and admitted as a new member of the Company upon the vote or consent of the Members or pursuant to a Permitted Disposition. Upon admission of a Member, in addition to the Company amending **Exhibit A** to properly reflect the Member's admission, the Managing Member shall add the new Member's name, address, Interest and Original Capital to the list of Members kept in the Company's principal office.

(b)    Notwithstanding any provision herein to the contrary, before any Person is admitted to the Company as a Member (whether as a new Member or a substituted Member):

(i)    That Person shall agree in writing to be bound by this Agreement;

(ii)    All of the Company's income, expenses, gains or losses through the date of admission shall be allocated to the existing Members so as to take into account the varying Interests of the existing Members and the new Members under any permissible method as determined by the Executive Committee; and

(iii)    Unless otherwise agreed by the existing Members, that Person shall pay all costs incurred by the Company relating to his, her or its admission as a Member.

(iv)    Notwithstanding anything to the contrary in this Agreement, but subject to Section 2.3(b), in the event that the Class B Member as of the Effective Date owns less than a 68% Percentage Interest, the Class A Members shall have the right to propose a new Member to the Company (the "**Special Class A Member**"). The new Member shall be subject to the approval of MWHP but which consent shall not be unreasonably withheld, conditioned or delayed. The Special Class A Member shall acquire from the Class A Members (on a pro rata basis based on their Pro Rata Shares, or as otherwise determined by the Class A Members) a portion of their Interests representing an aggregate Percentage Interest of up to an amount equal to the difference between the Percentage Interest then owned by the Class A Members and Twenty Five Percent (25%) (e.g., if the Class A Members own an aggregate Percentage Interest of 40%, they can transfer up to a 15% Percentage Interest to the Special Class A Member). The Special Class A Member shall be a Class A Member and, if determined by the other Class A Members, may have the right to appoint one or more Class A Executives.

(A)    Subject to Section 2.3(b)(iv)(B) below, if the Special Class A Member is admitted pursuant to this Section, it shall be a Class A Member for all purposes, including Section 2.4 below; provided, however, that Distributions pursuant to Section 9.4(a)(v) shall be as follows:

"Fifth, to the Members in accordance with the following: (A) to the Lennar Member and the LNR Members, pro rata in accordance with their respective Pro Rata Shares, in an aggregate amount equal to the sum of (a) their aggregate Percentage Interests plus (b) eight percent (8%) (as it may be adjusted as a result of a Reallocation Right, the "**Class A Members Promote Percentage**"), and (B) the balance to MWHP and the Special Class A Member, pro rata in accordance with their respective Pro Rata Shares."

(B)     If the Class A Members elect to replace Sections 9.4(a)(iv) and 9.4(a)(v) as provided in Section 9.4(b) and if the Special Class A Member is admitted pursuant to this Section 2.3(b)(iv), it shall be a Class A Member for all purposes, including pursuant to Section 2.4 below; provided, however, that Distributions pursuant to Section 9.4(a)(vi) shall be as follows:

"Sixth, to the Members in accordance with the following: (A) to the Lennar Member and the LNR Members, pro rata in accordance with their respective Pro Rata Shares, in an aggregate amount equal to the sum of (a) their aggregate Percentage Interests plus (b) eighteen percent (18%) (as it may be adjusted as a result of a Reallocation Right and together with the First Level Class A Members Promote Percentage, the "**Class A Members Promote Percentage**"), and (B) the balance to MWHP and the Special Class A Member, pro rata in accordance with their respective Pro Rata Shares."

2.4     **Actions by Lennar Member and LNR Members as the Class A Member**. Except as expressly provided in this Agreement with respect to any specific reference to the members of the Class A Members or to the Lennar Member, the LNR Members or one or more of the LNR Members, (i) the Lennar Member and the LNR Members (and any other Member admitted to the Company as a Class A Member) shall act jointly in making all decisions and taking all actions under this Agreement and, for all intents and purposes of this Agreement, including Section 11.5, as a single Class of Members (the "**Class A Members**"); (ii) all actions by the Class A Members hereunder shall require the unanimous approval of the Lennar Member and the LNR Member (and any other Member admitted to the Company as a Class A Member), as may be evidenced by the consent of at least one Executive appointed by each of the Lennar Member and the LNR Member (and any other Member admitted to the Company as a Class A Member), except for those matters in this Agreement expressly requiring the consent or approval of the Members as provided in Section 10.1, which shall require the written consent or approval of an officer of the Lennar Member and an officer of each of the LNR Members (and an officer of any other Member admitted to the Company as a Class A Member) on behalf of the Class A Members; provided, however, that the Lennar Member and the LNR Member (and any other Member admitted to the Company as a Class A Member), when voting as Members, shall act in concert as a group and shall have one single vote among them; (iii) all references in this Agreement to the consent or approval by the Members shall be deemed to be the consent or approval of the Class B Member and the Class A Members; (iv) unless otherwise expressly provided herein, all references in this Agreement to a Member, with respect to management,

actions, consents and approvals, shall be deemed to refer to the Class B Member or the Class A Members (acting as a group); (v) a default by any of the Lennar Member or any of the LNR Members (and any other Member admitted to the Company as a Class A Member) under this Agreement shall be deemed to be a default by each and all of the Lennar Member, the LNR Members (and any other Member admitted to the Company as a Class A Member) and the Class A Members; and (vi) and each of the Lennar Member and each of the LNR Members (and any other Member admitted to the Company as a Class A Member) are jointly and severally liable for any obligations of the Class A Members. Unless otherwise agreed by the Lennar Member and the LNR Members (and any other Member admitted to the Company as a Class A Member), in their sole discretion, each of the Lennar Member and the LNR Members (and any other Member admitted to the Company as a Class A Member), when making any payments or contributions under this Agreement, making a Member Loan, making a Substituted Capital Contribution, exercising a Reallocation Right and acting as the purchasing Member under Section 11.5 shall act in accordance with their respective Pro Rata Shares. Unless otherwise agreed by the Lennar Member and the LNR Members (and any other Member admitted to the Company as a Class A Member), each of the Lennar Member, on the one hand, and the LNR Members, on the other hand, (and any other Member admitted to the Company as a Class A Member) shall have equal rights, obligations and interests, in all respects, in and to the Class A Members. Although the Class A Members are treated as a single group for the purposes so described in this Agreement, it is understood that each of the Lennar Member and each LNR Member (and any other Member admitted to the Company as a Class A Member) is treated as a separate Member for purposes of the Act, for all other commercial and tax laws, including the determination and maintenance of Target Accounts and Capital Accounts and all allocations of Profits and Losses, and with respect to all Distributions hereunder.

## ARTICLE 3

### TERM

3.1     **Term**.  The Company commenced as of the date of filing of the Certificate of Formation and, unless dissolved as provided in Article 13 or under the Act, shall be of perpetual duration.

