any president or vice president of any of the LNR Members may act on behalf of the Managing Member, and may execute, under the title "co-managing member," and deliver, and bind the Company to, any contract, agreement, mortgage, loan, lease, note, document, instrument or transaction of any kind or nature whatsoever so specifically approved.

(b)     The Executives designated by a Member (the Class A Members or the Class B Member) will act as representatives and agents of that Member, and in voting or otherwise acting in their capacity as Executives, the Executives designated by a Member will have no obligation to consider what may be in the best interests of any other Member and will have no fiduciary duty, duty of care, duty of loyalty, or any other duty or obligation to any other Member to the fullest extent that such duties and obligations may be waived under applicable law. Members shall vote directly (with each of the Class A Members voting together as one Member) only on the matters specified in Sections 2.3, 10.2, 11.1, 13.1 and 17.1 and any other matters as to which a vote of the Members is expressly provided for in this Agreement. All other voting and approvals by the Members hereunder shall be performed by the Executive Committee. Notwithstanding the foregoing, Members shall be entitled to vote on any matters to the extent the Act or other applicable law specifically prohibits limiting such voting rights pursuant to this Agreement. To the extent that the Members are entitled to vote pursuant to this Agreement or under applicable law, the Class B Member shall be entitled to one vote and the Class A Members shall be entitled collectively to one vote and, except as otherwise expressly provided in this Agreement, all voting, consents, approvals and actions by the Members shall require the unanimous vote, consent, approval or action by the Members. The Executive Committee may delegate certain of their determinations to subcommittees, as determined by the Executive Committee, including a tax committee with members appointed by the Lennar Member, the LNR Members and the Class B Member.

10.2     **Number; Manner of Appointment; Vacancy**. The initial number of individuals comprising the Executive Committee shall be eight (8), which number may be increased or decreased from time to time by a determination of all of the Members but never below one. The Class A Members shall appoint four (4) Executives (the "**Class A Executives**"), who shall be appointed by and at all times serve at the will of the Class A Members, two (2) of whom shall be appointed by the Lennar Member (the "**Lennar Executives**") and two (2) of whom shall be appointed by the LNR Members (the "**LNR Executives**"). The Class B Member shall appoint four (4) Executives (the "**Class B Executives**"), who shall be appointed by and at all times serve at the will of the Class B Member, two (2) of whom shall be appointed by WRI, provided that WRI and MacFarlane Partners continue to jointly Manage or Control the Class B Member (the "**WRI Executives**") and two (2) of whom shall be appointed by MacFarlane Partners, provided that MacFarlane Partners and WRI continue to jointly Manage or Control the Class B Member (the "**MacFarlane Executives**"). An Executive may upon notice be removed and replaced at any time without cause by the Class of Members that originally appointed such Executive and shall hold office until such time as his or her successor shall have been appointed and become duly qualified. Any vacancy occurring on the Executive Committee shall be filled by the Member that originally appointed such Executive with respect to which such vacancy exists.

10.3     **Appointment of Initial Members of the Executive Committee**. The Class B Member hereby appoints the individuals described in **Exhibit 10.3** as the Class B Executives to

serve as the initial Class B Executives, and the Lennar Member and the LNR Members hereby appoint the individuals described in **Exhibit 10.3** as the Class A Executives to serve as the initial Class A Executives, in each case, having the rights, powers, duties and responsibilities set forth in this Agreement and the Act to the extent not in conflict with this Agreement.

10.4 **Place of Meetings**. All meetings of the Executive Committee or sub-committees thereof may be held in such place or places within or without the State of Delaware as the Executive Committee or such sub-committee may from time to time determine, and may be held telephonically as provided in Section 10.11. Each member of the Executive Committee shall be given advance notice of, and an opportunity to attend, all meetings of the Executive Committee.

10.5 **Regular Meetings**. Regular meetings of the Executive Committee may be held without notice at such times and places as may be determined from time to time by the Executive Committee.

10.6 **Special Meetings; Notice**. Any Member may call a special meeting of the Executive Committee by providing written notice to the other Member requesting such special meeting and specifically setting forth the matters to be placed on the agenda for such meeting. Such requesting Member shall give the other Member at least five (5) days written notice of the date and time of such special meeting. Such notice shall be accompanied by an agenda prepared by the Member requesting such meeting, which shall include the matter requested by the Member calling such special meeting and such supplemental information as such Member deems necessary or advisable. At such special meeting, all items on the agenda shall be considered by the Executive Committee unless the Executive Committee determines otherwise. Notwithstanding the foregoing, other than the matter requested by the Member calling such special meeting, neither the business to be transacted at, nor any other purpose of, any special meeting of the Executive Committee need be specified in the notice or waiver of notice of any special meeting.

10.7 **Quorum; Unanimous Vote**. At all meetings of the Executive Committee, at least one of each of the Lennar Executives, the LNR Executives, the WRI Executives and the MacFarlane Executives shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by law. If a quorum is not present at a meeting, the Executive(s) present at the meeting may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. At a meeting at which a quorum is in attendance, only the unanimous action of the Executive Committee shall be the act of the Executive Committee. The Class B Executives, as a class, shall have one vote and the Class A Executives, as a class, shall have one vote.

10.8 **Procedure; Minutes**. At meetings of the Executive Committee, business shall be transacted in such order as the Executive Committee may determine from time to time. At each meeting of the Executive Committee, one of the Executives who has been appointed by the Member who called the meeting, or, alternatively, a person jointly appointed by the Executive Committee, shall preside at the meeting. Such person presiding at the meeting shall appoint an individual to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, which shall be delivered to the Managing Member for placement in the minute

book of the Company, and copies thereof shall be delivered to the Members. All communications to and from the Executive Committee shall be directed to all of the Members.

10.9 **Compensation of Executives**. Executives, as such, shall not receive any stated salary for their services; provided, however, that nothing contained in this Agreement shall preclude any Executive from serving the Company in any other capacity and receiving compensation for services. The Company shall reimburse the Executives for any reasonable expenses incurred by the Executives in attending meetings of the Executive Committee.

10.10 **Action Without Meeting**. Any action which may be taken (or which is required by law, the Certificate of Formation, or this Agreement to be taken) at a meeting of the Executive Committee may be taken without a meeting if a consent in writing, setting forth the action so taken, shall have been signed by at least one of each of the WRI Executives, the MacFarlane Executives, the Lennar Executives and the LNR Executives. Such written consents shall have the same force and effect, as of the date stated therein, as a unanimous vote of the Executive Committee and may be stated as such in any document or instrument filed with the Secretary of State or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Executive signs one of the counterparts. The signed consent shall be delivered to the Executive Committee for placement in the minute book of the Company and a copy shall be delivered to each Executive who did not sign the consent. The designation of any sub-committee and the delegation of authority to it shall not operate to relieve the Executive Committee of any responsibility imposed upon it by law.

10.11 **Telephone and Similar Meetings**. Executives may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Executives participating in the meeting can simultaneously hear each other. Participation in a meeting so conducted shall constitute attendance and presence in person at such meeting, except where an Executive participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

10.12 **Tax Matters**. The Lennar Member shall act as tax matters partner of the Company pursuant to Section 6231 of the Code; provided, however, that the Executive Committee shall determine whether to make any available election pursuant to the Code, and must approve all tax returns and other elections to be made by the tax matters partner. Within ninety (90) days after the end of each Fiscal Year, or as soon thereafter as is practical, at the expense of the Company, the tax matters partner shall cause there to be prepared by the Accountants federal and state Company returns of income for the Company. Each Member shall timely be furnished information required to be set forth in such Member's federal and state income tax returns. If, after the Closing Date, there is a Distribution to a Member that would give rise to a positive basis adjustment under Section 734(b) of the Code, were an election under Section 754 of the Code in effect, the Company may make such an election, as determined by the Executive Committee. If, after the Effective Date, there is a transfer of an Interest in the Company permitted under this Agreement, (i) the Company shall, at the request of the transferring Member, file an election under Section 754 of the Code to adjust the basis of the assets of the Company in accordance with the provisions of Section 743(b) of the Code, and (ii)

any costs associated with such basis adjustment (such as accounting fees) shall be borne by the transferee of the Interest.

10.13 **Financial Records and Reports**.

(a)     The Managing Member shall maintain, or cause to be maintained, in accordance with U.S. GAAP, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Company) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the Company (including its Subsidiaries) and the Property. The Managing Member shall keep the financial records of the Company on the accrual basis for financial statement and tax purposes. Bills, receipts and vouchers shall be maintained on file by the Managing Member.  The Managing Member shall maintain or cause to be maintained said records, books and accounts in a safe manner and separate from any records, books and accounts not having to do directly with the Company or any Property.  Each Member or its duly authorized representative shall have the right, after reasonable notice, to inspect, examine and copy such books, records and accounts at the Company's office during reasonable business hours.  The Managing Member will furnish to each Member, at the expense of the Managing Member, copies of all reports required to be furnished to any lender of the Company.  Except as provided in Section 10.15, the Managing Member shall receive no additional compensation for performing such tasks.

(b)     During the term of this Agreement, the Managing Member shall use commercially reasonable efforts to prepare or have prepared on its behalf and submit the following reports to the Members with respect to the projects and the entire portfolio of projects at the times and containing the information specified below, all of which shall be delivered in a format reasonably acceptable to the Executive Committee; provided, however, that this provision shall not prevent any Member from inspecting or auditing the books, accounts and records of the Company maintained by the Managing Member at any reasonable time or from making reasonable requests to the Managing Member for extraordinary reports or other reports necessary to clear up any misunderstanding or confusion about the financial activities of the Company with respect to the projects, or to provide the Members with any additional information that any Member may reasonably require with respect to the projects:

_**Annual**_– *Within the following time periods after the end of each Fiscal Year:*

| REPORT | DATA |
| --- | --- |
| Annual Audited Financial Statements | Audited financial statements for the Company (90 days) |
| Tax Information | Written summaries of previous year tax results, tax returns and other tax information (90 days, except estimated tax results for the current year and projected tax results for the upcoming year shall be furnished no later than December 1 of each year). |

| Company Financial Statements | Financial statements for the Company (including an annual cash flow projection, if requested by MWHP) certified by an officer of the Company as being complete, accurate, and prepared in accordance with GAAP (90 days). |
|---|---|

*Monthly* – *For the applicable period and year to date shall be due within eight Business Days after the end of each calendar month (including after the end of each calendar quarter and each Fiscal Year):*

| REPORT | DATA |
|---|---|
| Monthly and Year to Date Income and Expense Statements | Unaudited income and expense statements for the Company and each Subsidiary, in a consolidating spreadsheet format with eliminations, if any. |
| Balance Sheet | Unaudited balance sheets for the Company and each Subsidiary, in a consolidating spreadsheet format with eliminations, if any. |

*Monthly* – *For each calendar month and cumulative year to date within 15 Business Days after the end of each calendar month (including after the end of each calendar quarter and each Fiscal Year):*

| REPORT | DATA |
|---|---|
| Monthly Management Summary | A report: (i) describing the Company's activities, including all Subsidiaries and each real estate project over the prior month; (ii) explaining any material entitlement, legal, environmental, or other problems, delays and any risk to timeline and the causes thereof; (iii) listing all costs by function which are funded during the month and inception to date of the projects; (iv) an estimate of costs to complete relative to budget highlighting all cost overruns; (v) listing all payments or disbursements, if any, made to the Managing Member or its Affiliates for services or materials furnished to the Company or any Subsidiary; (vi) explaining all other issues of which the Company is aware, such as liens or claims filed or threatened against the Company, any of the Subsidiaries or any of the real estate projects, and developments in any pending material legal actions affecting the Company, any of the Subsidiaries or any of the real estate projects during such fiscal quarter; (vii) containing an explanation relating to any cost overrun and the Company's recommendation and actions for remedying, offsetting, or minimizing such cost overrun, or preventing any further cost overruns; (viii) describing the status of site development and construction for all sites that are in the process of development and construction; (ix) status of any lot option takedowns pursuant to executive committee actions; (x) a listing by project of a profit participation analysis; (xi) status of all grading contracts including amounts, modifications, revised total budget and disbursements outstanding relative to that contract; and (xii) infrastructure budget (known at the Red Book or Green Book) and any changes or modifications to amounts or allocations resulting therefrom.. |
| Home Sales Summary | A statement listing all homesites for each real estate project either scheduled to close or actually closed during the prior month showing targeted close date, actual close date (if closed, or marked delinquent if scheduled to close but not yet closed), and for closed homesites, the gross sales prices received, net sales proceeds after closing costs and deposits previously received, amount applied to financing, and remaining proceeds deposited in the Company bank account. |
| Lot Option Closing Report | A summary report reflecting the budgeted and actual sales in terms of lots and sales prices to 3rd party builders versus the budget. Schedule should identify any variance with the approvals granted via the Executive Committee meetings. |
| Summary Sales Report | A sales report that summarizes by project the gross sales, cancellations, net sales, units under construction, units closed and average sales price. The report will include information for the current month as well as inception to date and year to date. The report will summarize the dollar amount of buyer concessions, if any. |

| | |
|---|---|
| Profit Participation Report | For any project for which a profit participation interest exists, either attributable to the Company from the builder or among the Members. The report should summarize allocations of profit to the respective interest. Calculation should be based on escrow statement from closed houses. Escrow statements will be provided if requested by Members. |

