# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 08-11111 (KJC) |
| LANDSOURCE COMMUNITIES | ) |
| DEVELOPMENT, LLC, *et al.*, | ) (Jointly Administered) |
| | ) |
| Reorganized Debtors. | ) **Re: Docket Nos. 1905, 2582, 2650 & 2651** |
| | ) **Response Deadline: March 26, 2010 at 4:00 p.m.** |
| | ) **Hearing Date: April 7, 2010 at 11:00 p.m.** |

## SCOPE'S ANSWERING BRIEF REGARDING
## CLASS 5 TRUST'S REJECTION OF SCOPE'S CLAIM

Pursuant to the Scheduling Order with Respect to Reorganized Debtors' Fifth Omnibus (Substantive) Objection to Claims and the Informal Response by the Santa Clarita Organization for Planning and the Environment ("Scheduling Order") (Docket No. 2582) entered in the above-referenced case on January 8, 2010, Santa Clarita Organization for Planning the Environment ("SCOPE"), a California non-profit public benefit corporation, files its brief responding to the objection of the Class 5 Trust to SCOPE's claim (Number 925) (the "Claim") filed against reorganized debtor Newhall Land and Farming Company ("Newhall Land"), a California limited partnership. The Claim arises out of a contract between SCOPE and Newhall Land (the "Contract"), *see* Exhibit A to the Declaration of Lynne Plambeck (the "Plambeck Declaration") attached hereto **Exhibit 1**. In the Declaration of Steven D. Zimmer in Support of the Class 5 Trust's Opening Brief to Objection to SCOPE Claim (the "Zimmer Declaration") (Docket No. 2651), the Contract was acknowledged by Newhall Land to exist as a written document by Newhall Land's Vice President Richard Zimmer (Zimmer Declaration at Ex. B). The Claim is attached to the Plambeck Declaration as Exhibit B.

For the reasons set forth below, the Contract is in the nature of a garden variety litigation settlement agreement, while still an executory contract due to Newhall Land's ongoing obligations to provide written reports, precisely organized, with precise details, concerning Newhall Land's use of public domain groundwater (aka well water) for crop irrigation on Newhall Land's fields, and because of Newhall Land's obligations with respect to the use of 7,038 acres of its crop farmland, as more particularly discussed below. That Contract was entered into between SCOPE and Newhall Land prior to the filing of Newhall Land's chapter 11 bankruptcy. The Contract was expressly stated to be formed and governed under California law, which through its text gave the Kern County Superior Court the jurisdiction to interpret and enforce the terms, as would be any settlement agreement of litigation before that court. (*See* Ex. 1 at Ex. A, p. 5-6, and in particular Clause 5 on p. 6.)

As more particularly set forth below, the Contract contained four distinct promises of further and future performance by Newhall Land over a lengthy time period, the obligation to write three different types of water usage reports on an annual or other periodic basis (as described below) and to refrain from using more than 7,038 acre feet per year [AFY] from Newhall Land's own water wells, as it converted its farm fields to housing tracts. Those four distinct promises were consideration for SCOPE's dismissing its appeal to a higher court (the California Court of Appeal) of "claims" (Ex. 1 at Ex. A, p. 3, ¶ E.3) arising out of litigation which had been going on for several years, in which the Kern County Superior Court had issued a 36 page opinion (Ex. 1 at Ex. F) and writ of mandamus directing the manner in which Newhall Land and Los Angeles County were to re-write an Environmental Impact Report ("EIR"), as described in that opinion, specifically concerning groundwater issues.

Prior to the filing of reorganized debtor Newhall Land's bankruptcy, SCOPE and the other appellants/plaintiffs/petitioners had on April 1, 2004 already performed their only obligation under the Contract, dismissal of their further appeal in that case. That dismissal of their appeal occurred by virtue of the fact that the Contract, by its own title is both a Notice of Settlement and Dismissal of Appeal (Ex. 1 at Ex. A, p. 1) and contains the actual dismissal of the appeal at page 6 Paragraph D of the Contract.

After the dismissal of the appeal on April 1, 2004, by way of the California Fifth District Court of Appeal filing that "Notice of Settlement and Dismissal of Appeal" (Ex. 1 at Ex. A, p. 1), reorganized debtor Newhall Land later utterly failed to perform any of the terms of the Contract before the filing of its chapter 11 petition, and during the pendency of its chapter 11 case failed to provide the two different types of water usage reports with the detail and in the manner of organization of the report information. Then reorganized debtor rejected its obligations for future performance under the Contract when its chapter 11 plan (the "Plan") was filed with this court, approved by this court, and made effective by the Plan's terms.

For the reasons set forth below, and in the Declarations of Lynne Plambeck (with Exhibits), John Buse and David Magney, the Class 5 Trust's objections to SCOPE's Claim for damages for breach of the Contract are without merit.

## FACTUAL BACKGROUND

The litigation from which the Contract arose was brought in California's Kern County Superior Court under the California Environmental Quality Act ("CEQA"), similar to the National Environmental Policy Act ("NEPA"), addressing the issue of the County of Los Angeles giving preliminary planning approval to the development of Newhall Ranch, which in theory would have resulted in reorganized debtor Newhall Land's subsidiary, Valencia Water

Company, over-pumping the two aquifers in the Santa Clarita River Watershed, to supply the drinking water and industrial use water to the 20,000+ homes and thousands of acres of industrial and commercial properties which reorganized debtor Newhall Land wants to build on its farm lands in the Los Angeles County portion of the Santa Clarita Valley, most of which is called Newhall Ranch.

Those farmlands proposed to be converted to homes and industrial areas by Newhall Land literally sit ON TOP OF the Santa Clarita River Watershed, with farming occurring in the River's flood plain. Under California Water Code Section 10910 and Government Code Section 66473.7, any public agency approving a real estate development containing 500 or more housing units must consider the question of long term drinking water supply, and assure adequate water supply for the new project, as well as for previously existing domestic water users. (Ex. 1 at ¶ 6-11.)

After the Kern County Superior Court trial in a case under CEQA brought against the County of Los Angeles, in which reorganized debtor Newhall Land was the real party in interest (Kern County Superior Court Case No. 239324-RDR), Judge Roger Randall wrote a 36 page opinion (*see* Ex. 1 at ¶ 13 and Ex. F) sending the EIR for the Newhall Ranch Specific Plan back to the Los Angeles County Board of Supervisors with a writ of mandamus ordering correction of that EIR on several issues, including the County's and the EIR's error of "counting" of "paper water" towards fulfillment of the drinking water needs of the Newhall Ranch project, as well as the drinking water needs of the rest of the residents of the Santa Clarita Valley, its businesses and industries, and other third parties. In his opinion, Judge Randall specifically discussed the obligation of the County of Los Angeles, under CEQA, California Water Code Section 10910 and California Government Code Section 66473.7, to meet the needs for drinking water for

residents in the Santa Clarita Valley, including future residents of reorganized debtor's Newhall Ranch, and the obligation of the County of Los Angeles not to count "paper water." "Paper water" is, among other things, water which the California State Water Project will never deliver to the Santa Clarita Valley due to its own water delivery cut-backs, for the reasons described in Paragraphs 8 and 9 of the Plambeck Declaration. (*See also* Ex. 1 at ¶ 13.)

On remand and writ of mandate from the Kern County Superior Court, the Los Angeles County Board of Supervisors directed the County Planning Department and Newhall Land to correct the EIR for the Specific Plan for Newhall Ranch, specifically with regard to the adequacy of water supply for all users in the Santa Clara River Watershed under CEQA. (Ex. 1 at ¶ 14.)

At the end of the second go-round of hearings on the compliance by the Los Angeles County Board of Supervisors with the prior opinion and writ of mandamus/order of the Kern County Superior Court, the Board of Supervisors approved a Revised EIR for the Newhall Ranch Specific Plan. That approval was then challenged by SCOPE and the other plaintiffs by writ of mandamus, again before the Kern County Superior Court. (Ex. 1 at ¶ 15.)