## ARTICLE 4

### PURPOSE OF BUSINESS; OTHER BUSINESS AND ACTIVITIES; NO PARTNERSHIP OR JOINT VENTURE

4.1     **Purposes of Business**.  The purposes of the Company are acquiring and owning Property for investment purposes and/or developing Property into homebuilding, commercial and/or mixed use building sites (including for the sale thereof or for construction thereon of homes (whether single family, multifamily, podium, on-grade style attached homes or otherwise) or other buildings and structures) and such related development as determined by the Executive Committee; condominium development or conversion; managing, mortgaging, financing, selling, marketing, conveying, renting, leasing or otherwise disposing of all or any portion of any

Property; obtaining, maintaining and perpetuating entitlements with respect to Property, Land Banking; operating, through a Company Subsidiary, financing, managing, selling or otherwise disposing of a water utility company; the management of recreational facilities; and engaging in any and all activities relating to, arising from or reasonably necessary or incidental to any of the foregoing, in any case, either directly by the Company or by and through one or more existing or hereafter formed Subsidiaries, including the Holding Subsidiary. Notwithstanding anything contained in this Agreement to the contrary, the Company shall not, without the prior approval of the Members, engage in any business, and it shall have no purpose unrelated to the Property and shall not acquire any material asset other than the Property and such incidental personal property as may be necessary for the development and sale of the Property.

4.2 **No Partnership or Joint Venture**. In no event shall this Agreement be held or construed to imply the existence of a partnership between or among the Members with regard to any matters, trades, businesses or enterprises outside the scope of this limited liability company or a general partnership or joint venture with regard to any such matters, trades, businesses or enterprises (except for the treatment of the Company as a partnership solely for purposes of income tax), and no Member shall have any power or authority under this Agreement to act as the partner, agent or representative of the other Member with regard to any matters beyond the scope of this limited liability company.

4.3 **Business Opportunities**. The Members recognize that each of the Members and their respective Affiliates, and their respective shareholders, members, partners, officers, directors, managers, employees, agents, and representatives have or may in the future have other business interests, activities and investments, some of which are or may be in direct or indirect conflict or competition with the business of the Company. Each Member and its Affiliates, and each of the other Persons referenced above, (a) are and shall continue to be entitled to carry on such other business interests, activities and investments, (b) may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without limitation, owning, financing, acquiring, selling, marketing, leasing, promoting, developing, converting into condominiums, improving, operating and managing real property on its own behalf or on behalf of other entities with which any of them is affiliated or otherwise, and (c) may engage in such activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or the other Member or to account for or otherwise share information relating thereto to or with the Company or any Member. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in and to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company or the Members, shall not be deemed wrongful or improper. Without limiting the generality of the foregoing, the Members (or their Affiliates) may, but shall not be obligated to, present to the Company any opportunities to acquire or invest in real property. If any Member (or its Affiliate) offers such opportunity to the Company and the Company does not elect to acquire or invest in such real property, or if such Member (or Affiliate) does not elect to make such offer to the Company, such Member (or Affiliate) may acquire or invest in such real property for its own account.

**ARTICLE 5**

24

## PRINCIPAL OFFICE, REGISTERED
## OFFICE AND REGISTERED AGENT

5.1   **Principal Office and Mailing Address**.  The principal office and mailing address of the Company shall be 25 Enterprise Drive, Suite 500, Aliso Viejo, California 92656.  The principal office and/or mailing address of the Company may be changed from time to time by the Executive Committee in its sole and absolute discretion.  Additional places of business and offices for the Company may be established by the Executive Committee in its sole and absolute discretion.

5.2   **Registered Agent and Office**.  The registered agent of the Company in Delaware, shall, until changed by the Executive Committee in its sole and absolute discretion, be The Corporation Trust Company, and the address of the Company's registered agent and the address of the Company's registered office in the State of Delaware shall initially be Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  The Executive Committee may, from time to time, designate a new registered agent and/or registered office of the Company.

## ARTICLE 6

## NAMES AND ADDRESSES OF MEMBERS

6.1   **Names, Addresses and Percentage Interests**.  The names and addresses of the Members of the Company and their respective Percentage Interests and their Capital as of the Effective Date are as set forth in **Exhibit A**.

## ARTICLE 7

## INVESTED CAPITAL AND LOANS

7.1   **Original Capital**.

(a)   The Lennar Member and the LNR Members, on or prior to the Effective Date, each shall have an Interest in the Company equal to the agreed upon value as is set forth as Original Capital on **Exhibit A**, subject to adjustment as provided in this Section 7.1.  Prior to the Class A Special Distributions, such value shall be deemed to equal the fair market value of the assets of the Company <u>less</u> the liabilities of the Company as of the Effective Date, as agreed upon by the Members (the "**Company Value**").  The Original Capital of MWHP consists of the MWHP Subsidiary Contribution and a cash contribution (the "**MWHP Preliminary Cash Contribution**") in the amount of the MWHP Preliminary Cash Contribution Amount as determined under the Formation Agreement, as set forth on **Exhibit A**.

(b)   The respective values initially set forth on **Exhibit A** of (i) the MWHP Subsidiary Contribution is equal to the estimated MWHP Preliminary Property Value and (ii) the Company Value is equal to the LandSource Preliminary Value; each of which is subject to adjustment after the Effective Date, as provided in Section 2.5(c) of the Formation Agreement.  After the determination of the MWHP Final Adjustment, (I) the MWHP

Subsidiary Contribution shall be deemed to be equal to the MWHP Final Property Value and (II) the MWHP cash contribution shall be equal to the MWHP Final Cash Contribution, as provided in Section 7.1(c). After the determination of the LandSource Final Adjustment, the Company Value shall be deemed to be equal to the LandSource Final Value. After taking into account the adjustments described in this Section 7.1(b):

(i) the Lennar Member's Capital Account shall be an amount equal to the sum of (A) 50% of (i) the LandSource Final Value less (ii) the amount of the LandSource Final Special Distribution less (iii) the LandSource Payable Debt immediately prior to being paid off on the Effective Date (such amount determined pursuant to this clause (A) shall be deemed to be the Lennar Member's Original Capital, and **Exhibit A** shall be amended to reflect such final Original Capital) plus (B) 50% of the fair market value of the Excluded Entities as reflected in **Exhibit A-1**.

(ii) each LNR Member's Capital Account shall be equal to its Pro Rata Share of an amount equal to the sum of (A) 50% of (i) the LandSource Final Value less (ii) the amount of the LandSource Final Special Distribution less (iii) the LandSource Payable Debt immediately prior to being paid off on the Effective Date (such amount determined pursuant to this clause (A) shall be deemed to be such LNR Member's Original Capital, and **Exhibit A** shall be amended to reflect such final Original Capital) plus (B) 50% of the fair market value of the Excluded Entities as reflected in **Exhibit A-1**.

(iii) MWHP shall have a Capital Account in the amount equal to the MWHP Final Property Value and the MWHP Final Cash Contribution, which amounts shall be deemed to be MWHP's Original Capital, and **Exhibit A** shall be amended to reflect such final Original Capital.

(c) The Members acknowledge that, as described in Section 2.5 of the Formation Agreement, the MWHP Preliminary Cash Contribution is an estimated amount and if the MWHP Final Cash Contribution is greater than the amount of the MWHP Preliminary Cash Contribution, MWHP shall contribute the amount of such deficiency to the capital of the Company within twenty (20) Business Days after the Adjustment Determination Date, which amount shall constitute Original Capital of MWHP consistent with Section 2.5(e) of the Formation Agreement. If the MWHP Final Cash Contribution is less than the amount of the MWHP Preliminary Cash Contribution, the Company shall make a special Distribution to MWHP such excess contribution within five (5) Business Days after the Adjustment Determination Date and the MWHP Preliminary Cash Contribution taken together with any related Distribution or contribution resulting from the calculation of the MWHP Final Cash Contribution shall be treated as a net contribution for purposes of this Agreement.