**_Quarterly_** *- Within 15 Business Days after the end of each calendar quarter (including after the end of each Fiscal Year):*

| REPORT | DATA |
|---|---|
| Project Cash Flows | Updated monthly cash flows for the Company and each Subsidiary, in a consolidating spreadsheet format, for each of the real estate projects and for the Company and for each Member. Cash flow, showing actual expenditures and receipts to date and revised projections of future expenditures and receipts for each of the real estate projects and for the Company, with the cash ending balance in such cash flows tied to current balance in Company and Subsidiary bank accounts. |
| Responsible Contractor | Cumulative reporting based on reporting year (7/1 through 6/30). |

**_Periodic_** *- As reasonably required by MWHP:*

| REPORT | DATA |
|---|---|
| Unanticipated Events Funds | Draw requests for an immediate deposit for unanticipated expenses to be received within ten Business Days following the due date. |
| Project Management Schedule | Any major event that impacts the timing for disbursement for a project. |
| Major Contracts | Members may request copies of significant contracts for master planned communities. |

(c)     Notices of Claims and Defaults.  The Managing Member shall notify each Member of any of the following in any way relating to any of the Subsidiaries or real estate projects promptly following the Managing Member's receipt or knowledge thereof:

(i)      written notice of any claim of violation of any legal requirement; written notice of any claim of liability; material written complaints from any contractor, sub-contractor or other party involved in providing or assisting with work;

(ii)     the filing of any mechanics liens over $25,000, which have not been bonded if in dispute, or that constitute a default under any financing documents;

(iii)     written notice of any default under any loan documents;

(iv)     any summons or other legal process; any material damage to, or threatened (in writing by an applicable governmental authority or its agent) condemnation, or acquisition in lieu of condemnation, of any of the real estate projects or any portion thereof;

(v)     any actual or alleged (in writing) personal injury or damage to any of the real estate projects; and ·

(vi)     any verbal notice the Managing Member receives related to any of the foregoing, but only if the Managing Member, acting reasonably and in good faith, deems the same to be material to the ownership or operation of the Company, any of the Subsidiaries or real estate projects.

(d)     Annual Responsible Contractor Report.  No later than 15 days following the end of each quarter, the Managing Member shall prepare and deliver to MWHP a Responsible Contractor Report in the form and containing such information as is required by **Exhibit 10.13(d)** hereto.

(e)     Wage Records.  The Managing Member shall maintain and shall use commercially reasonable efforts to cause all general contractors to maintain and to cause the subcontractors to maintain all records required by any applicable living wage, prevailing wage, Davis-Bacon and other similar laws.

(f)     Retention of Records.  The Managing Member shall retain copies of all construction-related files and reports for 10 years following completion.

(g)     The Managing Member, its Affiliates and the Subsidiaries in connection with their activities for and on behalf of the Company or the Subsidiaries shall comply in all respects with policies and requirements of MWHP, and its constituent partners, as they apply to the Company, the Subsidiaries and the Property regarding nondiscrimination, equal opportunity, responsible contractors, disabled service veterans and similar matters, as described in **Exhibit  10.13(g)** attached hereto.  The Managing Member, its Affiliates the Subsidiaries and their respective employees and agents shall assure that the conduct of each of their respective affiliates, employees and agents with regard to the Company and the Property comply with such policies and requirements.  The Managing Member, its Affiliates and the Subsidiaries and their respective employees and agents shall give written notice of their respective obligations under this clause to labor organizations with which they have a collective bargaining or other agreement.

(h)     The Managing Member, its Affiliates and the Subsidiaries, in contracting for goods and services on behalf of the Company or the Subsidiaries for projects in California, shall make good faith efforts to comply with CalPERS' objectives and then current policies regarding disabled veterans enterprises.  The Managing Member, its Affiliates and the Subsidiaries shall also comply, and use reasonable efforts to ensure that the contractor's providing services to the Company and the Subsidiaries comply with CalPERS' objectives and then current policies regarding the selection of responsible contractors.  A

copy of CalPERS' current objectives and policies regarding responsible contractors is attached hereto as **Exhibit 10.13(h)** and incorporated herein by reference. In each instance, such compliance shall include, but not be limited to, complying with CalPERS' reporting requirements regarding such efforts.

(i) The Managing Member acknowledges and agrees that a major investor in MWHP is the California Public Employees Retirement System ("**CalPERS**"). As such MWHP and its activities and investments are subject to periodic audits by CalPERS and its staff to insure compliance with all applicable CalPERS requirements. In the event that CalPERS desires to audit the Company, the Subsidiaries and their activities under this Agreement, the Managing Member shall fully cooperate with such audit and shall make available to the personnel performing such audit the Company's and the Subsidiaries' books and records. In all contracts with any subcontractors or suppliers in connection with the Company's or the Subsidiaries' projects, Managing Member shall insure that CalPERS shall have a similar right to audit the activities of such subcontractors and suppliers in connection with such projects. In addition to the foregoing the Managing Member shall fully cooperate with any audits required or being performed by MWHP and shall make available to the personnel performing such audit the Company's and the Subsidiaries' books and records.

10.14 **Accountants**. If the Executive Committee shall determine that accountants shall be engaged by the Company to do an audit, the Managing Member shall engage the Accountants on behalf of the Company. The costs and expenses of the Accountants' services and any and all other professionals involved in preparing the financial statements and reports required hereunder shall be borne by the Company.

10.15 **Duties of and Fees to the Managing Member**.

(a) The Company shall have one Managing Member, which may be one or more Members of any Class of Members. The Managing Member and any replacement of the Managing Member shall be appointed by the Executive Committee. The Managing Member shall have the right to delegate any or all of its duties to any Member or any Affiliate of any Member upon the approval of the Executive Committee, which approval shall not be unreasonably withheld, conditioned or delayed. In the event that the Managing Member delegates any such duties to any of its Affiliates, the Managing Member shall remain responsible for the actions and omissions of such delegee; provided, however, that in the event that Managing Member delegates any such duties to any other Member (other than a Member of the same Class of Members as the Managing Member), any other Class of Members or any Affiliate of such other Member or Class of Members, then such other Member, Class of Members or Affiliate (as the case may be), provided it has accepted such delegation, shall be responsible for the actions and omissions of such delegee and the Managing Member shall have no responsibility or liability in connection therewith whatsoever. The Executive Committee hereby appoints the Lennar Member and LNR Land Partners (acting together as a group, subject to such delegation of duties and allocation of the Development Management Fees among such Members as may be determined by such Members) as the initial Managing Member.

(b)    In addition to the other duties of the Managing Member hereunder, the Members hereby approve, authorize and direct the Managing Member (and its approved delegees) to perform the duties described in **Exhibit 10.15(b)** attached hereto (collectively, the "**Development Management Services**"), and to pay to the Managing Member, as compensation therefor, management fees (collectively, the "**Development Management Fees**") in the aggregate amount of (i) one and one-half percent (1.5%) of all Gross Revenues, excluding Gross Revenues derived from Land Banking; (ii) one percent (1.0%) of all Gross Revenues derived from the Current Land Bank Properties; and (iii) with respect to any Property, other than the Current Land Bank Properties, with respect to which the Executive Committee determines the Company will perform Land Banking ("**Future Land Bank Property**"), one and one-half percent (1.5%) of all Gross Revenues until the time such Land Banking services commence (generally, the transfer value price of the Property at "blue top" condition), and zero on any value added to the Property after Land Banking services have commenced; it being understood and agreed that such Development Management Fees shall be payable to the Managing Member on a monthly basis, in approximately equal installments. The Development Management Fees shall be paid based on estimated Gross Revenues with true ups to actual Gross Revenues on a periodic basis as determined by the Executive Committee, as follows (or as otherwise may be determined from time to time by the Executive Committee). For the period from the Effective Date through December 31, 2009, the Development Management Fees shall be paid at the rate of Seven Hundred Thousand Dollars ($700,000.00) per month. After December 31, 2009, there will be a true-up based upon actual Gross Revenues and revised projected Gross Revenues, without an inflation factor, on a go-forward basis (including actual Gross Revenues for the period from the Effective Date through December 31, 2009, and projected Gross Revenues, without an inflation factor, for the Company though the projected sale of all of the Property at 1.5% of Gross Revenues, compared to what was actually paid for period ending December 31, 2009). The monthly amount of Development Management Fees payable each subsequent three-year period after December 31, 2009 will be adjusted accordingly, and the same review and true up mechanism as in the prior period will be applied. Under no circumstances are any monthly Development Management Fees paid to the Managing Member subject to being returned because actual Gross Revenues or revised projected Gross Revenues reflect that more than 1.5% of actual Gross Revenues have been paid. Rather, future monthly Development Management Fees shall be decreased proportionally to adjust for any such overpayment.

(c)    If the Managing Member shall commit a Bad Act, any other Member other than a Member from the same Class of Members as the Managing Member) (the "**Non-Managing Member**") may elect, by giving written notice (the "**Removal Notice**") to the Managing Member specifying in reasonable detail the actions that the Non-Managing Member reasonably believes constitute a Bad Act, (1) to become the Substitute Managing Member of the Company, or (2) to designate any entity or individual (which may be an Affiliate of the Non-Managing Member) to become a Member of the Company and assume the role of Substitute Managing Member of the Company. In addition, if there is a Disposition of any direct or indirect interest in the Class A Members, including, without limitation, a Permitted Disposition, such that following such Disposition, either the Lennar Member or the LNR Members do not continue to possess at least 50% of the voting rights in the Class A Members, then, effective as of the date of such Disposition, the Managing

Member shall automatically be deemed to have been removed. In such event, the Executive Committee shall determine promptly whether to reinstate the Lennar Member and LNR Land Partners as the Managing Member or to appoint a Substitute Managing Member. To the extent that the Substitute Managing Member is not previously a Member or an Affiliate of a Member and acquires any equity interest in the Company, it shall come from the Non-Managing Member's Interest in the Company. Effective as of the date of the removal of the Managing Member, (i) the Substitute Managing Member shall have such rights and obligations with respect to the management of the Company that the Managing Member had pursuant to this Agreement immediately prior to such removal, (ii) the Managing Member shall have such rights and obligations with respect to the management of the Company that the Non-Managing Member had pursuant to this Agreement immediately prior to such removal; (iii) the Lennar Member and LNR Land Partners shall not have any further duties as Managing Member; and (iv) the Company shall pay the Lennar Member and LNR Land Partners all accrued and unpaid Development Management Fee due through such removal date. The costs of implementing a change of management control under this Section 10.15(c) (including the legal fees of the Non-Managing Member and any Substitute Managing Member) shall be borne by the Company.

(d)     If the Managing Member has been removed pursuant to Section 10.15(c), and if the Managing Member shall dispute whether it committed a Bad Act, the Members shall thereafter meet to resolve such dispute. If such dispute shall not be resolved within thirty (30) days following delivery of the Removal Notice, then either Member shall have the right to submit such dispute to binding arbitration under the Expedited Procedures provisions (Rules E-1 through E-10 in the current edition) of the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**"), by notice to the other party. In cases where such arbitration is utilized: (i) neither Member will have the right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule E-5, (ii) the first hearing shall be held within seven (7) Business Days after the appointment of the arbitrator, (iii) the losing party in such arbitration shall pay the arbitration costs charged by AAA and/or the arbitrator, but each Member shall each be responsible for the fees and disbursements of their own attorneys and (iv) if the arbitrator shall find the Managing Member has not committed a Bad Act, then, as of the date of such determination, (A) the Lennar Member and LNR Land Partners shall be reinstated as a Managing Member, and (B) the Lennar Member and LNR Land Partners shall be entitled to receive retroactive to the date of their removal all Development Management Fees that they would have received had they not been removed, plus interest on such amounts at the prime rate then established by Bank of America, N.A. or its successor financial institution for the period during which they were removed.

(e)     If the Non-Managing Member or its designee becomes the Substitute Managing Member pursuant to Section 10.15(c):

(i)     Managing Member shall not by reason of any change in management control under this Article 10 be released from any liability that Managing Member may have to Non-Managing Member or the Company by reason of the breach, if any, by Managing Member of its obligations under this Agreement prior to the change in management control.