SCOPE and the other plaintiff/appellants, through counsel including Declarant John Buse, disagreed with the trial court's finding that the Los Angeles County Board of Supervisors had complied with the prior opinion and order of the trial court, and the relevant California Government Code and Water Code provisions. So the matter was appealed to that Fifth District Court of Appeal to again determine whether the EIR for the Newhall Ranch Specific Plan, and the Los Angeles County Board of Supervisors decisions with regard to it, was appropriate in light of the prior opinion and order of the Judge Randall and the re-trial court and under CEQA, the Water Code and the Government Code. In California, the Court of Appeal reviews questions

of compliance with CEQA *de novo*, based solely on the administrative record which was before the public agency, *i.e.* the Board of Supervisors. (Ex. 1 at ¶ 15.)

Ultimately, rather than face further appellate litigation on the issue of potential over-drafting of the Santa Clara River Watershed by virtue of any housing, industrial or commercial development in the area covered by the Newhall Ranch Specific Plan, let alone 20,000+ more houses, counsel for reorganized debtor Newhall Land offered, on behalf of his clients, to limit ground water pumping for the Newhall Ranch Specific Plan area to a number which would never exceed the amount of ground water reorganized debtor Newhall Land was then pumping for its crop farming operations in Los Angeles County, 7038 acre feet per year (an acre foot equals approximately 325,000 gallons). (Ex. 1 at ¶ 16.)

That later limitation "in Los Angeles County" was important, in that reorganized debtor Newhall Land also conducts huge farming operations on land immediately adjoining, in Ventura County, California, which was not and could not be included in Los Angeles County's Specific Plan approval for Newhall Ranch. (Ex. 1 at ¶ 16.)

The quantification of how much agricultural water Newhall Land was using in Los Angeles County in 2004 is set forth at length in Paragraph II.A.1 of the Contract starting on page 2, using references to other documents which were part of the administrative record before the Los Angeles County Board of Supervisors. (Ex. 1 at ¶ 16.)

Newhall Land's decision to avoid appellate litigation over their, and the County of Los Angeles' attempts to rely upon "paper water" in approving the Newhall Ranch Specific Plan and its EIR, proved to be prescient and wise, in that two subsequent California Supreme Court and Court of Appeal cases specifically discussed the definition of, and disapproved reliance upon "paper water". *See Vineyard Area Citizens for Responsible Growth, Inc. v. City of Ranch*

*Cordova, et al.,* 40 Cal. 4th 412; 150 P.3d 709; 53 Cal. Rptr. 3d 821; 2007 Cal. LEXIS 748 (2007); *California Oak Foundation v. City of Santa Clarita*, 133 Cal. App. 4th 1219; 35 Cal. Rptr. 3d 434; 2005 Cal. App. LEXIS 1703 (2005).

As a consequence of that oral offer by Newhall Land's counsel in 2004, environmental litigation counsel for SCOPE and Declarant Plambeck drafted, and environmental litigation counsel for Newhall Land negotiated and drafted the Settlement Agreement, which is the Contract. Counsel for SCOPE and the other plaintiff/appellants and counsel for Newhall Land signed the Contract, and it was filed with the California Fifth District Court of Appeal, as indicated on page 1 thereof.

Contrary to the allegations of the Class 5 Trust relating to "who won" the state court litigation (an issue irrelevant here) in Paragraph C.1 of the Contract, at page 5, Newhall Land agreed to and did pay the plaintiff/appellants prevailing parties attorneys fees in the sum of $43,000. (Ex. 1 at ¶ 17.)

Counsel for SCOPE and Newhall Land signed the Contract, *i.e.* the Notice of Settlement and Dismissal of Appeal (Ex. 1 at Ex. A) and at page 6, Paragraphs E.3 and E.4 of that document made the customary contractual warranties that the parties to the Contract owned the claims at issue in the case, and that the parties signing the Contract were authorized to execute it on behalf of their clients.

The Contract specifically provided, at page 7, paragraph E.5 that: "This settlement shall be construed and enforced in accordance with the laws of the State of California. The Kern County Superior Court shall be the appropriate venue for any disputes arising from this settlement." (Ex. 1 at Ex. A and Zimmer Declaration Ex. B.)

**The Principal Contractual Obligation in the Contract, Which Newhall Land Has Rejected**

The essence of the Contract begins on its page 3, Part II, at the bottom of the page, wherein Newhall Land promises:

> Newhall shall do the following: Groundwater Use/Limitations: Groundwater historically and presently used for crop irrigation on the Newhall Ranch Specific Plan Site and elsewhere in Los Angeles County, shall be made available by Newhall or its assignee, to partially meet the potable water needs of the Newhall Ranch Specific Plan. The amount of this water pumped for this purpose shall not exceed 7,038 AFY [acre feet per year]. Newhall represents that this is the amount of groundwater pumped historically and presently by Newhall in Los Angeles County to support its agricultural operations, and that pumping this amount will not result in a net increase in the use of groundwater in the Santa Clarita Valley.

Thus, the central promise in the Contract was that Newhall Land or its assignee would not pump more than 7,038 acre-feet-per-year to partially supply the potable water needs for its Newhall Ranch Specific Plan. Since Newhall Land neither expressly assumed the Contract or cured its reporting requirement defaults as described below, and since the Contract was not specifically assumed by Newhall Land in its now-effective the Plan, Newhall Land has rejected the quoted portion of the Contract, even though it is an executory contract where Newhall Land had not performed its future obligations which would, perhaps, obviated more state court litigation on water issues.

SCOPE's damages for Newhall Land's rejection of its obligations under Paragraph 2(a) of the Contract (on its page 3) would be in the nature of SCOPE's future attorneys fees and costs to re-litigate the question of how much ground water Newhall Land may pump to use as potable water for its Newhall Ranch project, during the course of Newhall Land's obtaining subsequent land use entitlements in the nature described in the Plambeck Declaration at Paragraph 19. The dollar amount of those future attorneys fees and costs is unquantifiable. As a result, SCOPE

does not seek damages for Newhall Land's rejection of that "7,038" portion of the Contract, in large part because under the police powers reserved to the states under the Tenth Amendment of the U.S. Constitution, the question of how much groundwater Newhall Land may pump to supply potable water to proposed housing, industrial and commercial uses in the Newhall Ranch project, remains a discretionary police power decision within the purview of the Los Angeles County Board of Supervisors and the State of California, subject to California Water Code Section 10910 and Government Code Section 66473.7 (as described above) when Newhall Land seeks future land use entitlements in the nature described in the Plambeck Declaration at Paragraph 19, reviewable by the California courts under those and other relevant California laws pertaining to the development and subdivision of real estate and use of ground water by those who do not have adjudicated water rights. (*See* Ex. 1 at ¶ 10, 6, 7, 8 and 11.)

Since Newhall Land has rejected the Contract, Newhall Land's promises with respect to encumbering farm land with water use restrictions, in Contract Paragraph 2(c), relating to the "7,038" issue also are not litigated here.

However, SCOPE seeks damages for Newhall Land's failure to provide the written reports promised by Paragraph 2(b) and 2(d) of the Contract, at its page 4, with such reports containing the precise information required by the wording of the Contract.

**SCOPE Very Carefully Examined the Materials Sent to SCOPE After SCOPE's Sending of its Demand Letter and Filing of Its Claim, and the Documents Sent by Newhall Land Did Not Comply With the Contract**

As stated in the Declaration of SCOPE's President, Lynne Plambeck, at Paragraphs 23 and 32, and in Exhibits C and D to her Declaration, she made efforts outside of the bankruptcy court context to (a) obtain the reports required by Paragraphs 2(b) and 2(d) in the Contract, first

from the County of Los Angeles (*see* Ex. 1 at Ex. C), and then from Newhall Land itself (*see* Ex. 1 at Ex. D and also Zimmer Declaration at Ex. C).