7.2 **Additional Capital Contributions**.

(a) Pursuant to Section 2.7 of the Formation Agreement, up to three Realization Events may take place if, subject to the terms and conditions therein, certain

revenues are achieved by the Company. Each Realization Event, if any, is deemed to increase the LandSource Final Value effective as of the date of such Realization Event. Each time that a Realization Event takes place pursuant to the terms and conditions set forth in Section 2.7 of the Formation Agreement, (i) the Company shall issue, for no additional consideration, Preferred Capital to the Lennar Member and the LNR Members (in their respective Pro Rata Shares) in the amounts and at such time as provided in Section 2.7 of the Formation Agreement; and (ii) solely for purposes of this Agreement, each of the Lennar Member and the LNR Members shall be deemed to have made an Additional Capital Contribution in the amount of the Preferred Capital issued to it and shall receive an increase to its Capital Account in such amount, provided that in such case its Capital Account shall only be increased in the amount of the Preferred Capital issued to such Member.

(b)     [Intentionally omitted]

(c)     To the extent the Executive Committee determines from time to time that funds are required, in excess of the net proceeds available from Financings and other Gross Revenues, to operate the Company, including as a result of the Company's actual or projected failure to meet the Business Plan (each such event, a "**Shortfall**"), and the Executive Committee elects to have the Members fund such Shortfall, the Executive Committee shall provide written notice to the Members (each a "**Contribution Notice**"). In addition, either Member may issue a Contribution Notice (i) to prevent a payment default under (A) any development plan or other agreement between the Company or any Company Subsidiary and any Governmental Entity, or (B) any material Authorization; (ii) to prevent or mitigate an Emergency; or (iii) in the event such Member reasonably believes a Shortfall exists, and if the Business Plan that has been approved and adopted by the Executive Committee expressly provides for additional capital contributions (A) in the amount of the lesser of the amount of such Shortfall or the amount requested pursuant to such Contribution Notice, (B) to be used for the intended purpose and (C) to be made within the time frame that includes the time of the contribution required under such Contribution Notice. In each such event, the Members shall make Additional Capital Contributions to the Company for their Pro Rata Shares of the amount specified in such Contribution Notice within twenty (20) Business Days from the date of the Contribution Notice or such other period of time reasonably determined by the Executive Committee.

(d)     If any Member in a Class of Members fails to make an Additional Capital Contribution required to be made pursuant to Section 7.2(c) and no other Member in the same Class of Members has cured such default within the required time (a "**Capital Default**"), then such Class of Members (such Class of Members is collectively referred to as the "**Defaulting Member**") shall be in default hereunder and the other Class of Members, provided no Member in such other Class of Members has defaulted in its required Additional Capital Contribution (such non-defaulting Class of Members is collectively referred to as the "**Non-Defaulting Member**"), may elect within ten (10) Business Days after the end of such time period (unless cured by such Defaulting Member prior to the end of such 10-day period), by written notice to the Executive Committee and the Defaulting Member, one of the following remedies:

(i)     To pay into the Company a sum equal to the Capital Default and treat that payment as (x) a capital contribution by the Defaulting Member; and (y) a loan from the Non-Defaulting Member to the Defaulting Member (a "**Member Loan**") (provided, however, that in the event that the Member that made such contribution on behalf of the Defaulting Member (the "**Contributing Member**") exercises its Reallocation Right under Section 7.2(e) as a result of nonpayment of the Member Loan, the amount of the unpaid principal and accrued interest on such Contributing Member's Member Loan at the time of such exercise shall be deemed to be an Additional Capital Contribution by such Contributing Member and the amount of such unpaid principal shall be subtracted from the Defaulting Member's Additional Capital Contributions), which (1) is payable on demand by the Contributing Member on not less than ten (10) Business Days prior written notice, (2) will bear interest from the date the sum is paid into the Company until the date it is repaid at the rate of twenty percent (20%) per annum (or such lower rate as is the maximum rate permitted by law) which the Members agree is a commercially reasonable rate of return, (3) effective only upon such payment, with no other action required by a Member, will be secured by a lien on the Defaulting Member's Interests (in which event, the Defaulting Member hereby grants a security interest in its Interests to be effective upon a Capital Default and authorizes the Contributing Member to file, at the time of or after such payment, any UCC financing statements or take such other action as is necessary to perfect such lien), and (4) will be automatically repaid (whether or not a Contributing Member has demanded payment) by the Company's paying to the Contributing Member all sums which otherwise would be paid to the Defaulting Member hereunder (including Distributions, to be applied first against interest, and then against principal, until the loan and all interest on it has been repaid in full; in which event (x) the Defaulting Member shall, upon request by the Contributing Member, execute and deliver to the Contributing Member any other documents which the Contributing Member may reasonably request with respect thereto to evidence the Member Loan; and (y) upon the default of a Defaulting Member, subject to the terms of any Financings, the Contributing Member shall be entitled to exercise all of the rights afforded to a secured party under the applicable state Uniform Commercial Code or other applicable law, and may, upon such notice as may be required by the Uniform Commercial Code, cause the Defaulting Member's Interests to be sold at private sale to the Non-Defaulting Member in accordance with the Uniform Commercial Code or any other applicable law in satisfaction of such Member Loan.

(ii)    To make an Additional Capital Contribution to the Company in an amount equal to up to the amount of the Capital Default (each, a "**Substituted Capital Contribution**"), in which case the respective Interests and Capital Accounts of the Members shall be adjusted as provided in Section 7.2(e).

(iii)   To bring an action at law or in equity, in the Member's own name, and/or on behalf of the Company, to enforce the obligation of the Defaulting Member to make the required Member's Additional Capital Contribution.

(iv)    To make an Additional Capital Contribution to the Company in an amount equal to up to the amount of the Capital Default (each, a "**Priority Substituted Capital Contribution**"), in which case the Contributing Member shall receive Distributions described in Section 9.4(a)(i).