(ii)     All bank accounts, contracts, deposits, accounts or other evidences of any rights of the Company shall be transferred to the name or control of the Substitute Managing Member and Managing Member shall promptly execute such instruments and take such actions as the Substitute Managing Member may request to effect such transfer; provided that the Substitute Managing Member may execute any and all such documents in the name of the Managing Member to the extent required to effectuate any of the foregoing.

(iii)     The provisions of Sections 10.15(c), (d) and (e) shall take precedence over any provision to the contrary set forth in this Agreement. The date of change of management control pursuant to this Section 10.15 shall be the date Non-Managing Member gives a Removal Notice under Section 10.15(c), subject to the reinstatement provisions of Section 10.15(d).

(f)     In addition to the duties of the Managing Member provided elsewhere in this Agreement, the Managing Member shall have the following duties, subject to the required Executive Committee approval of Major Decisions:

(i)     To determine the appropriate accounting method or methods to be used by the Company, subject to Executive Committee approval;

(ii)     To pay, receive, batch, process, prepare, execute and issue checks for payment of obligations incurred by the Company, including all organizational and general and administrative expenses of the Company and all project costs;

(iii)     To engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the Company, and to review, negotiate, execute and deliver all contracts for the Company;

(iv)     To make expenditures as are required to implement the Business Plan, subject to the limitations in Section 10.21(g);

(v)     To cause a Member to return to the Company money or other property paid or distributed to such Member in violation of this Agreement or the Act;

(vi)     To cause to be paid any and all Taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Company, unless the same are contested by the Managing Member;

(vii)     To maintain the Company's books and records; and

(viii)     To prepare, submit and negotiate requests for project financing, and represent the Company and its Subsidiaries with the lenders providing project financing.

10.16  **Duties of and Fees to the Land Bank Managing Member**.

(a)     The Members hereby approve, authorize and direct the Class B Member to perform the duties described in **Exhibit 10.16(a)** attached hereto (collectively, the "**Land Bank Management Services**") with respect to the MWHP Land and all real property acquired by the Company or its Subsidiaries after the Effective Date for which the Company shall act as a Land Bank (the Class B Member, acting in such capacity, the "**Land Bank Managing Member**"), as reasonably determined by the Executive Committee, and to pay to the Land Bank Managing Member (or its approved delegee), as compensation therefor, management fees in the aggregate amount of (i) one-half of one percent (.5%) of Gross Revenues from the Current Land Bank Property and (ii) with respect to any Future Land Bank Property, one-half of one percent (.5%) of all Gross Revenues from such Property after the transfer to Land Banking (collectively, the "**Land Bank Management Fees**"), it being understood and agreed that such Land Bank Management Fees shall be payable to the Land Bank Managing Member on a monthly basis, in approximately equal installments. The Land Bank Managing Member shall have the right to delegate any or all of its duties to any Member or any Affiliate of any Member upon the approval of the Executive Committee, which approval shall not be unreasonably withheld, conditioned or delayed. In the event that the Land Bank Managing Member delegates any such duties to any other Member (other than a Member of the same Class of Members that constitute the Land Bank Managing Member), any other Class of Members or any Affiliate of such other Member or Class of Members, then such other Member, Class of Members or Affiliate (as the case may be), provided it has accepted such delegation, shall be responsible for the actions and omissions of such delegee and the Land Bank Managing Member shall have no responsibility or liability in connection therewith whatsoever. The Members hereby acknowledge and approve the delegation by the Class B Member of its duties as Land Bank Managing Member, effective as of the Effective Date, to MW Housing Management III, LLC, a California limited liability company and an Affiliate of MWHP. The Land Bank Management Fees shall be paid based on estimated Gross Revenues with true ups to actual Gross Revenues on a periodic basis as determined by the Executive Committee. An example of the calculation of the Development Management Fees and the Land Bank Management Fees is attached hereto as **Exhibit 10.16(a)-1**.

(b)     If the Land Bank Managing Member shall commit a Bad Act, the other Member (the "**Non-Land Bank Managing Member**") may elect, by giving a Removal Notice to the Land Bank Managing Member, which Removal Notice shall specify in reasonable detail the actions that the Non-Land Bank Managing Member reasonably believes constitute a Bad Act (1) to become the Land Bank Managing Member of the Company and assume the role of Land Bank Managing Member of the Company, or (2) to designate any entity or individual (which may be an Affiliate of the Non-Land Bank Managing Member) to become a Member of the Company and assume the role of Land Bank Managing Member of the Company. The Non-Land Bank Managing Member or any entity or individual which assumes the role of Land Bank Managing Member pursuant to this Section 10.16(b) shall be referred to herein as the "**Substitute Land Bank Managing Member**." To the extent that the Substitute Land Bank Managing Member is not previously a Member and acquires any equity interest in the Company, it shall come from the Non-Land Bank Managing Member's Interest in the Company. Effective as of the date of the removal of the Land Bank Managing Member, (i) the Substitute Land Bank Managing Member shall have such rights and obligations with respect to the management of the Company that the Land Bank Managing Member had pursuant to this Agreement immediately prior to such removal, (ii) the Land

Bank Managing Member shall have such rights and obligations with respect to the management of the Company that the Non-Land Bank Managing Member had pursuant to this Agreement immediately prior to such removal, including approval of all Major Decisions; (iii) the Class B Members shall not have any further duties as Land Bank Managing Member; and (iv) the Company shall pay the Class B Members all accrued and unpaid Land Bank Management Fee due through such removal date. The costs of implementing a change of management control under this Section 10.16(b) (including the legal fees of the Non-Land Bank Managing Member and any Substitute Land Bank Managing Member) shall be borne by the Company.

(c)     If the Non-Land Bank Managing Member or its designee becomes the Substitute Land Bank Managing Member pursuant to Section 10.16(b):

(i)     Land Bank Managing Member shall not by reason of any change in management control under this Article 10 be released from any liability that Land Bank Managing Member may have to Non-Land Bank Managing Member or the Company by reason of the breach, if any, by Land Bank Managing Member of its obligations under this Agreement prior to the change in management control.

(ii)     All evidences of any rights of the Company shall be transferred to the name or control of the Substitute Land Bank Managing Member and Land Bank Managing Member shall promptly execute such instruments and take such actions as the Substitute Land Bank Managing Member may request to effect such transfer; provided that the Substitute Land Bank Managing Member may execute any and all such documents in the name of the Land Bank Managing Member to the extent required to effectuate any of the foregoing.

(d)     If the Land Bank Managing Member has been removed pursuant to Section 10.16(b), and if the Land Bank Managing Member shall dispute whether it committed a Bad Act, the Members shall thereafter meet to resolve such dispute. If such dispute shall not be resolved within thirty (30) days following delivery of the Removal Notice, then either Member shall have the right to submit such dispute to binding arbitration under the Expedited Procedures provisions (Rules E-1 through E-10 in the current edition) of the Commercial Arbitration Rules of the AAA, by notice to the other party. In cases where such arbitration is utilized: (i) neither Member will have the right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule E-5, (ii) the first hearing shall be held within seven (7) Business Days after the appointment of the arbitrator, (iii) the losing party in such arbitration shall pay the arbitration costs charged by AAA and/or the arbitrator, but each Member shall each be responsible for the fees and disbursements of their own attorneys and (iv) if the arbitrator shall find the Land Bank Managing Member has not committed a Bad Act, then, as of the date of such determination, (A) the Class B Member shall be reinstated as a Land Bank Managing Member, (B) the Class B Member shall be entitled to receive retroactive to the date of its removal all Land Bank Management Fees that it would have received had it not been removed, plus interest on such amounts at the prime rate then established by Bank of

America, N.A. or its successor financial institution for the period during which it was removed.

(e)  The provisions of Sections 10.16(b), (c) and (d) shall take precedence over any provision to the contrary set forth in this Agreement. The date of change of management control pursuant to this Section 10.16 shall be the date Non-Land Bank Managing Member gives Removal Notice under Section 10.16(b), subject to the reinstatement provisions of Section 10.16(d).

10.17  **The Business Plan**.  The Members hereby adopt the preliminary business plan, budget and strategic operating plan (the "**Business Plan**") for the Company (including the Company's Subsidiaries), attached hereto as **Exhibit 10.17**, which sets forth (or when completed will set forth) a marketing plan and general operating strategy for the Property, through the anticipated sale of all of the Property, and all anticipated income, operating expenses, capital and other costs and expenses, anticipated capital calls and debt and other financing of the Company, which may be modified or revised from time to time by the Executive Committee. The Business Plan will also include a detailed project management schedule for each master planned community that will provide a timeline to track significant milestones and accomplishments including approval of entitlements, permits and construction and development events.  The Members acknowledge that the Business Plan attached as **Exhibit 10.17** is preliminary and based on the Company's operations and cash flows as of July 1, 2006. The Executive Committee shall determine the extent to which variances in the Business Plan are permitted.  Notwithstanding anything to the contrary set forth in this Section, each Member shall be entitled to expend available Company funds in respect of an emergency, where the failure to pay within 48 hours is likely to result in a material adverse effect on the Company or the Property and in respect of emergency repairs (i.e., necessary to prevent imminent injury to persons or loss of life) even if not set forth in the Business Plan (each, an "**Emergency**"); provided that to the extent reasonably practical, such Member shall give notice of such action within 48 hours.

(a)  Updates; Amendments.  The Managing Member shall update each budget within the Business Plan on a quarterly basis, no later than the fifteenth (15th) Business Day of the month following quarter end, to reflect actual costs spent through the previous quarter, with variance and variance narrative for all line items exceeding 110% of the approved budget for the applicable period, with a full projection of income, expenses and contributions of Capital on a cash and accrual basis through the end of the then current Fiscal Year.  In the event that costs are in excess of 110% of the approved budget, the revised budget needs to be approved by the Executive Committee.

(b)  Approval/Disapproval of Approved Business Plans.  Within 90 days after the Effective Date, and on or prior to August 15th of each year thereafter, commencing with the calendar year 2007, the Managing Member shall update and revise on a preliminary basis the Business Plan and submit it to the Executive Committee for approval.  The Executive Committee shall approve or disapprove of each draft business plan within thirty (30) days after the receipt of the draft business plan and, if disapproved, shall specify changes that the Executive Committee desires.  A proposed final draft business plan shall be prepared and delivered by the Managing Member on or before October 31 of each calendar year during the term hereof.  Each draft business plan shall be in such detail and shall be accompanied by

such supporting material as any Member or Executive reasonably requests and shall include the following items (or any updates thereof) as may be appropriate and applicable with respect to the period covered by the draft plan: (a) a narrative project summary of the proposed improvement plans for the Property (including a detailed summary of proposed entitlements and/or zoning changes (together with any anticipated conditions, exactions or concessions in connection therewith), horizontal and/or vertical development improvements, infrastructure improvements, etc.), including a summary of the current status of such entitlements and improvements with respect to the Property, (b) a comprehensive staffing plan identifying all expected consultants, contractors and vendors to the Company and all proposed compensation arrangements, including any arrangements with Affiliates of either Member, and (c) the proposed budget for the applicable Fiscal Year (as described in this Section 10.17). Within thirty (30) days after a disapproval of a draft business plan, the Managing Member shall submit a revised draft business plan to the Executive Committee. Once the Executive Committee approves the draft business plan, the same shall constitute the Business Plan for the Fiscal Year to which it pertains. If for any reason any business plan has not been approved by the Executive Committee by January 31 of the year to which it pertains, then the Business Plan for the prior Fiscal Year (excluding any extraordinary items) shall become the Business Plan for the year in question without the need for further documentation.

10.18  **Financing**.

(a)     The Members hereby approve the terms and conditions of that certain debt financing by Barclays Capital PLC, as lead lender, to the Holding Subsidiary (the "**Initial Financing**") as set forth in the Initial Financing Commitment Letter attached hereto as **Exhibit 10.18**, and authorize the Managing Member to execute and deliver on behalf of the Company, as the sole member of the Holding Subsidiary, the Financing Loan Documents as are necessary to consummate the Initial Financing (including any Financing Shortfall Loan, as defined in the Formation Agreement) pursuant to such approved terms and conditions. Any changes to the terms and conditions or any amendment or other modification or termination of the Initial Financing, and/or any substitute, replacement or additional debt financing obtained by the Company or the Holding Subsidiary, and the terms thereof, and of the documents and any recourse thereunder, other then under the terms and conditions set forth in **Exhibit 10.18**, shall require the approval of the Executive Committee. The Members acknowledge that it is the intent of the Members to refinance the Company's assets on or before the third anniversary of the Effective Date.