Summarizing the non-compliant documents sent to her by Newhall Land's environmental attorney Mark Dillon, SCOPE's President Plambeck says at Paragraph 24 of her Declaration, concerning SCOPE's examination of what they had received from Dillon (and now filed by the Class 5 Trust's Declarant Zimmer):

> To reiterate, the information which was not delivered to SCOPE, and still has not been delivered to SCOPE is that:
>
> "identifying the specific portions of irrigated farm lands in the County proposed to be retired from irrigated production to make agricultural water available to serve the subdivision. The documentation shall include the location of the irrigated fields to be retired and the types of planted crops on such land for the baseline period of 1996-2000." Neither through the efforts of Reorganized Debtor's attorney Mark Dillon, nor directly through filing of the Declaration of Steven Zimmer have Reorganized Debtors EVER supplied SCOPE with:
>
>> (a) survey maps, assessor's parcel maps or assessor's parcel numbers, legal descriptions of land "identifying the specific portions of irrigated farm lands...the location of the irrigated fields"
>>
>> NOR
>>
>> (b) any detail concerning the types of planted crops tied to where they were planted on "such land" for the baseline period of 1996-2000. "such land" meaning the specifically identified irrigated fields quoted from (a) above.
>
> Neither did Newhall Land identify own much ground water was being used on each specific portion of the irrigated farm lands.
>
> ....

**Newhall Land's Pre-Bankruptcy, During-Bankruptcy, and Post-Bankruptcy Breach of the Contract's Reporting Requirements at Paragraph 2(b) for Which SCOPE Is Entitled to Receive Breach of Contract Monetary Damages**

Paragraph 2(b) of the Contract entitles SCOPE and Los Angeles County to receive the following information from Newhall Land, organized in the following manner, tying specific pieces of land to specific crops to specific volumes of groundwater usage:

> (b) Reporting. To monitor groundwater use, Newhall or its assignee shall provide the county with an annual report indicating the amount of groundwater used in Los Angeles County, and the specific land upon which the groundwater was historically used for irrigation.

From the point of view of an expert preparing such an Annual Report, complying with the quoted phrase, in terms of information gathering and reporting, the expert's work requires an inventorying of each individual Los Angeles County Assessor's Parcel owned by Newhall Land used for crop farming, identifying which crop was grown on each Assessor's Parcel during a particular year, and then calculation of the amount of groundwater used (or in a reconstruction of the report without Newhall Land's cooperation the amount of groundwater likely to have been used) to irrigate that Assessor's Parcel during the particular year of the Annual Report. Once that information gathering and calculation is done for each Assessor's Parcel, tying specific parcels of land to specific crops to specific water usage, that information would be assembled into the required "Annual Report" for each year. (*See* the Declaration of David Magney (the "Magney Declaration"), attached hereto as **Exhibit 2**, at ¶ 5.)

Newhall Land has not prepared and delivered to SCOPE the Annual Reports for the years 2004 through 2008, tying particular pieces of real estate owned by Newhall Land (*i.e.* Assessors Parcels) to particular crop types and to particular quantities of water used for that crop one

particular year, *i.e.* failing to detail and organize information in the manner expressly set forth in Paragraph 2(b). (Ex. 1 at ¶ 22, 24.)

Newhall Land has not prepared and delivered to SCOPE a 2009 Annual Report compliant with the express wording and details required in Paragraph 2(b). Newhall Land has not prepared and delivered the 2009 Annual Report to SCOPE at all. (Ex. 1 at ¶ 22, 23.)

Newhall Land's obligation to provide the Annual Reports is open-ended based on the text of Paragraph 2(b), but SCOPE logically assumes that no Annual Reports would be needed or required once Newhall Land filed its last EIR or application with a California public agency for the granting of a discretionary land use entitlement, in the nature described in the Plambeck Declaration at Paragraph 19, and thus the Contract is construed by SCOPE to require continued Annual Reporting until 2014 at the very earliest. (Ex. 1 at ¶ 31.)

To save this court from having to go through the process of looking for the actual land descriptions (Assessors Parcels), crop type on that land and water usage for that crop on that land each year, by way of parsing the nearly incomprehensible charts and muddled reporting by Newhall Land attached to the Zimmer Declaration for some period through 2009 (which reports are not organized in the manner specifically quoted from Paragraph 2(b) above,) SCOPE has simply asked its expert crop and water consultant, David Magney Environmental Consulting ("DMEC") to write Annual Reports in the precise manner described in Paragraph 2(b), using the Assessor's Parcel by Assessor's Parcel basis to identify the crop land (the "Replacement Reports") for the calendar years of 2008 (one non-compliant Annual Report) and the years of 2009 through 2014, where the Annual Reports are and will be missing based upon Newhall Land's breach and then rejection of Paragraph 2(b) in the Contract. (Ex. 2 at ¶ 6, Ex. 1 at ¶ 31.)

As more fully described in the Magney Declaration at Paragraph 7, to prepare the Replacement Reports for the Annual Reports for 2008 through 2014, DMEC would charge $450,000. DMEC's professional qualifications to prepare such reports are set forth in full in the Magney Declaration. DMEC's charges, to prepare the Replacement Reports, are SCOPE's measure of monetary damages for Newhall Land's breach of Contract Paragraph 2(b) quoted above.

**Why Newhall Land's Breach and Rejection of Paragraph 2(b) of the Contract is a Material Denial of SCOPE's Benefit of Its Bargain to Settle the Litigation Concerning the Propriety of the Newhall Ranch Specific Plan Approval, for Newhall Land's Benefit, by Los Angeles County**

The purpose of Paragraph 2 subparagraphs (b), (c) and (d) in the Contract (found on pages 3-4 of the Contract) was to provide both Los Angeles County and the plaintiff/appellants including SCOPE with, as the contract called it "Ongoing Documentation" concerning how much ground water, for crop growing purposes on reorganized debtor's Newhall Land's real estate in Los Angeles County, both inside and outside the Newhall Ranch Specific Plan area, was being used DURING THE PERIOD BEGINNING WITH THE SIGNING OF THE CONTRACT AND ENDING WITH THE FILING OF NEWHALL LAND'S LAST APPLICATION FOR DISCRETIONARY LAND USE ENTITLEMENTS RELATING TO WATER SUPPLY. (Ex. 1 at ¶ 20.)

The Contract at Paragraph 2(d) also provided for a 5 year "look back" on Newhall Land's agricultural water usage in Los Angeles County, to make sure that Newhall Land was being truthful in its water reporting under Paragraphs 2(b), (c) and (d). (Ex. 1 at ¶ 20.)

The purpose of that precisely described data required by Paragraph 2(b) was to permit the data to be incorporated into the various Environmental Impact Statements ("EIS") and Second Tier, Subsequent or Supplemental Environmental Impact Reports ("SEIRs") described in

Paragraph 19 of the Plambeck Declaration, or in "comments" by SCOPE and other members of the public, permitted under NEPA and CEQA, to force the authors of the EIS and SEIRs to be truthful about groundwater availability issues. (Ex. 1 at ¶ 20.)

The additional purpose of the precisely designed criteria for the content of the Annual Reports was to allow that data to be used in, or in the County's, other public agencies', SCOPE's and other members of the public's objections to the EIS and SEIR, in order to allow the relevant decision makers to utilize the truthful information to make a rational and lawful decision on whether there was enough ground water in the Santa Clara River Watershed, to supply all current users, as well as the new users who would occupy Newhall Ranch's 20,000+ homes and Newhall Ranch's industrial and commercial buildings, as well as farm water users and drinking water well users downstream from Newhall Ranch. (Ex. 1 at ¶ 20.)