(e)    Reallocation Right.  If (I) a Member Loan has not been repaid in full (including principal and accrued interest) in accordance with the provisions of Section 7.2(d)(i) on or before the four (4) month anniversary of the making of such Member Loan or (II) the Contributing Member has elected to treat its funding of the Defaulting Member's Capital Default as a Substituted Capital Contribution in accordance with the provisions of Section 7.2(d)(ii) above, then, at any time thereafter and to the extent of the outstanding amount (including principal and interest, together with reasonable attorneys' and paralegals' fees (at trial and at all appellate levels)) of the Member Loan or funded Capital Default, the Contributing Member shall have the right, but not the obligation (the "**Reallocation Right**"), in its sole and absolute discretion, to elect to cause the Interests of each of the Members to be adjusted so that the Percentage Interest of each Member shall equal the percentage equivalent of the quotient determined by dividing (1) the positive difference, if any, between (a) the sum of (i) 100% of the Invested Capital of such Member (including all Additional Capital Contributions then made), plus (ii) 200% of the Substituted Capital Contributions then or theretofore made by such Member to the Company (the excess of 200% of such Member's Substituted Capital Contributions over such Member's Substituted Capital Contributions is referred to herein as the "**Excess Amounts**"), minus (b) the Excess Amounts attributable to the Substituted Capital Contributions then or theretofore made by the other Member to the Company, by (2) 100% of the Invested Capital of all of the Members (including all Additional Capital Contributions then made); provided, however, that in the event that at any time the Defaulting Member's Percentage Interest is diluted to less than one percent (1%), then the Defaulting Member's Percentage Interest shall become zero percent (0%) and the Defaulting Member shall no longer have an Interest, including any Preferred Capital, shall be deemed to have resigned from the Company as a Member, shall no longer be considered a Member for any purpose hereunder and shall have no right to any distribution under Section 18-604 of the Act or otherwise in connection with such resignation.  To the extent a Member's Interest includes Preferred Capital, any dilution hereunder shall be applied to both its Interest and its Preferred Capital.  In addition, the Class A Members Promote Percentage shall be adjusted in the same proportion as its Percentage Interest has been adjusted in the case of any such application of the Reallocation Right.  For example, if the Class A Members are the Defaulting Member and their aggregate Class A Members' Percentage Interest is diluted by 20%, then, in addition to the 20% decrease in the Percentage Interest of the Class A Members, (I) their Preferred Capital, if any, shall be decreased by an amount equal to 20% of the total outstanding Preferred Capital owned by the Members and the Contributing Member shall be deemed to have received such amount of Preferred Capital; and (II) Class A Members Promote Percentage shall be decreased by 20%.  If the Members' Interests are adjusted pursuant to this Section 7.2(e), then the Capital Account balances of the Members shall be adjusted so that they equal an amount such that if all of the Company's assets were sold for Book Basis, all of the liabilities of the Company were satisfied according to their terms (except that if a nonrecourse liability exceeds the Book Basis of the asset securing such liability such calculation shall be made assuming such asset were transferred to the lender in satisfaction of the liability), all Partnership Minimum Gain and Partner Minimum Gain were

properly taken into account, and the net proceeds were distributed to the Members in accordance with the provisions of Section 9.5, all Capital Accounts would equal zero after such Distribution.

(f) If a Contributing Member has not elected whether its payment is a Member Loan under Section 7.2(c)(i), a Substituted Capital Contribution under Section 7.2(c)(ii) or a Priority Substituted Capital Contribution under Section 7.2(c)(iii), as applicable, within thirty (30) days after paying such amount to the Company, it shall be deemed to be a Member Loan under Section 7.2(c)(i).

(g) Except as expressly provided in this Agreement or with the prior written consent of the Executive Committee, no Member shall be required or entitled to contribute any other or further capital to the Company.

7.3     **No Interest on Capital Contributions**. Except as specifically provided in this Agreement, no Member shall be paid interest on any Capital.

7.4     **Return of Capital Contributions**. Except as specifically provided in this Agreement, including Section 9.4 and Section 9.5, no Member shall have the right or be entitled to resign, or receive any return of, its Capital.

7.5     **Loans to Company**. No Member shall have any obligation to loan funds to the Company or guaranty debts of the Company, except as provided in any Financings.

**ARTICLE 8**

**COMPENSATION OF AND PAYMENTS TO
THE MEMBERS AND THEIR AFFILIATES;**

8.1     **Generally**. The Company may enter into transactions, contracts, agreements or arrangements with any Member and/or its or their respective Affiliates, including those described in Sections 8.2 and 8.3, only with the consent of the Executive Committee; provided that with respect to any decision to be made by the Company to take any action or exercise any right or remedy of the Company thereunder for any reason (including by reason of a default), to terminate or modify any such right or remedy or agree to a waiver or forbearance thereof (a **"Special Right or Remedy"**), the Executives appointed by the unaffiliated Member shall have the sole right to initiate or have control over all matters pertaining to the exercise, enforcement, consent or approval of such Special Right or Remedy, not to be unreasonably withheld, delayed or conditioned. Notwithstanding anything to the contrary set forth in this Section or in this Agreement, any determination with respect to any and all acquisition rights, including the pricing of, any Property for any purposes, including homesites and/or commercial sites, that may be acquired by a Member (or its Affiliate) (including pursuant to Sections 8.5, 8.6 or 8.7), shall be made by the Executive Committee (including the Executives appointed by the interested Member), although the enforcement of all rights or remedies on behalf of the Company as a result of a default by a Member or its Affiliate under any contract or agreement between such Member or its Affiliate and the Company shall be made by the Executives appointed by the Member that is not affiliated with the contracting party. In addition, in the event that any Class

30

A Member or its Affiliate fails to close on its obligation to acquire any Property from the Company or its Subsidiary and such failure (i) constitutes a breach by such Class A Member or Affiliate under a purchase and sale agreement or otherwise is not the result of a failure of a condition precedent to such obligation to purchase or (ii) is under an option agreement with the Company or its Subsidiary and is not the result of a failure of a condition precedent to such exercise of such option, then the Executives appointed by the Class B Member shall have the sole right to approve the terms upon which such Property is subsequently sold or otherwise disposed of to a Person that is not an Affiliate of the Company or any Member.

8.2     **Reimbursements; Payment of Compensation**.  Each of the Members shall be reimbursed by the Company for any reasonable out-of-pocket costs and expenses, including general and administrative costs and expenses incurred by it on behalf of the Company, as expressly provided to be incurred by such Member pursuant to the Business Plan or as otherwise expressly approved by the Executive Committee, upon the submission by such Member to the Company of reasonable supporting documentation therefor; provided, however, that to the extent that any Member (or its Affiliate) is reimbursed or has the right to be reimbursed for any such costs or expenses by any other Person, such reimbursed or reimbursable costs or expenses shall not be reimbursed by the Company, unless such reimbursements are contemplated in the Business Plan or otherwise approved by the Executive Committee, provided that the Executive Committee has been informed of such third party reimbursement.  Any commissions, fees, interest or other compensation authorized under this Agreement, the Business Plan or by the Executive Committee, to be paid to a Member or an Affiliate of a Member shall constitute an expense of the Company and shall be payable to such Member or its Affiliate, as the case may be, on the same basis and with the same priority as any other amounts payable by the Company to third party creditors similarly situated.  With respect to the payment of all such commissions, fees, interest or other compensation, the relationship between the Company and such Member (or its Affiliate, as the case may be) shall be that of debtor creditor.  In no event shall the general and administrative expenses of the Company (including its Subsidiaries), including the reimbursements or payments to any and all of the Members or any other expenditure of the Company or its Subsidiaries pursuant to this Section 8.2 (but not including any management fees or Distributions), exceed one and one-half percent (1.5%) of Gross Revenues in any Measurement Period without the consent of the Executive Committee; provided that, in the event such actual reimbursements and payments do exceed one and one-half percent (1.5%) of Gross Revenues in any Measurement Period, and the Executive Committee has not consented to or otherwise approved such excess payment or reimbursement, the Class A Members shall reimburse the Company the amount thereof in excess of one and one-half percent (1.5%) of Gross Revenues for such Measurement Period; and such payment by the Class A Members shall not constitute Capital.  The Class A Members shall pay the Company such reimbursement within twenty (20) Business Days after each such determination that excess general and administrative expenses have been paid during a Measurement Period.  The first "**Measurement Period**" shall mean the calendar year of January 1, 2007 through December 31, 2007, and, thereafter, the Measurement Period shall mean each three-year period after December 31, 2007.