(b)     The Member's respective liability under the Initial Financing and any other indebtedness to a lender approved by the Executive Committee and incurred by the Company (collectively, the "**Financings**") shall be determined as follows:

(i)     If either Member or both Members or one or more Affiliates of either Member incurs monetary obligations under the Financing Loan Documents, then, to the extent that any Member (or its Affiliate) incurs a monetary obligation which is disproportionate to its respective Percentage Interest, then the other Member shall promptly reimburse such overpaying Member an amount which, once paid, will have the effect of re-allocating such monetary obligation between

the Members in accordance with their respective Percentage Interests. If, after taking into account any reimbursements under the immediately preceding sentence, each Member has paid its respective Percentage Interest of such monetary obligation with respect to the guaranty obligations, then the amounts paid by each Member shall constitute Additional Capital Contributions. If, after taking into account any such reimbursements and/or any reimbursements under any reimbursement/indemnity agreement entered into by or among the Members and/or their Affiliates (collectively, a "**Reimbursement Agreement**") with respect thereto, either Member (an "**Overpaying Member**") has paid more than its Percentage Interest of such monetary obligation, and the other Member (the "**Underpaying Member**") does not reimburse the Overpaying Member the full amount of such overpayment within twenty (20) Business Days after written notice thereof, then the amount paid by the Overpaying Member hereunder or under a Reimbursement Agreement in excess of its Percentage Interest shall be deemed to be a Capital Default by the Underpaying Members under Section 7.2(d), making the Overpaying Member a Contributing Member and each Underpaying Member a Defaulting Member; and the Contributing Member may elect, by written notice to the Underpaying Member and all of the Executives, to treat such Capital Default which has been paid by the Contributing Member under either Section 7.2(d)(i) or 7.2(d)(ii).

(ii)     Notwithstanding the foregoing, if either Member (a "**Responsible Member**") (or any Person or Entity acting for or on behalf of any Person controlling or controlled by such Member), or an Affiliate of such Person (a "**Related Person**")) takes or fails to take, without the written consent of the other Member, any action, and such act or omission (i) constitutes a Bad Act, or (ii) a default by a Responsible Member or Related Person of any covenant or representation and warranty under Financing Loan Documents relating to such Responsible Member or Related Person (and not to the operation of the Property), which results in liability under one or more of the Financing Loan Documents (a "**Loan Document Liability**"), then the Responsible Member shall indemnify, defend and hold harmless the other Member from and against (excluding all consequential and/or punitive damages) any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for the other Member in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not the other Member shall be designated a party thereto), that may be imposed on, incurred by, or asserted against the other Member in any manner relating to or arising out of such Loan Document Liability (collectively, "**Damages**"); provided, however, that the principal amount and stated non-default interest and other non-default charges of any loan that is required to be repaid as a result of any Loan Document Liability shall not constitute Damages, but the repayment of a Financing triggered by the conduct of a Responsible Member as aforesaid shall not constitute Capital but shall, instead, be treated as a Special Loan. Notwithstanding anything to the contrary in this Agreement, in the event specified in the immediately preceding sentence, no amounts of Damages paid by

the Responsible Member in connection with such Loan Document Liability shall constitute an Additional Capital Contribution or Capital hereunder, nor shall it constitute a Special Loan. To the extent that the foregoing may be unenforceable because it violates any law or public policy, the Responsible Member shall pay or contribute to the other Member the maximum portion that it is permitted to pay and/or contribute to satisfy under applicable law the payment and satisfaction of all monetary obligations incurred under the Financing Loan Documents by the other Member. In the event that the Loan Document Liability of a Responsible Member includes the repayment of any principal amount of any Financing to the Company, such Responsible Member shall, within twenty (20) Business Days after incurring such obligation, make a loan ("**Special Loan**") to the Company in an amount equal to 100% of the principal amount of such repayment on terms and conditions, including the applicable interest rate (but not the default interest rate, unless the Company subsequently is in default on such Member Loan ignoring a default triggered by the conduct of the Member making the Special Loan), payment terms and due date, not less favorable to the Company than that provided in the loan that such Member is replacing, and no other Member shall be required to participate in the making of such Special Loan.

(iii) Notwithstanding anything to the contrary in this Agreement, including the provisions of Section 9.6(c), each Class A Member shall have the right, but not the obligation, to elect, at any time or from time to time, in its sole discretion by notice thereof to the Class B Member, for such Class A Member to either reimburse the Class B Member for all or any portion of the obligations or indemnify the Class B Member against any and all Damages that the Class B Member may incur under this Section 10.18; provided, however, that no Class A Member may exercise its rights under this Section 10.18(b)(iii) with respect to a particular obligation or loss in excess of its Pro Rata Share of such obligation or loss (treating, solely for this purpose, the entire obligation or loss as attributable to the Class A Members).

10.19 **Time**. Neither the Managing Member nor any of its or its Affiliates' employees, shall be required to devote all or any specific amount of their business time to the Company and its activities; rather, the Managing Member and its or its Affiliates' employees shall devote such time to the business and affairs of the Company as the Managing Member in its commercially reasonable discretion deems appropriate and necessary in order to properly manage the affairs of the Company without causing additional delay or expense to the business activities of the Company.

10.20 **Insurance**. The Managing Member shall purchase and maintain, on behalf of and at the expense of the Company, insurance with limits and risk coverage set by the Executive Committee. Each of the Members and the Company shall comply with, and the Managing Member shall take reasonable measures to confirm that outside contractors comply with, the insurance requirements described in **Exhibit 10.20**, as it may be revised from time to time by the Executive Committee. The Managing Member may, but shall not be obligated to, obtain such coverage by adding the Company and the Company Property to blanket policies of insurance

which also insure the Managing Member, Managing Member's Affiliates and property of each of them.

10.21 **Major Decisions**. Notwithstanding anything to the contrary contained in this Agreement (other than in respect of the Excluded Entities), the approval of each of the following matters (each a "**Major Decision**") shall require the vote of the Executive Committee, which approval shall be deemed to be given by the Executives to the extent such matter is contemplated in the Business Plan:

(a)     Approved Business Plan.  The approval of each Business Plan (including any budget thereunder) and any revisions thereto, including sales prices, terms and conditions (which prices, terms and conditions shall include profit participation by the Company to the extent it is common and appropriate in the marketplace at the time agreed upon, as determined by the Executive Committee based on market conditions at such time; provided, however, that the Members acknowledge that the current market conditions generally support a 50% profit participation for pre-tax profit above an 8% margin) for the sale of lots, option rights to be granted and any proposed takedown schedules under any such agreements.

(b)     Acquisition of New Property.  Any acquisition of new Property by the Company, other than in the ordinary course of business or as otherwise contemplated in an approved Business Plan.

(c)     Additional Capital Contribution.  Any call for an Additional Capital Contribution, other than a call by a Member that is expressly permitted pursuant to Section 7.2(c).

(d)     Financing; Refinancing.  Incur any indebtedness in excess of Five Million Dollars ($5,000,000.00) on behalf of the Company or any Company Subsidiary or mortgage, pledge, hypothecate or subject to any type of lien or encumbrance (other than inchoate liens for contractors and subcontractors established by applicable law) any of its assets (including Property) in connection with such indebtedness, or modify in any material respect any of the agreements entered into in connection therewith.

(e)     Accountants.  Selection or change of the Company's Accountants.

(f)     Legal Proceedings.  The institution of any legal proceedings in the name of the Company or any Subsidiary, the undertaking of any course of defense in connection with any litigation brought against the Company or any Subsidiary, the settlement of any legal proceedings not fully covered by insurance by or against the Company and/or confession of any judgment against the Company or any property of the Company.

(g)     Expenditures Beyond Approved Budget; Emergency Exception.  Except in the case of an Emergency, the expenditure of any sums for any item which may be in excess of 110% of the amount budgeted in the Business Plan, and the decision to enter into any contract or other commitment to make such excess expenditure.

(h)     Transactions with Members, Affiliates.  The entrance into or consummation of any transaction or arrangement with any Member or any Affiliate of any

Member, as well as the employment of any Affiliate on behalf of the Company, except as expressly allowed in this Agreement.

(i) <u>Bankruptcy</u>. The filing of any voluntary petition in bankruptcy on behalf of the Company or any Subsidiary; the consenting to the filing of any involuntary petition in bankruptcy against the Company or any Subsidiary; the filing of any petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency; the consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of the Company or any Property; the making of any assignment for the benefit of creditors; the admission in writing of the Company's or any Subsidiary's inability to pay its debts generally as they become due; or the taking of any action by the Company or any Subsidiary in furtherance of any such action.

(j) <u>Engagement, Dismissal of Managing Member and Land Bank Managing Member</u>. Except as specifically provided herein, the engagement, replacement or dismissal of (i) the Managing Member and any changes to Managing Member compensation, and (ii) the Land Bank Managing Member and any changes to the Land Bank Managing Member compensation.

(k) <u>Company as Surety</u>. The decision to obligate the Company, any Subsidiary or a Member as a surety, guarantor or accommodation party to any obligation, other than by endorsing checks for deposit to the Company's or any Subsidiary's accounts or otherwise acting in the ordinary course of business.

(l) <u>Transfers of Interest in Company or Subsidiary Property</u>. Except as otherwise expressly provided in Section 8.5 or 8.6, the acquisition, sale, conveyance, lease, hypothecation or encumbrance of any portion of or any interest in real property, including the pricing, the timing of Property take downs and all other terms and conditions upon which any Property will be sold to any Member or its Affiliates.

(m) <u>Lending Company Funds</u>. The lending of funds belonging to the Company or any Subsidiary, or extending credit on behalf of the Company or any Subsidiary.

(n) <u>Condemnation Awards</u>. The settlement of any claim for payment of awards or damages arising out of the exercise of eminent domain by any public or governmental authority.

(o) <u>Entitlement Documents</u>. Except as expressly contemplated by (and consistent in all material respects with) the Business Plan (in which case the actions below shall not be deemed Major Decisions), the submission of formal proposed agreements, plans, maps or amendments for official discretionary review to, or the entering into of agreements with, government officials relating to platting, development, zoning, subdivision, environmental or other land use or entitlement matters, including, without limitation, general plan amendments, specific plans, specific plan amendments, parcel maps, tentative tract maps, conditions of approval and development agreements, the making of economic or other material concessions in connection therewith, and/or the agreement to the imposition of

material restrictions on the Company or any Subsidiary and/or the Property in connection therewith.

(p)     Reorganization.    Cause the formation of any corporation or other subsidiary entity owned or controlled, in whole or in part, by the Company or any Subsidiary or merge the Company or any Subsidiary into, or convert its form of Entity into any other Entity or otherwise enter into any similar entity reorganization.

(q)     Dissolution of the Company.    Any determination that the Company or any Subsidiary should be dissolved or terminated, and any decision to distribute to the Members any Property in kind.

(r)     Matters Concerning Company Ventures.    The exercise of all of the Company's or any Subsidiary's rights, powers and privileges under the limited liability company agreement, operating agreement or partnership agreement of any other limited liability company, partnership or joint venture (each, a "**Venture Agreement**") in which the Company or any Subsidiary may invest (each, a "**Venture**"), to the extent required pursuant to Section 10.22.

(s)     Material Tax Position.    Taking any material tax return filing position with respect to any tax return of the Company or any of its Subsidiaries.

(t)     Community Construction.    Commence construction on any community with respect to Property of LandSource prior to the date for such commencement set forth in the Business Plan.

(u)     Excess G&A Expenses.    Incurring aggregate general and administrative expenses in any Measurement Period in an amount that exceeds one and one-half percent (1.5%) of consolidated Gross Revenues of the Company and its Subsidiaries.

(v)     Distributions.    Determining the amount of Available Cash and Distributions to be made by the Company, including the determination of the amount of Reserves to be maintained by the Company.

(w)     Attorneys.    Approving the selection of the Company's attorneys and any contract relating to any such engagement.

(x)     Insurance.    Determining the Company's insurance program, including insurers, coverage and policy amounts.

(y)     Tax Returns.    Except as otherwise specifically provided herein, approving any tax return or tax report prepared by the Managing Member prior to filing on behalf of the Company.

(z)     Material Liabilities.    Any other decision that is not contemplated in the Business Plan that the Managing Member knows will or it is reasonably likely to create a material liability, obligation, cost or expense for the Company.

(aa)    General Authority. The taking of any other action or making of any other decision which is reserved to the Executive Committee by this Agreement.

(bb)    Prohibited Tax Shelter Transactions. The use of any Company assets in a "prohibited tax shelter transaction" within the meaning of Section 4965(e)(1) of the Code.

10.22  **Management of Subsidiaries.** Each of the Members agrees that the Company shall cause its direct and indirect wholly-owned Subsidiaries other than the Excluded Entities to be managed in a manner substantially similar to the management requirements under this Agreement. Each of the Members agrees that the Company shall cause its direct and indirect partially-owned Subsidiaries (i.e., those Subsidiaries that are owned, in part, by third parties that are not Affiliates of any of the Members other than the Excluded Entities) to be managed so that no Major Decision is approved by any executive committee member appointed by any wholly-owned Subsidiary of the Company without the prior consent of the Executive Committee. Each of the Members further agrees to take all commercially reasonable actions to amend or modify the provisions of the applicable agreements for its direct and indirect Subsidiaries other than the Excluded Entities to make the Major Decisions set forth above applicable to such Subsidiaries as agreed to by the Members.