The other purpose of Paragraphs 2(b) of the Contract was to allow SCOPE and the other plaintiffs to utilize the data to conduct their own water quantity analysis, to make sure, at each stage of the project, that no one was relying on the phantom "paper water" in terms of agricultural water well production on Newhall Ranch (which tied to the 7038 acre foot per year limitation of conversion of that water from agricultural to residential use), to make sure that the reorganized debtor was not using "too much" water in its ongoing crop farming operations, and to make sure that the reorganized debtor was not prematurely abandoning its crop farm operations and thereby increasing the availability of Santa Clara River Watershed water to downstream users, including Protected Species in the River downstream of the Newhall Ranch project, only to see that non-adjudicated water supply inappropriately re-taken for Newhall Ranch's domestic uses later on. Without an adjudicated water basin, the basic principle of California water law is "You don't use it, you lose it to subsequent users." (Ex. 1 at ¶ 21.)

**Newhall Land's Pre-Bankruptcy, During-Bankruptcy, and Post-Bankruptcy Breach of the Contract's Reporting Requirements at Paragraph 2(d) for Which SCOPE Is Entitled to Receive Breach of Contract Monetary Damages**

Paragraph 2(d) of the Contract entitles SCOPE to receive the following information, organized in the following manner, tying specific pieces of land to specific crops to specific volumes of groundwater usage:

> documentation to the County of Los Angeles and the Appellants identifying the specific portions of irrigated farm lands in the County proposed to be retired from irrigated production to make agricultural water available to serve the subdivision. The documentation shall include the location of the irrigated fields to be retired and the types of planted crops on such land for the baseline period of 1996-2000.

From the point of view of an expert preparing such an Annual Report, complying with the quoted phrase, in terms of information gathering and reporting, Declarant Magney states the information required in Paragraph 2(d) of the Contract requires an inventorying of each individual Los Angeles County Assessor's Parcel, number by number, identifying which crop was grown on each Assessor's Parcel during a particular year, and then calculation of the amount of groundwater likely to have been used to irrigate that Assessor's Parcel for a particular crop:

(a) during each of the 1996 to 2000 base year periods and

(b) during the year in which Newhall Land includes each such Assessor's Parcel in a proposed Vesting Tentative Map which it files with the Los Angeles County Planning Department seeking approval of such Vesting Tentative map.

At his Declaration's Paragraph 8, Declarant Magney states that once that information gathering and calculation is done for each Assessor's Parcel, tying specific parcels of land to specific crops to specific water usage, that information would be assembled into:

(1) the required "Baseline Year Report for Each Year Between 1996 and 2000;" and

(2) the required "Retired from Irrigated Production Report" for each Assessor's Parcel included in a proposed Vesting Tentative Map filed with Los Angeles County by Newhall Land with their application for approval of subdivision of that Assessor's Parcel, i.e. additional Replacement Reports.

Newhall Land has not prepared and delivered to SCOPE the "Baseline Year Report for Each Year Between 1996 and 2000" with the detailed information organized in the manner set forth in Paragraph 2(d). (Ex. 1 at ¶ 22, 24 and 30-33.)

Newhall Land has not prepared and delivered to SCOPE the "Retired from Irrigated Production Reports" for the subdivision maps already filed by Newhall Land with Los Angeles County, tying particular pieces of real estate owned by Newhall Land (*i.e.* Assessors Parcels) to particular crop types and to particular quantities of water used for that crop one particular year. (Ex. 1 at Ex. C and ¶ 22, 24 and 30-33.)

Newhall Land's obligation to provide the "Retired from Irrigated Production Reports" is open-ended, in the sense that Newhall Land controls how many subdivision maps (properly called Vesting Tentative Maps) it files with Los Angeles County, and when they are filed. (Ex. 1 at Ex. A, ¶ 2(c) and ¶ 19.g.)

To create the Baseline Year Report for 1996 through 2000, as described in Paragraph 8, DMEC would charge $175,000. (Ex. 2 at ¶ 9.)

To create the "Retired from Irrigated Production Report" for each Vesting Tentative Map, DMEC would charge $100,000 per map, with an estimate of Newhall Land filing or having filed at least 5 Vesting Tentative Maps or a minimum of $500,000. (Ex. 2 at ¶ 10.) DMEC's charges for the "Retired from Irrigated Production Reports" would be more than those sums if Newhall Land filed more than 5 Vesting Tentative Maps with the County.

DMEC's charges, to prepare the Baseline Year Report and the Retired from Irrigated Production Reports, are SCOPE's measure of monetary damages for Newhall Land's breach of Contract Paragraph 2(b) quoted above.

**Why Newhall Land's Breach and Rejection of Paragraph 2(d) of the Contract is a Material Denial of SCOPE's Benefit of Its Bargain to Settle the Litigation Concerning the Propriety of the Newhall Ranch Specific Plan Approval, for Newhall Land's Benefit, by Los Angeles County**

The purpose of Paragraph 2 subparagraphs (c) and (d) in the Contract (found on pages 3-4 of the Contract) was to provide both Los Angeles County and the plaintiff/appellants including SCOPE with, as the Contract called it "Ongoing Documentation" concerning how much ground water, for crop growing purposes on reorganized debtor Newhall Land's real estate in Los Angeles County, both inside and outside the Newhall Ranch Specific Plan area, was being used DURING THE PERIOD BEGINNING IN 1996 AND ENDING WITH THE FILING OF NEWHALL LAND'S LAST APPLICATION FOR APPROVAL OF A SUBDIVISION MAP BY THE COUNTY. (The actual meaning of the term "file", "filed" and "filing" under California law is more particularly described below.) (Ex. 1 at ¶ 19 and 20.)

The Contract at Paragraph 2(d) specifically provided for a 5 year "look back" on Newhall Land's agricultural water usage in Los Angeles County, to make sure that Newhall Land was being truthful in its water reporting under Paragraphs 2(c) and (d). (Ex. 1 at ¶ 20.)

The purpose of that precisely described data was to permit the data to be incorporated into the various EIS and SEIR described in Paragraph 19 of the Plambeck Declaration, and to allow that data to be used in the County's, other public agencies', SCOPE's and other members of the public's objections to the EIS and SEIR, in order to allow the relevant decision makers to utilize the information to make a decision on whether there was enough ground water in the Santa Clara River Watershed, to supply all current users, as well as the new users who would

occupy Newhall Ranch's 20,000+ homes and Newhall Ranch's industrial and commercial buildings, as well as farm water users and drinking water well users downstream from Newhall Ranch. (Ex. 1 at ¶ 20.)

The other purpose of Paragraphs 2(b) and (d) of the Contract was to allow SCOPE and the other plaintiffs to utilize the data to conduct their own water quantity analysis, to make sure, at each stage of the project, that no one was relying on the phantom "paper water" in terms of agricultural water well production on Newhall Ranch (which tied to the 7038 acre foot per year limitation of conversion of that water from agricultural to residential use) to make sure that the reorganized debtor was not using "too much" water in its ongoing crop farming operations, and to make sure that the reorganized debtor was not prematurely abandoning its crop farm operations and thereby increasing the availability of Santa Clara River Watershed water to downstream users, including Protected Species in the River downstream of the Newhall Ranch project, only to see that non-adjudicated water supply inappropriately re-taken for Newhall Ranch's domestic uses later on. Without an adjudicated water basin, the basic principle of California water law is "You don't use it, you lose it to subsequent users." (Ex. 1 at ¶ 21.)