8.3     **Transactions with Members and/or Affiliates**.  The validity of any loan, transaction, agreement or payment involving the Company and a Member or a Member's Affiliate permitted by the terms of this Agreement or otherwise approved by the Members or the Executive Committee shall not be affected by reason of the relationship between the Company

and such Member or Affiliate. Notwithstanding the foregoing, the Members hereby acknowledge and agree that the Company may engage NAT, an Affiliate of Lennar, as title insurance and closing agent in connection with the purchase or sale of all or any portion of the Property on terms that are no less favorable to the Company than those that might be obtained on an arm's-length basis from a Person that is not an Affiliate of Lennar.

8.4 [Intentionally Omitted]

8.5 **Option Agreements; Development Agreements**. As of the Effective Date, MWHP has assigned its rights to the Company and the Company has assumed the obligations of MWHP with respect to the New Option Agreements as defined in that certain Option Termination Agreement (as defined in the Formation Agreement) effective as of the Execution Date. The Members ratify and confirm such assignment and assumption and authorize the Company to perform its obligations under the New Option Agreements. As of the Effective Date, each of the Development Agreements (as defined in the Option Termination Agreement) has been amended to refer to the New Option Agreements in place of the Existing Option Agreements (as defined in the Option Termination Agreement). The Members hereby approve, ratify and confirm the amendment of the Existing Southwest Options by the execution and delivery of the Amended Southwest Options and further authorize the Company to cause Southwest to perform its obligations under such Amended Southwest Options.

8.6 **Rights of First Offer**.

(a) The Members hereby approve, ratify and confirm the Company's execution and delivery of the following agreements:

(i) that certain residential property right of first opportunity agreement (the "**Residential ROFO Agreement**") among the Company, the Lennar Member and the Class B Member, a copy of which is attached hereto as **Exhibit 8.6(a)(i)** and

(ii) that certain commercial property right of first opportunity agreement (the "**Commercial ROFO Agreement**") among the Company, LNR Property and the Class B Member, a copy of which is attached hereto as **Exhibit 8.6(a)(ii)**.

(b) The Members acknowledge that, in addition to the Residential ROFO Agreement and the Commercial ROFO Agreement, Lennar and/or certain of its Affiliates, on the one hand, and LNR Parent and/or certain of its Affiliates, on the other hand, are, as of the Effective Date, parties to existing option agreements, purchase agreements, right of first refusal agreements, right of first offer agreements, joint venture agreements and/or other similar agreements, under which Lennar and/or certain of its Affiliates have acquired certain rights with respect to the acquisition of certain residential Property, and LNR Parent and/or certain of its Affiliates have acquired certain rights with respect to the acquisition of certain commercial Property (each, an "**Existing LandSource Agreement**"). A schedule of the Existing LandSource Agreements is attached hereto as **Exhibit 8.6(b)**, and, unless otherwise approved by the Executive Committee, all other agreements between the Company and any

Member or any Affiliate of a Member shall have been terminated or be deemed to be terminated effective as of the Effective Date. The Members hereby approve, ratify and confirm the execution and delivery of each Existing LandSource Agreement by the Company and further authorize the Company, and any applicable Subsidiary or Affiliate, as applicable, to perform the transactions contemplated pursuant to the terms and conditions thereof.

(c)     The Members hereby agree that, notwithstanding anything to the contrary contained in this Agreement, any Existing LandSource Agreement or any other agreement, if any Existing LandSource Agreement or other agreement limits the percentage or amount of Property that Lennar or LNR, or any of their respective Affiliates, may acquire under an Existing LandSource Agreement (collectively, the "**Existing LandSource Option Property**"), then each Member hereby agrees to use its commercially-reasonable efforts to amend or cause such agreements to be amended in such a manner as would permit Lennar, or any of its Affiliates, to acquire the maximum percentage or amount of Property that may be acquired by Lennar or any of its Affiliates (taking into account Lennar's reduced ownership in the Company as a result of the issuance of the Interests to the Class B Member) without subjecting Lennar to the requirement that such Existing LandSource Option Property or the Entities that own the Existing LandSource Option Property under such agreement be included in Lennar's consolidated financial statements pursuant to FASB Interpretation 46(R) prior to the proposed consummation of the acquisition of such Property, as reasonably determined by Lennar's Accountants.

(d)     In the event that either Lennar or any LNR Parent, or any of their respective Affiliates elects not to proceed, defaults under or is unable, for any other reason, to consummate the proposed acquisition of any Existing LandSource Option Property pursuant to their respective rights under any Existing LandSource Agreement, the Commercial ROFO Agreement or the Residential ROFO Agreement or any other Property as may be included within either the Commercial ROFO Agreement or the Residential ROFO Agreement pursuant to Section 8.7 ("**Remaining Property**"), then the Company shall offer such Remaining Property to the Class B Member or its Affiliates on similar terms and conditions as set forth in such Existing LandSource Agreement, the Residential ROFO Agreement or the Commercial ROFO Agreement (as the case may be) for such Remaining Property; subject, however, to obtaining any required consents from third parties and the Class B Member reimbursing Lennar or LNR Parent or their Affiliates for any unreimbursed costs (to the extent such costs are reasonably applicable or beneficial, as determined by the Executive Committee, to the Class B Member's intended development and/or use of such Remaining Property) and/or deposits paid or incurred. The rights of the Class B Member pursuant to this Agreement to acquire any Property that is not acquired by a Class A Member or its Affiliate shall not constitute a waiver of any rights that the Company may have at law or in equity as a result of the breach of any agreement between the Company or its Subsidiary and such Class A Member or Affiliate with respect to such Property, unless otherwise approved by the Executive Committee. The rights of the Class A Members, if any, pursuant to this Agreement to acquire any Property that is not acquired by the Class B Member or its Affiliate shall not constitute a waiver of any rights that the Company may have at law or in equity as a result of the breach of any agreement between the Company or its Subsidiary and the Class B Member or Affiliate with respect to such Property, unless otherwise approved by the Executive Committee.