## ARTICLE 11

## TRANSFER OF INTERESTS

11.1  **Prohibition Against Transfer.** Except as otherwise provided in Section 11.5, no Member may, without the written consent of the other Member not to be unreasonably withheld, delayed or conditioned, directly or indirectly Dispose of its Interest (or any portion thereof) including, the direct or indirect Disposition of any equity or beneficial interest in the Member, except for a Permitted Disposition. Notwithstanding anything set forth herein to the contrary, no Disposition of the Interests of a Member shall be made if, in the opinion of counsel to the Company, such Disposition (a) may not be effected without registration under the Securities Act or an exemption therefrom, (b) would result in the violation of any applicable state securities laws, (c) unless otherwise consented to by the Members, would result in the treatment of the Company as an association taxable as a corporation or as a "publicly-traded limited partnership" for tax purposes, (d) unless consented to by the Members, would violate any agreement with any lender to the Company or any other third party obligations, (e) would create a default under the terms of any indebtedness or other contractual obligation of the Company then outstanding to any third party, or (f) would cause a technical or other termination of the Company for federal income tax purposes that results in a material adverse tax effect on the non transferring Member that is not indemnified against by the transferring Member.

11.2  **Effect of Assignment; Documents.**

(a)    Except as otherwise permitted in Section 11.1, no Member shall have the right to substitute a transferee as a Member in the place of the transferring Member, except with the consent of the Executive Committee. Any purported Disposition by a Member of an Interest which is not in compliance with this Agreement is hereby declared null and void and of no force or effect whatsoever unless at the time of such purported Disposition the

Executive Committee, in its sole discretion, elects otherwise. Notwithstanding any other provision of this Agreement, no Disposition of an Interest by a Member, including a Permitted Disposition, shall release the original Member from any obligation or liability hereunder, unless specifically approved by the Executive Committee.

(b) A transferee who has been admitted as a substituted Member in accordance with this Article 11 shall have all the rights and powers and be subject to all the restrictions and liabilities of a Member under this Agreement.

(c) Upon admission of a substituted Member, the Company shall amend this Agreement in order to document such admission (including by amending **Exhibit A** to reflect the name, address and Interests of such Member. In such event, the Company shall not be dissolved or wound up, but instead shall continue as before with, however, the substitution of such new Member. No such Disposition shall relieve the transferor Member from any of its or his obligations under this Agreement arising prior to such Disposition (it being understood that, except as otherwise provided herein, the transferor Member may be relieved of such obligations to the extent that the same arise after such Disposition and the same are assumed in writing by the transferee).

11.3 **Effect of Transfer**. Any Person admitted to the Company as a substituted or new Member (it being understood that any such admission may only occur as set forth in this Article 11 or with the consent of the Members) shall be subject to all of the provisions of this Agreement.

11.4 **Amendment of Certificate of Formation**. The Executive Committee shall cause the Certificate of Formation to be amended or corrected to the extent necessary and required by the Act to add a substituted or new Member. A transferee shall be admitted pursuant to the terms of this Agreement as of the first day of the month following the month in which such transferee has acquired the Interest of a Member and been so substituted and, for purposes of allocating Profits, Losses and Distributions, such transferee shall be treated as having become a substituted member with respect to the Interest acquired on such date.

11.5 **Buy-Sell**.

(a) At any time a Member (an "**Offering Member**") shall have the right to serve a notice (a "**Buy-Out Notice**") on the other Member (the "**Offeree Member**") setting forth the Offering Member's desire to purchase all of the Interest of the Offeree Member. No Member that is in default of this Agreement may serve a Buy-Out Notice and no Defaulting Member may serve a Buy-Out Notice if it owes any amount under a Member Loan or if the Non-Defaulting Member has elected the remedy set forth in Section 7.2(c)(iii). The Buy-Out Notice shall contain a stated amount (the "**Buy-Sell Price**") at which the Offering Member would purchase all of the assets of the Company as if such assets were free and clear of all liens, claims and encumbrances. The Buy-Out Notice shall also include a statement of the other major economic terms and conditions upon which the Offering Member would be willing to purchase from the Offeree Member its Interest, including its interest in any loans to the Company, as well as a closing date of ninety (90) days after the date of the Buy-Out Notice (and in such case, under the circumstances described below, those terms and

conditions shall also apply to the sale by the Offering Member to the Offeree Member of its Interest). A copy of the Buy-Out Notice shall be delivered to the Accountants who shall, within fifteen (15) calendar days, determine and notify the Members as to the amount each Member comprising the Offeree Member would receive (the "**Offeree Value**") and the amount each Member comprising the Offering Member would receive (the "**Offeror Value**") on account of its Interest and any loans made by such Member to the Company if all Company assets (excluding the Excluded Entities) were sold for the Buy-Sell Price, all liabilities of the Company (including any loans by any such Member to the Company) were paid in full, and the remaining proceeds distributed to the Members in accordance with Section 9.5. The Offeree Member shall have fifteen (15) days from the date of the determination and notification of the Offeree Value in which to give notice ("**Election Notice**") to the Offering Member electing either (i) to sell to the Offering Member all of the Offeree Member's right, title and interest in and to its Interest and in any loans to the Company for a cash purchase price equal to the Offeree Value or (ii) to purchase all of the Offering Member's right, title and interest in and to its Interest and in any loans to the Company for a cash purchase price equal to the Offeror Value. The Election Notice may not contain any conditions or qualifications to such election and must contain one of the following statements: (1) In response to the Buy-Out Notice, **[Insert name of Offeree Member]** hereby irrevocably elects to sell its (and any Affiliate's) entire Interest to **[Insert name of Offering Member]**; or (2) In response to the Buy-Out Notice, **[Insert name of Offeree Member]** hereby irrevocably elects to purchase the entire Interest of **[Insert name of Offering Member and any Affiliate]**. In the case where the Offeree Member elects to purchase the Interest of the Offeror Member, the Election Notice shall set a date no later than the later of (i) thirty (30) days from the date of the Election Notice or (ii) on the closing date set forth in the Buy-Out Notice, on which the closing of such purchase and sale shall be held at the principal offices of the Company. Failure to give the Election Notice within fifteen (15) days following the determination and notification of the Offeree Value shall be deemed an acceptance by the Offeree Member of the Offering Member's offer to purchase the Offeree Member's Interest for the Offeree Value and the Offeree Member's agreement that the closing of such purchase and sale shall take place at the principal offices of the Company on the closing date provided in the Buy-Out Notice or at such other place and/or date agreed upon by the parties. Within five (5) days after the determination as to which Member shall be the purchasing Member under this Section 11.5, the purchasing Member shall deliver to counsel for the selling Member, or another Person acceptable to the Members, as escrow agent a deposit (the "**Buy Sell Deposit**") in an amount equal to fifteen percent (15%) of the purchase price (the Offeree Value or the Offeror Value, as the case may be), which may be in the form of an irrevocable letter of credit reasonably acceptable to the other Member (or equivalent collateral reasonably acceptable to the other Member). The purchasing Member shall be entitled to enforce its rights under this Section 11.5 by specific performance. If the purchasing Member defaults under this Section 11.5, the selling Member may elect within forty-five (45) days thereafter either (I) to retain the Buy-Sell Deposit as complete and liquidated damages for such default, and not as a penalty, and it shall constitute such Member's sole and exclusive remedy for such default, as the Members acknowledge and agree that the determination of actual damages would be extremely difficult or impractical and that the deposit represents a reasonable estimate of such damages, or (II) to purchase the purchaser's Interest by paying to purchaser, in cash, an amount equal to the Offeree Value or

the Offeror Value, as the case may be, discounted by a sum equal to twenty-five percent (25%) of such purchase price, in which event the Buy-Sell Deposit shall be returned to the original purchasing Member. The terms and provisions of this Section 11.5 shall be self-operative without the need to enter into any further agreements with respect to the matters set forth herein, except for such documents as may be reasonably required to document the transfer of any Interest pursuant to the terms hereof; provided, however, in all events the Interest shall be sold free and clear of all liens, claims, charges and encumbrances of any nature whatsoever. Notwithstanding the provisions of this Section 11.5 to the contrary, if a Member defaults under this Section 11.5 beyond any applicable cure period, such Member shall have no further right to serve a Buy-Out Notice on the other Member for a period of six (6) months.

(b) Prior to the closing pursuant to this Section 11.5, the Company and the remaining Member shall use their respective diligent efforts to have the selling Member (and/or, if applicable, its Affiliates) relieved pursuant to documentation in form and content as reasonably approved by the selling Member, effective upon such closing, of all material liability in connection with any and all Company debt and obligations for which the selling Member (and/or, if applicable, its Affiliates) has made itself jointly or severally liable with the prior consent of the non-selling Member. In the event that, notwithstanding such diligent efforts, the selling Member (and/or Affiliate) is not fully relieved of all material liability in connection with any such Company debt or obligation to which the selling Member (and/or Affiliate) is exposed, the remaining Member or one or more Affiliates of the remaining Member (or another Person) with a net worth of at least Five Hundred Million Dollars ($500,000,000) shall indemnify, defend and hold harmless the selling Member and its Affiliates, pursuant to documentation in form and content reasonably acceptable to the selling Member, from any and all damages, loss, costs and expenses (including reasonable attorneys' fees) incurred by such selling Member (and/or Affiliate) in connection with any such Company debt or obligation, and if no Person with such net worth can provide such indemnity, the closing shall not occur unless the selling Member (and/or Affiliate) is so relieved from all debt and other contractual obligations, as described in the first sentence of this Section 11.5(b). Notwithstanding the foregoing, if a Buy-Out Notice is delivered after the completion of the final phase of the development of the Property, the selling Member shall not be relieved of any debts or obligations or indemnified, defended and held harmless pursuant to this Section, unless otherwise agreed to in writing by the buying Member in its sole and absolute discretion. Any closing pursuant to this Section 11.5 shall take place on the closing date set forth in the Buy-Out Notice or the Election Notice, whichever is applicable, or as otherwise agreed to by the parties.

(c) The Members hereby agree that if the Class B Member is the purchasing Member, then, prior to the closing pursuant to Section 11.5, the Company will either sell the Excluded Entities and distribute the proceeds to the Class A Members or distribute the Excluded Entities in kind to the Class A Members.

11.6 **Pledges of Interests in Members**. Notwithstanding any provision of this Agreement to the contrary, nothing herein shall prevent, prohibit, impair, reduce or limit the right of any direct or indirect owner of any LNR Member to pledge, hypothecate or grant a security interest, encumbrance or similar charge pursuant to any Pledge Agreement (each, a "**Pledge**"), in

any ownership interest in any direct or indirect owner of such LNR Member (an "**Indirect Interest**"), in favor of Deutsche Bank, as collateral agent for the lenders from time to time party thereto and their respective successors and assigns (including any successor collateral agent); and any Pledge and/or any foreclosure or other realization upon, or taking of any comparable action with respect to a Pledge by Deutsche Bank, as collateral agent for the lenders from time to time party thereto, their respective successors and assigns (including any successor collateral agent), or any subsequent transferee by reason of the exercise of any rights and remedies under a Pledge (each, a "**Permitted Lender**") as a result of such foreclosure or realization is hereby permitted hereunder. The LNR Member shall give notice to the Class B Member and the Lennar Member, within five (5) Business Days after it has received notice or otherwise has actual knowledge of a default or event of default in any loan document, or of any other event, that could reasonably result in a foreclosure, realization, enforcement or action pursuant to which a Permitted Lender could become the owner of an Indirect Interest. In the event that a Permitted Lender becomes the resultant owner of an Indirect Interest (a "**Permitted Lender Transfer**"), then, from and after such date and notwithstanding any other provision in this Agreement to the contrary:

(a)     If the Lennar Member (or any other Member admitted to the Company as a Class A Member) fails at any time to Manage or Control the Class A Members after a Permitted Lender Transfer, the Class B Member shall have the right to appoint itself or its Affiliate, if it is not already, the Substitute Managing Member and the provisions of Section 10.15(c) (other than the ability of the Class A Member to invoke the arbitration provisions thereunder) shall apply.

(b)     Except as provided in Section 11.6(c) or applicable law, (i) the LNR Member shall lose any and all rights to consent or approve any action or decision of the Company, whether directly or acting through the Class A Members or members of the Executive Committee appointed by the LNR Members, and (ii) the Lennar Member shall have the sole and exclusive right and authority to consent or approve any action or decision of the Class A Members, whether directly or acting through members of the Executive Committee appointed by the Lennar Member (or any Member admitted to the Company as a Class A Member other than the LNR Member), as applicable.