### The Actual Meaning of "File", "Filed" and "Filed" With Respect to Newhall Ranch's Plat Maps

In California, the common terminology with respect to the subdivision of raw land into mapped and recorded lots is not to call them "plat maps", but instead to call the maps when filed with the County for approval of their content proposed "Tentative Maps" and when all pre-conditions to recording imposed by the County (*e.g.* subdivision engineering designs, school construction financing agreements, payment of fees) are met and the maps recorded "Final Maps". California's Subdivision Map Act also nuances those terms with the preceding adjective "Vesting" when a developer/subdivider has availed himself of the special protections of certain

sections of the act, more particularly described below. The developer's, county's and environmentalist's more common term for Tentative Maps is "tract maps" or "subdivision maps", although those terms are not found in the Subdivision Map Act. Declarant Zimmer, on behalf of Newhall Land, claims that Newhall Land was not required to comply with Paragraph 2(d) of the Contract, because subdivision maps had not yet been filed. In fact, Declarant Zimmer is gravely mistaken. As shown in Exhibit C to the Plambeck Declaration, Newhall Land has already filed many Tentative Maps or Vesting Tentative Maps with the County requesting that they be processed for approval, and the County has issued "Notices of Preparation" of a new, second tier EIR with respect to the Vesting Tentative Maps which have been filed. (Ex. 1 at ¶ 25.)

As discussed in the Declaration of John Buse, Esq. (the "Buse Declaration"), attached hereto as **Exhibit 3**, counsel for SCOPE and the other plaintiff/appellants in the case which lead to the creation of the Contract as a means of settling disputes about concerns raised by Judge Randall in his opinion concerning inadequate water supplies and paper water, the term "file", "filed" and "filing" is a term of art under the California Government Code, commonly understood by land use/environmental lawyers and County planners to mean the delivery of the proposed map to the County for processing, which as quoted below requires and EIR, SEIR or "negative declaration", as well as proof of long term potable water supply. This term "file", "filed"and "filing" is so common, and so well understood, both the California Government Code and the California Supreme Court use the term confidently when referring to the land mapping process under the Subdivision Map Act, because everyone (including the drafters of the Contract at issue here) understands its meaning:

Cal. Government Code 66452:

(a) A tentative map shall be filed with the clerk of the advisory agency or, if there is no advisory agency, with the clerk of the legislative body, or with any other officer or employee of the local agency as may be designated by local ordinance.

(b) A vesting tentative map shall be filed and processed in the same manner as a tentative map except as otherwise provided by this division or by a local ordinance adopted pursuant to this division.

(c) At the time a vesting tentative map is filed it shall have printed conspicuously on its face the words "Vesting Tentative Map.

Cal. Government Code 66452.1:

(a) If the advisory agency is not authorized by local ordinance to approve, conditionally approve or disapprove the tentative map, it shall make its written report on the tentative map to the legislative body within 50 days after the filing thereof with its clerk.

(b) If the advisory agency is authorized by local ordinance to approve, conditionally approve, or disapprove the tentative map, it shall take that action within 50 days after the filing thereof with its clerk and report its action to the subdivider.

(c) The local agency shall comply with the time periods referred to in Section 21151.5 of the Public Resources Code. The time periods specified in subdivisions (a) and (b) shall commence after certification of the environmental impact report, adoption of a negative declaration, or a determination by the local agency that the project is exempt from the requirements of Division 13 (commencing with Section 21000) of the Public Resources Code.

Cal. Government Code 66455.3. Not later than five days after a city or county has determined that a tentative map application for a proposed subdivision, as defined in Section 66473.7, is complete pursuant to Section 65943, the local agency shall send a copy of the application
to any water supplier that is, or may become, a public water system, as defined in Section 10912 of the Water Code, that may supply water for the subdivision.

Cal. Government Code 66452.4. (a) If no action is taken upon a tentative map by an advisory agency that is authorized by local

ordinance to approve, conditionally approve, or disapprove the tentative map or by the legislative body within the time limits specified in this chapter or any authorized extension thereof, the tentative map as filed, shall be deemed to be approved, insofar as it complies with other applicable requirements of this division and any local ordinances, and it shall be the duty of the clerk of the legislative body to certify or state his or her approval.

(b) Once a tentative map is deemed approved pursuant to subdivision (a), a subdivider shall be entitled, upon request of the local agency or the legislative body, to receive a written certification of approval.

In *City of Goleta et al., v. The Superior Court of Santa Barbara County, Respondent; Oly Chadmar Sandpiper General Partnership, Real Party in Interest*, 40 Cal. 4th 270; 147 P.3d 1037; 52 Cal. Rptr. 3d 114; 2006 Cal. LEXIS 14994 (2006), the California Supreme Court discusses exactly what it means by the use of the words "file," "filed," and "filing" in connection with a subdivision map:

> The Subdivision Map Act (Act) gives local agencies authority to regulate subdivision development within their boundaries. (§ 66411.) The agencies exercise their authority by reviewing maps of a proposed subdivision. A tentative map must, among other things, be consistent with either the general local plan or an existing specific plan. (§§ 66473.5, 66474.) Generally, a final map must be approved if it substantially complies with a previously approved tentative map (§ 66474.1) and meets the requirements applicable to the subdivision when the tentative map was approved (§ 66473)...

The Subdivision Map Act (Act) permits a subdivider to file a 'vesting tentative map' whenever the Act requires a tentative map. This procedure is intended to provide greater statutory protection to subdividers than was afforded under the common law vested rights doctrine. [Citations.]" (*Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 792 [24 Cal. Rptr. 2d 618].)"

In the *Bright Development* case, the California Court of Appeal said:

> The Subdivision Map Act (Act) permits a subdivider to file a "vesting tentative map" whenever the Act requires a tentative map. This procedure is intended to provide greater statutory protection to subdividers than was afforded under the common law vested rights doctrine. (Gov. Code, § 66498.1- 66498.9; Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 6.31; Curtin, Subdivision Map Act Manual (1992) p. 13.) The intent of the Legislature in enacting the vesting tentative map statute (Gov. Code, § 66498.1-66498.9) is spelled out in Government Code Section 66498.9: "By the enactment of this article, the Legislature intends to accomplish all of the following objectives: (a) To establish a procedure for the approval of tentative maps that will provide certain statutorily vested rights [*793] to a subdivider. (b) To ensure that local requirements governing the development of a proposed subdivision are established [***14] in accordance with Section 66498.1 when a local agency approves or conditionally approves a vesting tentative map. The private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency . . .

> Government Code sections 66498.1- 66498.9 were enacted in response to the erosion of the common law doctrine of vested rights. (Cal. Subdivision Map Act Practice, supra, § 6.28, 6.31; Curtin, Subdivision Map Act Manual, supra, pp. 12-13.) The Legislature enacted these provisions to freeze in place those "ordinances, policies and standards in effect" at the time the vesting tentative map application is deemed complete. (Cal. Subdivision Map Act Practice, supra, § 6.31.) These provisions enable the private sector to rely on vesting maps to plan and budget development projects. ( Gov. Code, § 66498.9, subd. (b).) "The vesting tentative map statute now offers developers a degree of assurance, not previously available, against changes in regulations." (Longtin's California Land Use (2d ed. 1987) § 6.50[2]; Subdivision [***15] Map Act Manual, supra, pp. 13, 15.)

In *City of Goleta,* the California Supreme Court specifically uses the term "file" with respect to a subdivision map, *i.e.* at the beginning of the subdivision map approval process, and then cites *Bright Development* which talks about the benefits of filing a vesting tentative map so that when the "application is complete" for the local government agency's approval of that

vesting tentative map, the subdivider/developer has the benefit of the laws which are applicable to his subdivision being 'locked down' to those laws which were in effect when the application for the vesting tentative map he filed is "complete". That is what the parties who negotiated, drafted and approved the Contract understood, in terms of the definition of the words "file," "filed," and "filing" because they understood the intricacies of California's land use entitlement process.