(e)     Notwithstanding anything to the contrary in this Agreement, to the extent that any LNR Parent or any of their Affiliates has the right to acquire any Property owned by the Company or any Subsidiary of the Company as of the Effective Date that is entitled, may become entitled or is intended by the Company or any Subsidiary of the Company to become entitled as commercial real property pursuant to any Existing LandSource Agreement or the Commercial ROFO Agreement, then at any time that an LNR Parent no longer has an obligation to acquire commercial or mixed use investments on behalf of any of its existing or hereafter formed LNR Funds ("**Available Property**"), an LNR Member shall provide notice to such effect to the Class B Member (the "**Available Property Notice**"). Upon receiving such Available Property Notice, the Class B Member (or its Affiliate MacFarlane Partners) shall have the right to acquire its Pro Rata Share as between the Classes of Members (i.e., as of the Effective Date, 68% to MWHP and 32% to an LNR Parent or its subsidiaries) of such Available Property (or such other percentages as agreed upon by the LNR Members and the Class B Member) on substantially the same terms and conditions as set forth in the Existing LandSource Agreement or the Commercial ROFO Agreement relating to such Available Property; and the LNR Members or their Affiliate and the Class B Member or its Affiliate shall enter into a joint venture to own such available properties or shall otherwise determine how to apportion such available properties between the Class B Member and LNR Members or their Affiliates. If either MWHP (or its Affiliate) or the LNR Members (or their Affiliate) does not elect to acquire its Pro Rata Share (as between the Classes of Members) or other agreed upon percentage of any Available Property, then the other Member(s) (i.e., MWHP or the LNR Members (or their respective Affiliates)) shall have the right to acquire all of such Available Property.

8.7     **Rights with respect to Future Residential and Commercial Property**.  The Executive Committee will determine, at the time the Company or any of its Subsidiaries acquires any Property after the Effective Date, the purchase, option and/or first offer rights, if any, that the Members shall have, if any, with respect to such Property; provided that, unless otherwise agreed to by the Executive Committee, all such future Property must be sold at fair market value or greater, and on material terms and conditions as determined by the Executive Committee.  Any such first offer rights shall be evidenced by a residential property right of first opportunity agreement in the form of the Residential ROFO Agreement or a commercial property right of first opportunity agreement in the form of the Commercial ROFO Agreement.

## ARTICLE 9

## CAPITAL ACCOUNTS; PROFITS AND LOSSES; DISTRIBUTIONS

9.1     **Capital Accounts**.  A separate and single Capital Account shall be maintained for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv) and, to the extent consistent with such Regulation, shall be determined and adjusted as follows:

(a)     Credits.  Each Member's Capital Account shall initially be the amount described in Section 7.1(b) and shall thereafter be credited with:

(i)     any contributions of cash made by such Member to the capital of the Company plus the Book Basis of any property contributed by such Member to

the Capital of the Company (net of any liabilities to which such property is subject or which are assumed by the Company);

(ii)     the Member's distributive share of Profit, items thereof, and items of income and gain specially allocated pursuant to Section 9.3; and

(iii)     any other increases required by Treasury Regulation Section 1.704-1(b)(2)(iv) or by Section 7.2(a) of this Agreement.

(b)     <u>Debits</u>.  Each Member's Capital Account shall initially be the amount described in Section 7.1(b) and shall thereafter be debited with:

(i)     any Distribution of cash made from the Company to such Member plus the fair market value of any property distributed in kind to such Member (net of any liabilities to which such property is subject or which are assumed by such Member);

(ii)     the Member's distributive share of Loss, items thereof and deductions or losses specially allocated to such Member pursuant to Section 9.3; and

(iii)     any other decreases required by Treasury Regulation Section 1.704-1(b)(2)(iv).

The provisions of this Section 9.1 relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder and shall be interpreted and applied in a manner consistent with those provisions.

9.2     <u>Allocations of Profit and Losses and Other Allocation Provisions</u>.

(a)     For each Fiscal Year, or part thereof, after adjustments to Capital Accounts pursuant to Section 7.2(e) and allocations pursuant to Sections 9.2(c), 9.3 and 9.5(b) have been made, Profit or Loss (or individual items of income, gain, expense, deduction or loss) shall be allocated between the Members so as to reduce, proportionately, the differences between their respective Target Accounts and Partially Adjusted Capital Accounts for such fiscal period.

(b)     If, during a fiscal period, a Member (the "**Transferring Member**") transfers its Interest in the Company in accordance with this Agreement, items of Profit and Loss, together with corresponding tax items, that otherwise would have been allocated to the Transferring Member with regard to such fiscal period shall be allocated between the Transferring Member and the transferee Member in accordance with their respective Interests in the Company during the fiscal period using any method permitted by Section 706 of the Code and selected by the Executive Committee.

(c)     If and to the extent that there is a Final Determination for federal income tax purposes that any allocation of Profits, Losses or any items thereof have not been

properly allocated, then, to the extent permitted by applicable law, the Executive Committee shall adjust subsequent allocations of Profit or Loss (and items thereof), together with corresponding tax items, so that over the term of the Company the aggregate amount of any Profit or Loss allocated to each Member shall, to the extent possible, be equal to the aggregate amount that would have been allocated to each such Member if the Final Determination regarding allocations had not occurred.

9.3 **Compliance with Section 704(b) and Excluded Entity Allocation**. The following special allocations shall, except as otherwise provided, be made in the following order:

(a) Minimum Gain Chargeback. Notwithstanding any other provision of this Article 9, if there is a net decrease in Partnership Minimum Gain or, with respect to any Member, in any Partner Minimum Gain during any Fiscal Year or other period, prior to any other allocation pursuant hereto, such Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount and manner required by Treasury Regulation Sections 1.704-2(f), 1.704-2(g), 1.704-2(j) or 1.704-2(i)(4) or any successor provisions. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2 or any successor provision.

(b) Qualified Income Offset. Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which causes or increases a negative balance in its or his Capital Account (adjusted as provided in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)) shall be allocated items of income and gain sufficient to eliminate such increase or negative balance caused thereby, as quickly as possible, to the extent required by such Treasury Regulation.

(c) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year or other period shall be allocated (as nearly as possible) amongst the Members under Treasury Regulation Section 1.704-2, or any successor provision in accordance with their respective Percentage Interests.

(d) Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Member that made, or guaranteed or is otherwise liable with respect to, the loan to which such Partner Nonrecourse Deductions are attributable in accordance with principles under Treasury Regulation Section 1.704-2(i) or any successor provision.

(e) Excluded Entities Allocations. All income, gain, loss, deduction or credit (and items thereof) attributable to the Excluded Entities shall be specially allocated to the Class A Members (pro rata in accordance with their respective Pro Rata Shares); provided, however, that allocations of items of income, gain, loss and deduction to the Lennar Member and the LNR Members under this Section 9.3(e) shall take into account Code Section 704(c)(1)(A) and the principles thereof.

9.4 **Distributions**.