(c)     Notwithstanding anything in this Agreement to the contrary, the prior written consent of the Permitted Lender, in its sole and absolute discretion, shall be required to approve, disapprove or otherwise effectuate any Company action which differentiates in the treatment of such Permitted Lender, or if applicable, LNR Member, with respect to a change in the Permitted Lender's or, if applicable, the LNR Member's right to receive, directly or indirectly, Distributions (including Distributions of capital or otherwise in respect of any capital contribution made by the LNR Members) from the Company (or in respect of the Capital Account, equity interest or, subject to the parenthetical below relating to fees and expenses, other economic interest of the LNR Members or, indirectly, the Permitted Lender), including (i) any decrease or delay with respect to the amount or timing of Distributions, (ii) any alteration of discretion on the part of any managing or voting party with respect to the amount or timing of Distributions, (iii) any decrease in the relative allocation of Distributions, capital, equity interests or, subject to the parenthetical below, economic interest of the LNR Members and/or the Permitted Lender, on the one hand, and the third parties holding the remaining Interests in the Company, on the other hand, or (iv) any other

variance of any rights or remedies the LNR Members or Permitted Lender may have under this Agreement or the Company's organizational or constituent documents with respect to the making of distributions and the Members' respective Capital Accounts, equity interests and economic interests (other than, for all purposes of this subsection (c), variations with respect to fees or expenses payable to the Managing Member (or its Affiliates) arising out of bona fide management, development asset management or advisory services or other similar services if any only to the extent that the LNR Member (or such Affiliates) has ceased to perform such services), in each case as a result of or based upon (A) the existence of any Pledge or any loan documents relating thereto, (B) the occurrence of any default or event of default under the loan documents with respect to any indebtedness for which there is a Pledge, or (C) any subsequent ownership of any Indirect Interest by reason of the exercise of any rights and remedies under such loan documents.

(d)     If, for any reason other than a Disposition of an Indirect Interest to a Permitted Lender, at least one LNR Parent ceases to own any Indirect Interest in the LNR Members (and therefore ceases to be a Class A Member), then, effective upon such event the provisions of this Section 11.6 shall be inapplicable.

11.7     **Effect of Noncompliance**.  Any Disposition in contravention of any of the provisions of this Article 11 shall be void, invalid and ineffectual and of no force or effect, and shall not bind or be recognized by the Company.

11.8     **Certificated Interests**.  At the direction of the Executive Committee, the Interest of each Member shall be represented by a certificate in such form as shall be prescribed by the Executive Committee from time to time.

## ARTICLE 12

## LIABILITY AND INDEMNIFICATION

12.1     **Liability of Executives and Members**.  No Covered Person shall be liable to the Company or another Member for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company unless such act or omission constitutes a Bad Act.  No Executive shall have any obligation to consider what may be in the best interests of any Member or shall owe any duty whatsoever (fiduciary, care, loyalty or otherwise) to the fullest extent that such obligations or duties may be waived under applicable law to any Member (except an Executive shall have such obligations and duties to the Member that appointed such Executive).  And no Executive or Member shall have any duty whatsoever (fiduciary, care, loyalty or otherwise) to any assignee or transferee of a Member or a Member's Interest (whether such assignee or transferee has become an assignee or transferee of such Member or such Member's Interest by direct or indirect assignment or transfer, operation of law or other reason or cause), and no such assignee or transferee shall have any right or standing to bring any action (derivative or otherwise) against the Executives, the Members or the Company relating to the Executives' or Members' conduct concerning the Company or this Agreement, unless such assignee or transferee has become a substituted member of the Company as permitted in this Agreement.

12.2 **Indemnification and Insurance**.

(a) Definitions. For purposes of this Article 12, the following definitions shall apply:

(i) Indemnification Expenses. "**Indemnification Expenses**" shall include, without limitation, attorneys' fees, disbursements and retainers, court costs, transcript costs, fees of accountants, experts and witnesses, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness or other participant in a Proceeding.

(ii) Proceeding. "**Proceeding**" includes any action, suit, arbitration, alternative dispute resolution mechanism, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative or investigative in nature.

(iii) Covered Person. "**Covered Person**" means the Managing Member, any Member, any Executive, or any officer, director, partner, manager, members, shareholder, employee or agent of the Company or of Managing Member, and/or any of their respective Affiliates, and any of such Persons' officers, directors, partners, managers, members, shareholders, employees, agents, successors or permitted assigns.

(b) Indemnification of Covered Persons.

(i) Company Obligation. The indemnification of a Covered Person under this Article 12 is an obligation of the Company to the extent the Covered Person was acting in the course of such Person's duties or responsibilities for or obligations to the Company, which shall exclude all acts or omissions by a Member or its Affiliates in its capacity as a party to any contract with the Company.

(ii) Extent of Indemnification. To the fullest extent permitted by law, the Company shall indemnify, defend and hold harmless any Covered Person who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (other than a Proceeding by or in the right of the Company) by reason of the fact that such Covered Person is or was an agent of the Company, against all Indemnification Expenses, amounts paid in settlement, judgments, fines and penalties actually and reasonably incurred by or levied against such Covered Person in connection with such Proceeding if it is determined by a court of competent jurisdiction that such Covered Person acted in good faith and in a manner that the Covered Person reasonably believed to be in or not opposed to the best interests of the Company and not in breach of this Agreement and, with respect to any criminal Proceeding, had no reasonable cause

to believe the Covered Person's conduct was unlawful. The termination of any Proceeding, whether by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that a Covered Person did not act in good faith and in a manner which the Covered Person reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that a Covered Person had reasonable cause to believe that the Covered Person's conduct was unlawful.

(iii) <u>Exclusions</u>. The Company shall indemnify, defend and hold harmless any Covered Person who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Covered Person is or was an agent of the Company only against Indemnification Expenses actually and reasonably incurred by such Covered Person in connection with such Proceeding if it is determined by a court of competent jurisdiction that such Covered Person acted in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, except that no indemnification shall be made with respect to any claim, issue or matter as to which such Covered Person shall have been adjudged liable to the Company unless and only to the extent that the court in which such Proceeding was brought or other court of competent jurisdiction shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Covered Person is fairly and reasonably entitled to indemnification from the Company for such Indemnification Expenses which such court shall deem proper.

(c) <u>Successful Defense</u>. To the extent that a Covered Person has been successful on the merits or otherwise in defense of any Proceeding, or in defense of any claim, issue or matter therein, such Covered Person shall be indemnified from the assets of the Company against Indemnification Expenses actually and reasonably incurred in connection therewith.

(d) <u>Payment of Expenses in Advance</u>. To the fullest extent permitted by law, expenses incurred by a Covered Person in connection with a Proceeding shall be paid by the Company from the assets of the Company in advance of the final disposition of such Proceeding upon receipt of a written undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized in this Article 12.

(e) <u>Indemnification of Other Agents</u>. The Company may, but shall not be obligated to, indemnify any Person (other than a Covered Person) who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (including any Proceeding by or in the right of the Company) by reason of the fact that such Person is or was an agent of the Company, against all Indemnification Expenses, amounts paid in settlement, judgments, fines and penalties actually and reasonably incurred by such Person in connection with such proceeding under the same circumstances and to the same extent as is provided for or permitted in this Article 12 with respect to a Covered Person.

Said indemnity shall not apply to any reckless, wanton or grossly negligent action or any intentional tort against a Person or property.

(f) <u>Indemnity Not Exclusive</u>. The indemnification and advancement of expenses provided by, or granted pursuant to, the provisions of this Article 12, shall not be deemed exclusive of any other rights to which any Person seeking indemnification or advancement of expenses may be entitled under any agreement, vote of Executive Committee or Members, or otherwise, both as to action in such Person's capacity as an agent of the Company and as to action in another capacity while serving as an agent. All rights to indemnification under this Article 12 shall be deemed to be provided by a contract between the Company and each Covered Person who serves in its respective capacity at any time while this Agreement and relevant provisions of the Act and other applicable laws, if any, are in effect. Any repeal or modification hereof or thereof shall not affect any such rights then existing. The Members acknowledge that certain indemnification rights and obligations in the Formation Agreement are applicable to the Members pursuant to the terms and conditions of the Formation Agreement. No provision of this Agreement shall limit or impair any indemnification rights available to a Member under the Formation Agreement and vice versa, provided that there shall not be two recoveries for the same loss, cost or damage. Notwithstanding anything to the contrary herein, in no event shall any amount payable by any Member pursuant to any indemnification obligation under the Formation Agreement be reimbursed by the Company or subject to any indemnification hereunder, unless otherwise approved by the Executive Committee.

(g) <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Covered Person of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as a Covered Person, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Article 12. If a Person receives payment from any insurance carrier or from the plaintiff in any action against such Person with respect to indemnified amounts after the Company made payment on account of all or part of such indemnified amounts pursuant to this Article 12, such Person shall reimburse the Company for the amount, if any, by which the sum of such payment by such insurance carrier or such plaintiff and payments by the Company to such Person exceeds such indemnified amounts; provided, however, that such portions, if any, of such insurance proceeds that the insurance carrier requires to be reimbursed under the terms of its insurance policy shall not be deemed to be payments to such Person. In addition, upon payment of indemnified amounts under the terms and conditions of this Agreement, the Company shall be subrogated to such Person's rights against any insurance carrier with respect to such indemnified amounts (to the extent permitted under such insurance policies). Such right of subrogation shall be terminated upon receipt by the Company of the amount to be reimbursed by such Person.

(h) <u>Heirs, Executors and Administrators</u>. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article 12 shall, unless otherwise provided when authorized or ratified, continue as to a Person who has ceased to be a Covered Person of the Company and shall inure to the benefit of such Person's legal representatives, heirs, successors, executors and administrators.

(i) Right to Indemnification Upon Application.

(i) *Application to Be Made Timely*. Any indemnification or advance under Section 12.2(b) or Section 12.2(d) shall be made promptly, and in no event later than 60 days after the Company's receipt of the written request of a Covered Person.

(ii) *Enforcement*. The right of a Person to indemnification or an advance of expenses as provided by this Article 12 shall be enforceable in any court of competent jurisdiction. Neither the failure by the Covered Person nor its independent legal counsel to have made a determination that indemnification or an advance is proper in the circumstances, nor any actual determination by the Covered Person or its independent legal counsel that indemnification or an advance is improper, shall be a defense to the action or create a presumption that the relevant standard of conduct has not been met. In any such action, the Person seeking indemnification or advancement of expenses shall be entitled to recover from the Company any and all expenses of the types described in the definition of Indemnification Expenses of this Agreement actually and reasonably incurred by such Person in such action, but only if such Person prevails therein. The Company shall have the right to require an undertaking or other adequate assurance of repayment in the event that the advance was not warranted.

(j) *Partial Indemnification*. If a Person is entitled under any provision of this Article 12 to indemnification by the Company for a portion of expenses, amounts paid in settlement, judgments, fines or penalties incurred by such Person in any proceeding but not, however, for the total amount thereof, the Company shall nevertheless indemnify such Person for the portion of such expenses, amounts paid in settlement, judgments, fines or penalties to which such Person is entitled.

## ARTICLE 13

## DISSOLUTION AND TERMINATION OF THE COMPANY

13.1 **Dissolution**.

(a) No act, thing, occurrence, event or circumstance shall cause or result in the dissolution of the Company, except that the happening of any one of the following events shall work an immediate dissolution of the Company:

(i) *Decision of Members*. Upon the agreement in writing of the Members to dissolve the Company; or

(ii) *No Remaining Members*. Any time that there is no remaining Member of the Company.

(b) Except as otherwise specifically provided in this Agreement, each Member agrees that, without the consent of the Members, a Member will not resign from or cause a voluntary dissolution of the Company. In the event that any Member resigns from or

causes a voluntary dissolution of the Company in contravention of this Agreement, such resignation or the causing of a voluntary dissolution shall not affect such Member's liability for obligations of the Company and such Member shall be liable for all damages attributable to its breach of this Agreement.

13.2    **Winding-Up**.

(a)    Commencement.  In the event of the dissolution of the Company for any reason, the Company shall commence to wind up the affairs of the Company and to liquidate its properties and investments.  The Executive Committee shall have full right and unlimited discretion to determine in good faith and in a reasonable manner the time, manner and terms of any sale or sales of the Property or any part thereof pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

(b)    Distributions.  Following the payment of all Cash Expenditures and all costs of liquidation and dissolution, and subject to the right of the Executive Committee to set up such reasonable cash Reserves as and for so long as is reasonably necessary in good faith for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds of the Company shall be distributed in accordance with Section 9.5 (after deducting from the distributive share of a Member any sum such Member owes the Company).