In her Declaration at Paragraph 29, SCOPE's President, Declarant Plambeck, states

> On information and belief, because virtually no subdivider/developer files a mere tentative map with Los Angeles County, but instead virtually all sophisticated developers file vesting tentative maps with Los Angeles County, this declarant believes that Reorganized Debtor's subdivision maps filed with the County, and referred to in Exhibit "C" [attached to the Plambeck Declaration] are vesting tentative maps. Moreover, as discussed in Government Code Section 66452.1(c), quoted above, Los Angeles County cannot approve that vesting tentative map until it has a complete and approved second tier Environmental Impact Report (i.e. an SEIR) associated with that vesting tentative map, in hand. The very information to which both SCOPE and the County are entitled under the Contract [at Paragraph 2(d)], as quoted in Paragraph 22 above, are in their nature the type of information which is required to be included in an SEIR required under Government Code Section 66452.1(c) (quoted above) which discusses the availability of ground water aka well water for use as potable water in a subdivision. It should be noted that the draft SEIR for the vesting tentative maps filed by Newhall Land and described in Exhibit "C" were completely lacking in the information required by Paragraphs 2(b) and 2(d) of the Contract....again illustrating why, prior to the effective date of the Reorganization Plan, the information to which SCOPE was entitled under Paragraphs 2(b) and 2(d) [of the Contract] was material to SCOPE receiving the benefit of its bargain under the Contract. Were SCOPE and the County to have agreed to wait until after the County Planning Commission had approved the Reorganized Debtor's vesting tentative map, after the Reorganized Debtor had complied with the conditions to the map's being recorded, and then the map actually being recorded, as Declarant Zimmer suggests, the information concerning Newhall Land's historical well water usage for particular agricultural crops and at particular locations

would be useless because the information would not have served the purpose intended, as recited at the last un-numbered subparagraph of Paragraph 1 of the Contract, i.e to "cross check" Newhall Land's agricultural ground water usage figures through subsequent planning processes, both as to over usage and under usage [causing the over-drafting of the groundwater supply] or resulting in the application of the principle "If you don't use it you lose it".

(Ex. 1 at ¶ 29; *see also* ¶ 10 and 37.)

Simply stated, SCOPE's demand for the information required under Paragraph 2(d) of the Contract was triggered by the filing by reorganized debtor Newhall Land of its applications for processing and approval of the EIR/EIS for the project's state and federal permits as described in Paragraph 19 of the Plambeck Declaration, compounded by the reorganized debtor Newhall Land filing proposed Tentative Maps or proposed Vesting Tentative Maps for the first phases of Newhall Ranch and requesting the County approve them. *See* Exhibit C attached to the Plambeck Declaration, confirming the filing of those proposed Maps with the County. Also see SCOPE's first letter to Newhall Land, as chapter 11 debtor in possession, demanding that precise data and reports, attached as Exhibit D to the Plambeck Declaration. (Ex. 1 at ¶ 22.)

**Prior to and After the Filing of Newhall Land's Bankruptcy, SCOPE Made Reasonable Efforts to Insure that Newhall Land Had Not Breached the Contract, Prior to Claiming That They Had Done So, and Then SCOPE Made Reasonable Efforts to Settle the Claim With Newhall Land's Environmental and Bankruptcy Lawyers, Prior to Newhall Land's Rejection of the Contract**

Prior to and after the filing of Newhall Land's chapter 11 bankruptcy petition, SCOPE made reasonable efforts to insure that Newhall Land had not breached the Contract, prior to claiming to third parties and the Bankruptcy Court that Newhall Land had done so. After sending SCOPE's demand for performance and cure letter to Newhall Land under the Contract and filing its Claim SCOPE then made reasonable efforts to settle the Claim for the reports, containing the detailed information required by the Contract, with Newhall Land's

environmental and bankruptcy lawyers, until Newhall Land's rejection of the Contract, including

the prohibition on Newhall Land's use of more than 7038 acre feet per year of well/ground water

for use by its home buyer customers, and the concomitant requirement in Paragraph 1 and

Paragraph 2(c) of the Contract that farm land equal using an amount of water equal to the

amount in that quota be fallowed once building permits were issued.

As sworn to by SCOPE's President Plambeck, in her Declaration filed herewith, at

Paragraph 23:

> Before SCOPE made its demand for that Paragraph 2(b) and 2(d) data, I personally visited with the Los Angeles County Planning Department, questioned its staff, and looked through its files on the proposed subdivision maps, to make sure that the precise data required by Paragraphs 2(b) and 2(d) had not been already sent to the County while inadvertently not being sent to SCOPE.
>
> As indicated on Exhibit "E", beginning in or about 2007 I had previously advised the County Planning Department that Newhall Land had failed to deliver the annual water reports with the information specifically required by the Contract at Paragraph 2(b). I was informed by the Los Angeles County Planning Department staff person, whose salary is paid by Newhall Land through a reimbursement arrangement with the County, that those letters (attached as Exhibit "C") had been forward by him to the EIR preparation consultant paid by Newhall Land, to prepare the SEIR and Federally required EIS/SEIR as discussed in Paragraph 19 above. As indicated in my later letter directly to Newhall Land ( Exhibit "D" hereto), delivery of the precise data described in Paragraph 2(d) of the Contract to SCOPE and the County was required as a concurrent condition to filing of the request to the County for approval of the maps.
>
> None of the data required by Paragraph 2(b) or 2(d) of the Contract was in the County's files, in a format anywhere near close to matching the text and detail of Paragraphs 2(b) and 2(b) through a date a few days before I sent the letter to Newhall Land which is Exhibit "D".

In Paragraph 31 of her Declaration, SCOPE further shows its reasonableness in terms of the time frame in which it was asking reorganized debtor Newhall Land to prepare the reports as specifically required by Paragraphs 2(b) and 2(d) of the Contract:

> In preparing SCOPE's claim for breach of the Contract, we noted that a ten (10) year time frame for preparation of the annual reports described in Paragraph 2(b) and the crop acreage retirement reports described in Paragraph 2(d) of the Contract would be appropriate, given the expected time frame from the first missing annual report (2004) to the likely time frame for completion of all of the discretionary land use entitlements (described in Paragraph 19 above) for which the information required in Contract Paragraph 2(d) would be relevant, i.e. 2014.

(Ex. 1 at ¶ 31.)

In Paragraph 32 of her Declaration, SCOPE's President Plambeck further describes how Newhall Land had also breached its promise, under the Contract with SCOPE, to deliver the precisely detailed reports to the County of Los Angeles, so that they could be used in evaluating the veracity of the SEIR being prepared at Newhall Land's expense, by a Newhall Land selected EIR preparation consultant and Newhall environmental attorney Dillon (at the debtor estate's expense):

> Given my being told by the principal County planner assigned to the project's review that Newhall Land failed to provide those annual reports (i.e. the Paragraph 2(d) annual reports), which I believe probably was because Newhall Land did not want its yearly water usage for farming operations made public, SCOPE concluded that the only way SCOPE was going to get that information was to hire a hydrologist or farming expert, to use aerial photos which would show which crops had been grown in which years, and to use standard water-volume-per acre for each crop, to calculate Newhall Land's agricultural water usage on an annual basis, beginning in 2004, and to continue that calculation forward until such time as Paragraph 2(b) of the Contract would have naturally expired, i.e. when all subdivision maps aka tentative maps for the project had been approved by the County and any administrative appeals or litigation with respect thereto completed.

In Paragraph 35 of her Declaration, SCOPE's President Plambeck describes why she

believes that in response to SCOPE's demand letter (Zimmer Declaration at Ex. C and Ex. D)

and the Claim, Newhall Land's environmental lawyer, Mark Dillon, finally tried to send

something to SCOPE in an attempt to bluster his way through his client not having performed

under the terms of Paragraphs 2(b) and 2(d) of the Contract:

> Upon discovering Newhall Land's recalcitrance in giving the
> contractually required annual reports to the County, which SCOPE
> was entitled to see under the California Public Records Act as
> above, and because SCOPE understood that Newhall Land was
> also refusing to make public its water usage for its then current
> farming operations in 2008 and 2009, SCOPE began to advise the
> U.S. Army Corps of Engineers, U.S. Fish & Wildlife Service,
> California Fish & Game Department, and senior planning officials
> of Los Angeles County, that Newhall Land was "hiding the ball"
> on its current agricultural water usage, in defiance of the Contract.
> Only then did Newhall Land's environmental attorney, Mark
> Dillon, begin to provide SCOPE with the information required by
> the Contract. While LandSource/Newhall Land's Chapter 11 Plan
> was being prepared but not yet approved by the court or effective,
> Newhall Land's attorney at Weil Gotschal & Manges, Gabriel
> Morgan, began working with us as a conduit to get the information
> required by the Contract, so Newhall Land would not have to pay
> the claim.