(a) Except as provided in Sections 2.3(b)(iv), 9.4(b), 9.4(c), 9.4(d), 9.4(e), 9.4(f) and Section 9.5, and subject to the terms of the Financing (which permit certain tax

Distributions, which shall be distributed in the order set forth in this Section 9.4(a)), all Available Cash and any non-cash items shall be distributed at such time or times as determined by the Executive Committee in its sole discretion (but not less frequently than quarterly) to each of the Members in the following order:

        (i)     First, to each Member, if any, that has made a Priority Substituted Capital Contribution (if more than one Member, pro rata in accordance with the respective aggregate amounts of Priority Substituted Capital Contributions made by each Member) until such time as such Member shall have received Distributions under this Section 9.4(a)(i) sufficient to provide such Member with a 30% IRR with respect to its Priority Substituted Capital Contribution;

        (ii)     Second, to the Members that have been issued Preferred Capital, if any, pro rata in accordance with their respective Unreturned Preferred Returns, until and to the extent required to reduce the balance of each such Member's Unreturned Preferred Return to zero (it being understood that Preferred Returns will continue to accrue until all Unreturned Preferred Capital has been paid in full);

        (iii)     Third, to the Members that have been issued Preferred Capital, if any, pro rata in accordance with their respective Unreturned Preferred Capital until and to the extent required to reduce the balance of each such Member's Unreturned Preferred Capital to zero;

        (iv)     Fourth, to the Members pro rata in accordance with their respective Percentage Interests, as the same may be adjusted pursuant to the terms and conditions of this Agreement, until such time as MWHP shall have received Distributions under this Section 9.4(a)(iv) sufficient to provide it with a thirteen percent (13%) IRR with respect to its Capital; and

        (v)     Fifth, to the Members in accordance with the following: (A) to the Lennar Member and the LNR Members, pro rata in accordance with their respective Pro Rata Shares, in an aggregate amount equal to the sum of (a) their aggregate Percentage Interests plus (b) eight percent (8%) (as it may be adjusted as a result of a Reallocation Right, the "**Class A Members Promote Percentage**"), and (B) the balance to MWHP; provided, however, that in the event of an admission of a Special Class A Member, the Distribution provision set forth in Section 2.3(b)(iv)(A) shall be deemed to have replaced this Section 9.4(a)(v).

        (b)     Notwithstanding Section 9.4(a), the Class A Members may elect, by delivering written notice to the Company and to the Class B Member, at any time prior to the earlier of the third year anniversary of the Effective Date and the first date on which Distributions under Section 9.4(a)(v) are made, to replace Sections 9.4(a)(iv) and 9.4(a)(v) with the following; provided that it does not subject Lennar to the requirement that any Property (other than the Excluded Entities) or the entity or entities that own any Property

(other than the Excluded Entities) be included in its consolidated financial statements pursuant to FASB Interpretation 46(R), as reasonably determined by Lennar:

(iv)    Fourth, to the Members pro rata in accordance with their respective Percentage Interests, as the same may be adjusted pursuant to the terms and conditions of this Agreement, until such time as MWHP shall have received Distributions under this Section 9.4(a)(iv) sufficient to provide it with a twelve percent (12%) IRR with respect to its Capital; and

(v)    Fifth, to the Members in accordance with the following: (A) to the Lennar Member and the LNR Members, pro rata in accordance with their respective Pro Rata Shares, in an aggregate amount equal to the sum of (a) their aggregate Percentage Interests plus (b) eight percent (8%) (as it may be adjusted as a result of a Reallocation Right, the "**First Level Class A Members Promote Percentage**"), and (B) the balance to MWHP until such time as MWHP shall have received Distributions under this Section 9.4(a)(v) sufficient to provide MWHP with a seventeen percent (17%) IRR with respect to its Capital; and

(vi)    Sixth, to the Members in accordance with the following: (A) to the Lennar Member and the LNR Members, pro rata in accordance with their respective Pro Rata Shares, in an aggregate amount equal to the sum of (a) their aggregate Percentage Interests plus (b) eighteen percent (18%) (as it may be adjusted as a result of a Reallocation Right and together with the First Level Class A Members Promote Percentage, the "**Class A Members Promote Percentage**"), and (B) the balance to MWHP; provided, however, that in the event of an admission of a Special Class A Member, the Distribution provision set forth in Section 2.3(b)(iv)(B) shall be deemed to have replaced this Section 9.4(a)(vi)."

(c)    Notwithstanding Section 9.4(a), concurrently with or immediately following its receipt of the proceeds of the Initial Financing, the Company shall distribute to the Class A Members, pro rata in accordance with their respective Pro Rata Shares, special Distributions in the aggregate amount of the LandSource Preliminary Special Distribution Amount (the "**Class A Special Distributions**"). The Members acknowledge and agree that, for administrative convenience, the Company may effectuate the Class A Special Distributions by directing the lender of the Initial Financing to pay such Gross Closing Debt Financing Proceeds directly to the Class A Members rather than to the Company. In no event shall any cash or other property contributed by any Member be distributed to the Lennar Member or the LNR Members as part of the Class A Member Special Distribution except with the prior written consent of the Class A Members.

(d)    Notwithstanding Section 9.4(a), if the LandSource Final Special Distribution amount is greater than the Class A Special Distributions the Company shall make a special Distribution to the Lennar Member and the LNR Members for their Pro Rata Shares of such Distribution deficiency within five (5) Business Days after the Adjustment Determination Date; provided, however, that any such special Distribution shall be made from sources available to the Company sufficient to be consistent with Section 9.6(c); and if no such sources are available, then, with the written consent of the Class A Members, such

Distribution shall be made from any source available to the Company. In the event the LandSource Final Special Distribution amount is less than the Class A Special Distributions, the Lennar Member and the LNR Members shall return to the Company an amount equal to their Pro Rata Shares of such excess Distribution within five (5) Business Days after the Adjustment Determination Date, which shall be netted against and deemed a reduction in the amount of the Class A Special Distribution.

(e)     Notwithstanding Section 9.4(a), the Company shall make a special Distribution to the Class B Member to the extent, if any, required pursuant to the last sentence of Section 7.1(c).

(f)     Notwithstanding anything to the contrary in this Agreement, all amounts generated by or allocable to any and all of the Excluded Entities shall be distributed, at such times as determined by the Executives appointed by the Class A Members, subject to the provisions in the Financings effective as of such time, solely to the Class A Members (pro rata in accordance with their Pro Rata Shares).

9.5     **Distributions in Liquidation**.

(a)     Upon the liquidation of the Company caused other than by the termination of the Company under Section 708(b)(1)(B) of the Code, the Company shall proceed to wind-up its affairs in accordance with Section 13.2. During such winding up process, Profits, Losses and Distributions shall continue to be allocated among the Members in accordance with Section 9.2 through 9.4. The proceeds of sale and other assets of the Company, after giving effect to the provisions of Section 13.2, shall be first applied to the payment of all other debts and liabilities of the Company including debts to any Members who are creditors of the Company, and then distributed not later than the latest time specified for such Distributions pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2), to the Members in accordance with the provisions of Section 9.4.

(b)     The Members believe and intend that the effect of making any and all liquidating Distributions in accordance with the provisions of this Section 9.5 will result in each Member receiving liquidating Distributions equal to the amount of Distributions each such Member would have received if liquidating Distributions were instead distributed in accordance with the positive capital standing in each such Member's Capital Account. If for any reason liquidating Distributions would not be so distributed, then the Executive Committee, upon the advice of tax counsel to the Company, may to make such revisions to the allocation provisions of this Article 9 and/or to file such amended tax returns for the Company as may be reasonably necessary (determined in good faith and in the manner giving rise to the least adverse economic consequences to the Members) to cause such allocations of Profit and Loss, to be in compliance with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder; provided that in no event shall the allocation in Section 9.3(e) be revised.

9.6     **Compliance with Section 704(c) and Debt Allocation**.

(a)     Other than with respect to the Excluded Entities (the allocations for which are provided in Section 9.3(e)), in accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, income, gain, loss, deduction and tax depreciation with respect to any property contributed to the capital of the Company, or with respect to any property which has a Book Basis different than its adjusted tax basis, shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis of such property to the Company and the Book Basis of such property. Such allocations shall be made using the traditional method provided for in applicable Treasury Regulations unless the Executive Committee determines that a different method is necessary to preserve the economic arrangements set forth in this Agreement.