13.3    **Dissolution and Cancellation**.  Upon the completion of the liquidation of the Company, the Distribution of all Company funds and the wind up of the affairs of the Company, all in accordance with this Agreement, the Company shall be dissolved and the Executive Committee shall cause to be executed and recorded a certificate of cancellation of the Company as well as any and all other documents required to effectuate the dissolution and termination of the Company.

13.4    **Waiver of Action for Dissolution**.  The Members acknowledge and agree that the remedy for a material dispute under this Agreement is pursuant to Section 11.5. Accordingly, to the fullest extent allowed by law and for the duration of the Company's existence, each Member hereby irrevocably waives any right that such Member may have to force a judicial dissolution of the Company, including pursuant to Section 18-802 of the Act, or to maintain any action or make application for the judicial dissolution of the Company and, upon any breach of this Agreement by a Member, the other Member, in addition to all rights and remedies available at law or in equity, shall be entitled to a decree or order restraining and enjoining such action or application.

## ARTICLE 14

### NOTICES

14.1     **Notices**.  Whenever any notice, any of the reports specified in Article 10 or any other communication is required or permitted to be given under any provision of this Agreement, such notice or other communication shall be in writing, signed by or on behalf of the person giving the notice or other communication, and shall be deemed to have been given on the earlier to occur of (a) the date of the actual delivery, (b) if sent with a nationally recognized overnight courier services, fees prepaid, the first business day following receipt of the notice by the courier service for delivery or (c) if by facsimile, on the day of such facsimile (provided, however, that the sender sends a copy of such notice by another method provided in this Section 14.1) to the respective address(es) or fax number(s) of the Member (and any designated representatives provided on **Exhibit A**) or Members to whom such notice is to be given as set forth in **Exhibit A**, or at such other address of which such Member shall have given written notice to the other Member as provided in this Agreement.  Any notice to the Company shall be sent as provided in this Section 14.1 to the attention of the Managing Member, with a copy to the Class B Member. Any notice to the Managing Member (at the time any Class A Members are the Managing Member or to the Class A Members shall be delivered, pursuant to this Section 14.1, to both the Lennar Member and the LNR Member.  Legal counsel for a Member may provide notice on behalf of such Member.  All notices or other communications from the Executive Committee shall be directed to all of the Members.

## ARTICLE 15

### FISCAL YEAR

15.1     **Fiscal Year**.  The fiscal year of the Company shall end as of December 31 of each year (the "**Fiscal Year**"), subject to the requirements of Section 706 of the Code.

## ARTICLE 16

### BANK ACCOUNTS

16.1     **Bank Accounts**.  The Executive Committee shall cause there to be opened and maintained in the name of the Company one or more bank or money market account or accounts, as the Executive Committee shall deem necessary, in its sole and absolute discretion, into which account(s) shall be deposited all Gross Revenues of the Company.  Withdrawals from such accounts shall be made upon the authorized signature or signatures of such person or persons as shall be designated by the Executive Committee in its sole and absolute discretion.

## ARTICLE 17

### AGREEMENT AND AMENDMENTS

17.1     **Agreement and Amendments**.     This  Agreement  contains  the  entire understanding among the parties hereto concerning the operation of the Company and the rights

and obligations of the Members, and supersedes any Amended Agreement and understanding between or among them, whether written or oral, respecting the subject matters addressed herein. This Agreement may be modified, amended, restated or repealed only by a written amendment, restatement or other document signed by all of the Members.

## ARTICLE 18

### BINDING EFFECT

18.1 **Binding Effect**. Except as otherwise provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the Members, their legal representatives, heirs, successors and permitted assigns.

## ARTICLE 19

### APPLICABLE LAWS

19.1 **Applicable Laws**. This Agreement and the rights of the Members hereunder shall be governed by and interpreted and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws provisions.

## ARTICLE 20

### DISCLOSURES

20.1 **Disclosures**. Each of the Members hereby acknowledges, represents, warrants and/or agrees as follows:

      (a)    THAT SUCH MEMBER UNDERSTANDS THAT, TO THE EXTENT THAT IT IS LEGALLY DETERMINED THAT THERE IS AN ACQUISITION OF A SECURITY (WITHOUT CONCEDING SUCH HEREUNDER), THE INTEREST BEING ACQUIRED BY SUCH MEMBER HAS NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT, OR ANY STATE SECURITIES LAWS, IN RELIANCE ON EXEMPTIONS THEREFROM FOR NON PUBLIC OFFERINGS OR OTHER EXCEPTIONS AND FURTHER UNDERSTANDS THAT SUCH INTEREST HAS NOT BEEN FILED WITH OR REVIEWED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES ADMINISTRATOR OR ANY OTHER FEDERAL OR STATE AGENCY, AND NO SUCH AGENCY, ADMINISTRATOR OR AUTHORITY HAS PASSED ON OR ENDORSED THE MERITS OF ACQUIRING AN INTEREST OR THE ACCURACY OR ADEQUACY OF ANY INFORMATION PROVIDED BY THE COMPANY TO SUCH MEMBER. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

      (b)    THAT, TO THE EXTENT THAT IT IS LEGALLY DETERMINED THAT THERE IS AN ACQUISITION OF A SECURITY (WITHOUT CONCEDING SUCH HEREUNDER), THE INTEREST OF SUCH MEMBER HAS BEEN ACQUIRED FOR INVESTMENT AND HAS NOT BEEN (NOR WILL IT BE) REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS BY REASON OF AND

IN RELIANCE UPON SPECIFIC EXEMPTIONS THEREUNDER RELATED TO THE LIMITED AVAILABILITY OF THE INTERESTS (IN ADDITION TO THE OTHER SUBSTANTIAL LIMITATIONS, RESTRICTIONS AND REQUIREMENTS SET FORTH IN THIS AGREEMENT).

(c)     THAT SUCH MEMBER, OR THE SIGNATORY FOR SUCH MEMBER, IF THIS AGREEMENT IS BEING EXECUTED BY THE SIGNATORY IN A REPRESENTATIVE OR FIDUCIARY CAPACITY, HAS FULL POWER AND AUTHORITY TO EXECUTE AND DELIVER THIS AGREEMENT FOR HIMSELF OR IN SUCH CAPACITY AND ON BEHALF OF SUCH MEMBER FOR WHOM SUCH SIGNATORY IS EXECUTING THIS AGREEMENT, AS THE CASE MAY BE, AND SUCH MEMBER HAS FULL RIGHT, POWER AND AUTHORITY TO PERFORM ALL OBLIGATIONS UNDER THIS AGREEMENT. MWHP IS A LIMITED PARTNERSHIP DULY FORMED AND IN GOOD STANDING UNDER THE LAWS OF THE STATE OF DELAWARE, AND IS QUALIFIED TO DO BUSINESS IN EACH FOREIGN JURISDICTION WHERE SUCH QUALIFICATION IS REQUIRED. EACH CLASS A MEMBER IS A LIMITED LIABILITY COMPANY OR CORPORATION DULY FORMED OR ORGANIZED AND IN GOOD STANDING UNDER THE LAWS OF THE STATE OF DELAWARE.  IF THE SIGNATORY HERETO IS EXECUTING THIS AGREEMENT IN A REPRESENTATIVE OR FIDUCIARY CAPACITY, THE REPRESENTATIONS, WARRANTIES, COVENANTS AND INDEMNITIES SET FORTH IN THIS ARTICLE XX SHALL BE DEEMED TO HAVE BEEN MADE ON BEHALF OF THE PERSON WHOM SUCH SIGNATORY REPRESENTS.

(d)     THAT, TO THE EXTENT THAT A COURT OF COMPETENT JURISDICTION DETERMINES THAT THERE IS AN ACQUISITION OF A SECURITY (WITHOUT CONCEDING SUCH HEREUNDER), SUCH MEMBER IS ACQUIRING AN INTEREST IN THE COMPANY FOR ITS OR HIS OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH A VIEW TO THE SALE OR OTHER DISTRIBUTION THEREOF, IN WHOLE OR IN PART OR DIRECTLY OR INDIRECTLY, AND SUCH MEMBER IS NOT AN UNDERWRITER, BROKER OR DEALER WITH RESPECT TO SECURITIES OF ANY KIND, AS SUCH TERMS ARE DEFINED IN THE SECURITIES ACT.

(e)     THAT SUCH MEMBER IS FULLY FAMILIAR WITH ALL FACTS AND CIRCUMSTANCES ATTENDANT TO ITS INVESTMENT IN THE COMPANY, HAS BEEN OFFERED ACCESS TO AND AN OPPORTUNITY TO REVIEW ALL BOOKS, RECORDS, DOCUMENTS AND OTHER INFORMATION RELATED TO THE COMPANY AND ITS BUSINESS, OPERATIONS, AFFAIRS AND PLANS, AND HAS HAD AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, REPRESENTATIVES OF THE COMPANY, AND THAT ALL INVESTIGATIONS, DUE DILIGENCE AND QUESTIONS HAVE BEEN COMPLETED OR ANSWERED TO SUCH MEMBER'S SATISFACTION.

(f)     THAT SUCH MEMBER (AND ITS OFFICERS, DIRECTORS, MANAGERS AND ATTORNEYS IN FACT, IF ANY, WHO ARE ACTING ON ITS BEHALF) HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND

BUSINESS MATTERS SO AS TO BE CAPABLE OF EVALUATING, ALONE OR TOGETHER, THE MERITS AND RISKS OF A POTENTIAL INVESTMENT IN THE COMPANY.

20.2 **Member's Indemnity**. To the fullest extent permitted by law, each Member hereby agrees to indemnify and hold harmless the Company, the Members and their respective Affiliates, and the employees and agents of the Company from and against any and all loss, damage, liability, cost or expense (including reasonable attorneys' and paralegals' fees and costs before and at trial and at all appellate levels) due to or arising out of any inaccuracy in, or breach of, any representation, warranty or covenant of such Member contained in this Article 20.

## ARTICLE 21

## MISCELLANEOUS

21.1 **Waiver of Action for Dissolution**. Each of the Members irrevocably waives, to the extent waivable, during the duration of the Company, any right that such Member may have to force a judicial dissolution of the Company or to maintain any action or make application for the judicial dissolution of the Company and, upon any breach of this Agreement by a Member, the other Member, in addition to all rights and remedies available at law or in equity, shall be entitled to a decree or order restraining and enjoining such action or application.

21.2 **Third Party Beneficiaries**. Nothing contained in this Agreement is intended to benefit any third parties not specifically herein enumerated, and no Person is entitled to any benefits as a third party beneficiary hereunder on account of any obligation of the Members to make Capital or other contributions or loans hereunder or to make payments of any nature or to perform any other obligation as required hereunder; it being expressly understood that the benefits, duties and obligations of any of the Members hereunder are solely and exclusively the rights and obligations of said Members and are not intended to benefit any third parties unless expressly stated to the contrary herein

21.3 **Counterparts**. This Agreement may be executed in several counterparts, and/or by the execution of counterpart signature pages that may be attached to one or more counterparts of this Agreement, and all so executed shall constitute one agreement binding on all of the Members, notwithstanding that all of the Members are not signatory to the original or the same counterpart. In addition, any counterpart signature page may be executed by any Member wheresoever such Member is located, and may be delivered by telephone facsimile transmission, and any such facsimile transmitted signature pages may be attached to one or more counterparts of this Agreement, and such faxed signature(s) shall have the same force and effect, and be as binding, as if original signatures had been executed and delivered in person.

21.4 **Provisions Severable**. In the event that any sentence, paragraph, provision, section or article of this Agreement is declared by a court of competent jurisdiction to be void, such sentence, paragraph, provision, section or article shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in effect.

21.5 **Waiver**. Any waiver by any Member of any of its rights or remedies under this Agreement or of any breach or violation of or default under this Agreement must be in writing and signed by the party to be charged thereunder and shall not constitute a waiver of any of its other rights or remedies or of any other or future breach, violation or default hereunder.

21.6 **Further Assurances**. The Members agree from time to time to execute and deliver such further and other documents, certificates, instruments and amendments and to do all matters and things which may be convenient or necessary to more effectively and completely to carry out the intentions and purposes of this Agreement.

21.7 **Construction of Agreement**. The parties agree that they have been represented by counsel during, and each has been active in, the negotiation, preparation and execution of this Agreement and, therefore, waive the application of any law or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

21.8 **Fees and Costs**. In any suit, arbitration or other proceeding by any Member or the Company to enforce the terms and provisions of this Agreement, the prevailing party shall be entitled to all reasonable costs and expenses incurred by it or him in connection therewith (including reasonable attorneys' and paralegals' fees and costs incurred before and at any trial or arbitration and at all appellate levels), as well as all other relief granted or awarded in such suit, arbitration or other proceeding.