However, as clearly explained by Declarant Plambeck, the information attorneys Dillon

and Morgan provided did not tie crop data or water usage data to specifically identifiable pieces

of land, as required by the Contract at Paragraphs 2(b) and 2(d):

> To reiterate, the information which was not delivered to SCOPE,
> and still has not been delivered to SCOPE is that:
>
> "identifying the specific portions of irrigated farm lands in the
> County proposed to be retired from irrigated production to make
> agricultural water available to serve the subdivision. The
> documentation shall include the location of the irrigated fields to
> be retired and the types of planted crops on such land for the
> baseline period of 1996-2000." Neither through the efforts of
> Reorganized Debtor's attorney Mark Dillon, nor directly through

filing of the Declaration of Steven Zimmer have Reorganized Debtors EVER supplied SCOPE with:

(a) survey maps, asssessor's parcel maps or assessor's parcel numbers, legal descriptions of land "identifying the specific portions of irrigated farm lands...the location of the irrigated fields"

NOR

(b) any detail concerning the types of planted crops tied to where they were planted on "such land" for the baseline period of 1996-2000."such land" meaning the specifically identified irrigated fields quoted from (a) above.

(Ex. 1 at ¶ 24.)

**No Further Reports or Attempts at Compliance With the Contract, as to Pre-Effective Date Breaches, Was Made by Newhall Land After the Contract Was Rejected**

As explained by SCOPE's President Plambeck in her Declaration:

> However, for whatever tactical reason, Newhall Land elected to tacitly reject the Contract, never assuming it by notice to SCOPE, and not mentioning it in its Chapter 11 Plan as an assumed contract. After the effective date of the Chapter 11 Plan, no further responsiveness or cooperation was forthcoming from the Newhall Land'a lawyers with whom I had been dealing.The Contract was a rejected executory contract, not a fully performed contract, because Newhall Land had not completed the entitlement processing described in Paragraph 19 [of her declaration], and in particular the filing of subdivision maps for processing and approval or rejection by the County. As indicated above, SCOPE expected the contract to not be fully performed until 2014, which was SCOPE's informed assumption as to when Newhall Land, or its successor/assign, would have completed all of the steps in Paragraph 19 [of her declaration] probably ending with the filing of the last vesting tentative map for processing and conditional approval by the County. After this court approved the Chapter 11 Plan for LandSource/Newhall Land, Newhall Land's attorneys ceased providing the remaining outstanding information required in Paragraphs 2(b) and 2(d) of the Contract, e.g. the annual water report for 2009 required by Paragraph 2(b) as well as any information in compliance with Paragraph 2(d).

SCOPE has not received the 2009 annual report required under Paragraph 2(b) of the Contract, nor to my knowledge has the County of Los Angeles. Even though Newhall Land has filed multiple tentative tract maps or vesting tentative tract maps with the County, as shown on Exhibit "C", SCOPE has not received any of the specific information required under Paragraph 2(d) of the Contract.

Based upon the text of the Contract, and the information Newhall Land's lawyers provided SCOPE during the bankruptcy, SCOPE is still entitled to receive monetary damages for cost of obtaining the information not provided as a result of Newhall Land's continuous breach:

(a) The annual reports with the precise detail described in Contract Paragraph 2(b) for the years 2009 through 2014, reports which can be prepared by an independent consultant to SCOPE, using aerial photographs and standard water-per-acre figures for the types of crops shown in the aerial photos, i.e. growing of oat hay requires far less water than alfalfa or vegetables or fruit trees.

(b) The specific permanent crop fallowing land information, which again can be calculated using the methodology referred to in Paragraph 38(a) above.

(Ex. 1 at ¶ 36, 37 and 38.)

## Total Amount of SCOPE's Monetary Damages for Newhall Land's Breach of Paragraphs 2(b) and 2(d) of the Contract for the Aggregate Reporting Period Between 1996 and 2014

SCOPE's expert calculates that the cost of preparing the missing reports, as described in Paragraph 38, under the breached and now rejected Contract is the sum expressed in the Magney Declaration, filed concurrently herewith. The aggregate sum of those monetary damages is $1,125,000. (*See* Ex. 2.)

## All Elements of Entitlement to Payment of a Claim by the Class 5 Trust, As Articulated by Its Counsel, Have Been Satisfied by SCOPE

At Docket No. 2650, citing California case law *Trayk v. Farmers Group Inc.* 171 Cal. App. 4th 1305, 1352, 90 Cal. Rptr. 3d 589 (Cal App. 4th 2009) and *Wall Street Network v. New York Times Co.* 164 Cal. App. 4th 1177, 80 Cal. Rptr. 3rd 3016 (2nd Dist. 2008), the Class 5

Trust's counsel summarizes, at page 9 of their opening brief on this Claim, California law determining when payment of breach of contract damages are due. The Class 5 Trust's counsel claims only four (4) facts must be proven:

(1) A contract between the parties exists;

(2) The plaintiffs have performed their obligations under the terms of the contract;

(3) The defendants have breached the contract; and

(4) The plaintiffs have been damaged by the breach.

Existence of the Contract. Here, there exists a contract between Newhall Land and SCOPE, attached to the Plambeck Declaration as Exhibit A, executed by the attorneys for the parties, as a "settlement agreement" of state court litigation. That Contract is in writing, satisfying any requirement of the Statute of Frauds. That Contract contains consideration given by each party:

(a) SCOPE, Sierra Club and Friends of the Santa Clara River dismissing the appeal by the wording of the Contract at Paragraph D on page 6, when it was filed with the California Court of Appeal, as shown on page 1 of that document.

(b) Newhall Land agreeing to limit its annual usage of groundwater from its Los Angeles County crop farm properties, to supply water to is massive project called Newhall Ranch, to 7038 acre feet per year, with a concomitant fallowing of farm land using that same amount of ground water; Newhall Land agreeing to prepare and deliver the reports to the County of Los Angeles in the detailed manner described in Paragraph 2(b) of the Contract, copies of which SCOPE could obtain either by requesting them from Newhall Land or obtaining the County's copies under the California Public Records Act; Newhall Land agreeing to deliver reports to SCOPE and the County described in Paragraph 2(c) of

the Contract; and Newhall Land agreeing to prepare and deliver the reports to SCOPE in the detailed manner described in Paragraph 2(d) of the Contract.

Here, the Contract contained all of the customary verbiage to make it enforceable by the parties after dismissal of the lawsuit, *i.e.* Section E beginning on page 6 of the Contract.

Thus, until the date of Newhall Land's tacit rejection of the Contract, by virtue of it not providing for assumption of the Contract by motion or in the text of the Plan for the company, an enforceable California contract existed.

## PLAINTIFFS' PERFORMANCE

Sierra Club, Friends of the Santa Clara River and SCOPE (as the breach of contract claimant/plaintiff herein) performed their only obligation under the contract, dismissing their appeal, by the very act of filing the Contract with the California Court of Appeal, signed by their counsel. *See* Paragraph D on page 6 of the Contract, and the signature by plaintiff/appellants counsel at the end of the court-filed document.

## DEFENDANTS BREACH OF THE CONTRACT

Newhall Land (as breach of contract debtor/defendant herein) breached their obligations to SCOPE under the Contract by:

(1) Newhall Land failing and refusing to prepare and deliver the Annual Reports to the County, and later to SCOPE for the period of 2004 through 2008, in a manner complying with express text of Paragraph 2(b) of the Contract, *i.e.* tying specific agricultural parcels of land (*e.g.* Assessor's Parcels) to specific quantities of water used to water each of those agricultural parcels of land in a particular year. Paragraph 2(b) provided:

> (b) Reporting. To monitor groundwater use, Newhall or its assignee shall provide the county with an annual report indicating the amount of groundwater used in Los Angeles County, and the

specific land upon which the groundwater was historically used for irrigation.