(b)     Allocations with respect to Realization Event. Other than with respect to the Excluded Entities (the allocations for which are provided in Section 9.3(e)), in accordance with principles of Treasury Regulation §§ 1.704-1(b)(4)(i) and 1.704-3(a)(6), to the extent a Class A Member's Capital Account is increased by a Realization Event, such Member shall be treated as having additional "reverse section 704(c)" amount with respect to the LandSource Property held by the Company at the time of such Realization Event.

(c)     Provisions for Debt Allocation - Initial Financing.

(i)     The Members acknowledge and agree that the Initial Financing is a nonrecourse liability within the meaning of Treasury Regulation § 1.752-1(a)(2). The Company shall allocate the Initial Financing under Treasury Regulation § 1.752-3(a) to the maximum extent possible to the Lennar Member and the LNR Members. Without limiting the generality of the preceding sentence, the Initial Financing shall be allocated between the Lennar Member and the LNR Members to permit each of them to receive the Class A Special Distribution and, to the maximum extent possible any additional special Distribution pursuant to Section 9.4(d), without the recognition of gain under section 731 of the Code at the time of the distribution or thereafter.

(ii)     No Member or any Person related to a Member under Treasury Regulation Section 1.752-4(b) shall take any action (or permit any action to be taken), including, without limitation, acquiring a direct or indirect interest in, pledging property to secure the repayment of, or entering into any guarantee, indemnity, stop-loss, or other arrangement with respect to, all or any portion of the Initial Financing that, in the reasonable judgment of the Class A Members, could cause all or any portion of the Initial Financing to be allocated in any manner other than that provided in Section 9.6(c)(i).

(iii)     The Initial Financing may be amended, restated and/or refinanced in whole or in part, and any such amended, restated and/or refinanced loans shall be deemed to be the Initial Financing for purposes of this Section.

9.7 **Priority of Members**. Except as otherwise specifically provided herein, no Member shall have any right to demand or receive property other than cash in any Distribution and no Member shall have any priority over any other Member.

9.8 **No Restoration of Negative Capital Account**. No Member shall be required or obligated to restore or repay to the Company, any Member or any creditor of the Company any negative balance in its Capital Account upon liquidation or dissolution of the Company.

9.9 **Withheld Amounts**. If and to the extent that the Company shall be required to withhold or pay any withholding or other taxes which are determined in whole or in part by the status or identity of a Member, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a Distribution pursuant to the relevant clause of Section 9.4 with respect to such Member's Interest to the extent that such Member would have received a Distribution for such withholding. To the extent that the aggregate of such payments to a Member for any period exceeds the Distributions that such Member would have received for such period but for such withholding, the Executive Committee shall notify such Member as to the amount of such excess and such Member shall make a prompt payment to the Company of such amount. Any withholdings by the Company referred to in this Section 9.9 shall be made at the applicable statutory rate under the applicable tax law unless the Executive Committee shall have received an opinion of counsel, or other evidence, satisfactory to it, to the effect that a lower rate is applicable, or that no withholding is applicable.

9.10 **Consent to Allocations**. Each Member, as a condition of becoming a Member, expressly consents to the foregoing allocations as set forth in this Article 9.

9.11 **Certificate of Nonforeign Status**. Each Member represents and warrants that for purposes of the Foreign Investment Real Property Tax Act, it is composed of Persons who are United States citizens or resident aliens. Upon the execution of this Agreement, each Member will execute a Certificate of Nonforeign Status and will inform the Company immediately of any changes that would render the certificate invalid or misleading.

9.12 **Indemnification of Responsible Withholding Agent**. The Company shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Person who is or who is deemed to be the responsible withholding agent for United States federal, state or local or non-U.S. income tax purposes against all claims, liabilities and expenses of whatever nature (other than any claims, liabilities and expenses in the nature of penalties and accrued interest thereon that result from such Person's gross negligence or willful misconduct) relating to such Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Company or as a result of such Member's participation in the Company.

9.13 **Tax Treatment**. The Members agree that the Company is classified as a partnership for federal income tax purposes, and no Member or Affiliate will take any action inconsistent with this treatment. The parties intend to treat (i) the Class A Special Distributions (and any additional distributions made to the Lennar Member and the LNR Members pursuant to Section 9.4(d) to the extent determined by the Class A Members) as distributions under Section 731(a) of the Code, and (ii) MWHP's contribution of the MWHP Subsidiary Contribution and the

MWHP Preliminary Cash Contribution in exchange for the Class B Member's Interest as an exchange described in Section 721 of the Code, and no Member or Affiliate will take any action inconsistent with this treatment, unless otherwise required by a Change in Law or by a Final Determination, as evidenced by an opinion of counsel or big four accounting firm reasonably acceptable to the other Members to the effect that there is no realistic possibility (within the meaning of Section 10.34(d) of Treasury Department Circular 230) of a position consistent with the foregoing being sustained on the merits.

## ARTICLE 10

## MANAGEMENT OF THE COMPANY

10.1    **Management by Managing Member and Executive Committee**.

(a)    Unless otherwise provided herein, it being intended that the terms of this Agreement are intended to have priority over those of the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company (including the business and affairs of the Company's Subsidiaries other than the Excluded Entities) shall be managed by, (i) the Members acting through a committee (the "**Executive Committee**") of individuals appointed by the Members; provided, however, that, except as otherwise expressly provided in this Agreement, the Executive Committee delegates the management of the Company, and each and every aspect of the management thereof, to be vested in a managing Member (the "**Managing Member**"), who shall be designated by the Executive Committee and who shall direct and manage the business of the Company subject to the direction of the Executive Committee. The initial Managing Member shall be the Lennar Member and LNR Land Partners, with each of them designated a "co-managing member." Except (i) with respect to Major Decisions, (ii) as otherwise expressly provided herein, or (iii) as may be required by non-waivable provisions of applicable law (collectively, the "**Approval Actions**"), the Managing Member shall have full and complete authority, power and discretion to manage and control the business and affairs of the Company, to execute documents on behalf of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business in its discretion. Managing Member shall keep the other Member advised on a reasonable basis and in accordance with the terms of this Agreement regarding the status of the Company and its business, the status of the Business Plan, potential capital requirements and distributions. Subject to obtaining approval for the Approval Actions, in addition to the powers and authorities expressly conferred by this Agreement upon the Managing Member, the Managing Member may exercise all such powers of the Company and do all such lawful acts and things as are not directed or required to be exercised or done by the Members by the Act, the Certificate of Formation or this Agreement. Subject to obtaining approval for the Approval Actions, the Managing Member, acting alone, is hereby specifically authorized to take any and all acts and actions, to make any and all decisions and to do anything and everything it deems necessary, proper, convenient or advisable in conjunction with its foregoing rights, powers and authority and/or in connection with or related to the purposes of the Company and/or its business or affairs. Subject to obtaining approval for the Approval Actions, which may be set forth in the Business Plan adopted by the Executive Committee, any president or vice president of any of the Lennar Member or