21.9 **Recalculation of Interest**. If any applicable law is judicially interpreted so as to deem any Distribution, contribution, payment or other amount received by any Member or the Company under this Agreement as interest and so as to render any such amount in excess of the maximum rate or amount of interest permitted by applicable law, then it is the express intent of the Members and the Company that all amounts in excess of the highest lawful rate or amount theretofore collected be credited against any other Distributions, contributions, payments or other amounts to be paid to the recipient of the excess amount or refunded to the appropriate Person, and the provisions of this Agreement immediately be deemed reformed, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the payment of the fullest amount otherwise required hereunder. All sums paid or agreed to be paid that are judicially determined to be interest shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the term of such obligation so that the rate or amount of interest on account of such obligation does not exceed the maximum rate or amount of interest permitted under applicable law.

21.10 **Venue**. Each of the Members consents to the jurisdiction of any court in Wilmington, Delaware for any action arising out of matters related to this Agreement. Each of the Members waives the right to commence an action in connection with this Agreement in any court outside of Wilmington, Delaware.

21.11 **[Intentionally Omitted]**

21.12 **Confidentiality**.

(a)     The terms of this Agreement, the identity of any person with whom the Company may be holding discussions with respect to any investment, acquisition, disposition or other transaction, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company, the Property or the relative or absolute rights or interests of any of the Members (collectively, the "**Confidential Information**") that is not already publicly available or that has not been publicly disclosed pursuant to authorization by all of the Members is confidential and proprietary information of the Company, the disclosure of which would cause irreparable harm to the Company and the Members.  Accordingly, each Member represents that it has not and agrees that it will not and will direct its shareholders, managers, partners, members, directors, officers, employees, agents, lender, advisors and Affiliates not to, disclose to any Person any Confidential Information or confirm any statement made by third Persons regarding Confidential Information until the Company has publicly disclosed the Confidential Information pursuant to authorization by the Executive Committee and has notified each Member that it has done so; provided, however, that any Member (or its Affiliates) may disclose such Confidential Information to any financial lender, or any direct or indirect owner or potential owner of the Member (or its Affiliates) in connection with the financing of the Member or its Affiliates or the direct or indirect ownership interest in the Member or its Affiliates, or if required by law (it being specifically understood and agreed that anything set forth in a registration statement or any other document filed pursuant to law, including applicable securities law, will be deemed required by law), if necessary for it to perform any of its duties or obligations hereunder or in any development or management agreement to which it is a party covering any Property and to its attorneys, accountants and advisors who agree to maintain a similar confidence.

(b)     Subject to the provisions of subsection (a), above, each Member agrees not to disclose any Confidential Information to any Person (other than a Person (including an attorney, accountant or advisor) agreeing to maintain all Confidential Information in strict confidence or a judge, magistrate or referee in any action, suit or proceeding relating to or arising out of this Agreement or otherwise), and to keep confidential all documents (including responses to discovery requests) containing any Confidential Information.  Each Member hereby consents in advance to any motion for any protective order brought by any other Member represented as being intended by the movant to implement the purposes of this Section, provided that, if a Member receives a request to disclose any Confidential Information under the terms of a valid and effective order issued by a court or governmental agency and the order was not sought by or on behalf of or consented to by such Member, then such Member may disclose the Confidential Information to the extent required if the Member as promptly as practicable (i) notifies each of the other Member of the existence, terms and circumstances of the order, (ii) consults in good faith with each of the other Member on the advisability of taking legally available steps to resist or to narrow the order, and (iii) if disclosure of the Confidential Information is required, exercises its diligent efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to the portion of the disclosed Confidential Information that any other Member designates.  The cost (including attorneys' fees and expenses) of obtaining a protective order

covering Confidential Information designated by such other Member will be borne by the Company.

(c)     The covenants contained in this Section will survive the transfer of the Interest of any Member and the dissolution of the Company.

21.13   **Publicity**.   The parties agree that no Member shall issue any press release or otherwise publicize or disclose the terms of this Agreement or the proposed terms of any acquisition of the Property, without the consent of the other Member, except as such disclosure may be made in the course of normal reporting practices by any Member or CalPERS to its members, shareholders, owners or partners or as otherwise required by law.

21.14   **Arbitration**.   In the event that one Member acquires all of the Interest of the other Member pursuant to a buy-sell under Section 11.5, all disputes, if any, that survive the consummation of the buy-sell of a Member's Interest, which may arise under this Agreement, shall be settled by arbitration by a panel of three arbitrators.  The disputing Members first shall attempt to agree upon the three arbitrators.  If they do not so agree within 30 days, each disputing Member shall appoint an arbitrator and the third arbitrator of the dispute shall be selected by said two appointees.  If such two appointees fail to select a third arbitrator of the dispute within 30 days after the designation of the two appointees, the third arbitrator shall be designated by the AAA upon application by the disputing Members.   All hearings in connection with said arbitration shall be conducted in either Orange County or San Francisco County, California. The decision of at least two of the three arbitrators shall be binding on the parties to the controversy and their representatives.  Such decision shall be enforced with the same force and effect as a decree of a court having jurisdiction over the matter.  The fees and expenses which may be incurred in connection with any such arbitration shall be paid by the party whose contention is rejected by the decision of the arbitration or, if only partially rejected, as allocated by the decision of the arbitrator.

21.15   **JURY TRIAL WAIVER**.  TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT, POWER, REMEDY OR DEFENSE ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE, OR WITH RESPECT TO ANY COURSE OR CONDUCT, COURSE OR DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY RELATING TO THIS AGREEMENT; AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY.  EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LITIGATION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LITIGATION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  FURTHER, EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NONE OF ITS REPRESENTATIVES, AGENTS OR ATTORNEYS HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IT WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.   EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THE

PROVISIONS OF THIS SECTION ARE A MATERIAL INDUCEMENT TO THE ACCEPTANCE OF THIS AGREEMENT BY THE OTHER PARTIES HERETO.

**[SIGNATURES ARE ON THE FOLLOWING PAGES]**

**IN WITNESS WHEREOF**, the Members and the Company have executed and adopted this Agreement as of the date first above written.

**LENNAR HOMES OF CALIFORNIA, INC.,** a California corporation

By:_____

Name: Emile Haddad

Title: Vice President

**LNR LAND PARTNERS SUB, LLC**, a Delaware limited liability company

By:_____

Name:_____

Title:_____

**LNR NWHL HOLDINGS, INC.,** a Delaware corporation

By:_____

Name:_____

Title:_____

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*
*(ADDITIONAL SIGNATURE PAGE FOLLOWS)*

**IN WITNESS WHEREOF**, the Members and the Company have executed and adopted this Agreement as of the date first above written.

**LENNAR HOMES OF CALIFORNIA, INC.**, a California corporation

By:_____
Name:_____
Title:_____

**LNR LAND PARTNERS SUB, LLC**, a Delaware limited liability company

By:_____
Name:____Zena M. Dickstein_____
Title:____Vice President_____

**LNR NWHL HOLDINGS, INC.**, a Delaware corporation

By:_____
Name:____Zena M. Dickstein_____
Title:____Vice President_____

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*
*AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*
*(ADDITIONAL SIGNATURE PAGE FOLLOWS)*

**MW HOUSING PARTNERS III, L.P.,**
a California limited partnership

By: MW Housing Management III, LLC,
a California limited liability company, its general
partner

By: MacFarlane Housing, LLC,
a Delaware limited liability company, a
member and co-manager

By: _Jennifer Glover_
Jennifer K. Glover
Managing Director

By: WRI CP Investments III LLC, a Washington limited
liability company, a member and co-manager

By: Weyerhaeuser Realty Investors, Inc., a
Washington corporation, its manager

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY*
*AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*
*(ADDITIONAL SIGNATURE PAGE FOLLOWS)*

**MW HOUSING PARTNERS III, L.P.,**
a California limited partnership

By:    MW Housing Management III, LLC,
a California limited liability company,
its general partner

        By:    MacFarlane Housing, LLC,
a Delaware limited liability
company, a member and co-manager

                By: _____
Jennifer K. Glover
Managing Director

        By:    WRI CP Investments III LLC,
a Washington limited liability
company, a member and co-manager

                By:    Weyerhaeuser Realty
Investors, Inc., a Washington
corporation, its manager

                By: _____
Name: David Brentlinger
Title: Senior Vice President

                By: _____
Name: _____
Title: _____

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY*
*AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*
*(ADDITIONAL SIGNATURE PAGE FOLLOWS)*

**LANDSOURCE COMMUNITIES DEVELOPMENT LLC,** a Delaware limited liability company

By: Lennar Homes of California, Inc., a California corporation, its co-managing member

  By: _____
  Name: Emile Haddad
  Title: Vice President

By: LNR Land Partners Sub, LLC, a Delaware limited liability company, its co-managing member

  By: _____
  Name:_____
  Title:_____

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*

**LANDSOURCE COMMUNITIES DEVELOPMENT LLC,** a Delaware limited liability company

By:    Lennar Homes of California, Inc., a California corporation, its co-managing member

        By:_____
        Name: Emile Haddad
        Title: Vice President

By:    LNR Land Partners Sub, LLC, a Delaware limited liability company, its co-managing member

        By:_____
        Name: Zena M. Dickstein
        Title: Vice President

*[SIGNATURE PAGE TO SECOND AMENDED AND RESTATED LIMTITED LIABILITY COMPANY AGREEMENT OF LANDSOURCE COMMUNITY DEVELOPMENT LLC]*

3

# EXHIBIT A

## MEMBERS
## As of Effective Date

| Member: | Percentage Interests: | Original Invested Capital: | Preferred Capital |
|---|---|---|---|
| Lennar Member: | 16% | $228,470,112.16 | **None** |

Lennar Homes of California, Inc.
**With Notices to:**

Lennar Homes of CA, Inc.
25 Enterprise Drive
Aliso Viejo, CA 92691
Attention: Emile Haddad
Facsimile: (949) 598-8625

*with a copy to:*

**c/o Lennar Corporation**
700 N.W. 107th Avenue
Miami, FL 33172
Attn: General Counsel
Telephone:     (305) 229-6400
Facsimile:     (305) 229-6650

*and with a copy to:*

**Bilzin Sumberg Baena Price & Axelrod LLP**
2500 Wachovia Financial Center
200 S. Biscayne Boulevard
Miami, Florida 33131
Attn: Brian L. Bilzin, Esq.
Telephone:     (305) 350-2363
Facsimile:     (305) 351-2200

**LNR Members:**

| | | | |
|---|---|---|---|
| LNR NWHL Holdings, Inc. | 14.368% | $205,166,160.71 | |
| LNR Land Partners Sub, LLC | 1.632% | $23,303,951.45 | |
| Total LNR Member | 16% | $228,470,112.16 | **None** |

| Member: | Percentage Interests: | Original Invested Capital: | Preferred Capital |
|---|---|---|---|

**With Notices to:**

**LNR Property Corporation**
1601 Washington Ave., 8th Floor
Miami Beach, FL 33139
Attention: David Team and General Counsel
Facsimile: (305) 695-5719

*and with a copy to:*

**Bilzin Sumberg Baena Price & Axelrod LLP**
2500 Wachovia Financial Center
200 S. Biscayne Boulevard
Miami, Florida 33131
Attn: Brian L. Bilzin, Esq.
Telephone:     (305) 350-2363
Facsimile:     (305) 351-2200

*and*

**Schulte Roth & Zabel**
919 Third Avenue
New York, NY 10022
Attention: Andre Weiss and Robert B. Loper
Facsimile: (212) 593-5955

| Member: | Percentage Interests: | Original Invested Capital: | Preferred Capital |
|---|---|---|---|
| **Total Class A Members** | 32% | 456,940,224.32 | None |
| **MWHP (Class B Member)** | 68% | $970,997,976.68 | None |

**c/o MacFarlane Partners**
201 Spear Street, 14th Floor
San Francisco, CA 94105-1636
Attn:  Victor MacFarlane and Jennifer Glover
Fax:  (415) 356-2599

*with a copy to:*

**WRI CP Investments III LLC**
1301 Fifth Avenue, Suite 3100

| Member: | Percentage Interests: | Original Invested Capital: | Preferred Capital |
|---|---|---|---|
| Seattle, WA 98101-2647<br>Attn: Stephen M. Margolin<br>Fax: (206) 264-2240 | | | |

*and with a copy to:*

**Orrick, Herrington & Sutcliffe LLP**
405 Howard Street
San Francisco, CA 94105
Attn: William G. Murray, Jr.
Fax: 415-773-5759

| | | | |
|---|---|---|---|
| **Total** | **100%** | **$1,427,938,201** | **None** |

**EXHIBIT A-1**

**EXCLUDED ENTITIES – CAPITAL ACCOUNT**

The Capital Accounts of the Class A Members shall include their respective Pro Rata Shares of Forty-Four Million Eight Hundred Forty-Five Thousand Four Hundred Eleven Dollars ($44,845,411) with respect to the Excluded Entities.