To reiterate SCOPE's description of what was wrong with the nearly incomprehensible documents delivered by Newhall Land, only after SCOPE's demand letter and Claim, with the specious claim that they complied with Paragraph 2(b), is that that the documents delivered do not tie the amount of groundwater used and the specific land upon which the groundwater was used for litigation, *i.e.*:

> (a) survey maps, assessor's parcel maps or assessor's parcel numbers, legal descriptions of land identifying "the specific land upon which the ground water was used"
>
> WITH
>
> (b) the amount of groundwater used on each of those specific pieces of land.

(2) Newhall Land failing and refusing to prepare and deliver the Baseline Year Report to SCOPE to the County, for the period of 1996 through 2000, in a manner complying with express text of Paragraph 2(d) of the Contract, i.e. tying specific agricultural parcels of land (e.g. Assessor's Parcels) to specific crops to specific quantities of water used to water each of those agricultural parcels of land in a particular year. Paragraph 2(d) required to Newhall Land to provide:

> ....documentation to the County of Los Angeles and the Appellants identifying the specific portions of irrigated farm lands in the County proposed to be retired from irrigated production to make agricultural water available to serve the subdivision. The documentation shall include the location of the irrigated fields to be retired and the types of planted crops on such land for the baseline period of 1996-2000.

To reiterate SCOPE's description of what was wrong with the nearly incomprehensible documents delivered by Newhall Land, only after SCOPE's demand letter and Claim,

with the specious claim that they complied with Paragraph 2(d), is that that the documents delivered do not tie the specific land (*i.e.* location) containing irrigated land to be retired, or the types of crops grown on that land each year between 1996 and 2000 and the amounts of groundwater used on those specific lands which would "make water available to serve the subdivision", *i.e.* tying:

> "specific portions of irrigated farm lands to be retired from agricultural production" , i.e. the "location of irrigated fields to be retired", i.e. "such land" to
>
> "agricultural water available to serve the subdivision" to
>
> "the types of planted crops on such land" in the "baseline period of 1996-2006"

(3) With respect to the Vesting Tentative Maps aka tract maps aka subdivision maps already filed with the Los Angeles County Planning Department by Newhall Land (as confirmed by the Notices of Preparation of SEIRs for specific tract maps and by the emails of the Los Angeles County Planning Deparment staff) as shown on Exhibit C to the Plambeck Declaration, Newhall Land Failing and refusing to prepare and deliver the "Retired from Irrigated Production Reports" *i.e.* reports about "irrigated farm lands in the County proposed to be retired from production to make agricultural water available to the subdivision" *i.e.* tying specific agricultural parcels of land (*e.g.* Assessor's Parcels) to specific quantities of water used to water each of those agricultural parcels of land Paragraph 2(d) required to Newhall Land to provide:

> ...documentation to the County of Los Angeles and the Appellants identifying the specific portions of irrigated farm lands in the County proposed to be retired from irrigated production to make agricultural water available to serve the subdivision. The documentation shall include the location of the irrigated fields to be retired and the types of planted crops on such land for the baseline period of 1996-2000.

To reiterate SCOPE's description of what was wrong with the nearly incomprehensible documents delivered by Newhall Land, only after SCOPE's demand letter and Claim, with the specious claim that they complied with Paragraph 2(d), is that that the documents delivered do not tie the specific land (*i.e.* location) containing irrigated land to be retired, and 2000 and the amounts of groundwater used on those specific lands which would "make water available to serve the subdivision", *i.e.* tying:

> "specific portions of irrigated farm lands to be retired from agricultural production" , i.e. the "location of irrigated fields to be retired", i.e. "such land" to

> "agricultural water available to serve the subdivision"

(4)  Newhall Land rejecting the Contract, *i.e.* refusing to perform their future obligations on the Contract (A) with respect to the 7038 acre feet of water, as described in detail above, and its related Contract provision at Paragraph 1(c), and (B) refusing to perform their future obligations under Paragraph 2(c) of the Contract (on its page 4), by (1) refusing to perform their obligations to prepare the Annual Reports in the manner provided in Paragraph 2(b) for the 2009 Annual Report and (2) thereafter, and refusing to perform their obligations to prepare the Paragraph 2(d) "Retired from Irrigated Production Report" for each Vesting Tentative Map aka subdivision map aka tract map for each such map filed after the rejection of the Contract.

## DAMAGE TO PLAINTIFF/CLAIMANT SCOPE

As to this last element of proof of breach of contract, under California law, the only manner in which SCOPE can obtain the reports to which is entitled, as listed in Paragraphs (1) through (4) immediately above, is to hire an agriculture/hydrology expert to do those reports. SCOPE has identified and conditionally retained such an expert, David Magney and his company

DMEC, which is one of the few environmental/agriculture/hydrology consultants unafraid to incur the ire (and lose the business of) Newhall Land and its management company, Five Points Development, and its partial owner Lennar.

David Magney's Declaration, filed herewith, recites how he would create the missing reports, as listed above, which he calls the "Replacement Reports", and the dollar amount of money he would charge SCOPE to prepare them for their intended use, *i.e.* by SCOPE in the further entitlement process described in Paragraph 19 of the Plambeck Declaration. As this court well knows, over the course of LandSource/Newhall Land's 16 or so months as a chapter 11 debtor, Newhall Land spent multiple millions of dollars of the debtor estate's money for consultants and environmental attorneys to prepare similar types of reports as Newhall Land pursued the obtaining of land use entitlements in the nature described in Paragraph 19 of the Plambeck Declaration. As a result, those money damages as a result of Newhall Land's breach of contract are real.

In addition, SCOPE has suffered actual damages in the nature of having to incur future attorneys fees and costs, to re-litigate the issues of (a) how much groundwater Newhall Land may utilize for its housing development (since the 7038 acre foot per year ceiling was rejected in the rejection of the Contract) and (b) whether Newhall Land and Los Angeles County will try to "count paper water" in complying with the California Public Resources Code, California Government Code and California Water Code sections referred to above, requiring the insurance of an ample water supply for existing human uses and agricultural uses and uses to maintain habitat and lives of Protected Species, prior to state or local government agencies granting land use entitlements which would put an additional strain on an already over-taxed water supply. SCOPE's damages in having to relitigate the "use of agricultural water" issue, at the state and

county administrative agency level, and then if necessary in the California courts, is very real, although not quantifiable by any competent environmental attorney, simply because the shortfall in water for the Santa Clarita Valley is continuing unabated, and that shortfall will change from year to year as the entitlements are processed by the various state, county and Federal agencies. SCOPE's money damages from rejection of the "7038 limitation" are real, but unquantifiable without further extensive hearings before this court, which will be unnecessary if SCOPE's Claim is paid.

## CONCLUSION

SCOPE has proven, by competent evidence, all four elements of its Claim for breach of contract by reorganized debtor Newhall Land, and its actual damages and Claim in the amount set forth in the Magney Declaration.

WHEREFORE, SCOPE respectfully requests the court enter an order granting and approving SCOPE's claim, in the amount set forth in the Magney Declaration and granting SCOPE such other and further relief as is just.

Dated: March 26, 2010  
      Wilmington, Delaware

**ELLIOTT GREENLEAF**

Neil R. Lapinski (DE Bar No. 3645)  
1105 North Market Street, Suite 1700  
Wilmington, Delaware 19801  
Telephone: (302) 384-9402  
Facsimile: (302) 384-9399  
Email: nrl@elliottgreenleaf.com

*Counsel to Santa Clarita Organization*  
*for Planning the Environment*